## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR<br>1374 Wakefield Road<br>Lynchburg, VA 24503 | ) |
| | ) |
| ALLYSON KIRK<br>14096 Reva Road<br>Boston, VA 22713 | ) |
| | ) |
| CHELSEA KIRK<br>1915 East Main Street<br>Apt. D209<br>Richmond, VA 23223 | )   Civ. A. No._____ |
| | ) |
| JONATHAN SCOLNIK<br>12110 Devilwood Drive<br>Potomac, MD 20854 | ) |
| | ) |
| MATTHEW SINGER<br>6715 Roe Street<br>Cincinnati, OH 45227, | ) |
| | ) |
|     individually and on behalf of a class<br>    of persons similarly situated, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA<br>John A. Wilson Building<br>1350 Pennsylvania Avenue, N.W.<br>Washington, DC  20004, | ) |
| | ) |
|     Defendant. | ) |

## COMPLAINT

**(Class Claims Under First and Fourth Amendments of the U.S. Constitution, and
Common Law False Arrest and False Imprisonment;
Chelsea Kirk Claim For Common Law Assault and Battery,
Intentional Tightening of Handcuffs upon Complaint of Over-tightness;
Matthew Singer Claim For Common Law Assault and Battery, Pepper Spraying)**

Plaintiffs Sarah Carr, Allyson Kirk, Chelsea Kirk, Jonathan Scolnik, and Matthew Singer, individually and on behalf of a class of persons similarly situated, allege as follows:

## INTRODUCTION

1.  This case is a class action for damages and other relief for illegal mass arrest and detention by the District of Columbia Metropolitan Police Department ("MPD") of persons who had been participating in or observing a demonstration lacking a police permit in the Adams Morgan neighborhood in Washington, D.C. on the evening of January 20, 2005.  The MPD illegally arrested plaintiffs for "parading without a permit," a pedestrian traffic infraction that subjects violators to a civil fine, but not custodial arrest.  Plaintiffs committed no acts providing probable cause for custodial arrest.

2.  Plaintiff Chelsea Kirk seeks damages individually for injuries she sustained after she told an officer that her handcuffs were too tight and the officer intentionally tightened them further, causing lacerations and swelling.  Plaintiff Matthew Singer also seeks damages individually for injuries he sustained when a MPD officer sprayed pepper spray directly in his face at a range of about two feet while Mr. Singer, in compliance with police orders, knelt unresisting with his hands on the ground.

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367.  Plaintiffs bring this action under 42 U.S.C. § 1983 to vindicate rights established by the First and Fourth Amendments to the United States Constitution.  Plaintiffs also seek relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

Plaintiffs' common law claims arise from the same occurrences as their constitutional claims and are within the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

4.  Venue is proper in this district under 28 U.S.C. § 1391(b).  The events or omissions giving rise to plaintiffs' claims occurred in this judicial district.

**PARTIES**

5.  Plaintiff Sarah Carr is a resident of Virginia.  She had come to the District of Columbia on January 20, 2005, to participate in demonstrations protesting the second inauguration of George W. Bush; prior to this time Ms. Carr had never before participated in any protest activity.  After attending an "anti-inaugural concert" that night, she joined a demonstration that marched in the street from the concert venue into the Adams Morgan neighborhood.  Ms. Carr did not know if the march had a permit; however, never having attended any demonstration before, it did not ever occur to her to ask if the march had a permit or even if one was required.  Members of the MPD arrested Ms. Carr when she was attempting to leave the march after she witnessed acts of vandalism by a few persons in the vicinity.  Ms. Carr committed no act providing probable cause for her arrest.  Ms. Carr did not hear, and the police never gave, an order to disperse prior to her arrest.  MPD officers thereafter detained her against her will, charged her with parading without a permit, and released her on citation at approximately 6:30 a.m. on January 21, 2005.

6.  Plaintiff Allyson Kirk is a resident of Virginia.  She had come to the District of Columbia on January 20, 2005 with her sister, Chelsea Kirk, and other family members to participate in demonstrations protesting the second inauguration of George W. Bush. Like plaintiff Carr, Ms. Kirk and her sister attended the "anti-inaugural concert" and

joined the march described above.  Ms. Kirk did not know if the march had a permit or if one was required.  Members of the MPD arrested Ms. Kirk and her sister when they were attempting to leave the march after she witnessed acts of vandalism by a few persons in the vicinity.  Ms. Kirk committed no act providing probable cause for her arrest.  Ms. Kirk did not hear, and the police never gave, an order to disperse prior to her arrest.  The MPD thereafter detained her against her will, charged her with parading without a permit, and released her after she elected to "post and forfeit" $50 at approximately 7:30 a.m. on January 21, 2005.

7.  Plaintiff Chelsea Kirk is a resident of Virginia.  She had come to the District of Columbia on January 20, 2005 with her sister, plaintiff Allyson Kirk, and other family members to participate in demonstrations protesting the second inauguration of George W. Bush.  Ms. Kirk and her sister attended the "anti-inaugural concert" and joined the march described above.  Ms. Kirk did not know if the march had a permit or if one was required.  Members of the MPD arrested Ms. Kirk and her sister when they were attempting to leave the march after she witnessed acts of vandalism by a few persons in the vicinity. Ms. Kirk committed no act providing probable cause for her arrest.  Ms. Kirk did not hear, and the police never gave, an order to disperse prior to her arrest.  The MPD thereafter detained her against her will, charged her with parading without a permit, and released her after she elected to "post and forfeit" $50 at approximately 7:30 a.m. on January 21, 2005.

8.  Plaintiff Jonathan Scolnik is a resident of Maryland.  On January 20, 2005, he participated in demonstrations protesting the second inauguration of George W. Bush.  Mr. Scolnik attended the "anti-inaugural concert" and joined the march described above.

Mr. Scolnik did not know if the march had a permit; however, he had participated previously in other demonstrations in the District of Columbia that did not have permits and which the MPD had allowed without incident.  Members of the MPD arrested him when he was attempting to leave the march.  Mr. Scolnik committed no act providing probable cause for his arrest.  Mr. Scolnik did not hear, and the police never gave, an order to disperse prior to his arrest.  The MPD detained him thereafter against his will, charged him with parading without a permit, and released him after he elected to "post and forfeit" $50 at approximately 6:00 a.m. on January 21, 2005.

9.  Plaintiff Matthew Singer is a resident of Ohio.  On January 20, 2005, during his first trip to Washington, DC, he participated in activity protesting the inauguration of George W. Bush and thereafter saw tourist sights.  That night he was at Madam's Organ, a music club located on 18th Street in the Adams Morgan neighborhood, when he saw the march described above go by.  Mr. Singer ran from the club because he wanted to get a closer look at the marchers and learn their message.  When police in the vicinity began chasing the marchers, he ran with the marchers away from the police and into an alley; during this chase Mr. Singer did not hear, and the police never gave, an order to disperse or any other orders.  Then Mr. Singer stopped running and decided to approach the police because he knew he had not committed any act warranting his arrest.  When he approached the police, they ordered him to get down on his hands and knees; he complied with their order without resisting.  While he remained in this position, a MPD officer approached him and, from a distance of about two feet, sprayed pepper spray directly into his face.  The MPD thereafter detained him against his will, charged him with parading

without a permit, and released him after he elected to "post and forfeit" $50 at approximately 6:30 a.m. on January 21, 2005.

10.  Defendant District of Columbia is a municipal corporation and constitutes the local government of Washington, D.C.

## CLASS ALLEGATIONS

11.  Plaintiffs Sarah Carr, Allyson Kirk, Chelsea Kirk, Jonathan Scolnik and Matthew Singer bring this suit on behalf of themselves and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the class of all persons who (a) were arrested for parading without a permit on the evening of January 20, 2005, in the Adams Morgan neighborhood of the District of Columbia in the area approximately bounded by Columbia Road, 18th Street, and Belmont Road; and (b) may have paraded without a permit, but who committed no other act providing probable cause for custodial arrest.  This suit is maintainable as a class action under Rules 23(a) and Rules 23(b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure.

12.  Approximately seventy-two persons were arrested in the mass arrest described above and the great majority of them are members of the class. The class members are geographically dispersed throughout the United States, making joinder of all class members impracticable.  The number and identities of the arrestees are known to the defendant through the arrest records of the Metropolitan Police Department.

13.  The questions of law and fact common to members of the class include:

   a.  whether the police gave any order to disperse audible to the members of the class, or any order to disperse at all, prior to the mass arrest;

b.  whether on January 20, 2005, the pedestrian traffic infraction of "parading without a permit" was an offense under District of Columbia law for which violators were subject to custodial arrest;

c.  whether the police lacked probable cause to arrest the members of the class;

d.  whether the mass arrest and detention of the class members violated the First and Fourth Amendments to the Constitution of the United States;

e.  whether the mass arrest and detention of the class members was caused by a District of Columbia policymaker or a District of Columbia officer exercising delegated policymaking authority, or was pursuant to a District of Columbia custom, policy, or practice of allowing police officers to arrest and detain demonstrators for the pedestrian civil traffic infraction of parading without a permit.

14.  The named plaintiffs' claims are typical of the claims of all members of the class.  The interests of the named plaintiffs are not antagonistic to the interests of other members of their class, and the named plaintiffs will fairly and adequately protect the interests of all class members.  Plaintiffs are represented by counsel competent to prosecute this civil rights class action.

15.  The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, including legal and factual issues relating to damages.

16.  A class action is superior to other available methods for the fair and efficient adjudication of the claims.  The class is readily defined and prosecution of a class action will eliminate the possibility of repetitious litigation, while also providing redress for

claims, which in some instances may not be large enough to warrant the expense of individual litigation.

## FACTS

### Mass Arrest in Adams Morgan

17.  Plaintiffs were all participants in or bystanders in the vicinity of a street demonstration for which no permit had been obtained, and who were swept up and arrested by officers of the MPD late in the evening on January 20, 2005.

18.  January 20, 2005 was the date of the second inauguration of President George W. Bush, when the District of Columbia was the scene of many celebrations and protests of this event.  One protest was a well-publicized "anti-inaugural concert" held that evening at the Sanctuary Theater, in a church located at 1459 Columbia Road, NW. Plaintiffs, except Mr. Singer, attended this concert, as did most members of the plaintiff class.  When these plaintiffs arrived at the concert venue, they heard an announcement or were given a flier inviting them to take part in a previously unpublicized march that would begin after the concert's end.  The flier described the route of the march from the concert to the Hilton Hotel on Connecticut Avenue, which was the site of one of the official inaugural balls.  According to the flier, the plan was for the marchers to hold a protest at that site.  The flier also stated, in pertinent part: "[p]lease remember to be respectful of people in the Columbia Heights neighborhood where we are guests."

19.  Plaintiffs at the concert decided to join this march.  Plaintiffs Carr and the Kirk sisters did not know if the march had a permit and did not know if one was required. Plaintiff Scolnik believed that there would be no problem even if the march did not have

8

a permit because he had participated previously in protest activities lacking a permit and the MPD had accommodated these activities without incident.

20.  The march, which included several hundred persons, began after the concert ended at around 11:00 p.m.  The march headed west along Columbia Road.  Some marchers were on the sidewalks and others were in the street.  At the start of the march Ms. Carr was in the front, and Mr. Scolnik and the Kirk sisters were at the back of the march.

21.  After the march crossed 16th Street, it took up only the westbound lanes. Eastbound motorists honked their horns and gave a thumb's up sign in support of the marchers.  At Mozart Place an unmarked police car—a white sedan with lights mounted in the rear window—began following slowly behind the march.  Mr. Scolnik saw this car.

22.  After about fifteen minutes, when the march reached the commercial area of Columbia Road, a few people wearing bandanas over their faces pulled newspaper vending machines into the street and sprayed paint on some buildings.  Windows were broken.  Marchers yelled at those people to stop because their conduct was contrary to the purpose of the march.  The Kirk sisters and Ms. Carr had seen some of this misconduct and decided to leave the march as soon as they could figure out where they were and how to reach a Metro station.  Mr. Scolnik, at the back of the march, did not see anyone engage in misconduct.  He saw some newspaper vending machines in the road and later he saw persons move them out of the way of vehicular traffic.

23.  When the march reached the intersection of 18th Street and Columbia Road, a helicopter appeared and shone its light on the marchers.  The march then turned left onto 18th Street and headed south, using only the southbound lanes.  Many motorists in the

northbound lanes saluted the marchers as they drove by.  By this time police cars with their lights flashing were following behind the march, and at some point MPD officers blocked off Columbia Road south of the march, at the intersection with Belmont Road.

24.  As the march proceeded down 18th Street, some persons who were in buildings along that street came outside to see what was happening.  Among them was plaintiff Singer, who had left Madams Organ, leaving his coat there.  Mr. Singer mingled with the marchers.

25.  Many marchers, including plaintiffs Carr and Scolnik, turned right onto Belmont Road.  Ms. Carr believed that, in turning right, she was leaving the march.  Mr. Scolnik surmised that the police may have ordered the marchers to take this direction. Other marchers, including the Kirk sisters, fell back from the march and were between the police vehicles that were following the march and police on foot in front of them. These marchers turned right into an alley.  The Kirk sisters did not know where they were, but went into the alley in an effort to avoid any unpleasant encounter with the police.

26.  The marchers who had turned right onto Belmont Road, including plaintiffs Carr and Scolnik, went to Columbia Road and turned right.  Mr. Scolnik decided to leave the march, but police closed in and he and others had no place to go except to retreat into an alley adjacent to the restaurant "Grill from Ipanema."  They went into the alley.   Ms. Carr, after turning right onto Columbia Road, went a short distance and encountered riot-clad police on foot.  She told them she was trying to leave the march.  A police officer raised his baton as if he were about to hit her, and another officer told the group to "turn the f*** around!"  This order was the first that Ms. Carr had heard from police that night.

10

Police herded many marchers, including plaintiff Carr, into the alley adjacent to the

"Grill From Ipanema."  Police herded them to a part of the alley where the MPD had

already detained others.

27.  The Kirk sisters, and others who had fallen back from the march and entered

an alley, encountered MPD officers who were blocking the other end of the alley.  One

officer drew his gun and pointed it at them, while other police screamed at them to "get

the **** back!"  This order was the first that the Kirks had heard from police that night.

The Kirk sisters and others with them turned around to go back from where they had

come, but when they did this they encountered more police in full riot gear.  As they

approached these police to explain that they were trying to leave the march, the officers

screamed obscenities at them, then pushed and herded them to another part of the alley

where the MPD had already detained others.

28.  Plaintiff Singer, who without his coat had left Madam's Organ to observe the

march and learn its message, went alongside the marchers until a police helicopter flying

overhead gave him cause for concern.  Mr. Singer decided to return to the club.  Just as

he was turning back, however, MPD vans appeared on the scene and police clad in riot

gear poured out and began charging toward the marchers.  They gave no orders.  They

chased the marchers into an alley.  Mr. Singer, who had become mingled with the

marchers, felt forced to flee with them in order to avoid an unpleasant encounter with

these police.  At the end of the alley, however, he saw other police blocking the alley's

exit.  Knowing that he had done no wrong, and believing that it would be best simply to

approach the police and explain that he was a bystander, Mr. Singer approached the

police with his hands raised.  Police ordered him "to get down on all fours," which were

the first words he had heard police speak that night.  Mr. Singer complied immediately

by dropping to the ground on his hands and knees, with his arms spread.  He shouted to a

police officer who approached him that he was peaceful; the officer told Mr. Singer that

if he moved, the officer would "bash in" his "f***ing head."  Then, at a distance of about

two feet, the officer sprayed Mr. Singer directly in the face with pepper spray.  This

spraying lasted for two-to-three seconds.  The officer then took Mr. Singer to another

area of the alley where the MPD had already detained others.

29.  Police arrested plaintiffs, and the other members of the plaintiff class, in the

alleys into which the police had forced them to go, or on nearby streets or sidewalks.

Before arresting them, police neither ordered them, nor afforded them opportunity, to

disperse.

**Detention and Release**

30.  By about 11:30 p.m., MPD officers had arrested all five plaintiffs and

approximately sixty-seven other persons, and detained them together in one alley.  The

police forced plaintiffs and the other arrestees to kneel on the ice-covered ground with

their hands on their heads.  Whenever plaintiffs and other arrestees tried to shift to a more

comfortable position, officers ordered them to return to their original position and to keep

still; or yanked, kicked or pushed them back into position.  Plaintiffs and the other

arrestees were forced to remain in this painful position for one-to-two hours.  The officers

were hostile and intimidating.  One said, "You're in a dark alley and we can do anything

we want to you!"  When arrestees asked why they were being detained, officers did not

answer or gave reasons unrelated to misconduct, such as "Because you were involved."

31.  Plaintiff Singer, who had been sprayed in the face with pepper spray, was in agony from the effects of the spray as he knelt in the alley.  An officer poured cold water over Mr. Singer's face, but this did not alleviate his suffering and only made him feel the cold more acutely.  He stayed in this condition for about an hour, when police finally took him to a medic to have his eyes washed with water.  Mr. Singer again tried to obtain his release by explaining his circumstances to a lieutenant, but this officer returned him to the group of arrestees.

32.  Transport vans arrived.  Officers took plaintiffs and the other arrestees in small groups from the alley, searched them, photographed them, recorded their names and other identifying information, and handcuffed them with their hands behind their backs.  This process required arrestees to remain outside for lengthy periods, up to approximately an hour and a half, with the temperature near freezing.  Officers loaded arrestees onto the vans and transported them to the arrest processing facility at Blue Plains.  The last van left the arrest area at about 3:00 a.m.

33.  The handcuffs were made of hard plastic.  Plaintiff Chelsea Kirk cried out in pain when her handcuffs were applied because her skin had become pinched inside the closure.  She asked the officer applying the cuffs to loosen them, but this officer replied, "Shut up, they're not tight enough!" and pulled them even tighter.  The intentional tightening of Ms. Kirk's handcuffs caused lacerations and swelling of her wrists.  Later, other officers refused Ms. Kirk's request to replace the too-tight handcuffs.  Ms. Kirk's overly tight handcuffs were not removed for several hours.

34.  The handcuffs that plaintiff Scolnik was required to wear for several hours were too tight, causing cuts, numbed fingers, and a strained left shoulder.  Mr. Scolnik

complained that his cuffs were too tight before being loaded into the transport van, and later after the van arrived at Blue Plains, but his cuffs were not loosened. The officer transporting Mr. Scolnik stated that he lacked the necessary equipment for replacing the handcuffs.

35.   After the vans arrived at Blue Plains, plaintiffs and the other arrestees were forced to wait from forty-five minutes to three hours before being brought inside for arrest processing. A transport officer told Mr. Scolnik that the reason for the delay was because inexperienced police recruits were doing the processing. Plaintiff Chelsea Kirk, who suffers from claustrophobia, felt ill from the prolonged waiting in the darkened van. Transport officers abandoned plaintiff Singer's van for several hours, forcing some of the men locked inside to urinate in the van because there was no one they could ask to take them to a restroom. The transport officers for Plaintiff Scolnik's van took one arrestee to a restroom after a long delay, but said that they would not do the same for the other arrestees in the van.

36.   When plaintiffs and the other arrestees were finally brought inside the facility for arrest processing and to await release, the police took their photographs and identifying information.

37.   Police removed the handcuffs that had been applied during the arrests and handcuffed the arrestees in front with soft, plastic "flex-cuffs," but some of these new cuffs were still too tight. Plaintiff Chelsea Kirk showed an officer her swollen, bleeding wrists and asked that her handcuffs be loosened, but the officer refused her request, saying that she might be able to slip out of loosened handcuffs.

14

38.  Officers told plaintiffs and the other arrestees that their charge was "parading without a permit."  Police gave them written information regarding release options, urging them to elect the "post-and-forfeit" option.  Police warned plaintiff Singer and the Kirk sisters that they would be held longer if they chose to contest the charge.  An officer also told the Kirk sisters that if they contested the charge, they would be transported to an actual jail before being released.  An officer told plaintiff Carr that contesting the charge would be a waste of the officer's time.  Plaintiffs Scolnik, Singer, and the Kirk sisters chose the "post-and-forfeit" option, but Ms. Carr chose to contest the charge.

39.  Police gradually released plaintiffs and the other arrestees on the morning of January 21, 2005, beginning sometime after 6:00 a.m., after detaining them between seven-to-eight hours.  Plaintiffs waited in the cold until they were picked up by friends or found rides to the Metro.

**Liability of the District of Columbia**

40.  All of the law enforcement officers who arrested and detained plaintiffs and treated them as described above, were MPD officers who acted under color of law and within the scope of their employment.

41.  The arrest and detention of plaintiffs were caused by a District of Columbia policymaker or a District of Columbia officer exercising delegated policymaking authority, or were pursuant to a District of Columbia custom, policy, or practice of allowing police officers to arrest and detain demonstrators for the pedestrian civil traffic infraction of parading without a permit.

42.  Plaintiffs suffered numerous injuries and damages, including the following, as a direct and proximate result of the customs, policies, and practices of the

District of Columbia, the actions of District of Columbia policymakers or officials exercising delegated policymaking authority, and the actions of the District of Columbia police officers who arrested and detained plaintiffs: monetary loss, including criminal fines, forfeited collateral, and other expenses arising out of their illegal arrest, detention, and mistreatment; reputational injuries; loss of liberty; bodily and personal injuries including pain and suffering, humiliation, anguish, and emotional distress (resulting from arrest and lengthy detention, themselves, and the circumstances of the arrest and detention, including forced kneeling in alleys, overly-tight handcuffs, and extended outdoor exposure in near freezing temperature).

## CONSTITUTIONAL CLAIMS FOR RELIEF

43.  On the facts alleged above, defendant District of Columbia is liable to the named plaintiffs and the class members under 42 U.S.C. § 1983 for violation under color of law of their constitutional rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution, and their constitutional right to be free from unreasonable seizure of their persons under the Fourth Amendment to the United States Constitution.

## COMMON LAW CLAIMS FOR RELIEF

44.  On the facts alleged above, defendant District of Columbia is liable to the named plaintiffs and the class members under District of Columbia law for false arrest and imprisonment.

45.  On the facts alleged above, defendant District of Columbia is liable to plaintiff Chelsea Kirk under District of Columbia law for assault and battery for injuries she sustained after she told an officer that her handcuffs were too tight and the officer

intentionally tightened them further, causing lacerations, swelling, pain and suffering, humiliation, anguish, and emotional distress.

46. On the facts alleged above, defendant District of Columbia is liable to plaintiff Matthew Singer under District of Columbia law for assault and battery when, in the moments before he was formally placed under arrest and while he was kneeling unresisting with his hands and knees on the ground in compliance with a MPD order to be in that position, an officer holding a canister of pepper spray from a range of about two feet, sprayed him directly in the face with pepper spray, causing pain and suffering, humiliation, anguish, and emotional distress.

47. The notice requirements of D.C. Code § 12-309 have been satisfied as to the named plaintiffs and the members of the class by virtue of the notice letter delivered by Susan B. Dunham, undersigned counsel, on July 11, 2005, and by reports and records of the MPD regarding the January 20, 2005 mass arrests in Adams Morgan.


**PRAYER FOR RELIEF**

WHEREFORE, the named plaintiffs and the other class members request relief as follows:

a. an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying the named plaintiffs as class representatives, and designating the undersigned as class counsel;

b. judgment declaring that the defendant violated the First and Fourth Amendment rights of the class, the common law right of the class to be free from false

arrest and false imprisonment, and the common law right of plaintiffs Chelsea Kirk and

Matthew Singer to be free from assault and battery;

    c.  compensatory damages against the defendant;

    d.  an order compelling defendant to expunge all records of the arrests of the

named plaintiffs and the other class members relating to the January 20, 2005 arrests

described herein, and compelling defendant to retrieve and expunge, or cause the

expungement of, all such records that are in the hands of other government agencies as a

result of having been transmitted or forwarded by defendant;

    e.  an order directing defendant to reimburse criminal fines and forfeited collateral

collected from the named plaintiffs and the other class members;

    f.  attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

    g.  such other relief, including injunctive relief, as is just and proper under the

circumstances.

## JURY DEMAND

    Trial by jury is demanded on all issues for which a jury trial is available.

                    Respectfully submitted,

                    _____
                    Arthur B. Spitzer, D.C. Bar No. 235960
                    Fritz Mulhauser, D.C. Bar No. 455377
                    American Civil Liberties Union of the
                    National Capital Area
                    1400 20th Street, N.W., #119
                    Washington, D.C. 20036
                    202/457-0800

_____
Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, P.C.
1666 Connecticut Avenue, N.W., Suite 225
Washington, D.C. 20009
202/328-2244

On behalf of the D.C. Chapter, National
Lawyers Guild and the American Civil
Liberties Union of the National Capital Area

Counsel for Plaintiffs

January 19, 2006