UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. A. No. 06-00098 (ESH) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABIILTY**

Under Fed. R. Civ. P. 56(d)(2) plaintiffs move the Court for partial summary judgment

holding defendant liable to plaintiffs and the plaintiff class for arresting them on the night of

January 20-21, 2005, in violation of the First and Fourth Amendments to the Constitution of the

United States and District of Columbia common law.  In addition, plaintiffs Chelsea Kirk and

Matthew Singer move the Court for partial summary judgment holding defendant liable to them

under District of Columbia common law for assault and battery by police officers on that same

night.

In support of this motion plaintiffs rely on the accompanying memorandum, statement of

material facts, and exhibits.

Respectfully submitted,

/s/ Arthur B. Spitzer
Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

/s/ Daniel M. Schember
Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National Lawyers
Guild and the American Civil Liberties Union of the
National Capital Area

Counsel for Plaintiffs

January 25, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al*., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. A. No. 06-00098 (ESH) |
| ) | |
| DISTRICT OF COLUMBIA, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON LIABIILTY**

We show below that the material facts are undisputed and that, as a matter of law,

defendant District of Columbia is liable to plaintiffs for arrest in violation of the Constitution and

common law and liable to plaintiff Matthew Singer and plaintiff Chelsea Kirk for common law

assault and battery.  Consequently, plaintiffs are entitled to partial summary judgment on

liability.  Fed. R. Civ. P. 56(d)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Unlawful Arrest of Plaintiffs**

On the night of January 20-21, 2005, plaintiffs[1] peacefully assembled and marched in

District of Columbia streets, expressing opposition to the second inauguration of President

George W. Bush.  (Ex. A, Sarah Carr Deposition Tr. 35, 67-68, 90-92, 94-95, 113, 120; Ex. B,

Allyson Kirk Deposition Tr. 48-49, 104, 167-68, 170-73; Ex. C, Chelsea Kirk Deposition Tr. 30-

---

[1] In this memorandum "plaintiffs" refers to both the named class representatives and the members of the plaintiff class.  The Court's October 11, 2006, Order (Doc 27) certifying this case as a class action under Fed. R. Civ. P. 23(b)(2) stated "Plaintiffs are class representatives . . . of all persons who (a) were arrested for parading without a permit on the evening of January 20, 2005, in the Adams Morgan neighborhood of the District of Columbia in the area approximately bounded by Columbia Road, 18th Street, and Belmont road; and (b) may have paraded without a permit, but who committed no other act providing probable cause for custodial arrest."  Order (Doc 27) at 1.

33, 162-63; Ex. D, Jonathan Scolnik Deposition Tr. 46, 65-67, 80-81, 83, 92-94, 101, 122, 126, 144, 151; Ex. M, Brandon Jourdan Video; Ex. N, Barry Student Deposition Tr. 89; Ex. O, Barry Student Video.)[2]  About 250-300 persons participated in the march.  (Ex. F, Cathy Lanier Deposition Tr. 32.)

During the march some unidentified individuals in the area committed criminal acts such as spray-painting buildings, throwing objects, breaking windows, or pulling newspaper vending machines into the street.  (Ex. F, Cathy Lanier Deposition Ex. 4, Declaration of Cathy Lanier, at 2-3; Ex. F, Cathy Lanier Deposition Tr. 32-42, 61, 64; Ex. P, Metropolitan Police Department Reports.)[3]  Several minutes after the march began, plaintiff Carr observed two people on bicycles who knocked over newspaper vending machines and then rode off on their bicycles. (Ex. A, Sarah Carr Deposition Tr. 101.)  She voiced her disapproval of that misconduct (*id.* at 107-08).  She also saw what appeared to be freshly sprayed paint on three buildings and a vehicle (*id.* at 109).  Plaintiffs Allyson and Chelsea Kirk observed individuals who sprayed paint and then ran away.  (Ex. B, Allyson Kirk Deposition Tr. 102; Ex. C, Chelsea Kirk Deposition Tr. 79-81).  Their companion voiced disapproval to those individuals; plaintiffs did not see the wrongdoers again and assumed that they were not part of the march.  (Ex. C, Chelsea Kirk

---

[2] Plaintiffs Carr, Allyson Kirk, Chelsea Kirk, and Scolnik participated in the march from the beginning.  (Ex. A, Sarah Carr Deposition Tr. 53; Ex. B, Allyson Kirk Deposition Tr. 55-56; Ex. C, Chelsea Kirk Deposition Tr. 47-49; Ex. D, Jonathan Scolnik Deposition Tr. 60-62.)  Plaintiff Singer was at Madam's Organ, a nightclub on 18th Street, NW, when he saw the march go by. He went into the street to learn more about the demonstration.  (Ex. E, Matthew Singer Deposition Tr. 106-107.)

[3] The police reports state: "This large group of people were then surrounded by MPdc in the alley rear of 1800 Columbia Rd.  They were all arrested for parading without a permit (65 persons). No individual person was charged for the destruction of property for they were in MASS and had faces covered therefore their identity could not be determined." They also state: "NO arrests were made directly for the dest[ruction] of property – 65 people were arrested for Parading without a permit and were the group identified doing the crime while walking down Columbia Rd, no individual person could be identified at the time."

Deposition Tr. 79-81; Ex. B, Allyson Kirk Deposition Tr. 102.)  They also saw newspaper

vending machines that had been put in the road, but did not see anyone do this.  (Ex. C, Chelsea

Kirk Deposition Tr. 87.)  Plaintiff Scolnik also saw news vending machines in the road and

freshly sprayed paint on a bank building.  (Ex. D, Jonathan Scolnik Deposition Tr. 82.)  These

plaintiffs did not see any broken windows on buildings.  (Ex. A, Sarah Carr Deposition Tr. 117;

Ex. B, Allyson Kirk Deposition Tr. 101-02; Ex. D, Jonathan Scolnik Deposition Tr. 127.)

       Later in the march, plaintiff Jonathan Scolnik saw a projectile thrown in the direction of a

police car and heard the sound of breaking glass.  (Ex. D, Jonathan Scolnik Deposition Tr. 87.)

Plaintiff Allyson Kirk witnessed a projectile break the windshield of a police car.  (Ex. B,

Allyson Kirk Deposition Tr. 100-01.)  At that point she, her sister Chelsea, and their companion

decided to separate themselves from the march.  (Ex. B, Allyson Kirk Deposition Tr. 101; Ex. C,

Chelsea Kirk Deposition Tr. 89-93.)  Plaintiff Singer did not witness any of the aforementioned

acts of vandalism or any other conduct he perceived to be illegal activity.  (Ex. E, Matthew

Singer Deposition Tr. 109-10.)

       District of Columbia police, without ordering the marchers to stop or to disperse, or

otherwise informing them that their demonstration would not be allowed, diverted marchers from

their route; herded them into an alley; and, in the alley, surrounded and arrested about 65-75

persons, including plaintiffs.  (Ex. D, Jonathan Scolnik Deposition Tr. 85-86, 88-89, 97-99; Ex.

A, Sarah Carr Deposition Tr. 142; Ex. B, Allyson Kirk Deposition Tr. 110-12, 115; Ex. C,

Chelsea Kirk Deposition Tr. 145-46; Ex. F, Cathy Lanier Deposition Ex. 4 at 3-4; Ex. M,

Brandon Jourdan Video; Ex. P, Metropolitan Police Department Reports.)

       The police acted on order of then-Commander Cathy Lanier, who is now the police chief.

(Ex. F, Cathy Lanier Deposition Tr. 5; Ex. F, Cathy Lanier Deposition Ex. 4 at 2-3.)  Ms. Lanier

was deposed simultaneously in her individual capacity and as the District of Columbia's

designated representative under Fed. R. Civ. P. 30(b)(6). (Ex. F, Cathy Lanier Deposition Tr. 8;

Ex. F, Cathy Lanier Deposition Ex. 1, Notice of Deposition, at 1.) Ms. Lanier was one of the

first police officers to arrive on the scene of the march. She approached the march from behind

in her patrol car and saw the criminal acts described above. (Ex. F, Cathy Lanier Deposition Ex.

4 at 2-3; Ex. F, Cathy Lanier Deposition Tr. 8.) She testified that she could not say who threw

the missles (Ex. F, Cathy Lanier Deposition Tr. 61), nor could she say that each and every march

participant destroyed property (*id.* at 64). *See also*, Ex. P, Metropolitan Police Department

Reports quoted *supra* at n. 3 ("no individual person could be identified").

Ms. Lanier testified that she ordered plaintiffs arrested as a group for rioting because (1)

during the street march unidentified individuals in the area committed or incited the criminal acts

stated above; and (2) plaintiffs did not walk away after these criminal acts occurred. (Ex. F,

Cathy Lanier Deposition Ex. 4 at 2-3; Ex. F, Cathy Lanier Deposition Tr. 51-52, 61, 62, 64, 74).

Ms. Lanier testified:

> Q    Each and every person arrested in the alley was engaged in
> a riot?
>
> A    The definition of a riot is groups of five or more. Those
> persons who were not engaging in riotous behavior would have
> walked away.
>
> * * *
>
> Q   With respect to the persons who did not personally commit an act of
> property destruction, or violence such as what we have been talking about—
> setting a fire, throwing a missle, spray painting, pulling newspaper cans in the
> street— with respect to the people who did not do such things, what did they do to
> willfully engage in a riot?
>
> Mr. Koger:    You may answer.
>
> THE WITNESS    Again, I'll state that the group was viewed as a group. The
> conduct of the group is what based my decision that the group posed a danger to
> property and persons in the area based on the conduct of the group.

(Ex. F, Cathy Lanier Deposition Tr. 62, 74.)[4]

After ordering plaintiffs arrested as a group, Ms. Lanier spoke by telephone with Terry Ryan, the police department's general counsel.  (Ex. F, Cathy Lanier Deposition Ex. 9, Metropolitan Police Department event log, at 6; Ex. F, Cathy Lanier Deposition Tr. 52.)  After this conversation, Ms. Lanier decided not to charge plaintiffs with rioting, but to charge them with "parading without a permit."  (Ex. F, Cathy Lanier Deposition Tr. 52.)[5]

We show below that, as to either charge, the arrest of the plaintiffs was unlawful.

**Arrest of the Plaintiffs for Rioting was Unlawful Because the Plaintiffs Were Not Rioting and had no Obligation to Leave the Public Streets**

As the Court's July 26, 2006, Order (Doc 18) correctly held, whether the police had probable cause to arrest the plaintiffs for rioting due to the criminal acts described above depended on whether "officers witnessed any *particular* plaintiffs engaging in these acts."  Order (Doc 18) at 10 (emphasis added); *Scales v. United States*, 367 U.S. 203, 224-25 (1961) ("[i]n our jurisprudence guilt is personal"; punishment without personal guilt violates due process); *Barham v. Ramsey*, 424 F.3d 565, 573 (D.C. Cir. 2006) ("probable cause is a reasonable ground for belief of guilt, and . . . belief of guilt must be particularized with respect to the person to be . .

---

[4] A police department manual states that the elements of "rioting" include "willfully engag[ing] in [a] public disturbance on purpose" and that "public disturbance" means "more than mere loud noise making or minor breaches of the peace."  (Ex. G, Metropolitan Police Department Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances & Prisoner Processing (Revised May 2003), at 85-86.)

[5] In her declaration filed at the outset of the litigation (Doc 17), Ms. Lanier said that she had ordered the plaintiffs arrested for parading without a permit, not rioting.  (Ex. F, Cathy Lanier Deposition Ex. 4 at 2-3.)  Her event log and the police reports also indicate this.  (Ex. F, Cathy Lanier Deposition Ex. 9 at 6; Ex. P, Metropolitan Police Department Reports.)  At her deposition, however, she corrected this, saying she had ordered the plaintiffs arrested for rioting and had switched the charge to parading without a permit after consulting the police department's lawyer. (Ex. F, Cathy Lanier Deposition Tr. 51- 52.)

. seized") (quotation marks and citation omitted).  In *Barham*, the Court addressed Assistant

Chief Peter Newsham's mass arrest of demonstrators in Pershing Park on September 27, 2002.

The Court affirmed Judge Sullivan's denial of Newsham's claim of qualified immunity, on the

following grounds:

> No reasonable officer in Newsham's position could have believed that probable cause existed to order the sudden arrest of every individual in Pershing Park.  Even assuming that Newsham had probable cause to believe that *some people* present that morning had committed arrestable offenses, he nonetheless lacked probable cause for detaining *everyone* who happened to be in the park.
>
> * * *
>
> Nowhere have appellants suggested that the particular individuals observed committing violations were the same people arrested; instead, they refer generically to what "demonstrators" were seen doing.  This is the upshot of making arrests based on the plaintiffs' occupancy of a randomly selected zone, rather than participation in unlawful behavior.  While we have no reason to doubt that unlawful activity might have occurred in the course of the protest—with some individuals engaging in disorderly conduct, for example—the simple, dispositive fact here is that appellants have proffered no facts capable of supporting the proposition that Newsham had reasonable, particularized grounds to believe every one of the 386 people arrested was observed committing a crime.

434 F.3d at 573, 574.  The Court's holding in *Barham* applies here.  Because it is undisputed that

the police had no evidence identifying particular individuals who had engaged in the criminal

acts witnessed by Ms. Lanier and that the police simply herded, surrounded, and arrested

plaintiffs as a group because they had been in the area where the acts occurred, arrest of the

plaintiffs for rioting was unlawful under the Fourth Amendment.[6]

---

[6] Because probable cause must be particular to an individual, it does not matter whether a small or large portion of a group is engaged in criminal acts.  The relevant question is whether police can identify the culpable individuals.  Here, they could not.  Ex. P, Metropolitan Police Department Reports.  The evidence, however, also shows that the criminal acts were committed by persons who were either not part of the march or a small minority of the participants.  (Ex. A, Sarah Carr Deposition Tr. 101 Ex. B, Allyson Kirk Deposition Tr. 102, 135-36, 167-68; Ex. C, Chelsea Kirk Deposition Tr. 79-81; Ex. F, Cathy Lanier Deposition Tr. 32-42; Ex. M, Brandon Jourdan Video; Ex. O, Barry Student Video.)

Arrest of the plaintiffs for rioting also violated the First Amendment, because plaintiffs were in the area for purposes protected by the First Amendment and their own conduct was constitutionally protected.[7]  The First Amendment prohibits punishment of persons for crimes committed by others who are, or are perceived to be, politically associated with them, even where they have knowledge of the crimes and continue the association thereafter.  Persons engaged in conduct protected by the First Amendment can be held liable for their associates' criminal acts only if they specifically intended to further those acts.  *United States v. Robel*, 389 U.S. 258, 262-65 (1967); *Keyishian v. Board of Regents of Univ. of State of New York*, 385 U.S. 589, 606 (1967); *Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966).[8]

Plaintiffs' failure to abandon their own constitutionally protected conduct by leaving the area where others were engaged in criminal acts is not a permissible basis for holding plaintiffs criminally liable, any more than failure to renounce membership in a political organization that includes members who are known to be engaged in unlawful acts is a basis for criminal liability.  *Robel*, 389 U.S. at 262; *Keyishian*, 385 U.S. at 606; *Elfbrandt*, 384 U.S. at 19.  Like failure to end membership, failure to end apparent association with others by walking away is not evidence

---

[7] Because District of Columbia streets are a public forum, plaintiffs had a First Amendment right to assemble, march, and express their political views in the streets, subject only to reasonable time, place, or manner restrictions.  *Perry Education Assn. v. Perry Local Educators' Ass.*, 460 U.S. 37, 45 (1983); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1980).  In the next section, we show there was no probable cause to arrest plaintiffs for violation of a reasonable time, place, or manner restriction.

[8] Under *Robel*, *Keyishian*, and *Elfbrandt*, persons may not even be denied government employment, let alone subjected to arrest or criminal punishment, for political association with others who are engaged in criminal acts—absent specific intent to further those acts.  This is true even where the existence of the political association, such as membership in the same organization, is undisputed.  Here, it is not clear that all of the criminals, or any particular criminal, was part of the march.  But even if the police were justified in perceiving all or some of the criminals to be assembled or associated politically with the plaintiffs, the holdings in *Robel*, *Keyishian*, and *Elfbrandt* precluded punishment of the plaintiffs absent evidence that they specifically intended to further the criminal acts.  Police had no such evidence.

of specific intent to further the others' unlawful acts.  Because plaintiffs were engaged in conduct protected by the First Amendment and police lacked evidence that any particular plaintiff committed or acted with specific intent to further any criminal act, the arrest of the plaintiffs for rioting violated the First as well as the Fourth Amendment.

The same is true under District of Columbia law.  Presence at, and failure to leave, the scene of rioting by others is not a basis for criminal liability.  *Perry v. United States*, 276 A.2d 719, 719-20 (D.C. 1971) ("only evidence against appellant was that he was standing in front of the broken window of a store that was being burglarized by two other men, with one of whom he had a casual acquaintance"; evidence "not sufficient for finding appellant guilty").  *See generally*, *Hordge v. United States*, 545 A.2d 1249, 1254 (D.C. 1988).  The District of Columbia rioting statute requires that persons "willfully" engage in a riot or "willfully" incite others to engage in a riot.  D.C. Code § 22-1322.  Plaintiffs did not engage in this conduct and police had no evidence that any particular person arrested had done so.  District of Columbia law therefore prohibited arrest of the plaintiffs for rioting, as the police department's General Counsel apparently understood.

In the District of Columbia, "the gist of any complaint for false arrest or false imprisonment is an unlawful detention and that being shown the burden is imposed upon the defendant to establish that there was probable cause for the arrest."  *Clarke v. District of Columbia,* 311 A.2d 508, 511 (D.C. 1973); *Marshall v. District of Columbia*, 391 A.2d 374, 1380 (D.C. 1978) (citing *Clarke*).  In the absence of particularized probable cause, arrest of the plaintiffs for rioting was false arrest under District of Columbia common law.

**Arrest of the Plaintiffs for Demonstrating in the Street Without Police Permission was Unlawful Because Police Arrested Plaintiffs Without Warning or Order to Disperse**

Because District of Columbia streets are a public forum, plaintiffs had a First Amendment right to assemble, march, and express their political views in the streets, subject only to reasonable time, place, or manner restrictions. *Perry Education Assn. v. Perry Local Educators' Ass.*, 460 U.S. 37, 45 (1983) ("public places" traditionally associated with expressive activities, such as streets, are "public forums" for which the state may enforce reasonable time, place and manner restrictions). To be reasonable, time, place, and manner restrictions must, *inter alia*, be "narrowly tailored to serve a significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), *quoting Clarke v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Here, the undisputed facts show that plaintiffs were not in violation of any reasonable time, place, or manner restriction; that the police had no probable cause to believe otherwise; and that in arresting plaintiffs the police invoked a restriction that was unreasonable both because plaintiffs had no notice of it and because it was not narrowly tailored to serve the government's interest.

At the time of plaintiffs' arrest, District of Columbia policy allowed demonstrators to obtain a written permit to parade in the streets, but also authorized police on the scene to allow street marches that had no written permits. (Ex. H, Defendant's Response to First Request for Admissions, Request 5; Ex. F, Cathy Lanier Deposition Ex. 4 at 3.) The demonstration in which plaintiffs participated was in this latter category. (Ex. F, Cathy Lanier Deposition Ex. 8, Defendant's Responses to Plaintiff's First Set of Interrogatories**,** at 8.)

9

The majority of street demonstrations in the District of Columbia are in this non-permitted category.  Testifying before the Council of the District of Columbia in December 2003, former police Chief Charles Ramsey stated:

> [T]he vast majority of demonstrations in our city [meaning the District of Columbia]— approximately 80 percent over the past year [meaning 2003]—are non-permitted marches and rallies.  These are events [meaning non-permitted rallies and marches] that spring up without advance notice, and which we [meaning District of Columbia police] must respond to *and support*.

(Ex. I, Defendant's Response to Second Request for Admissions, Requests 1 and 2 (emphasis added).)  Mr. Ramsey's testimony was true.  (Ex. I, Defendant's Response to Second Request for Admissions, Requests 3f and 3g.)

The undisputed facts show that plaintiffs' planned march was one that District policy required the police to support, not prohibit.  Plaintiffs Carr, Allyson Kirk, Chelsea Kirk, and Scolnik learned of the demonstration a few hours before it began, from a flyer distributed at an anti-inaugural concert they attended at a church located on Columbia Road between 15th and 16th Streets, N.W.  (Ex. A, Sarah Carr Deposition Tr. 35-36; Ex. B, Allyson Kirk Deposition Tr. 46-47; Ex. C, Chelsea Kirk Deposition Tr. 30-32; Ex. D, Jonathan Scolnik Deposition Tr. 45-47.) The flyer said the march would assemble outside after the concert, march on Columbia Road to 18th Street, turn left on 18th Street, then right onto Florida Avenue, and go to the Hilton hotel where an inaugural ball was occurring.  (Ex. C, Chelsea Kirk Deposition Ex. 2.)  The march route also was announced from the concert stage.  (Ex. C, Chelsea Kirk Deposition Tr. 44-47.)

Undercover police also were at the concert.  (Ex. F, Cathy Lanier Deposition Tr. 56-57.) They learned about the demonstration and informed their superiors, who informed Ms. Lanier. (*Id*. at 57.)  At her deposition, Ms. Lanier acknowledged that she had advance notice of the demonstration from the reports of the undercover officers at the concert.  (*Id*. at 56-59.)  Asked

why in light of the advance notice of the time, place, and planned manner of the march she did

not order officers to go to the demonstration assembly point and announce to the gathering

crowd that police would not allow the demonstration, she testified, "Because I wouldn't do that.

I would never prevent a group who wants to peaceably march to march." (*Id*. at Tr. 79.)

      At the time of plaintiffs' arrests, it was the policy of the District of Columbia not to arrest

persons parading in the street simply because they did not have a permit. (Ex. F, Cathy Lanier

Deposition Tr. 12, 30; Cathy Lanier Deposition Ex. 2, Transcript of Hearing September 27,

2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS) (D.D.C.) at 31.) Also, several months

earlier, in September 2004, at a hearing before Judge Sullivan, the District of Columbia had

announced that, with unstated exceptions, it would not arrest persons without warning for

parading in the street. (Ex. F, Cathy Lanier Deposition Ex. 2, Transcript of Hearing September

27, 2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS) (D.D.C.) at 26-27, 28, 39-42; Ex. F,

Lanier Deposition Ex. 3, *Barham* Order (Sept. 29, 2004).)

      Ms. Lanier, however, ordered officers to arrest plaintiffs without warning after she saw

some unknown individuals in the area commit the criminal acts noted above. (Ex. F, Cathy

Lanier Deposition Tr. 31-51; Ex. F, Cathy Lanier Deposition Ex. 4 at 2-3; Ex. P, Metropolitan

Police Department Reports.) Ms. Lanier said that she acted pursuant to an exception to the

warning policy stated in a police manual. (Ex. F, Cathy Lanier Deposition Ex. 4 at 1-2, ¶¶ 3- 4.)

Under this exception, she said, "if time and circumstances does [sic] not permit, MPD could

make arrests for activities related to mass demonstrations, including parading without a permit,

without first issuing a warning to the crowd to disperse." (Ex. F, Cathy Lanier Deposition Tr.

21.) The manual provision invoked by Ms. Lanier said

        When the intensity level of a crowd rises and unlawful disruption, either through violent
        or passive means, is occurring to the extent that the Field Commander determines there is

need to make a positive police response, he/she will instruct the affected unit commanders, where time and circumstances permit, to issue warnings to the crowd to disperse.

(Ex. F, Cathy Lanier Deposition Ex. 5, Metropolitan Police Department Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances & Prisoner Processing (Revised May 2003) at 34.)

This manual had not been published so as to provide notice to the public that arrest without warning could occur if "the Field Commander determines there is need to make a positive police response" and "time and circumstances [do not] permit . . . warnings to the crowd to disperse." (Ex. F, Cathy Lanier Deposition Tr. 21; Ex. J, E-mail from Thomas Koger, Counsel for the defendant District of Columbia, to Susan Dunham, Counsel for Plaintiffs, October 5, 2007 (confirming "that the Manual was an internal police document, not a document published to the public and available in libraries or a police reading room").)

In her declaration filed at the outset of the litigation (Doc 17), Ms. Lanier said that the exception stated in the manual applied to plaintiffs. She said the circumstances did not allow her to order plaintiffs to disperse and to afford them opportunity to do so before arresting them because

> In this instance, the activities of a large number of the participants in the unlawful parade were destructive and violent. To have attempted to negotiate with the "organizers" of this procession would have unreasonably placed police officers and demonstrators at risk of being injured. I did not issue any warnings initially because I had no back-up and the protesters far outnumbered me. I did not issue an[y] warnings thereafter because the situation had turned violent when the brick was thrown through the windshield of CDU 43. Issuing warnings was not appropriate under these circumstances.

(Ex. F, Cathy Lanier Deposition Ex. 4 at 2.) Ms. Lanier's declaration, however, did not state why the police could not have given the demonstrators an order to disperse, and afforded them opportunity to comply, *after* police had surrounded them in the alley.

12

This same question had been raised before, in 2003, in an investigation by the Council of the District of Columbia of another mass arrest.  The investigation was conducted by law professor Mary Cheh, then a consultant to, and now a member of, the District of Columbia Council.  (Ex. K, Testimony under oath by Assistant Chief Brian Jordan before District of Columbia Council Committee on the Judiciary (November 12, 2003), Tr. at 3; http://www.dccouncil.us/members.html  (listing members of the District of Columbia Council).) The investigation concerned an arrest that had occurred on September 27, 2002.  This arrest, challenged in *Burgin v. District of Columbia*, Civ. A. No. 03-02005 (EGS) (D.D.C. accepted offer of judgment in the amount of $1,000,000 approved Aug. 1, 2007), involved demonstrators who had left a park at 14th and K Streets, N.W., marched west on K Street and then north on Vermont Avenue, where police blocked their path and surrounded and arrested them near Vermont Avenue and K Street.  Brian Jordan, then an Assistant Chief of police, testified that the circumstances did not allow him to warn the demonstrators or order them to disperse before arresting them.  Ms. Cheh, however, pointed out that the demonstrators could have been ordered and allowed to disperse *after* police had surrounded them:

> ASSISTANT CHIEF JORDAN:  [O]nce it got up to Vermont Avenue, we stationed [police] units at one end of the block and after they went into the block, we stationed [police] units behind and at that point the decision was made that we had to make the arrests.
>
> * * *
>
> MS. CHEH:  But what I am trying to find out is . . . where . . . a crowd is moving and you want to bring them under control [whether] you might set up your lines front and back, as you've described, and detain them and tell them to disperse? . . . In other words, to have them perhaps dribble out or release them after the crowd itself has come under control. . . . Would that ever make sense to do that?
>
> ASSISTANT CHIEF JORDAN:  It could make sense.

(Ex. K, Testimony under oath by Assistant Chief Brian Jordan before District of  Columbia Council Committee on the Judiciary (November 12, 2003), Tr. at 41-44.)  Mr. Jordan testified

that he did not order, or allow, the demonstrators arrested at Vermont and K to disperse after they were surrounded and under control because "the decision was already made to arrest," and the arrest "prevented further danger":

> MS. CHEH:  [Y]ou're saying that the situation was fluid, . . . it was not under control, correct?
>
> ASSISTANT CHIEF JORDAN:  What was fluid was the fact that the marchers without warning and without any clear direction just began snake marching through the street.
>
> MS. CHEH:  But once you had the [police] line in front of them and the [police] line in back of them, they were controlled, weren't they?
>
> ASSISTANT CHIEF JORDAN:  But the decision was already made to arrest.
>
> MS. CHEH:  So even though at that point, once there was a [police] line in front of them and a [police] line in back of them, even though in your own mind you had made a decision to arrest, where was the danger?
>
> ASSISTANT CHIEF JORDAN:  The [police] action stopped the danger.  If [the demonstrators] were allowed to continue the danger would continue.  The [police] action stopped and prevented further danger.

(*Id.* at 83-84.)

At her deposition, Ms. Lanier did not embrace former Assistant Chief Jordan's "danger prevention" rationale for arrest without warning of persons demonstrating in the streets.  Instead, she testified as follows:

> Q    Is it not true that in any case in which it is possible to arrest a person for parading without a permit, time and circumstances do permit giving that person a warning and an opportunity to avoid the arrest by complying with the warning?
>
> MR. KOGER:  Vague, ambiguous, calls for speculation.
>
> THE WITNESS:  Could you read back the question.
>
> (The requested portion was read.)
>
> THE WITNESS:  I can't answer that question based on the fact you're asking me to respond to any number of circumstances.  I can't answer that question.

BY MR. SCHEMBER:

Q    If you have sufficient control of a person to arrest them for parading without a permit, don't you always have sufficient control of that person to be able to say to them I'm going to arrest you if you don't leave the area and disperse?

MR. KOGER:  Argumentative, vague and ambiguous as to the meaning of arrest in the context of the question.  You may answer.

THE WITNESS:  You're asking me to comment if it is always possible. I cannot answer that question.  I would say no, it is not always possible, but you're asking me to comment on any number of circumstances.

* * *

Q    When a person is within police control, can't you say to the person you will be free to leave if you quietly walk down the sidewalk, but if you don't, I'm going to arrest you.  Isn't that an option available to police who have a person within their control, an ability to speak with them?

MR. KOGER:  Argumentative, compound question.

THE WITNESS:  It is within a police officer's discretion to do that based on circumstances with which they are faced at the time.  I can think of very few where that would be a good option.

BY MR. SCHEMBER:

Q    Why?

A    If the conduct for which a person is seized is egregious and dangerous, there would be no reason to allow them to simply walk away.

Q    But what if the conduct for which they're seized is parading without a permit?

MR. KOGER:  Hypothetical, vague and ambiguous as to circumstances.

THE WITNESS:  I will say again, we would not simply arrest someone for parading without a permit.  We would, in cases of simply parading without a permit, if there were -- and I can think of no circumstances in my time on the police department where for simply parading without a permit we would do that.  We would facilitate that parade.

15

(Ex. F, Cathy Lanier Deposition Tr. 26, 29-30.)[9]

In sum, according to Ms. Lanier's testimony and the police department's manual, it was District of Columbia policy not to arrest persons *at all* "simply" for parading without a written permit, but to arrest them *without warning* and *charge them with parading without a written permit*, if, in addition to parading, they *or others in their "group"* engaged in riotous or other egregious or dangerous conduct requiring a "positive police response" and time and circumstances did not permit a warning to be given. (Ex. F, Cathy Lanier Deposition Tr. 26, 29-30, 52, 62, 74; Ex. F, Cathy Lanier Deposition Ex. 5 at 34.)

This policy was not a reasonable time, place, or manner restriction on political assembly and expression in the public streets. First, plaintiffs had no notice of this restriction. The part of the policy announced at the *Barham* hearing—namely, that with unstated exceptions there would be no arrest without warning—was vague because the exceptions were unstated. *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972) (vague law that fails to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and that abuts upon sensitive areas of basic First Amendment freedoms operates to inhibit the exercise of those freedoms) (brackets and, quotation marks omitted). Further, because the police manual's exception to the policy prohibiting arrest without warning was not published to the public, plaintiffs had no notice that they could be *arrested* without warning and *charged* with parading without a permit merely because the "circumstances" of a street march required some sort of "positive police response" before an order to disperse could be given.

_____

[9] Ms. Lanier's "time on the police department," however, included the time of the September 27, 2002, mass arrest at Vermont and K. (Ex. F, Cathy Lanier Deposition Tr. 5.) The policy of no arrest "simply" for parading without a written permit, however, was in effect no later than September 27, 2004. (*Id*. at 10-12.)

Second, this policy was not reasonable even if notice of it had been provided to the public. As Judge Sullivan pointed out during the September 2004 hearing in *Barham v. Ramsey*, a policy authorizing police on the scene to allow political street marches that have no written permit, but also granting the police power to arrest marchers without warning on a charge of "parading without a permit," is a "Sword of Damocles" hanging over the heads of the demonstrators. (Ex. F, Cathy Lanier Deposition Ex. 2, Transcript of Hearing September 27, 2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS) (D.D.C.) at 26 (transcribed as "sort of damocles").) The secret exception applied to plaintiffs, moreover, was particularly unreasonable because it was not narrowly tailored. It subjected plaintiffs to arrest where (1) the "circumstance" requiring "positive police response" was criminal misconduct by persons in the crowd *other than the plaintiffs*; (2) the positive police response required was merely action to control the crowd in order to end ongoing criminal acts and if possible to arrest the criminals, *not mass arrest of everyone in a particular geographic area*; and (3) an order to disperse and opportunity to avoid arrest by obeying the order could have been given by the police *after* the "positive police response" surrounded the plaintiffs in the alley.

Our Court of Appeals made these same points long ago in *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977). In *Barham*, the Court of Appeals reviewed and reaffirmed these principles:

> [I]n . . . *Cullinane* . . . police confront[ed] violently disruptive anti-war protests. . . . [T]he court explained that: "It is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit." . . . The *First Amendment* does not conflict with the need for flexibility when dealing with large, unruly assemblies: "Confronted with a mob the police cannot be expected to single out individuals; they may deal with the crowd as a unit." . . . However, the *Cullinane* decision includes an important caveat:

> We do not suggest of course that one who has violated no law may be arrested for
> the offenses of those who have been violent or obstructive.  As we have seen
> however the police may validly order violent or obstructive demonstrators to
> disperse or clear the streets.  If any demonstrator or bystander refuses to obey
> such an order after fair notice and opportunity to comply, his arrest does not
> violate the Constitution even though he has not previously been violent or
> obstructive.
>
>                                          * * *
>
> *Cullinane* instructs that police officers may quell an unruly demonstration by "dealing
> with the crowd as a unit" only after invoking a valid legal mechanism for clearing the
> area and then providing an opportunity for affected persons to follow an order to
> disperse.

*Barham v. Ramsey*, 424 F.3d 565, 575-76 (D.C. Cir. 2006).  The *Barham* Court noted that these

same principles had been enforced in *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977):

> *Dellums* held that a group of demonstrators lawfully gathered on the Capitol steps could
> not be arrested unless the Chief had reason to believe (1) that the demonstrators could be
> validly evicted under the Capitol Grounds ordinance, (2) that the police gave
> demonstrators an order to disperse that "apprised the crowd as a whole that it was under
> an obligation to leave," and (3) that there had been a "reasonable opportunity" to comply.

*Barham*, 566 F.2d at 576 (citation omitted).

        As in *Cullinane*, the *Barham* Court noted that police lines can be a "valid legal

mechanism" to control a demonstration as a unit and to clear an area.  *Id.* at 576.  *Cullinane*

instructs, however, that *after* police have used police lines to obtain control of a demonstration

that has become infected with violence, police must "then provid[e] an opportunity for affected

persons to follow an order to disperse."  *Barham*, 424 F.3d at 576.  Under *Cullinane*, a

reasonable need to deploy police lines quickly and without warning to control a demonstration

does not justify *arresting the participants* without warning.  After control is acquired through use

of police lines, an opportunity for peaceful demonstrators and bystanders to avoid arrest by

complying with a police order to disperse always can, and must, be afforded.  Mass arrest

without warning of all persons in a geographic area surrounded by police is not a narrowly
tailored response to the need to obtain control of a demonstration.

The *Barham* Court held that the Fourth Amendment prohibition against unreasonable
seizure demands that police comply with the *Cullinane* principles. *Id*. Because seizure in
violation of these principles is unreasonable under the Fourth Amendment, it follows that any
time, place, or manner restriction on street demonstrations that violates these principles is an
unreasonable restriction. The exception to the policy against arrest without warning that Ms.
Lanier invoked to arrest the plaintiffs violated the *Cullinane* principles. It therefore was not a
reasonable time, place, or manner restriction; and arrest of the plaintiffs pursuant to this
exception violated both the First and Fourth Amendments.

There is another, related reason why arrest of the plaintiffs without warning for marching
in the street was unconstitutional. Under the First Amendment, demonstrating in the street
without permission cannot be a strict liability offense. *American-Arab Anti-Discrimination
Committee v. City of Dearborn*, 418 F.3d 600, 611-12 (6th Cir. 2005). Actual knowledge that
police have denied permission is constitutionally required. *Id*. In *City of Dearborn*, the court
held unconstitutional an ordinance that imposed strict liability for parading without a permit.
The court said:

> [P]arades and processions are a unique and cherished form of political expression,
> serving as a symbol of our democratic tradition. There is scarcely a more powerful form
> of expression than the political march. Unlike stationary demonstrations or other forms
> of pure speech, the political march is capable of reaching and mobilizing the larger
> community of citizens. It is intended to provoke emotive and spontaneous action, and
> this is where its virtue lies. As it progresses, it may stir the sentiments and sympathies of
> those it passes, causing fellow citizens to join in the procession as a statement of
> solidarity. Automatically criminalizing participation in a permitless march destroys the
> spontaneity and enthusiasm which public demonstrations of this nature are meant to
> engender. . . .

> [T]he Ordinance placed the onus upon every participant to be aware of whether the march has a permit, and would hold any participant liable for its violation, even in cases where the participant was mistakenly advised that a permit has been issued. A good-faith belief is no excuse, and thus the potential protestor cannot rely upon the assurances of participants in the march. Rather, the potential protestor would be well advised to seek personal verification from a city official that the demonstration has been authorized, or run the risk of being thrown in jail. Requiring potential march participants to seek authorization from city officials before joining a public procession or risk being jailed is antithetical to our traditions, and constitutes a burden on free expression that is more than the *First Amendment* can bear.

418 F.3d at 611-12.

The *mens rea* element must be read into a prohibition against demonstrating without permission, or the prohibition is unconstitutional. In *United States v. Sheehan*, __ F.3d __, No. 07-3002 (D.C. Cir. Jan. 11, 2008), our Court of Appeals construed National Park Service permit regulations to contain a *mens rea* element, noting that the government "ostensibly concedes that the NPS regulations would be unconstitutional if they imposed strict liability." *Sheehan, slip op*. at 13-14. The Court said "[t]his means that individuals cannot be convicted of demonstrating without a permit unless the government proves beyond a reasonable doubt that they had the requisite knowledge and intent to do so." *Id*. at 14. The Court held that where probable cause as to the *mens rea* element is based on a police warning given at the scene, the defendant must be allowed to defend against the charge at trial by introducing evidence that she did not hear the warning. *Id.* at 19 and 21. The Court reversed the conviction because the Magistrate Judge precluded the defendant from presenting this defense. *Id.* at 21.

Here, District of Columbia policy gave police on the scene authority to allow a demonstration that did not have a written permit and they routinely did so. In these circumstances, demonstrators cannot know that police have denied permission to demonstrate unless and until the police tell them this. Absent a reasonably conveyed police announcement or order denying or revoking permission to march, there can be no probable cause for police to

believe that demonstrators are *knowingly* demonstrating without police permission, and therefore no probable cause to arrest them for that offense.

It is undisputed that the time, place, and planned manner of plaintiffs' march were such that District policy required the police to support the march at the outset, not prohibit it.  (Ex. F, Cathy Lanier Deposition Tr. 79.)  If circumstances arising during the march warranted termination of the demonstration, police were required to tell the demonstrators this and afford them reasonable opportunity to disperse, as the Court held in *Dellums v. Powell*, 566 F.2d 167, 183 (D.C. Cir. 1977).  Police could have ordered plaintiffs to disperse after they surrounded plaintiffs in the alley.  Absent such an order, police lacked probable cause to arrest plaintiffs for knowingly marching without police permission.

This same point establishes that arrest of the plaintiffs violated District of Columbia law, as well as the First and Fourth Amendments.  Because the *mens rea* element must be read into any prohibition against demonstrating in the street without police permission, lack of probable cause as to this element renders an arrest unlawful under District of Columbia law.  *Clarke v. District of Columbia,* 311 A.2d 508, 511 (D.C. 1973) (arrest without probable cause is false arrest under District law; defendant who arrested plaintiff has burden to show probable cause for arrest); *Marshall v. District of Columbia*, 391 A.2d 374, 1380 (D.C. 1978) (citing *Clarke*).

**Arrest of the Plaintiffs for Demonstrating in the Street Without Police Permission was Unlawful Because "Parading Without a Permit" was Not a Crime**

Arrest of the plaintiffs for "parading without a permit" also violated District of Columbia law and the Fourth Amendment because, under District law, parading without a permit was not a criminal offense in the first place.  The Court's July 26, 2006, Order (Doc 18) at 5-6 held that, under *Doe v. Metropolitan Police Department of District of Columbia*, 445 F.3d. 460 (D.C. Cir. 2006), whether arrest of the plaintiffs violated the Fourth Amendment because "parading without

a permit" was not a criminal offense, depended on whether "a prudent person could have reasonably believed" that this conduct was a crime. Order at 6, quoting *Doe*, 445 F.3d at 469.[10] Under *Doe*, the answer to the question depends on the "history of enforcement" of parading without a permit and official "statements of policy or procedure." Order at 9-10.

The record shows that District of Columbia policy and enforcement history did not deem political parading in the street without a written permit, *by itself*, to be wrongdoing *of any kind*, let alone a criminal offense. Under District policy, police on the scene had authority to allow a street demonstration that had no written permit. (Ex. H, Defendant's Response to First Request for Admissions, Request 5; Ex. F, Cathy Lanier Deposition Ex. 4 at 3.) The vast majority of street demonstrations had no written permit. (Ex. I, Defendant's Response to Second Request for Admissions, Requests 1 and 2 (emphasis added).) The policy of the District was to "support" these demonstrations, as former Chief Ramsey testified, not prevent them or stop them. *Id.* Mr. Ramsey's testimony was true. (Ex. I, Defendant's Response to Second Request for Admissions, Requests 3f and 3g.) It was the policy of the District *never* to prevent or stop demonstrators from peacefully marching in the street. (Ex. F, Cathy Lanier Deposition Tr. 12, 30, 79.) It was the District's policy not to arrest demonstrators *simply* for marching in the street without a

---

[10] We disagree with *Doe*. We believe that the relevant question is one of law, not reasonable belief. *United States v. McDonald*, 453 F.3d 958, 961-62 (7th Cir. 2006) (noting that the majority of circuits reject the concept that probable cause can be based on an officer's reasonable mistake of law as to whether a prohibition is criminal). The question should be one of law at least in a civil action against the District of Columbia as a municipality. *See Owen v. City of Independence*, 445 U.S. 622 (1980) (municipality may not assert the good faith of its officers or agents as a defense to liability for damages). For the reasons stated in our opposition to defendant's motion to dismiss (Doc 14) at 3-10 and 16-19, we maintain that as a matter of law "parading without a permit" was not a criminal offense and that for this reason arrest of the plaintiffs for parading violated District law and the Fourth Amendment. We understand, however, that the Court is bound by *Doe* and does not have authority to accept this argument. We raise it here in order to preserve it for possible presentation to the *en banc* Court of Appeals or the Supreme Court.

written permit.  (Ex. F, Cathy Lanier Deposition Ex. 2, Transcript of Hearing September 27,

2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS) (D.D.C.) at 31; Ex. F, Cathy Lanier

Deposition Tr. 12, 30.)[11]  Under District policy and enforcement history, political parading in the

street without a written permit, *by itself*, was not deemed to be wrongdoing at all.

   In *United States v. Laub*, 385 U.S. 475 (1967), the Court relied on similar considerations

in holding that a travel restriction stated in a regulation should not be deemed to be a crime.  The

Court said:

> Ordinarily, citizens may not be punished for actions undertaken in good faith reliance
> upon authoritative assurance that punishment will not attach. . . . [W]e may not convict a
> citizen for exercising a privilege which the State clearly had told him was available to
> him. . . .  [C]riminal sanctions are not supportable if they are to be imposed under vague
> and undefined commands, or if they are inexplicably contradictory and certainly not if the
> Government's conduct constitutes active misleading.

385 U.S. at 487 (citations and quotation marks omitted).  Given the District's statements

reviewed above, the Court should conclude that parading without a permit was not a crime.

   The record also shows, however, that it was District policy to (1) arrest street

demonstrators as a group if some persons among them committed criminal acts *other than*

simply parading, and then (2) charge everyone in the arrested group with parading without a

permit (if, as in the majority of cases, there was no permit).  Under *Doe*, the question before the

Court is whether "a prudent person could have reasonably believed" that, because of this policy,

parading without a permit, by itself, was a criminal offense.

---

[11] Ms. Lanier, testifying on behalf of the District, said that this had been the policy for as long as
she had been a police officer.  (Ex. F, Cathy Lanier Deposition Tr. 30.)  It certainly was the
policy no later than September 27, 2004, when the District acknowledged it at the *Barham*
hearing.  (Ex. F, Cathy Lanier Deposition Tr. 10-12; Ex. F, Cathy Lanier Deposition Ex. 2,
Transcript of Hearing September 27, 2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS)
(D.D.C.) at 26-27, 28, 39-41.)

The Court should hold that, in light of the *Cullinane* principles discussed above, a prudent person would have believed that this policy was unconstitutional law enforcement, not a reasonable basis to believe that parading without a permit by itself was a criminal offense. Apart from this, a municipal policy of charging persons with parading without a permit *only if* someone in their group does something *besides* parade, does not even *logically* support a reasonable inference that parading *itself* is a crime, particularly where municipal policy also says that parades having no written permits are to be *supported* by the police and no one is ever to be arrested *simply* for parading without a permit.

The Court should hold that, under *Doe*, no prudent person reasonably could have believed that parading without a written permit was, by itself, a criminal offense. Under *Doe*, the Court should hold that arrest of the plaintiffs for parading without a permit violated the Fourth Amendment and the common law.

### The District of Columbia is Liable as a Matter of Law for the Unlawful Arrest of the Plaintiffs, Under Both 42 U.S.C. § 1983 and Local Law

Because plaintiffs' arrest was ordered by Ms. Lanier, a police officer employed by the District of Columbia who acted within the scope of her employment, the District of Columbia is liable to plaintiffs under the doctrine of *respondeat superior* for false arrest in violation of District of Columbia common law. Ex. H, Defendant's Response to First Request for Admissions, Requests 1 and 11; *Holder v. District of Columbia*, 700 A. 2d 738 (D.C. 1997); *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1986); *District of Columbia v. Coron*, 515 A.2d 435, 437-438 (D.C. 1986).

The District is also liable to plaintiffs under 42 U.S.C. § 1983 for arrest in violation of the First and Fourth Amendments because District of Columbia custom, policy, or practice caused or subjected plaintiffs to the arrest. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658

(1978).  The mass arrest of plaintiffs was the organized action of a large group of officers

implementing the order of their supervisor, who held the high rank of Commander and whose

decision to arrest continued to be implemented, with a change in charge, after she consulted the

police department's General Counsel.  (Ex. H, Defendant's Response to First Request for

Admissions, Request 11; Ex. F, Cathy Lanier Deposition Tr. 52; Ex. F, Cathy Lanier Deposition

Ex. 9 at 6; Ex. M, Brandon Jourdan Video; Ex. O, Barry Student Video.)  *Bordanaro v. McLeod,*

871 F.2d 1151, 1156 (1st Cir. 1989) (existence of custom "inferred from the event itself," which

"involved the joint actions of the entire night watch," thus supporting "reasonable inference . . .

that all of the officers involved were operating under a shared set of rules and customs");

*Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir. 1985) (single incident involving many

officers, followed by no discipline, may by inference prove municipal custom, policy, or

practice); *Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C. Cir. 1986) (approving

*Grandstaff*).

The District has admitted that "[t]he arrests of the plaintiffs did not violate District of

Columbia custom, policy, or practice."  Ex. H, Defendant's Response to First Request for

Admissions, Request 6.[12]  Further, when plaintiffs asked the District to admit that it did not

discipline Ms. Lanier for her decision to arrest the plaintiffs, it not only admitted this but also

expressly objected to any implication "that there may have been any basis in fact, law and/or

policy upon which it would have been lawful and/or appropriate to have disciplined Cathy Lanier

for having made the decision to arrest the plaintiffs."  (*Id*., Request 12.)  The exception to the

---

[12] Thus, the circumstances here are the opposite of those in *Qutb v. Ramsey*, 285 F. Supp. 2d 33
(D.D.C. 2003), where the police officers' actions were contrary to the District's written policy
and could be characterized as "individual instances of rogue behavior."  285 F. Supp. 2d at 45
and 46.

policy against arrest without warning that Ms. Lanier invoked to arrest the plaintiffs was authorized by the District's police manual and the District's statement to Judge Sullivan at the *Barham* hearing that there were exceptions to the policy against arrest without warning. (Ex. F, Cathy Lanier Deposition Tr. 21; Ex. F, Cathy Lanier Deposition Ex. 2, Transcript of Hearing September 27, 2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS) (D.D.C.) at 39-41.)  The District took no action against Ms. Lanier indicating that it deemed her decision to arrest the plaintiffs to have been incorrect, and it subsequently promoted her to Chief of Police.  (Ex. H, Defendant's Response to First Request for Admissions, Requests 13 and 14.)  At her deposition, Ms. Lanier testified not only in her individual capacity, but also on behalf of the District of Columbia as its designated witness under Fed. R. Civ. P. 30(b)(6).  (Ex. F, Cathy Lanier Deposition Tr. 8-9.)

The District expressly has asserted that "under current policy, practice or custom" it would be "proper to arrest demonstrators" again "in circumstances similar to those in which plaintiffs were arrested."  Ex. L, Defendant's Responses to Plaintiffs' Third Set of Interrogatories at 20-21 (Interrogatory 4).  For this reason, the District is liable under 42 U.S.C. § 1983 not only for money damages, but also for injunctive relief against the custom, policy, or practice that caused or subjected the plaintiffs to arrest and that threatens to cause or subject future demonstrators to unconstitutional arrest.  *United States v. Grace*, 461 U.S. 171 (1983) (injunction against enforcement of criminal statute against leafleting); *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983) (injunction against police conduct appropriate if "the City . . . authorized police officers to act in such manner").

For all of these reasons, the District is liable under 42 U.S.C. § 1983 for the unconstitutional arrest of the plaintiffs.

**Assault and Battery of Plaintiff Singer**

In the alley, plaintiff Singer walked toward police with his hands in the air, saying repeatedly that he was peaceful and not part of the protest.   A police officer approached him and ordered him to get down.  Mr. Singer got down on all fours.  He repeated that he was peaceful and not part of the protest.  The officer told him to shut up and that if he moved the officer would bash in his head.  (Ex. E, Matthew Singer Deposition Tr. 38, 41.)  Mr. Singer remained on all fours and said nothing.  (*Id*. at 26.)  Another officer approached Mr. Singer, bent down, and sprayed Mr. Singer's face with pepper spray, causing Mr. Singer to suffer pain on his face and in his eyes.  (*Id*. at 26, 41, 45.)

The officer's pepper spraying of Mr. Singer was clearly excessive force and therefore an assault and battery under District of Columbia common law.  *See Triplett v. District of Columbia*, 108 F.3d 1450, 1452 (D.C. Cir. 1997) (citing District of Columbia cases).  *See Park v. Shiflett*, 250 F.3d 843, 852-53 (4th Cir. 2001) (spraying person posing no threat with pepper spray at very short range excessive).

The officers who arrested Mr. Singer acted within the scope of their employment in arresting him.  Ex. H, Defendant's Response to First Request for Admissions, Request 1.  Police officers are authorized to use pepper spray, and making judgments about when and how to use it is part of their jobs.  (Ex. F, Cathy Lanier Deposition Tr. 80-81.)  The officer's pepper spraying of Mr. Singer incident to Mr. Singer's arrest therefore was action within the scope of the officer's employment.  *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27, 29 (D.C. 1978) ("[w]hatever is done by the employee in virtue of his employment and in furtherance of its ends is deemed by law to be an act done within the scope of his employment"; question is "whether he was at the time engaged in serving his master").  *See also District of Columbia v.*

*Coron*, 515 A.2d 435, 438 (D.C. 1986) (finding off duty police officer acted outside scope of

employment during an altercation "bent on personal vengeance for a perceived personal

affront"); *Boykin v. District of Columbia*, 484 A.2d 560, 563 (D.C. 1984) (finding sexual assault

on student by school employee on school grounds was outside scope of employment because the

employee's job assignments gave only "the *opportunity* to pursue his personal adventure")

(emphasis in original).

      Under the doctrine of *respondeat superior* the District of Columbia is liable to Mr. Singer

for this pepper spray assault and battery. *Wade v. District of Columbia*, 310 A.2d 857, 863 (D.C.

1973) (en banc) (holding "that the District of Columbia may be sued under the common law

doctrine of *respondeat superior* for the intentional torts of its employees acting within the scope

of their employment."); *Taylor v. District of Columbia*, 691 A.2d 121, 126 (D.C. 1997) (citing

*Wade*).  *See also Holder v. District of Columbia*, 700 A. 2d 738 (D.C. 1997); *Weinberg v.*

*Johnson*, 518 A.2d 985, 988 (D.C. 1986); *District of Columbia v. Coron*, 515 A.2d 435, 437-438

(D.C. 1986).

**Assault and Battery of Plaintiff Chelsea Kirk**

      In arresting plaintiffs, police officers tied plaintiffs' hands behind their backs with plastic

handcuffs.  (Ex. F, Cathy Lanier Deposition Tr. 79.)  An officer applied the handcuffs tightly to

plaintiff Chelsea Kirk's wrists, pinching her skin and causing her to scream out that the

handcuffs were too tight.  (Ex. C, Chelsea Kirk Deposition Tr. 161.)  The officer then tightened

them further, causing painful cuts, bleeding, and swelling of Ms. Kirk's wrists. (*Id*. at 161, 167.)

      The officer's further tightening of the handcuffs after they already were pinching Ms.

Kirk's skin was clearly excessive force and therefore an assault and battery under District of

Columbia common law. *See Triplett v. District of Columbia*, 108 F.3d 1450, 1452 (D.C. Cir. 1997) (citing District of Columbia cases).

The officers who arrested Ms. Kirk acted within the scope of their employment in arresting her. Ex. H, Defendant's Response to First Request for Admissions, Request 1. Police officers are authorized to use plastic handcuffs to secure the hands of arrestees and applying these handcuffs to arrestees' wrists is part of their jobs. (Ex. F, Cathy Lanier Deposition Tr. 79-80.) The officer's further tightening of Ms. Kirk's handcuffs after they already were pinching her skin was action within the scope of the officer's employment. *District of Columbia v. Coron*, 515 A.2d 435, 438 (D.C. 1986); Boykin v. District of Columbia, 484 A.2d 560, 563 (D.C. 1984); *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27, 29 (D.C. 1978).

Under the doctrine of *respondeat superior* the District of Columbia is liable to Ms. Kirk for this handcuff assault and battery. *Wade v. District of Columbia*, 310 A.2d 857, 863 (D.C. 1973) (en banc) (holding "that the District of Columbia may be sued under the common law doctrine of *respondeat superior* for the intentional torts of its employees acting within the scope of their employment."); *Taylor v. District of Columbia*, 691 A.2d 121, 126 (D.C. 1997) (citing *Wade*). *See also Holder v. District of Columbia*, 700 A. 2d 738 (D.C. 1997); *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1986); *District of Columbia v. Coron*, 515 A.2d 435, 437-438 (D.C. 1986).

## CONCLUSION

Plaintiffs' motion for partial summary judgment on liability should be granted.

Respectfully submitted,

/s/ Arthur B. Spitzer
Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

/s/ Daniel M. Schember
Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National Lawyers
Guild and the American Civil Liberties Union of the
National Capital Area

Counsel for Plaintiffs

January 25, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td></td><td>)</td></tr>
<tr><td>SARAH CARR, <em>et al</em>.,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiffs,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)    Civ. A. No. 06-00098 (ESH)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>DISTRICT OF COLUMBIA,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendant.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABIILTY**

The following material facts are not genuinely disputed.

1. On the night of January 20-21, 2005, plaintiffs[13] peacefully assembled and marched in

District of Columbia streets, expressing opposition to the second inauguration of President

George W. Bush. (Ex. A, Sarah Carr Deposition Tr. 35, 67-68, 90-92, 94-95, 113, 120; Ex. B,

Allyson Kirk Deposition Tr. 48-49, 104, 167-68, 170-73; Ex. C, Chelsea Kirk Deposition Tr. 30-

33, 162-63; Ex. D, Jonathan Scolnik Deposition Tr. 46, 65-67, 80-81, 83, 92-94, 101, 122, 126,

144, 151; Ex. M, Brandon Jourdan Video; Ex. N, Barry Student Deposition Tr. 89; Ex. O, Barry

Student Video.)

2. Plaintiffs Carr, Allyson Kirk, Chelsea Kirk, and Scolnik participated in the march

from the beginning. (Ex. A, Sarah Carr Deposition Tr. 53; Ex. B, Allyson Kirk Deposition Tr.

---

[13] In this statement "plaintiffs" refers to both the named class representatives and the members of the plaintiff class. The Court's October 11, 2006, Order (Doc 27) certifying this case as a class action under Fed. R. Civ. P. 23(b)(2) stated "Plaintiffs are class representatives . . . of all persons who (a) were arrested for parading without a permit on the evening of January 20, 2005, in the Adams Morgan neighborhood of the District of Columbia in the area approximately bounded by Columbia Road, 18th Street, and Belmont road; and (b) may have paraded without a permit, but who committed no other act providing probable cause for custodial arrest." Order (Doc 27) at 1.

55-56; Ex. C, Chelsea Kirk Deposition Tr. 47-49; Ex. D, Jonathan Scolnik Deposition Tr. 60-62.)

    3.  Exhibit M, the Brandon Jourdan Video, is a videotape showing parts of plaintiffs' march that are representative of the march.  (Jonathan Scolnik Deposition Tr. 65-67, 92-94, 101, 122, 126.)

    4.  Exhibit O, the Barry Student Video, shows parts of plaintiffs' march.  (Ex. N, Barry Student Deposition Tr. 89.)

    5.  Plaintiff Singer, who was at Madam's Organ, a nightclub on 18th Street, NW, when he saw the march go by, went into the street to learn more about the demonstration.  (Ex. E, Matthew Singer Deposition Tr. 106-107.)

    6.  About 250-300 persons participated in the march.  (Ex. F, Cathy Lanier Deposition Tr. 32.)

    7.  During the march some unidentified individuals in the area committed criminal acts such as spray-painting buildings, throwing objects, breaking windows, or pulling newspaper vending machines into the street.  (Ex. F, Cathy Lanier Deposition Ex. 4, Declaration of Cathy Lanier, at 2-3; Ex. F, Cathy Lanier Deposition Tr. 32-42, 61, 64; Ex. P, Metropolitan Police Department Reports.)

    8.  Several minutes after the march began, plaintiff Carr observed two people on bicycles who knocked over newspaper vending machines and then rode off on their bicycles.  (Ex. A, Sarah Carr Deposition Tr. 101.)

    9.  Plaintiff Carr voiced her disapproval to the individuals on bicycles who knocked over newspaper vending machines and then rode off on their bicycles.  (Ex. A, Sarah Carr Deposition Tr. 107-08.)

10. Plaintiff Carr saw what appeared to be freshly sprayed paint on three buildings and a vehicle. (Ex. A, Sarah Carr Deposition Tr. 109.)

11. Plaintiffs Allyson and Chelsea Kirk observed individuals who sprayed paint and then ran away. (Ex. B, Allyson Kirk Deposition Tr. 102; Ex. C, Chelsea Kirk Deposition Tr. 79-81).

12. Plaintiffs Allyson and Chelsea Kirk's companion voiced disapproval to the individuals who sprayed paint and then ran away. (Ex. C, Chelsea Kirk Deposition Tr. 79-81; Ex. B, Allyson Kirk Deposition Tr. 102.)

13. Plaintiffs Allyson and Chelsea Kirk did not see again the individuals who sprayed paint and then ran away, and plaintiffs assumed that these individuals were not part of the march. (Ex. C, Chelsea Kirk Deposition Tr. 79-81; Ex. B, Allyson Kirk Deposition Tr. 102.)

14. Plaintiffs Allyson and Chelsea Kirk also saw newspaper vending machines that had been put in the road, but did not see anyone do this. (Ex. C, Chelsea Kirk Deposition Tr. 87.)

15. Plaintiff Scolnik also saw news vending machines in the road and freshly sprayed paint on a bank building. (Ex. D, Jonathan Scolnik Deposition Tr. 82.)

16. Plaintiffs Carr, A. Kirk, C. Kirk, and Scolnik did not see any broken windows on buildings. (Ex. A, Sarah Carr Deposition Tr. 117; Ex. B, Allyson Kirk Deposition Tr. 101-02; Ex. D, Jonathan Scolnik Deposition Tr. 127.)

17. Later in the march, plaintiff Scolnik saw a projectile thrown in the direction of a police car and heard the sound of breaking glass. (Ex. D, Jonathan Scolnik Deposition Tr. 87.)

18. Plaintiff Allyson Kirk witnessed a projectile break the windshield of a police car. (Ex. B, Allyson Kirk Deposition Tr. 100-01.)

19.  At the point that Allyson Kirk witnessed a projectile break the windshield of a police car, she, her sister Chelsea, and their companion decided to separate themselves from the march. (Ex. B, Allyson Kirk Deposition Tr. 101; Ex. C, Chelsea Kirk Deposition Tr. 89-93.)

20.  Plaintiff Singer did not witness any of the aforementioned acts of vandalism or any other conduct he perceived to be illegal activity.  (Ex. E, Matthew Singer Deposition Tr. 109-10.)

21.  District of Columbia police, without ordering the marchers to stop or to disperse, or otherwise informing them that their demonstration would not be allowed, diverted marchers from their route; herded them into an alley; and, in the alley, surrounded and arrested about 65-75 persons, including plaintiffs.  (Ex. D, Jonathan Scolnik Deposition Tr. 85-86, 88-89, 97-99; Ex. A, Sarah Carr Deposition Tr. 142; Ex. B, Allyson Kirk Deposition Tr. 110-12, 115; Ex. C, Chelsea Kirk Deposition Tr. 145-46; Ex. F, Cathy Lanier Deposition Ex. 4 at 3-4; Ex. M, Brandon Jourdan Video; Ex. P, Metropolitan Police Department Reports.)

22.  The police who took the actions stated in ¶ 21 acted on order of then-Commander Cathy Lanier, who is now the police chief.  (Ex. F, Cathy Lanier Deposition Tr. 5; Ex. F, Cathy Lanier Deposition Ex. 4 at 2-3.)

23.  Cathy Lanier was deposed simultaneously in her individual capacity and as the District of Columbia's designated representative under Fed. R. Civ. P. 30(b)(6).  (Ex. F, Cathy Lanier Deposition Tr. 8; Ex. F, Cathy Lanier Deposition Ex. 1, Notice of Deposition, at 1.)

24.  Cathy. Lanier, who was one of the first police officers to arrive on the scene of the march, approached the march from behind in her patrol car and saw the criminal acts described in ¶ 7.  (Ex. F, Cathy Lanier Deposition Ex. 4 at 2-3; Ex. F, Cathy Lanier Deposition Tr. 8.)

25.  Cathy Lanier did not know who threw objects.  (Ex. F, Cathy Lanier Deposition Tr. 61; Ex. P, Metropolitan Police Department Reports.)

26. Cathy Lanier could not say that each and every march participant destroyed property. (Ex. F, Cathy Lanier Deposition Tr. 64.)

27. Cathy Lanier ordered plaintiffs arrested as a group for rioting because (1) during the street march unidentified individuals in the area committed or incited the criminal acts stated in ¶ 7; and (2) plaintiffs did not walk away after these criminal acts occurred. (Ex. F, Cathy Lanier Deposition Ex. 4 at 2-3; Ex. F, Cathy Lanier Deposition Tr. 51-52, 61, 62, 64, 74).

28. A police department manual states that the elements of "rioting" include "willfully engag[ing] in [a] public disturbance on purpose" and that "public disturbance" means "more than mere loud noise making or minor breaches of the peace." (Ex. G, Metropolitan Police Department Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances & Prisoner Processing (Revised May 2003), at 85-86.)

29. After ordering plaintiffs arrested as a group for rioting, Ms. Lanier spoke by telephone with Terry Ryan, the police department's general counsel. (Ex. F, Cathy Lanier Deposition Ex. 9, Metropolitan Police Department event log, at 6; Ex. F, Cathy Lanier Deposition Tr. 52.)

30. After the conversation referenced in ¶ 29, Cathy Lanier decided not to charge plaintiffs with rioting, but to charge them with "parading without a permit." (Ex. F, Cathy Lanier Deposition Tr. 52.)

31. In a declaration by Cathy Lanier filed by defendant at the outset of the litigation (Doc 17), Ms. Lanier said that she had ordered the plaintiffs arrested for parading without a permit, not rioting, a point that her event log and police reports indicate, as well; but at her deposition she corrected this, saying that she had ordered the plaintiffs arrested for rioting and had switched the charge to parading without a permit after consulting the police department's lawyer. (Ex. F,

5

Cathy Lanier Deposition Ex. 4 at 2-3; Ex. F, Cathy Lanier Deposition Ex. 9, at 6; Ex. F, Cathy

Lanier Deposition Tr. 51- 52; Ex. P, Metropolitan Police Department Reports.)

    32.  At the time of plaintiffs' arrest, District of Columbia policy allowed demonstrators to

obtain a written permit to parade in the streets, but also authorized police on the scene to allow

street marches that had no written permits.  (Ex. H, Defendant's Response to First Request for

Admissions, Request 5; Ex. F, Cathy Lanier Deposition Ex. 4 at 3.)

    33.  The street march in which plaintiffs participated did not have a written permit.  (Ex.

F, Cathy Lanier Deposition Ex. 8, Responses First Set of Interrogatories, at 8.)

    34.  The majority of street demonstrations did not have written permits.  (Ex. I,

Defendant's Response to Second Request for Admissions, Requests 1, 2, 3f.)

    35.  District of Columbia policy required the police to support, not prohibit, street

marches that did not have written permits, including street marches at the time and place of

plaintiffs' march and marches conducted in the same manner as that which police knew was

planned for plaintiffs' march.  (Ex. I, Defendant's Response to Second Request for Admissions,

Requests 1, 2, 3g; Ex. F, Cathy Lanier Deposition Tr. 56-59, 79; (Ex. C, Chelsea Kirk Deposition

Ex. 2, flyer announcing time, place, and planned manner of plaintiffs' march.)

    36.  Plaintiffs Carr, Allyson Kirk, Chelsea Kirk, and Scolnik learned of the march in

which they participated a few hours before it began, from a flyer distributed at an anti-inaugural

concert they attended at a church located on Columbia Road between 15th and 16th Streets, N.W.

(Ex. A, Sarah Carr Deposition Tr. 35-36; Ex. B, Allyson Kirk Deposition Tr. 46-47; Ex. C,

Chelsea Kirk Deposition Tr. 30-32; Ex. D, Jonathan Scolnik Deposition Tr. 45-47.)

    37.  The flyer referenced in ¶ 36 said the march would assemble outside after the concert,

march on Columbia Road to 18th Street, turn left on 18th Street, then right onto Florida Avenue,

and go to the Hilton hotel where an inaugural ball was occurring.  (Ex. C, Chelsea Kirk

Deposition Ex. 2.)

      38.  The march route stated in ¶ 37 also was announced from the concert stage.  (Ex. C,

Chelsea Kirk Deposition Tr. 44-47.)

      39.  Undercover police also were at the concert referenced in ¶ 36.  (Ex. F, Cathy Lanier

Deposition Tr. 56-57.)

      40.  Undercover police at the concert referenced in ¶ 36 learned about plaintiffs' planned

march and informed their superiors, who informed Ms. Lanier, providing her advanced

knowledge of the march.  (Ex. F, Cathy Lanier Deposition Tr. 56-59.)

      41.  Cathy Lanier did not order officers to go to the assembly point of plaintiffs' march

and announce to the gathering crowd that police would not allow the march because prohibiting

the planned march would have been contrary to District of Columbia policy.  (Ex. F, Cathy

Lanier Deposition Tr. 79.)

      42.  At the time of plaintiffs' arrests, it was the policy of the District of Columbia not to

arrest persons parading in the street simply because they did not have a permit.  (Ex. F, Cathy

Lanier Deposition Tr. 12, 30; Ex. F, Cathy Lanier Deposition Ex. 2, Transcript of Hearing

September 27, 2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS) (D.D.C.) at 31.)

      43.  Several months before plaintiffs' march, in September 2004, at a hearing before

Judge Sullivan, the District of Columbia announced that, with unstated exceptions, it would not

arrest persons without warning for parading in the street.  (Ex. F, Cathy Lanier Deposition Ex. 2,

Transcript of Hearing September 27, 2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS)

(D.D.C.) at 26-27, 28, 31, 39-42; Ex. F, Cathy Lanier Deposition Ex. 3, *Barham* Order,

September 29, 2004.)

44.  Cathy Lanier ordered officers to arrest plaintiffs without warning after she saw some unknown individuals in the area commit the criminal acts referenced in ¶ 7.  (Ex. F, Cathy Lanier Deposition Tr. 31-51; Ex. F, Cathy Lanier Deposition Ex. 4 at 2-3; Ex. P, Metropolitan Police Department Reports.)

45.  In ordering plaintiffs arrested without warning, Cathy Lanier acted pursuant to an exception to the warning policy stated in a police manual.  (Ex. F, Cathy Lanier Deposition Ex. 4 at 1-2, ¶¶ 3- 4.)

46.  Under the exception referenced in ¶ 45 District of Columbia police could make arrests for activities related to mass demonstrations, including parading without a permit, without first issuing a warning to the crowd to disperse if time and circumstances did not permit a warning.  (Ex. F, Cathy Lanier Deposition Tr. 21.)

47.  The police manual provision referenced in ¶ 45 said:

> When the intensity level of a crowd rises and unlawful disruption, either through violent or passive means, is occurring to the extent that the Field Commander determines there is need to make a positive police response, he/she will instruct the affected unit commanders, where time and circumstances permit, to issue warnings to the crowd to disperse.

(Ex. F, Cathy Lanier Deposition Ex. 5, Metropolitan Police Department Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances & Prisoner Processing (Revised May 2003) at 34.)

48.  The police manual provision referenced in ¶¶ 45-47 had not been published so as to provide notice to the public that arrest without warning could occur if "the Field Commander determines there is need to make a positive police response" and "time and circumstances [do not] permit . . . warnings to the crowd to disperse."  (Ex. F, Cathy Lanier Deposition Tr. 21; Ex. J, E-mail from Thomas Koger, Counsel for the defendant District of Columbia, to Susan

Dunham, Counsel for Plaintiffs, October 5, 2007 (confirming "that the Manual was an internal police document, not a document published to the public and available in libraries or a police reading room").)

49.  The exception to the warning policy stated in the manual referenced in ¶¶ 45-47 applied to plaintiffs and defendant maintains that under this exception the circumstances did not allow police to order plaintiffs to disperse and to afford them opportunity to do so before arresting them because, in the words of Cathy Lanier:

> In this instance, the activities of a large number of the participants in the unlawful parade were destructive and violent.  To have attempted to negotiate with the "organizers" of this procession would have unreasonably placed police officers and demonstrators at risk of being injured.  I did not issue any warnings initially because I had no back-up and the protesters far outnumbered me.  I did not issue an[y] warnings thereafter because the situation had turned violent when the brick was thrown through the windshield of CDU 43.  Issuing warnings was not appropriate under these circumstances.

(Ex. F, Cathy Lanier Deposition Ex. 4 at 2.)

50.  An investigation in 2003 by the Council of the District of Columbia of another mass arrest raised the question whether it would be appropriate for police to give demonstrators an order to disperse, and afford them opportunity to comply, *after* police obtained control of the demonstrators by surrounding them. (Ex. K, Testimony under oath by Assistant Chief Brian Jordan before District of Columbia Council Committee on the Judiciary (November 12, 2003) at 41-44, 83-84.)

51.  The investigation referenced in ¶ 50 concerned an arrest that had occurred on September 27, 2002, involving demonstrators who had left a park at 14th and K Streets, N.W., marched west on K Street and then north on Vermont Avenue, where police blocked their path and surrounded and arrested them near Vermont Avenue and K Street.  (Ex. K, Testimony under

oath by Assistant Chief Brian Jordan before District of Columbia Council Committee on the

Judiciary (November 12, 2003) at 41-44, 83-84.)

52.  Regarding the demonstration referenced in ¶ 51, Brian Jordan, then an Assistant

Chief of police, testified as follows during the investigation referenced in ¶ 50:

> ASSISTANT CHIEF JORDAN:  [O]nce it got up to Vermont Avenue, we stationed CDU units at one end of the block and after they went into the block, we stationed CDU units behind and at that point the decision was made that we had to make the arrests.
>
> * * *
>
> MS. CHEH:  But what I am trying to find out is . . . where . . . a crowd is moving and you want to bring them under control [whether] you might set up your lines front and back, as you've described, and detain them and tell them to disperse? . . . In other words, to have them perhaps dribble out or release them after the crowd itself has come under control. . . . Would that ever make sense to do that?
>
> ASSISTANT CHIEF JORDAN:  It could make sense.
>
> * * *
>
> MS. CHEH:  [Y]ou're saying that the situation was fluid, . . . it was not under control, correct?
>
> ASSISTANT CHIEF JORDAN:  What was fluid was the fact that the marchers without warning and without any clear direction just began snake marching through the street.
>
> MS. CHEH:  But once you had the [police] line in front of them and the [police] line in back of them, they were controlled, weren't they?
>
> ASSISTANT CHIEF JORDAN:  But the decision was already made to arrest.
>
> MS. CHEH:  So even though at that point, once there was a [police] line in front of them and a [police] line in back of them, even though in your own mind you had made a decision to arrest, where was the danger?
>
> ASSISTANT CHIEF JORDAN:  The [police] action stopped the danger.  If [the demonstrators] were allowed to continue the danger would continue.  The [police] action stopped and prevented further danger.

(Ex. K, Testimony under oath by Assistant Chief Brian Jordan before District of Columbia

Council Committee on the Judiciary (November 12, 2003), Tr. at 41-44, 83-84.)

53.  At her deposition, Cathy Lanier did not embrace former Assistant Chief Jordan's "danger prevention" rationale for arrest without warning of persons demonstrating in the streets; instead, Cathy Lanier testified as follows on this subject:

Q    Is it not true that in any case in which it is possible to arrest a person for parading without a permit, time and circumstances do permit giving that person a warning and an opportunity to avoid the arrest by complying with the warning?

MR. KOGER:  Vague, ambiguous, calls for speculation.

THE WITNESS:  Could you read back the question.

(The requested portion was read.)

THE WITNESS:  I can't answer that question based on the fact you're asking me to respond to any number of circumstances.  I can't answer that question.

BY MR. SCHEMBER:

Q    If you have sufficient control of a person to arrest them for parading without a permit, don't you always have sufficient control of that person to be able to say to them I'm going to arrest you if you don't leave the area and disperse?

MR. KOGER:  Argumentative, vague and ambiguous as to the meaning of arrest in the context of the question.  You may answer.

THE WITNESS:  You're asking me to comment if it is always possible. I cannot answer that question.  I would say no, it is not always possible, but you're asking me to comment on any number of circumstances.

* * *

Q    When a person is within police control, can't you say to the person you will be free to leave if you quietly walk down the sidewalk, but if you don't, I'm going to arrest you.  Isn't that an option available to police who have a person within their control, an ability to speak with them?

MR. KOGER:  Argumentative, compound question.

THE WITNESS:  It is within a police officer's discretion to do that based on circumstances with which they are faced at the time.  I can think of very few where that would be a good option.

BY MR. SCHEMBER:

Q    Why?

A    If the conduct for which a person is seized is egregious and dangerous, there would be no reason to allow them to simply walk away.

Q    But what if the conduct for which they're seized is parading without a permit?

MR. KOGER:  Hypothetical, vague and ambiguous as to circumstances.

THE WITNESS:  I will say again, we would not simply arrest someone for parading without a permit.  We would, in cases of simply parading without a permit, if there were -- and I can think of no circumstances in my time on the police department where for simply parading without a permit we would do that.  We would facilitate that parade.

(Ex. F, Cathy Lanier Deposition Tr. 26, 29-30.)

54.  At the time of plaintiffs' arrest, it was District of Columbia policy not to arrest persons *at all* "simply" for parading without a written permit, but to arrest them *without warning* and *charge them with parading without a written permit*, if, in addition to parading, they *or others in their "group"* engaged in riotous or other egregious or dangerous conduct requiring a "positive police response" before time and circumstances permitted a warning to be given.  (Ex. F, Cathy Lanier Deposition Tr. 10-12, 26, 29-30, 52, 62, 74; Ex. F, Cathy Lanier Deposition Ex. 2 at 31 and Ex. 5 at 34.)

55.  Defendant has admitted that, in arresting plaintiffs, Cathy Lanier and the other police officers who carried out her arrest order acted within the scope of their employment by the District of Columbia.  (Ex. H, Defendant's Response to First Request for Admissions, Requests 1 and 11.)

56.  The arrest of the plaintiffs was action by many police officers acting on order of Cathy Lanier.  (Ex. F, Cathy Lanier Deposition Ex. 4 at 2-3; Ex. M, Brandon Jourdan Video; Ex. O, Barry Student Video.)

57.  At the time she ordered plaintiffs' arrest, Cathy Lanier held the rank of Commander, and she consulted the police department's General Counsel concerning the charges to be made against plaintiffs.  (Ex. H, Defendant's Response to First Request for Admissions, Request 11; Ex. F, Cathy Lanier Deposition Tr. 52; Ex. F, Cathy Lanier Deposition Ex. 9 at 6.)

58.  The arrests of the plaintiffs did not violate District of Columbia custom, policy, or practice.  (Ex. H, Defendant's Response to First Request for Admissions, Request 6.)

59.  When plaintiffs asked the District to admit that it did not discipline Cathy Lanier for her decision to arrest the plaintiffs, it not only admitted this but also expressly objected to any implication "that there may have been any basis in fact, law and/or policy upon which it would have been lawful and/or appropriate to have disciplined Cathy Lanier for having made the decision to arrest the plaintiffs."  (Ex. H, Defendant's Response to First Request for Admissions, Request 12.)

60.  The exception to the policy against arrest without warning that Cathy Lanier invoked to arrest the plaintiffs was authorized by the District's police manual. (Ex. F, Cathy Lanier Deposition Tr. 21.)

61.  The District stated to Judge Sullivan at the *Barham* hearing that there were exceptions to the policy against arrest without warning. (Ex. F, Cathy Lanier Deposition Ex. 2, Transcript of Hearing September 27, 2004, *Barham v. Ramsey*, Civ. A. No. 02-2283 (EGS) (D.D.C.) at 40-41.)

62. Cathy Lanier's decision to arrest the plaintiffs continued to be implemented after she consulted the police department's attorney. (Ex. F, Cathy Lanier Deposition Tr. 52.)

63. The District took no action against Ms. Lanier indicating that it deemed her decision to arrest the plaintiffs to have been incorrect, and it subsequently promoted her to the position of police Chief. (Ex. H, Defendant's Response to First Request for Admissions, Requests 13 and 14.)

64. At her deposition, Cathy Lanier testified not only in her individual capacity, but also on behalf of the District of Columbia as its designated witness under Fed. R. Civ. P. 30(b)(6). (Ex. F, Cathy Lanier Deposition Tr. 8-9.)

65. The District expressly has asserted that "under current policy, practice or custom" it would be "proper to arrest demonstrators" again "in circumstances similar to those in which plaintiffs were arrested." Ex. L, Defendant's Responses to Plaintiffs' Third Set of Interrogatories at 20-21 (Interrogatory 4).

66. In the alley where plaintiff Singer was arrested on the night of January 20-21, 2005, plaintiff Singer that night walked toward police with his hands in the air, saying repeatedly that he was peaceful and not part of the protest; a police officer approached him and ordered him to get down; Mr. Singer got down on all fours; he repeated that he was peaceful and not part of the protest; and the officer told him to shut up and that if he moved the officer would bash in his head. (Ex. E, Matthew Singer Deposition Tr. 38, 41.)

67. After the events stated in ¶ 66, Mr. Singer remained on all fours and said nothing. (Ex. E, Matthew Singer Deposition Tr. 26.)

68. While Mr. Singer remained on all fours and said nothing, as stated in ¶ 67, another officer approached Mr. Singer, bent down, and sprayed Mr. Singer's face with pepper spray,

causing Mr. Singer to suffer pain on his face and in his eyes.  (Ex. E, Matthew Singer Deposition

Tr. 26, 41, 45.)

68.    Defendant has admitted that the officers who arrested Mr. Singer acted within the

scope of their employment in arresting him.  Ex. H, Defendant's Response to First Request for

Admissions, Request 1.

70.    District of Columbia  police officers are authorized to use pepper spray, and making

judgments about when and how to use it is part of their jobs.  (Ex. F, Cathy Lanier Deposition

Tr. 80-81.)

71.    In arresting plaintiffs on the night of January 20-21, 2005, District of Columbia

police officers tied plaintiffs' hands behind their backs with plastic handcuffs.  (Ex. F, Cathy

Lanier Deposition Tr. 79.)

72.    In arresting plaintiff Chelsea Kirk on the night of January 20-21, 2005, a District of

Columbia police officer applied the handcuffs tightly to plaintiff Chelsea Kirk's wrists, pinching

her skin and causing her to scream out that the handcuffs were too tight.  (Ex. C, Chelsea Kirk

Deposition Tr. 161.)

73.    After the events stated in ¶ 72, the officer referenced in that paragraph then further

tightened plaintiff Chelsea Kirk's plastic handcuffs, causing painful cuts, bleeding, and swelling

of plaintiff Chelsea Kirk's wrists. (Ex. C, Chelsea Kirk Deposition Tr. 161, 167.)

74.    Defendant has admitted that the officers who arrested plaintiff Chelsea Kirk acted

within the scope of their employment in arresting her.  Ex. H, Defendant's Response to First

Request for Admissions, Request 1.

75.  District of Columbia police officers are authorized to use plastic handcuffs to secure the hands of arrestees and applying these handcuffs to arrestees' wrists is part of their jobs.  (Ex. F, Cathy Lanier Deposition Tr. 79-80.)

Respectfully submitted,

/s/ Arthur B. Spitzer
Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

/s/ Daniel M. Schember
Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National Lawyers
Guild and the American Civil Liberties Union of the
National Capital Area

Counsel for Plaintiffs

January 25, 2008