UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civ. A. No. 06-00098 (ESH) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABIILTY**

# Exhibit A

# Excerpts, Deposition of Sarah Carr

Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National
Lawyers Guild and the American Civil
Liberties Union of the National Capital Area

Counsel for Plaintiffs

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4    - - - - - - - - - - - - - -x

5    SARAH CARR, et al.,              :

6              Plaintiffs,            :    Civil Action Number

7       vs.                          :    06-00098 (ESH)

8    DISTRICT OF COLUMBIA,            :

9              Defendant.            :

10    - - - - - - - - - - - - - -x

11

12

13

14

15              DEPOSITION OF SARAH CARR

16

17                        Washington, D.C.

18                        Monday, July 16, 2007

19

20

21    REPORTED BY:

22       CARMEN SMITH

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700          800-336-6646          410-684-2550

1    Deposition of SARAH CARR, called for examination

2    pursuant to notice of deposition, on Monday, July

3    16, 2007, in Washington, D.C., at the offices of the

4    Attorney General for the District of Columbia, 441

5    Fourth Street Northwest, 6th Floor South, at 10:17

6    a.m., before CARMEN SMITH, a Notary Public within

7    and for the District of Columbia, when were present

8    on behalf of the respective parties:

9

10        DANIEL M. SCHEMBER, ESQ.

11        SUSAN B. DUNHAM, ESQ.

12        Gaffney & Schember, P.C.

13        1666 Connecticut Avenue Northwest, Suite 225

14        Washington, DC 20009

15        202-328-2244

16        On behalf of Plaintiffs

17

18

19

20

21

22                                        --continued--

1    APPEARANCES (Continued):

2

3            FRITZ MULHAUSER, ESQ.

4            American Civil Liberties Union of the

5              National Capital Area

6            1400 20th Street Northwest, #119

7            Washington, DC 20036

8            202-457-0800

9            On behalf of Plaintiffs

10

11           THOMAS L. KOGER, ESQ.

12           Office of the Attorney General for the

13             District of Columbia

14           441 Fourth Street Northwest, Suite 600 South

15           Washington, DC 20001

16           202-724-6610

17           On behalf of Defendant

18

19

20   ALSO PRESENT: MARK VORKINK

21              JASON ATKINSON

22              BRANDI AMOS

1   and positive and nonviolent, and we were going to go

2   to an inaugural ball and it was going to start after

3   the show.  And we could just line up after the show

4   and leave from the church.

5       Q    Okay.  Now, you opened your answer

6   speaking in terms of only the announcements made by

7   the singers; correct?

8       A    Yes.

9       Q    What does that exclude?

10      A    The flier that was distributed.

11      Q    Is that the only thing that that

12  introduction to your prior answer excludes?

13      A    Yes.

14      Q    Tell me about the flier.

15      A    I submitted a copy to my counsel, and it

16  basically provided the route of the march, its

17  mission, which was to -- you know, I guess a further

18  explanation of how it was supposed to be positive

19  and respectful of the Columbia Heights neighborhood,

20  and it did express some slight anger but not violent

21  anger, but, you know, a justifiable anger at George

22  Bush.

1          And what else.  That's all I can recall.

2          Q     Okay.  Did that document have printing on

3     one side or both sides?

4          A     It had more than two sides.  It had -- may

5     I explain?

6          Q     Oh, I wish you would.

7          A     It was a piece of paper folded in half, so

8     it had a cover, which was printed, a first page, a

9     second page both in the middle and then a back.  And

10    if I recall, both pages of the inside had printing

11    on it, and the back had the J20 logo on it.

12              MR. KOGER:  Off the record.

13              (Discussion off the record.)

14              BY MR. KOGER:

15         Q     In light of the fact that America had been

16    at war with Iraq since March of 2003, resulting in

17    the deaths of over a thousand American troops and

18    countless Iraqis as of January 20, 2005, how would

19    you characterize justifiable anger at George Bush?

20         A     Justifiable means that everyone who was

21    angry could give the reasons why they were angry and

22    one would find them cogent and not irrational.

1   A  Will you repeat that, please?

2   Q  Sure.

3   A  Okay.

4   Q  After Q and Not U played, you left and you

5 went to the Safeway; right?

6   A  Yes.

7   Q  Okay.  And after being at the Safeway for

8 a while, you went to where the march was starting;

9 right?

10   A  Yes.

11   Q  Okay.  Best recollection, what was that

12 location where the march was starting?

13   A  Right outside of the church where the show

14 had occurred.

15   Q  Okay.  How many people assembled there

16 before the march took its first step out?

17   A  I estimate at less than a hundred.

18   Q  Did the march become bigger at some point?

19   A  Yes.

20   Q  At what point did the march become bigger?

21   A  I am not sure.

22   Q  Do you have a sense of how far along in

67

1    police car drive past us in the opposite lane of

2    traffic, and there was no flashing signal, you know,

3    no.

4        Q    At the time that that occurred, do you

5    believe it would have been readily apparent to

6    passersby that the march was, in fact, a

7    demonstration protesting against the Bush

8    administration?

9        A    Yes.

10       Q    How would you characterize what the

11   unifying theme or message of the demonstration was?

12       A    You know, it really doesn't seem like it

13   was unified.  It seemed -- I can't say that -- I

14   really can't answer this question, actually.  I

15   don't know.  I mean, I thought that everyone was

16   there to peacefully march and speak against the

17   administration.  That's it.

18       Q    You would agree that there was criminal

19   behavior by some persons in the context of the

20   march, would you not?

21       A    I -- no, I don't agree with that.  I agree

22   that there was criminal conduct, but I can't say if

1    the criminals even commenced with our march or we

2    came across them with our route.  I don't know who

3    those people were or, you know, where they came

4    from.  I can't tell you that they were even

5    associated with the march.

6        Q    Would you agree that criminal misconduct

7    occurred along the parade route simultaneously with

8    the march?

9        A    Yes, but I've seen lots of criminal

10   conduct in Adams Morgan.  I mean, it's a bar

11   district.

12       Q    A lot of underage drinking going on, isn't

13   there?

14       A    What?

15       Q    A lot of underage drinking going on in

16   Adams Morgan, isn't there?

17       A    I think so.  I mean, I don't know, but I

18   would guess so.  I'm of age now, but I didn't go out

19   there then, you know.  They could have been coming

20   from a bar and done this.  I don't know who they

21   were or where they came from.

22       Q    Those people who were not engaged in

1                    AFTERNOON SESSION        (1:51 p.m.)

2    Whereupon,

3                         SARAH CARR

4    resumed the stand and, having been previously duly

5    sworn, was examined and testified further as

6    follows:

7                    EXAMINATION (Continued)

8              BY MR. KOGER:

9         Q    Ms. Carr, when the march was ongoing in

10   the first 10 or 15 minutes before you observed any

11   conduct that you thought might be improper, people

12   were chanting; is that right?

13        A    Yeah.

14        Q    What were they chanting?

15        A    Just protest songs that rhymed.

16        Q    Was anybody chanting "whose streets our

17   streets"?

18        A    Yeah.

19        Q    At any time while the march was underway,

20   did you hear anyone yell "kill Bush"?

21        A    No.

22        Q    Did you hear anyone yell "kill the

1    president"?

2        A    No.

3        Q    As the march began, you and your friends

4    marched toward the front of the march; right?

5        A    Yes.

6        Q    Okay.  And when I say that, now I'm only

7    speaking about Mr. Bach and Mr. Beasley, not anyone

8    else we may not have identified in this.

9        A    I understand you to mean them.

10       Q    Okay.  Many people in the area that you

11   were marching through cheered and applauded as you

12   marched by; is that right?

13       A    Yes.

14       Q    Did people come out of their residences to

15   cheer and applaud?

16       A    Yes.  I would say yes, they did.

17       Q    Did anyone indicate that they disagreed

18   with the position that the march was communicating?

19       A    No.

20       Q    Did anyone indicate that they were

21   displeased that the march was passing through the

22   area?

1        A    Yes.

2        Q    Who -- how would you describe the people

3    that indicated they were displeased?

4        A    Oh, wait, did you ask me who indicated

13:53:41    5    they were pleased or who were displeased?

6        Q    No, displeased.

7        A    Oh.   Then I change -- I thought you

8    said -- I didn't hear the prefix.

9        Q    That's fine.   So nobody indicated they

13:53:52    10   were displeased?

11       A    No.

12       Q    When the march began, did you observe some

13   marchers wearing backpacks?

14       A    On the video but not in person, because it

.3:54:14   15   didn't strike me as unusual in person.

16       Q    Does having seen the video depicting

17   people in the march having worn backpacks refresh

18   your recollection that people were wearing backpacks

19   at the point of the march?

3:54:48    20       A    It reminds me that they were present and

21   were wearing backpacks.

22       Q    Amongst the marchers?

94

1      Q      Would you agree that a march of 100 or

2   more persons, some of whom held flaming torches,

3   some of whom concealed their faces with bandanas as

4   the group marched through the street, chanting and

5   drumming, could be intimidating to nonparticipants?

6      A      They could be if the person was being

7   unreasonable, because they were not threatening

8   other people with those instruments and torches.

9      Q      Would you agree that a march with 100 or

10   more persons, some of whom held flaming torches and

11   some of whom concealed their faces with hoods,

12   marching through the street, could be intimidating

13   to nonparticipants?

14      A      Wait.  What was that in addition to

15   wearing hoods?

16      Q      That they were marching through the street

17   as a group.

18      A      No, because the -- it was very cold

19   outside that night, and it just looked like bundling

20   up for that.  And it also was a politically active

21   day.  So -- and it was an obviously political march.

22   So I don't think anybody who was being reasonable

1  would find that intimidating.

2      Q    Same question.  Assume the hoods are all

3  white and conical in shape.

4      A    Well, that has cultural resonations that

5  definitely imply racism and violence.

6      Q    And in the culture of the United States,

7  the concealment of one's face with a bandana does

8  not hearken back to any image of hiding an outlaw's

9  identity?

10     A    Not recently.  That's like an outlaw in

11 the old west.  It's kind of like a cliche and a

12 caricature now.

13     Q    So if persons in Seattle in December 1999

14 protesting the World Trade Organization meetings

15 there were wearing bandanas to conceal their

16 identities, we wouldn't now think of that in terms

17 of its cultural antecedent?

18     A    I don't -- I don't claim to know how well

19 that incident is formed in the public consciousness,

20 and I mean, I wasn't even aware that they did that.

21     Q    Well, let me ask, in 2007, a bunch of

22 people marching around at night with their faces

1    your interrogatory responses and read to yourself

2    the first two sentences, would you do that and tell

3    me when you've completed it?

4         A    The first two sentences?

5         Q    Yes, third paragraph on page 14.

6              (Witness reviewed the document.)

7         A    Yes, I'm done.

8         Q    Now, would you agree that we have,

9    according to your answer, three persons whose faces

10   were covered with bandanas knocking over newspaper

11   vending machines?

12        A    I said about three, so like I saw someone

13   who was running off from a newspaper box, and I

14   assumed that he did it, he or she.  And then I saw a

15   boy and a girl do one together and rode off on

16   bicycles.

17        Q    Does your interrogatory response say

18   anything about riding off on bicycles?

19        A    No, but I wasn't -- I gave information,

20   and then I was asked questions, and I wasn't asked

21   to further describe that.  And I did say before this

22   in reading it, if you asked me questions, I could

1          Q     You didn't yell at the people engaged in

2     knocking over the newspaper boxes, did you?

3          A     I didn't yell specifically at anybody, but

4     in their direction where those things were

14:15:40     5     happening.

6          Q     And what did you yell?

7          A     I said stop doing that, that's not what

8     we're here for, you know, that was the gist of it.

9     You know, that's not why we're marching.

4:15:57     10          Q     Does that not seem to be a meaningful

11     oversight of your affirmative actions in your

12     response to the interrogatory?

13          A     What do you mean?

14          Q     I mean the fact that you are testifying

4:16:14     15     that you acted in some manner against this criminal

16     misconduct seems like a significant fact.

17          A     I didn't -- already, I didn't know you

18     weren't done.

19          Q     I'm sorry.  Don't you agree?

4:16:31     20          A     I didn't act against them.  I said

21     something and continued along the march.  I just

22     thought that if they were doing something that I

108

1    didn't approve of, I should let them know that's not

2    why we're doing this and remind them of what the

3    flier said, you know, because I don't agree with

4    that sort of behavior.

5    And if you interpret it to be a

6    significant fact, I mean, I -- that's fine, you

7    know.  It bothered me that those people were doing

8    that, and if -- you know, I think they should have

9    been arrested for that.  But I was arrested for

10   that.

11       Q    You didn't leave the march at that point,

12   did you?

13       A    Well, I wanted to leave, but Corey and

14   Karl didn't.  And I was with them, and I already

15   mentioned I didn't exactly know where I was.  So

16   they said we could leave soon and --

17       Q    Corey and Karl did?

18       A    Yes, that's what I mean when I said

19   "they."  And we continued on.  And the helicopter

20   showed up, and that's when they decided they wanted

21   to leave.

22       Q    But before the helicopter showed up, you

1   also saw what appeared to be freshly sprayed paint

2   on three buildings and one jeep; is that right?

3        A    Yes.

4        Q    And you recognized the spray painting of

5   the buildings and the jeep reflected criminal

6   behavior, did you not?

7        A    Yes.

8        Q    And by the time that you observed the

9   spray painting of the buildings and the jeep, you

10  noticed that at least one police car had started

11  following slowly behind the march?  Hadn't you

12  noticed that then?

13       A    Yes, and no siren was on and no

14  announcements were made from that vehicle.

15       Q    The vehicle did nothing to act against the

16  marchers generally at that point; correct?

17       A    As I earlier defined those actions, yes,

18  they didn't, they didn't act out against us.

19       Q    Did it surprise you the police car should

20  be following behind the marchers along the same

21  roadway that led you past the criminal behavior and

22  evidence of crimes?

1     paragraph of page 14, carrying over onto the top of

2     page 15.

3          A     Okay.

4               (Witness reviewed the document.)

14:24:22     5               It says that some of the marchers left the

6     scene.

7          Q     Okay.  Now, I'm going to ask you a

8     different question, which is having read that, does

9     that refresh your recollection as to whether some of

.4:24:32     10     the marchers left the scene?

11          A     Yes, but vaguely.

12          Q     Okay.

13          A     Because it has been 2-1/2 years now, and I

14     have a -- like I have a visual memory, and I just

4:24:49     15     don't have that image anymore.

16          Q     You and your friends at that point moved

17     to the sidewalk but did not want to leave because

18     you hadn't taken part in any misconduct; is that

19     right?

4:25:09     20          A     Yes.

21          Q     You had witnessed some of the misconduct,

22     though; right?

114

1       A    Yes.

2       Q    And the police car by that point was

3   behind you; right?

4       A    I don't -- yes, but they weren't behind us

5   the whole time.  Or if they stayed behind us, I lost

6   track when the helicopter showed up.  Because that's

7   when things became chaotic for me.

8       Q    Did the -- was the police car behind you

9   between the time that you saw the newspaper vending

10  boxes knocked over and the time that the helicopter

11  came overhead?

12      A    What?  Can you repeat that, sir?

13      Q    Sure.  Was there a police car following

14  behind the march between the time you saw the

15  newspaper boxes knocked over and the time the

16  helicopter flew overhead?

17      A    I don't know.

18      Q    You don't know at any time?

19      A    Not at any time.  I mean, I saw that one

20  car for a little while, and then I -- you know, I

21  stopped paying attention to that.

22      Q    Okay.  But you saw that one car for a

1    see?

2         A    I saw, you know, traces of what happened

3    with spray paint, and I saw things, like the

4    newspaper boxes, dumped in the street, very minor

14:29:47    5    incidents.

6         Q    Did you see a roadway barricaded across

7    the width of the roadway by newspaper boxes at any

8    time?

9         A    No.

14:30:01    10         Q    Did you see anybody throw a rock through

11    the window of the Riggs Bank there?

12         A    No.

13         Q    Did you see anybody throw a rock through

14    the window of the Latino -- the MPD Latino Liaison

4:30:29    15    office along Columbia Road?

16         A    No.

17         Q    Would you think that a rock going through

18    a police office window would likely trigger a

19    response from the police?

4:30:44    20         A    Yes.    But I didn't know those things were

21    going on, so I thought a helicopter seemed extreme

22    for what I had seen, which I explained to you.

1          A    I did consider all of those things

2    relative to where I was at that time, and I wasn't

3    doing anything wrong, at least arrestable.  I

4    could -- you know, I didn't vandalize any property,

14:34:01    5    and I wasn't harming anybody.

6          Q    But if it were constitutionally

7    permissible to arrest for parading without a permit,

8    whether you believe it should be or not, you had

9    paraded without a permit, is that not true?

14:34:21    10          A    I paraded without a permit, but I don't

11    think that's an arrestable offense, especially in

12    the context and circumstances of my situation.  I'm

13    talking about me as an individual.

14          Q    Do you believe that the First Amendment

14:34:52    15    should be applied to you differently than anybody

16    else?

17          A    No.

18          Q    Interrogatory number 8 asks you about your

19    damages.

14:35:38    20          A    Interrogatory number 8?  What page is

21    that?

22          Q    It starts on number 10.  You mention

1    become known to me since I wrote this paper, I'm not

2    surprised it wasn't.  But also that -- I mean, it

3    wasn't stopped when it happened.  I know that.

4        Q    And the march in which you participated

5    was not stopped at its commencement, was it?

6        A    No, it wasn't stopped until -- I had

7    made -- I had walked a considerable distance since

8    its commencement when I was ordered by a

9    policeman -- by several policemen to go into the

10   alley.

11       Q    Right.  And in the course of walking that

12   distance, it had gone from a peaceful march, which

13   you had anticipated and contemplated, into something

14   more violent and more destructive; true?

15            MR. SCHEMBER:  Objection; foundation --

16   sorry to interrupt the question.  I don't think she

17   testified that the march changed its character.

18            MR. KOGER:  I believe that the third

19   paragraph on page 14 of Ms. Carr's responses to

20   interrogatories provides legitimate foundation for

21   the question.

22            MR. SCHEMBER:  The phrase "took on a sour