UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. A. No. 06-00098 (ESH) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
LIABIILTY**

# Exhibit F

## Excerpts, Deposition of Cathy Lanier

## Deposition Exhibits 1, 2 (Excerpts), 3, 4, 5 (Excerpts),
8 (Excerpts), & 9 (Excerpts)

Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National
Lawyers Guild and the American Civil
Liberties Union of the National Capital Area

Counsel for Plaintiffs

1

1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

2

- - - - - - - - - - - - - -x
3                                   :
   SARAH CARR, et al.,              :
4                                   :
            Plaintiffs,             :
5                                   :
       vs.                          : Civil Action No.
6                                   : 06-00098 (ESH)
   DISTRICT OF COLUMBIA,            :
7                                   :
            Defendant.              :
8                                   :
- - - - - - - - - - - - - -x
9

10                            Washington, D.C.

11                            Thursday, September 13, 2007

12       Deposition of

13              CATHY L. LANIER

14          a witness, taken on behalf of counsel for

15    the Plaintiffs in the above-entitled matter, before

16    Denise M. Brunet, RPR and Notary Public in and for the

17    District of Columbia, taken at the offices of the

18    District of Columbia Metropolitan Police Department,

19    300 Indiana Avenue, Northwest, Washington, D.C.,

20    commencing at 10:16 a.m., when were present on behalf

21    of the respective parties:

22

       MISTY KLAPPER & ASSOCIATES     (703) 780-9559

2

```
 1              A P P E A R A N C E S:

 2   ON BEHALF OF THE PLAINTIFFS:

 3        DANIEL M. SCHEMBER, ESQUIRE
          SUSAN B. DUNHAM, ESQUIRE
 4        Gaffney & Schember
          1666 Connecticut Avenue, Northwest
 5        Washington, D.C.  20009
          (202) 328-2244
 6
          FRITZ MULHAUSER, ESQUIRE
 7        American Civil Liberties Union
          of the National Capital Area
 8        1400 20th Street, Northwest
          Washington, D.C.  20036
 9        (202) 457-0800

10   ON BEHALF OF THE DEFENDANT:

11        THOMAS KOGER, ESQUIRE
          Senior Assistant Attorney General
12        D.C. Office of the Attorney General
          441 4th Street, Northwest
13        Washington, D.C.  20001
          (202) 724-6610
14
          TERRENCE D. RYAN, ESQUIRE
15        General Counsel
          Office of the General Counsel
16        Metropolitan Police Department
          300 Indiana Avenue, Northwest
17        Washington, D.C.  20001
          (202) 727-4129
18
          RONALD HARRIS, ESQUIRE
19        Deputy General Counsel
          Metropolitan Police Department
20        300 Indiana Avenue, Northwest
          Washington, D.C.  20001
21        (202) 727-2317

22   ALSO PRESENT:  Stephen Almeida


        MISTY KLAPPER & ASSOCIATES     (703) 780-9559
```

3

```
 1                    I N D E X

 2            DEPOSITION OF CATHY L. LANIER

 3                 SEPTEMBER 13, 2007

 4

 5    EXAMINATION BY                          PAGE

 6        Mr. Schember                          5

 7
```

```
 8    EXHIBITS              DESCRIPTION        PAGE

 9    No. 1        Notice of Depositions         8

10    No. 2        Transcript of a Motion        9

11    No. 3        Order                        16

12    No. 4        Declaration of Cathy Lanier  20

13    No. 5        Standard Operation Procedures 22
                   for Mass Demonstrations,
14                 Response to Civil Disturbances &
                   Prisoner Processing
15
      No. 6        Copy of photograph           45
16
      No. 7        July 6, 2007 letter with     46
17                 attachment

18    No. 8        Defendant's Responses to     55
                   Plaintiffs' First Set of
19                 Interrogatories to Defendant
                   District of Columbia
20
      No. 9        55th Inauguration 2005       74
21

22
```

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

4

1    (Cont'd)

2    EXHIBITS              DESCRIPTION              PAGE

3    No. 10          Defendant District of        81
                     Columbia's Responses to
4                    Plaintiffs' Third Request for
                     Admissions to Defendant
5                    District of Columbia

6    No. 11          Arrestee Information Form     84

7

8                         - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

5

```
 1                    P R O C E E D I N G S

 2         Thereupon,

 3                        CATHY L. LANIER

 4    was called for examination by counsel for the

 5    Plaintiffs and, after having been sworn by the Notary

 6    Public, was examined and testified as follows:

 7            EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

 8              BY MR. SCHEMBER:

 9        Q      What is your name?

10        A      Cathy Lanier.

11        Q      How are you employed?

12        A      Chief of Police, Metropolitan Police

13    Department.

14        Q      How long have you been an employee of the

15    Metropolitan Police Department?

16        A      Since September of 1990.

17        Q      On January 20, 2005, what was your position

18    with the department?

19        A      Commander of Special Operations Division.

20        Q      Who was your immediate superior?

21        A      I think it was Chief Broadbent, Alfred

22    Broadbent.
```

8

1   branch that handled special events?

2        A      Yes.  That would be Captain Herold.

3               MR. SCHEMBER:  Would you mark this for me,

4    please.

5               (Thereupon, the document was marked as

6               Lanier Deposition Exhibit No. 1 for

7               identification.)

8               BY MR. SCHEMBER:

9        Q      I'm going to show you now the document that

10   has been marked with a blue sticker saying Exhibit

11   Lanier 1.

12              Have you ever seen that document before?

13       A      Yes.

14       Q      Referring to the numbered paragraphs in

15   this document, which, if any, of the topics stated in

16   those paragraphs are subjects for which you are the

17   designated representative of the District of Columbia

18   for purposes of the deposition today?

19       A      I believe all of these, 1 through 15.

20       Q      With respect to any of these subjects, have

21   you had a conversation with anyone in which you

22   indicated your understanding of the truth of any of

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

9

1   the matters embraced within these topics and the

2   person has said to you something like well, that may

3   be your understanding of the truth, but the District

4   of Columbia's understanding is different?

5           MR. KOGER:  Objection on attorney/client,

6   attorney work product grounds.  I'm not directing the

7   witness not to answer.

8           THE WITNESS:  Can you repeat that, please.

9           MR. SCHEMBER:  Would you read the question,

10  please.

11          (The requested portion was read.)

12          THE WITNESS:  No.

13          BY MR. SCHEMBER:

14  Q     Do you have any reason to believe that your

15  understanding of the truth of any of the matters

16  embraced within these topics is different from the

17  District of Columbia's understanding of the truth?

18  A     No.

19          MR. SCHEMBER:  Would you mark this for me,

20  please.

21          (Thereupon, the document was marked as

22          Lanier Deposition Exhibit No. 2 for

        MISTY KLAPPER & ASSOCIATES      (703) 780-9559

10

```
 1            identification.)

 2            BY MR. SCHEMBER:

 3       Q    I'm going to show you now a document that

 4  has been marked with a blue sticker saying Exhibit

 5  Lanier 2.

 6            Have you ever seen that document before?

 7       A    I don't believe so.

 8       Q    I will represent to you that this document

 9  is a transcript of court proceedings in a case

10  identified on the first page.  Those proceedings

11  having occurred on Monday, September 27, 2004.  And

12  I'll ask you to read on pages 40 and 41, the numbering

13  at the top of the page, please, the text that begins

14  at the bottom of the page, line 24, and continues to

15  the top of page 41, line 3.  Let me know when you've

16  done that.

17       A    Do you want me to read this to myself?

18       Q    Yes.

19       A    Okay.

20       Q    Now, I'm going to read these lines and you

21  tell me if I've done so correctly.

22            THE COURT:  The city just announced that as
```

MISTY KLAPPER & ASSOCIATES       (703) 780-9559

1   far as the city is concerned, it will not arrest for

2   this offense without giving notice.  Now, there may be

3   exceptions to that rule.

4          MR. KOGER:  Right.

5          Is that what that says?

6     A    Yes.

7     Q    Would you take a look on page 40, line 5.

8   Do you see the reference there to parading without a

9   permit in line 5?

10    A    Yes.

11    Q    On the assumption that the reference in

12  line 25 to this offense refers to parading without a

13  permit, was it the policy of the District of Columbia

14  as of September 27, 2004 that the city will not arrest

15  for the offense of parading without a permit without

16  giving notice, but there may be exceptions to that

17  rule?

18    A    Yes.

19    Q    Would you take a look at page 31, please,

20  beginning with line 4.  Would you tell me if I have

21  correctly read what the text there says.

22          MR. KOGER:  We wouldn't arrest simply

12

1    because you haven't got a permit.

2            THE COURT:  So that's the position of the

3    city, the city will not arrest because you don't have

4    a permit?

5            MR. KOGER:  Right.

6            THE COURT:  And that will be the position

7    of the city in upcoming demonstrations?

8            MR. KOGER:  Yes, Your Honor.

9            Have I read that portion of the transcript

10   correctly?

11       A    Yes.

12       Q    Was it the case as of September 27, 2004

13   that it was the policy of the District of Columbia

14   that persons parading in the street would not be

15   arrested simply because they haven't got a permit?

16       A    That's correct.

17       Q    At any time, to your knowledge, did the

18   District of Columbia ever issue a publication for the

19   general public, like the District of Columbia

20   Register, saying what the exceptions to the rule were?

21       A    I don't believe the exceptions to the rule

22   have been laid out and specified, because there are

        MISTY KLAPPER & ASSOCIATES       (703) 780-9559

21

1    of Columbia policy as of January 20, 2005?

2        A    Yes.

3        Q    Does this statement mean that where time or

4    circumstances did not permit, it was the policy of the

5    District of Columbia to permit officers to arrest

6    persons for parading without a permit without first

7    issuing a warning?

8            MR. KOGER:  Asked and answered.  You may

9    answer.

10            THE WITNESS:  What it says is that if time

11    and circumstances does not permit, MPD could make

12    arrests for activities related to mass demonstrations,

13    including parading without a permit, without first

14    issuing a warning to the crowd to disperse.

15            BY MR. SCHEMBER:

16        Q    There was -- let me ask you:  Was there any

17    publication for the general public by the District of

18    Columbia discussing situations in which time or

19    circumstances would not permit the issuing of a

20    warning before arresting persons for parading without

21    a permit?

22        A    I will answer you again the same way I've

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

26

1            (The requested portion was read.)

2            THE WITNESS:  I can't answer that question

3    based on the fact you're asking me to respond to any

4    number of circumstances.  I can't answer that

5    question.

6            BY MR. SCHEMBER:

7        Q    If you have sufficient control of a person

8    to arrest them for parading without a permit, don't

9    you always have sufficient control of that person to

10   be able to say to them I'm going to arrest you if you

11   don't leave the area and disperse?

12           MR. KOGER:  Argumentative, vague and

13   ambiguous as to the meaning of arrest in the context

14   of the question.  You may answer.

15           THE WITNESS:  You're asking me to comment

16   if it is always possible.  I cannot answer that

17   question.  I would say no, it is not always possible,

18   but you're asking me to comment on any number of

19   circumstances.

20           BY MR. SCHEMBER:

21       Q    In order to arrest a person, you have to

22   have a measure of physical control over them, correct?

          MISTY KLAPPER & ASSOCIATES      (703) 780-9559

29

1    is out there.  What I hear is -- I don't want to --

2              THE WITNESS:  I can only repeat my answer.

3    Once a person has been taken into custody and is under

4    arrest, yes, they are in my control.

5              BY MR. SCHEMBER:

6         Q    Is a person under arrest when they are not

7    free to leave police control?

8         A    I would say yes.

9         Q    When a person is within police control,

10   can't you say to the person you will be free to leave

11   if you quietly walk down the sidewalk, but if you

12   don't, I'm going to arrest you.  Isn't that an option

13   available to police who have a person within their

14   control, an ability to speak with them?

15             MR. KOGER:  Argumentative, compound

16   question.

17             THE WITNESS:  It is within a police

18   officer's discretion to do that based on circumstances

19   with which they are faced at the time.  I can think of

20   very few where that would be a good option.

21             BY MR. SCHEMBER:

22        Q    Why?

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

30

1     A     If the conduct for which a person is seized

2  is egregious and dangerous, there would be no reason

3  to allow them to simply walk away.

4     Q     But what if the conduct for which they're

5  seized is parading without a permit?

6          MR. KOGER:  Hypothetical, vague and

7  ambiguous as to circumstances.

8          THE WITNESS:  I will say again, we would

9  not simply arrest someone for parading without a

10 permit.  We would, in cases of simply parading without

11 a permit, if there were -- and I can think of no

12 circumstances in my time on the police department

13 where for simply parading without a permit we would do

14 that.  We would facilitate that parade.

15          BY MR. SCHEMBER:

16    Q     Directing your attention to Lanier

17 Exhibit 4.  This declaration, generally speaking,

18 describes actions you took on January 21, 2005 and

19 reasons for them.  Is that a fair summary of what this

20 document is?

21    A     Yes.

22    Q     Referring to paragraph 5 of the document on

          MISTY KLAPPER & ASSOCIATES     (703) 780-9559

31

1    page 2 where the sentence says at the beginning of

2    that paragraph at approximately 11:20 p.m., I observed

3    a group of several hundred protestors on the move in

4    the 1700 to 1800 block of Columbia Road.

5              Where were you when you observed that?

6    A    Directly behind the group.

7    Q    Were you on foot?

8    A    In a police car.

9    Q    What was your route of travel to the point

10   where you arrived behind the group?

11   A    I don't recall my route of travel.

12   Q    From where had you come in your car to the

13   point where you arrived behind the group?

14   A    Special operations division headquarters.

15   Q    And where is that?

16   A    Twenty-third and L Street, Northwest.

17   Q    What caused you to go to that location on

18   Columbia Road?

19   A    I received information from my intelligence

20   branch that there was a large group in that area that

21   were engaging in criminal conduct.

22   Q    And so you drove up and got behind the

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

32

1    group?

2        A    Yes.

3        Q    The second sentence says that you saw

4    persons with bandanas covering their faces, correct?

5        A    Yes.

6        Q    You could see the faces from behind the

7    group?

8        A    Yes.  There were several members of the

9    group that turned, faced sideways, faced rear.  But

10   yes, I could see what portion of the face was not

11   covered.

12       Q    This was a group of several hundred

13   persons, correct?

14       A    I'd say 2, 250, maybe 300.

15       Q    From your position behind them, about how

16   many of them could you see?

17       A    At different points, different -- because

18   of the levelness of the roadway, at different points I

19   could see more of the group than in other points.  But

20   I could see the majority of the group.  I could see it

21   was a large group.

22       Q    Could you see the faces of the majority of

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

1    the group?

2        A    Majority of the faces of the members of the

3    group were covered.  But I could see -- I couldn't --

4    I would have to say I couldn't see the majority of the

5    faces of the members of the group, no.

6        Q    Where you say in the second sentence the

7    group mainly was composed of individuals dressed in

8    black clothing with bandanas covering their faces,

9    what does mainly mean?

10       A    The majority of the group was either in

11   very dark clothing or black clothing.

12       Q    Did the majority have their faces covered?

13       A    I would say no.

14       Q    In the next sentence, saying members of the

15   group were carrying pipes and torches, what do you

16   mean by pipes?

17       A    There were what appear to be metal and wood

18   pipes with objects, various different objects on the

19   ends of the pipes, some tied on.  I don't know how

20   else to describe it, but pipes.

21       Q    Describe what was tied on the end.

22       A    I couldn't tell you.

34

1     Q     How many members of the group did you see

2  carrying pipes?

3     A     Several.

4     Q     Less than ten?

5     A     More than ten.

6     Q     What would be the top end of your estimate

7  of the number of persons you saw carrying pipes?

8     A     From the back of the group, I'd say 15 to

9  20.

10     Q     And about how many did you see carrying

11  torches?

12     A     Dozens, lots of torches throughout the

13  group.  I couldn't see who from the back of the group.

14  I just saw several dozens of torches sticking up in

15  the crowd.

16     Q     As many as 50?

17     A     I can't say with certainty how many.

18     Q     Did the majority of the persons in the

19  group carry a torch?

20     A     I couldn't see the whole crowd, so I can't

21  say with certainty how many.

22     Q     Well, of the portion that you could see,

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

35

1    did it appear that a majority of the portion were

2    carrying torches?

3         A     I would say no, not the majority of the

4    ones that I could see.

5         Q     In paragraph 6, you refer to observing

6    several individuals destroying private property by

7    breaking windows of business establishments, correct?

8         A     Yes.

9         Q     Where were these business establishments?

10        A     All along the entire path, Columbia Road.

11   I recall Payless shoe store, a bank.  There were

12   several all along the block, spray paint on cars.

13        Q     What did the individuals do to break the

14   windows?

15        A     Rocks, bricks.

16        Q     They threw them?

17        A     Yes.

18        Q     And where were they when they threw them?

19        A     In the street.

20        Q     About how many individuals did you see do

21   that?

22        A     I would say I saw -- personally observed at

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

36

1    least 10 to 15 rocks or bricks come from the crowd and

2    smash into windows or cars or even in the direction of

3    people on the sidewalk.

4         Q    And referring to the next sentence, how

5    many persons did you see deface property by spray

6    painting?

7         A    I couldn't give you a number.

8         Q    What do you mean by several?

9         A    I can't give you a number.  I can tell you

10   that there were several people who were spray painting

11   objects along -- objects and cars along the side of

12   the roadway.

13        Q    Well, this sentence refers to the front of

14   businesses, correct?

15        A    Yes.

16        Q    Did you see that?

17        A    Yes.

18        Q    When persons spray painted the front of

19   businesses, they did that from the sidewalk, correct?

20        A    Yes.

21        Q    The next sentence refers to several small

22   fires were started along the way, correct?

37

1       A     Yes.

2       Q     Did you see those fires as they were

3    started or did you just see them after they had

4    started, if you saw them at all?

5       A     I observed members of the group with the

6    torches putting the torches -- leaning the torches

7    over towards newspapers stands and trash receptacles,

8    lighting paper and debris in the trash receptacles and

9    attempting to light papers and other boxes on fire.

10      Q     And after that, they continued to march in

11   the street, correct?

12      A     The forward movement of the group never

13   stopped.

14      Q     The next sentence says newspaper boxes also

15   were being hauled into the street, correct?

16      A     Yes.

17      Q     You saw this yourself?

18      A     Yes.

19      Q     About how many newspaper boxes did you see

20   hauled into the street?

21      A     At least four or five.  It was a very

22   chaotic and disorganized mob of people.  There were

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

38

1    periodically members of the group running up and

2    smashing windows, painting, lighting things on fire,

3    flipping things over.  It was a very large group.  The

4    only best way for me to describe that was it was just

5    a chaotic movement, large group.

6        Q    In paragraph 7, you refer to the blocking

7    of traffic from passing in all directions, correct?

8        A    Yes.

9        Q    And this was a group that was moving west

10   to begin with on Columbia Road, correct?

11       A    Yes.

12            MR. KOGER:  Vague.

13            BY MR. SCHEMBER:

14       Q    Did the group block the eastbound traffic

15   on Columbia Road?

16       A    Yes.

17       Q    Was that at all points in time that you

18   were present on Columbia Road?

19       A    Not continuously, no.

20       Q    Was it intermittently that the eastbound

21   traffic was blocked?

22       A    It was intermittently blocked with members

39

1     of the group but also by objects thrown into the

2     roadway.

3          Q     As you followed along in your car behind

4     the westbound group, did cars pass you going

5     eastbound?

6          A     I do not recall any cars passing me going

7     eastbound.

8          Q     At any point in time, did you see a line of

9     cars or any car that was stopped in the eastbound lane

10    of Columbia Road that could not proceed due to the

11    presence of debris or persons?

12         A     I did observe one vehicle come to an abrupt

13    stop as a newspaper stand was thrown into the roadway,

14    yes.

15         Q     Where was that?

16         A     I can't give you an exact location.

17         Q     But that was on Columbia Road?

18         A     Yes.

19         Q     And before that act was done, traffic could

20    have traveled eastbound on Columbia Road?

21              MR. KOGER:  Vague as to time.

22              THE WITNESS:  I recall traffic

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

40

```
 1   intermittently being blocked by the persons in the

 2   group and objects in the street.  I can't tell you it

 3   was before or after that incident.

 4            BY MR. SCHEMBER:

 5   Q     Paragraph 7 also refers to destruction of

 6   vehicles, correct?

 7   A     Yes.

 8   Q     What do you mean by destruction?

 9   A     There were vehicles that had spray paint on

10   them, scratches.  I also recall seeing one vehicle

11   with a broken window.

12   Q     In paragraph 8, you refer to Lieutenant

13   Riley getting in front of your squad car, correct?

14   A     Yes.

15   Q     And he was in a car himself, correct?

16   A     Yes.

17   Q     When did his car -- excuse me -- where did

18   his car get in front of yours?

19   A     I don't know the exact location.

20   Q     And how did he do that, by overtaking you

21   or by turning in from a side street or how?

22   A     He came from behind me.  I had called for
```

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

41

1    backup, because I had no other units on the scene to

2    assist me and the group had got increasingly violent.

3    He came from behind and pulled alongside and started

4    to pull in front of my vehicle.  He didn't quite make

5    it in front of my vehicle before he was hit with a

6    brick.

7        Q    Where was his vehicle when it was hit with

8    a brick?

9        A    Alongside of mine, trying to attempt to

10   pull in front of mine.

11       Q    And where were your vehicles at that time?

12       A    In the roadway.

13       Q    Which roadway?

14       A    I believe we were on 18th Street at the

15   time.

16       Q    Where on 18th Street?

17       A    I can't remember.

18       Q    Was it near Belmont?

19       A    No.

20       Q    Was Lieutenant Riley's car hit by more than

21   one object?

22       A    Several.

42

1       Q       And did that occur at different points in

2       time or several objects almost simultaneously?

3       A       I observed several objects strike his car

4       in rapid succession after the brick hit the

5       windshield.  It almost -- once the brick hit the

6       windshield, it almost seemed to incite others to throw

7       objects.  So that was the first object I saw thrown at

8       the police car, and as soon as the window broke, it

9       seemed to incite the rest of the group to start

10      throwing objects as well.  So then there was a barrage

11      of objects thrown in the car.

12      Q       Where was this group?

13      A       It was the group that I had been following

14      in the middle of the street.  I believe we were on

15      18th Street at the time.

16      Q       Your belief is that the objects were thrown

17      at Lieutenant Riley's car by a group on 18th Street;

18      is that correct?

19      A       It was the group that we had been

20      following, yes.

21      Q       And at the time the brick was thrown, the

22      group was on 18th Street, as you recall?

43

 1      A      I believe so, but I'm not a hundred percent

 2    sure exactly where we were.

 3      Q      After the brick was thrown that broke the

 4    windshield, did the group that you saw continue

 5    marching on 18th Street?

 6      A      Yes.

 7      Q      Did there come a point in time when they

 8    left 18th Street?

 9      A      I don't remember the exact path that they

10    followed.  I only remember continuing behind the

11    group, I believe, to the point of Belmont.  I remember

12    making a radio transmission about Belmont.  I don't

13    remember the exact path that we followed because of

14    the chaos on the scene, to be honest with you.  I

15    would have to review my log and look at the exact path

16    that we followed.  I just don't recall.

17      Q      Did there come a point in time when you got

18    out of your vehicle?

19      A      No, I stayed in the vehicle.

20      Q      Paragraph 7 refers to your seeing blood on

21    the pavement, correct?

22      A      Yes.

44

1      Q      You saw that from your car?

2      A      Yes.

3      Q      Where was that blood?

4      A      It was on a sidewalk.  I remember there was

5   an ATM machine close by.  I don't remember exactly

6   where it was on the block.  I just want to clarify.

7   As I was a passenger in the car, not the driver, I

8   wasn't paying that much attention to the route we were

9   following as much as I was the group in front of us,

10  but I do recall the blood -- seeing the blood on the

11  sidewalk by an ATM machine.

12     Q      Who was driving your car?

13     A      Lieutenant Ralph Ennis, E-N-N-I-S.

14     Q      Who else was in your car, if anyone?

15     A      I had a scribe in the back seat, Officer

16  Patrick Keller.

17     Q      How did the blood get on the pavement?

18     A      It appeared -- because there was a rock or

19  a chunk of -- what appeared to be more like a chunk of

20  concrete or a large rock was laying in the vicinity of

21  the blood -- that somebody had been struck by a rock

22  or whatever that chunk of concrete was that was there.

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

45

1    Q    That's what appeared to you at the time?

2    A    Yes.

3    Q    Have you received any information since the

4  night of that -- that you observed that providing

5  additional information about how the blood may have

6  come to appear there?

7    A    I don't know how the blood got there.

8    Q    My question is have you received any

9  additional information as to how the blood may have

10 got there?

11   A    No.

12        MR. SCHEMBER:  Would you mark this for me,

13 please.

14        (Thereupon, the document was marked as

15        Lanier Deposition Exhibit No. 6 for

16        identification.)

17        BY MR. SCHEMBER:

18   Q    I'm going to show you now a document that

19 has been marked with a blue sticker Exhibit Lanier 6.

20        Is that document a picture of the blood

21 that you saw?

22   A    It appears to be, but I can't say for sure.

MISTY KLAPPER & ASSOCIATES    (703) 780-9559

46

1    I did order the crime scene search officers to go back

2    and photograph several areas after arrests were made,

3    and I did ask them to go back and photograph that

4    area.  So it may be.

5              MR. SCHEMBER:  Would you mark that for me,

6    please.

7              (Thereupon, the document was marked as

8              Lanier Deposition Exhibit No. 7 for

9              identification.)

10             BY MR. SCHEMBER:

11       Q    I'm going to show you now a group of

12   documents that have been stapled together and labeled

13   with a blue sticker Exhibit Lanier 7.

14             Have you seen any of those documents

15   before?

16       A    They do not look familiar to me, no.

17       Q    Do you know a Sergeant Norman Power?

18       A    I do.

19       Q    Does Sergeant Power have any

20   responsibilities for conducting an investigation into

21   events of January 20, 2005 in Adams Morgan?

22       A    Sergeant Power is the Office of

          MISTY KLAPPER & ASSOCIATES      (703) 780-9559

1    Professional Responsibility, Force Investigation Team.

2        Q      Is he involved in investigating incidents

3    of January 20, 2005 in Adams Morgan?

4        A      It appears so, yes.

5        Q      But before coming here today, you were not

6    aware that he was doing that?

7        A      I was aware that there was a force

8    investigation team investigation around several events

9    on that day.  But no, I was not aware that Sergeant

10   Power was responsible for this investigation, no.

11       Q      Did you know that any officer was

12   conducting an investigation as to how the blood you

13   saw got on the pavement?

14       A      No.

15              MR. KOGER:   Foundation.

16              BY MR. SCHEMBER:

17       Q      I'm sorry, your answer is?

18       A      No.

19       Q      Would you take a look at the last sheet of

20   that Exhibit 7 that I handed to you.  There are two

21   pictures there, correct?

22       A      Yes.

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

48

1        Q     Looking at the bottom picture, does it

2   appear to you that the blood pictured in Exhibit 6 is

3   also pictured in that bottom picture of Exhibit 7?

4        A     It does appear to be the same, yes.

5        Q     Do you have any knowledge of information

6   that has been provided to the Metropolitan Police

7   Department, either to Sergeant Power or anyone else,

8   by a person named Nathan Singer concerning how that

9   blood that you saw got on the pavement?

10       A     No.

11             MR. KOGER:  Scope.  Is this a 30(b)(6)

12  topic?

13             MR. SCHEMBER:  Yes.

14             MR. KOGER:  Which one?

15             MR. SCHEMBER:  Let's see.  Well, it

16  certainly pertains to her declaration, which mentions

17  the blood on the pavement.  But I have no further

18  questions about this document.

19             MR. KOGER:  If I'm not -- the truth to the

20  matters, scope objection stands.  And I understand

21  that the line of questioning is regarding topic number

22  3 to the Notice of Deposition.  Do I understand that

            MISTY KLAPPER & ASSOCIATES      (703) 780-9559

49

1    correctly?

2          MR. SCHEMBER:  I didn't hear what you said,

3    I'm sorry.

4          MR. KOGER:  I said my scope objection

5    stands.  And I understand the line of questioning

6    regarding topic number 3 of the Notice of Deposition

7    has ended; is that correct?

8          MR. SCHEMBER:  No.  The questions that I

9    have regarding the blood on the pavement have ended.

10          BY MR. SCHEMBER:

11    Q    Your declaration refers to approximately 65

12    to 75 protestors being arrested for parading without a

13    permit in paragraph 11, correct?

14    A    Yes.

15    Q    And it says that these persons ran into an

16    alley --

17    A    Yes.

18    Q    -- correct?  And they were arrested in the

19    alley, correct?

20    A    Yes.

21    Q    Did you see them run into the alley?

22    A    No.

MISTY KLAPPER & ASSOCIATES    (703) 780-9559

50

```
 1       Q      How do you know they ran into the alley?

 2       A      Radio transmissions.

 3       Q      From who?

 4       A      CDU units on the scene that were behind

 5  them.

 6       Q      When you say behind them, do you mean in

 7  back of them as they ran away from the units?

 8       A      Let me correct that.  I'm not sure where

 9  the CDU units were.  I heard the transmission as they

10  gave their location.  Maybe I made the assumption they

11  were behind them.  I don't know where they were.

12       Q      Where were you when you received that

13  transmission?

14       A      I believe I stopped my car on the corner of

15  Belmont, 18th and Belmont.

16       Q      At paragraph 10, you say that you ordered

17  the arrest of protestors for parading without a permit

18  at approximately -- or -- yes, at approximately

19  12:23 a.m., correct?

20       A      Yes, that's what it says.

21       Q      Was that before or after you received the

22  radio transmission indicating that persons had run
```

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

51

1   into the alley?

2        A     After.  In fact, it was some time after.

3        Q     What steps did officers under your command

4   take to effect that arrest?

5        A     I did not observe the steps they took to

6   effect that arrest.  They were stopped in the alley.

7        Q     When you say they were stopped, do you mean

8   the officers or --

9        A     The officers actually made the apprehension

10  of those that were arrested in the alley, and I did

11  not observe that.

12       Q     Do you know how they did it?

13       A     I do not.

14       Q     Did you go into the alley yourself?

15       A     I did not.  I would like to clarify on the

16  question about the statement in paragraph 10, the

17  order to place the charge for parading without a

18  permit given at 12:23 a.m.  I ordered the arrest of

19  the group based on the behavior that I observed.  That

20  to me was conduct consistent with that of a riot.  It

21  was dangerous conduct that had to be stopped before

22  serious injury occurred.

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

52

1          So I gave the order to arrest based on

2     those circumstances.  I later determined that the

3     charge would be parading without a permit.  So the

4     arrest that was ordered before 12:23 a.m. was for

5     rioting.

6          Q     On what basis did you decide to charge the

7     arrestees with parading without a permit?

8          A     I had an option to use my discretion to

9     place a charge, and through circumstances on the scene

10    and conversation with general counsel, I determined

11    that I would place the charge of parading without a

12    permit as opposed to rioting.

13         Q     And that was the charge that was placed

14    against the 65 to 75 persons who were arrested in the

15    alley, correct?

16         A     Yes.

17         Q     Did you have information indicating that

18    each of the persons arrested in the alley knew that

19    the march did not have a permit?

20         A     Again, the arrest was not -- I ordered the

21    arrest for rioting.  I later placed the charge of

22    parading without a permit because it's within my

1    interrogatories.

2        Q    Referring to page 8 of this document, do

3    you see, oh, about a third of the way down, a number 2

4    in parentheses and language after that saying at

5    10:00 p.m., Commander Lanier was advised by an MPD

6    officer at the AIC that a plan to engage in a snake

7    march from the AIC to an inaugural ball site,

8    et cetera?  Do you see that?

9        A    Yes.

10       Q    What does AIC mean?

11       A    Anti-inaugural Committee, if I can recall

12   correctly.

13       Q    Might that be a reference to the concert

14   that you're referring to?

15       A    Yes.

16       Q    And there was an MPD officer at the

17   concert?

18            MR. KOGER:  You may answer.

19            THE WITNESS:  Yes.

20            BY MR. SCHEMBER:

21       Q    Was that MPD officer in uniform?

22            MR. KOGER:  You may answer.

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

57

```
 1              THE WITNESS:  No.

 2              BY MR. SCHEMBER:

 3        Q     What did that officer do to advise you as

 4    indicated in that language there?  What I mean is how

 5    did the MPD officer communicate to you?

 6        A     He didn't communicate to me.  He

 7    communicated to the supervisor who communicated to me.

 8        Q     Who was that supervisor?

 9        A     Lieutenant Pavlik, Michael Pavlik.

10        Q     What was Lieutenant Pavlik's duty

11    assignment at that time?

12        A     Responsible for the management of the

13    intelligence unit.

14        Q     Now, is that an intelligence unit of the

15    special operations division or not in that division?

16        A     Not in that division.

17        Q     Was it Lieutenant Pavlik that spoke with

18    you about this matter?

19        A     Yes.

20        Q     What did Lieutenant Pavlik say?

21        A     During which conversation at what point?

22        Q     Regarding advice by an MPD officer
```

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

58

1    referenced in this language following number 2 on

2    page 8.

3        A    I recall in general the conversation that

4    the lieutenant advised me that he was being told that

5    there were fliers distributed inside of the concert

6    that talked of the march, planned march after the

7    concert to the inaugural ball site, the plan to

8    destroy property along that march and crash the

9    inaugural ball site I believe at the Hilton.

10            I recall him saying that there were

11    announcements made over the microphone to the group

12    about that march, and that during the course of the

13    evening, at the point when he spoke with me, he was

14    very concerned that the group had gotten quite large

15    and appeared to be eager to engage in this march

16    quickly.

17        Q    And this is what he said in a conversation

18    at 10:00 p.m.?

19        A    At 10:00 p.m., the only -- yes.  I'd say

20    that's a fairly accurate summation of what I was told

21    at 10:00 p.m.

22        Q    What was the content of the announcement

MISTY KLAPPER & ASSOCIATES       (703) 780-9559

59

1    from the stage that Lieutenant Pavlik reported to you

2    as having occurred?

3        A    I believe he summarized the content of the

4    announcement.  I don't believe it was a verbatim

5    repeat.  But that there was a person with a microphone

6    who was advising members of the group that there would

7    be a march, I believe initially had been planned for

8    midnight, and that they would crash the inaugural ball

9    sites.

10       Q    What information did you receive from

11   Lieutenant Pavlik regarding a plan to engage in

12   property damage along the way?

13       A    Again, in summation, he indicated that

14   there were discussions about engaging in various types

15   of property damage along the way, to include the use

16   of spray paint.

17       Q    And you understood him to mean discussions

18   among persons at the concert?

19       A    I understood him to mean both discussions

20   among persons at the concert -- I would say yes, among

21   persons at the concert.

22       Q    Was the carrying of flaming torches by

1    living in the neighborhood were yelling at them out

2    their windows to stop destroying their property.  It

3    was a very chaotic scene.

4         Q    Did you hear the residents say that?

5         A    Yes.  Yes, I did.

6         Q    How many residents did you hear say that?

7         A    I observed two young men in an apartment

8    window screaming down, trying to get over the sound,

9    loud sound of the group, about his car being destroyed

10   by the group as they moved through the street.

11        Q    Did you have any information indicating

12   that any of the persons arrested in the alley had

13   thrown a missile into public space?

14        A    The persons arrested in the alley were part

15   of the mob of people that were engaging in a riotous

16   behavior, yes.

17        Q    Are you saying that each and every one of

18   them through a missile?

19        A    I didn't say I could identify who threw

20   missiles.  I said the persons that were arrested in

21   the alley were part of a large group of persons

22   engaging in a riot.

62

1      Q      Each and every person arrested in the alley

2   was engaged in a riot?

3      A      The definition of a riot is groups of five

4   or more.  Those persons who were not engaging in

5   riotous behavior would have walked away.

6      Q      Did the persons, then, in your view, have a

7   duty to walk away?

8      A      I would say persons in that group who saw

9   the violent and destructive behavior and conduct of

10  those persons, for their own safety, if not common

11  sense, should have walked away.

12     Q      But to avoid committing the offense of

13  rioting, they had a legal duty to walk away?

14     A      They remained with a riotous group of

15  people engaging in very destructive and dangerous

16  behavior.

17     Q      When you say remained with, do you mean

18  were in the presence of?

19     A      I mean were engaging with the mob of folks

20  engaging in the riotous behavior.

21     Q      Everyone was engaging in riotous behavior?

22     A      The entire group.

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

64

```
 1   members of the community, were engaging in property

 2   damage and dangerous behavior, dangerous to the

 3   public.  They were walking in traffic and destroying

 4   property.

 5       Q    But each and every one of them did not

 6   destroy property.  What was the conduct --

 7            MR. KOGER:  Argumentative.

 8            BY MR. SCHEMBER:

 9       Q    Correct?  You're not testifying -- it's not

10   your understanding that each and every one of them

11   destroyed property, correct?

12       A    I didn't say each and every one of them

13   destroyed property.

14       Q    What did those who did not themselves

15   destroy property do to be guilty of rioting?

16            MR. KOGER:  Asked and answered.  You may

17   answer.

18            THE WITNESS:  I've answered the question

19   four times.  They were in a large group of people

20   walking in and out of traffic, creating a hazard,

21   being loud and boisterous in a late hour and engaging

22   with the rest of the group in what was dangerous
```

MISTY KLAPPER & ASSOCIATES      (703) 780-9559

74

1    personally commit an act of property destruction or

2    violence such as what we've been talking about --

3    setting a fire, throwing a missile, spray painting,

4    pulling newspaper cans in the street -- with respect

5    to the people who did not do such things, what did

6    they do to willfully engage in a riot?

7             MR. KOGER:  You may answer.

8             THE WITNESS:  Again, I'll state that the

9    group was viewed as a group.  The conduct of the group

10   is what based my decision that that group posed a

11   danger to property and persons in the area based on

12   the conduct of the group.

13            MR. SCHEMBER:  Would you mark this for me,

14   please.

15            (Thereupon, the document was marked as

16            Lanier Deposition Exhibit No. 9 for

17            identification.)

18            BY MR. SCHEMBER:

19       Q    I'm going to place before you now a

20   document that has been labeled with a blue sticker

21   Exhibit Lanier 9.

22            What is that?

        MISTY KLAPPER & ASSOCIATES      (703) 780-9559

1       A       I would only be speculating if I answered

2  that question.

3       Q       If you knew about this march at about

4  10:00 on January 20th, why didn't you send officers to

5  the concert site soon thereafter and simply tell the

6  persons coming out of the concert and gathering in the

7  street hey, folks, disperse, we're not going to allow

8  this march?  Why didn't you do that?

9       A       Because I wouldn't do that.  I would never

10  prevent a group who wants to peaceably march to march.

11       Q       I noticed in your declaration that you made

12  no mention of the intel report from the concert.  Was

13  there a reason for that?

14       A       No.

15       Q       The persons arrested in the alley had

16  plastic restraints used on their wrists, correct?

17       A       That's my understanding, yes.

18       Q       And those plastic restraints are called

19  flexicuffs, correct?

20       A       Yes.

21       Q       And they are MPD equipment, correct?

22       A       Yes.

80

1    Q    And officers of the MPD are authorized to

2  use that equipment in securing the hands of arrestees,

3  correct?

4    A    Yes.

5    Q    And applying flexicuffs to arrestees when

6  flexicuffs are used is part of their jobs, correct?

7    A    Yes.

8    Q    MPD officers at this time -- and what you

9  just testified to was true on January 20 and 21, 2005

10  regarding officer application of flexicuffs, correct?

11    A    Yes.

12    Q    At that same time, January 20, 21, 2005,

13  MPD officers were authorized to have personal

14  canisters of what I would call pepper spray, correct?

15    A    Yes.

16    Q    There is a more formal name for the pepper

17  spray, isn't there?

18    A    OC spray.

19    Q    What does OC stand for?

20    A    Oleoresin capsicum.

21    Q    Would you take a look at the standard

22  operating procedures, exhibit page 18 at the top.

MISTY KLAPPER & ASSOCIATES    (703) 780-9559

1          Do you see about halfway down the spelling

2     of the spray that you're referring to?

3          A     Yes.

4          Q     And would you spell it?

5          A     O-L-E-O-R-E-S-I-N C-A-P-S-I-C-U-M, OC.

6          Q     And again, at this time, January 20, 21,

7     2005, making judgments about when and how to use OC

8     spray is part of the jobs of Metropolitan Police

9     Department officers, correct?

10         A     Yes.

11         Q     And use or nonuse of the spray in

12    accordance with those judgments, that is also part of

13    their jobs, correct?

14         A     Yes.

15               MR. SCHEMBER:  Would you mark that for me,

16    please.

17               (Thereupon, the document was marked as

18               Lanier Deposition Exhibit No. 10 for

19               identification.)

20               BY MR. SCHEMBER:

21         Q     I'm going to show you now a document that

22    has been marked with a blue sticker as Exhibit

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH CARR, *et al.*,                            )
                                                  )
                          Plaintiffs,             )
                                                  )
                                                  )        Civ. A. No. 06-00098 (ESH)
                    v.                            )
                                                  )
DISTRICT OF COLUMBIA,                             )
                                                  )
                          Defendant.              )
                                                  )

## NOTICE OF DEPOSITIONS

Please note that on September 13, 2007, at 10:00 a.m. at the Headquarters of the

Metropolitan Police Department, 300 Indiana Avenue, N.W., Washington, D.C. 20001,

plaintiffs will take by stenographic means the deposition of MPD Chief Cathy Lanier

and the deposition of defendant District of Columbia under Rule 30(b)(6), Fed. R. Civ.

P., through its designated representative Cathy Lanier as to the following matters known

or reasonably available to defendant District of Columbia to the extent the District

designates Cathy Lanier as its designated representative as to those matters:

    1. Any matter stated in any admission request that the District fails to admit and the

facts, sources of the facts and reasons for the failure to admit.

    2. Defendant's interrogatory answers, the factual bases therefor, the sources of these

facts, and the reasoning on which the answers are based.

    3. The truth of the matters stated in the June 19, 2006, Lanier declaration and the facts,

sources of the facts, and reasons why any of the matters are true or not true.



4. The truth of the matters stated in documents produced in response to plaintiffs' document production requests and the facts, sources of the facts, and reasons why any of the matters are true or not true.

5. The factual bases for any objections to plaintiffs' discovery requests.

6. Whether any documents falling within the scope of plaintiffs' document production requests existed at one time but no longer exist; were within defendant's possession, custody, or control but are no longer in defendant's possession, custody, or control; when, how, and why these changes in existence, possession, custody, or control occurred; and, as to the last three these kinds of changes where the documents are or likely may be now.

7. The truth of the matters stated in plaintiffs' interrogatory answers and documents produced by plaintiffs in response to defendant's requests for production; and the facts, sources of the facts, and reasons on which defendant bases any belief that any of the matters are not true.

8. The types of circumstances in which District of Columbia custom, policy, and practice applicable at the time of plaintiffs' arrests made it proper to arrest persons for parading without a permit, without giving them an order to stop parading, or an order to do something else, and affording them reasonable opportunity to avoid arrest by obeying the order.

9. The facts and reasons why under District of Columbia custom, policy, and practice it was proper to arrest plaintiffs for parading without a permit, without giving them an order to stop parading, or an order to do something else, and affording them reasonable opportunity to avoid arrest by obeying the order.

10. Whether after police had surrounded plaintiffs it would have been proper under District of Columbia custom, policy, and practice for police to address the plaintiffs and afford them opportunity to either (a) disperse individually or in small groups through an opening in the police lines or (b) continue their parade in the street or on the sidewalk with police escort.

11. Whether under *current* District of Columbia law, custom, policy, and practice, in circumstances similar to those in which plaintiffs were arrested, it is proper to arrest demonstrators who are parading in the street without giving them an order to stop parading, or an order to do something else, and affording them reasonable opportunity to avoid arrest by obeying the order; and why such arrests now are or are not proper.

12. Whether at the time of plaintiffs' arrests it was the custom, policy, or practice of the District of Columbia to allow persons arrested for parading without a permit to post and forfeit fifty dollars.

13. Whether persons arrested by District of Columbia police on September 27, 2002, for parading without a permit in the District of Columbia were allowed to post and forfeit fifty dollars.

14. Whether plaintiffs were allowed to post and forfeit fifty dollars.

15. Whether at and before the time of plaintiffs' arrests the results of posting and forfeiting money incident to arrest for parading without a permit in the District of Columbia were (a) no court proceeding would occur unless the arrestee initiated it, (b) the arrestee would have an arrest record for that instance of parading without a permit, (c) the arrestee would not have a criminal conviction for that instance of parading without a permit.

Respectfully submitted,

/s/ Arthur B. Spitzer
Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

/s/ Daniel M. Schember
Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

Counsel for Plaintiffs

**Certificate of Service**

I certify that a copy of the foregoing Notice of Depositions was mailed postage prepaid

this 27th day of August, 2007, to

Thomas Koger
Senior Assistant Attorney General
D.C. Office of the Attorney General
441 4th Street, N.W.
Washington, D.C. 20001

Daniel M. Schember

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEFFREY BARHAM, et al.,                    .

                           .  Docket No. CA-02-2283
        Plaintiffs,                        .

        vs.                                .

CHARLES RAMSEY, et al.,                    .

                          .  Washington, D.C.
        Defendants,                        .  Monday, September 27, 2004
                          .  11:35 a.m.

. . . . . . . . . . . . . . . .

TRANSCRIPT OF A MOTION
BEFORE THE HONORABLE EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Barham Plaintiffs:     CARL L. MESSINEO, Esquire
                           MARA E. VERHEYDEN-HILLIARD, Esquire
                           PARTNERSHIP FOR CIVIL JUSTICE
                           1901 Pennsylvania Avenue NW
                           Suite 607
                           Washington, DC 20006

For Chang Plaintiffs:     DANIEL C. SCHWARTZ, Esquire
                           BRYAN CAVE, LLP
                           700 13th Street, NW
                           Suite 700
                           Washington, DC 20005

For Federal Defendants:   MARINA UTGOFF BRASWELL, Esquire
                           US ATTORNEYS OFFICE FOR THE
                           DISTRICT OF COLUMBIA
                           555 Fourth Street, NW
                           Room 10-413
                           Washington, DC 20530

For the District:         THOMAS LOUIS KOGER, Esquire
                           MARTHA J. MULLEN, Esquire
                           LORI PARRIS, Esquire
                           OFFICE OF THE CORPORATION COUNSEL, D.C.
                           441 Fourth Street, NW
                           Washington, DC 20004

PENGAD 800-631-6989
EXHIBIT
Lanier 2
9-13-07 DAB

1  of sort of damocles in that it's out there and maybe there have

2  been arrests before, maybe there have been charges before. Am

3  I correct in saying that none of the plaintiffs in the Barham

4  class have arrest records for parading without a permit or

5  either convictions for that offense, is that correct?

6        MR. KOGER:  Based upon my review of all of the

7  citations and the printout of charges, yes, that is correct,

8  they have not?

9        THE COURT:  Has the city or the police chief said

10  anything recently in an effort to discourage people from

11  exercising their legitimate first amendment rights that if they

12  participate in demonstrations and parade without a permit

13  they'll be arrested for that offense?

14        MR. KOGER:  No, Your Honor, not to my knowledge. And

15  I am in contact with the Office of General Counsel on a daily

16  basis.

17        THE COURT:  But they have this concern that if they

18  come here, they're going to be arrested and charged with this

19  offense, notwithstanding the city's position that it has taken

20  in the past. And the city rarely charges anyone for parading

21  without a permit, is that an accurate statement?

22        MR. KOGER:  That is accurate, Your Honor. What

23  commonly happens is that, particularly in small manageable

24  groups, there's an effort when we learn of it, when the

25  department learns of it, to interact with organizers and try to

1    negotiate a way that the parade, if you will, can move along a

2    route to its intended destination, although it may not be the

3    route of their choice, and tries to limit the effect on

4    vehicular traffic by having them stay on a sidewalk, or at

5    worst, the sidewalk and one lane in.

6         As the declaration of Jeffrey Herold next to our

7    opposition brief reflects, that was a function which occurred

8    on April 15, 2000 of which plaintiffs assert they were arrested

9    for parading without a permit.  In fact, a negotiation was

10   conducted, the protesters were warned to get out of the street,

11   and they were arrested after having declined to comply with

12   that.

13        THE COURT:  Is that an offense for which they can be

14   arrested without giving any prior notice to, without receiving

15   prior notice?

16        MR. KOGER:  Your Honor, our reading is that that

17   would be permissible by virtue of the fact that the regulation

18   puts them on notice of a need to have obtained the permit and

19   that the infraction would be complete upon stepping into the

20   roadway, if you will.

21        This would be --

22        The cases that are cited to the contrary about

23   decriminalization of the traffic code are inapposite in the

24   regard that they speak to particularly unlawful assembly as

25   requiring a multiplicity of persons and an additional criminal

1    offense.

2         This statute is not written in that manner.  Instead,

3    the statute is routinely, or, rather, the regulation, as I have

4    learned from the officers who have been involved in these

5    matters over the incidents complained of, routinely they try to

6    locate an organizer where they see a gathering and try to

7    negotiate that the persons will stay in a route that the

8    department can safely maintain warning them that you may not

9    parade through the roadway, you may parade along the sidewalk

10   and we will handle the crossings and so forth.

11        To that extent, there is a de facto warning and

12   opportunity to not disperse, but to follow a path that will not

13   result in police actions.  So although our position is 1) that

14   it is an arrestable offense, and 2) that it does not

15   necessitate a warning by virtue of the fact that it presents in

16   advance the requirement for the movement, the expression on a

17   moving basis, in fact, the officials advise, in the instances

18   of which I am aware, which are the subject, in fact, of a

19   litigation before Your Honor and other judges, that you can't

20   go this way, work with us on this and we can work it out.  But

21   you can't just walk out into the street, as is what Assistant

22   Chief Jordan complained of at Vermont and K.

23        THE COURT:  If I understand you correctly, and tell

24   me if I'm wrong, but you're saying that Dellums doesn't apply

25   then because the offer of police officers to conduct a parade

1  department, I believe not.  I stand by the representation that
2  we wouldn't because we don't.

3          THE COURT:  I'm sorry, you wouldn't?

4          MR. KOGER:  We wouldn't arrest simply because you
5  haven't got a permit.

6          THE COURT:  So that's the position of the city, the
7  city will not arrest because you don't have a permit?

8          MR. KOGER:  Right.

9          THE COURT:  And that will be the position of the city
10  in upcoming demonstrations?

11          MR. KOGER:  Yes, Your Honor.

12          In the instance of Franklin Square, which resulted in
13  the Vermont and K arrests, a lieutenant from the special
14  operations division went to the park seeking organizers
15  advising that the march could not go out into the roadway of K
16  Street.  It nevertheless did.  The march went into incoming
17  traffic.

18          And, at that point, the opportunity to disperse or
19  order an orderly and safe dispersal became more of a question,
20  as I understand it.  In fact, a police line shut down traffic
21  and that takes us into where we end up with the arrest, which
22  is complained of most particularly in the Diamond slash Bergen
23  case.

24          So to the extent that we speak of policy, the policy
25  is to try and work it out with advising the would be

1   no way for the person to determine if such a suspension had

2   been granted.

3         In this regard the parading --

4         Well, 24 DCMR 705 and 707 are distinguishable from

5   that.  They lay out a process.  You apply for a permit.  You

6   may end up negotiating for a permit.  You either --

7         THE COURT:  You're saying a lot of things.  And I

8   respect what you're saying.  You've told me, though, these

9   folks are not going to be arrested for their legitimate

10   participation in first amendment activities, they're not going

11   to be arrested?

12         MR. KOGER:  Right, they are not.

13         THE COURT:  They can come to Washington, D.C. with

14   that assurance they will not be arrested.

15         But then there's a "but, however, if" that you want

16   to get into.  Or maybe you don't.  Is that the assurance, they

17   will not be arrested?

18         MR. KOGER:  Certainly, I'm not --

19         THE COURT:  Just leave it there then.

20         MR. KOGER:  I'm certainly not going to say you're not

21   going to get arrested if you come into Washington, D.C.

22         THE COURT:  No, not arrested for parading without a

23   permit.  That's what you just said.

24         MR. KOGER:  What I'm saying is you're not going to

25   get arrested for parading without a permit if we don't warn you

1    to the contrary.  What I'm trying to distinguish, Your Honor,

2    is what we believe, and perhaps it needs to be decided --

3          THE COURT:  Why do you object to their request for

4    relief then?  All they're asking for is that the plaintiffs not

5    be arrested for parading without a permit without first being

6    afforded an opportunity to disperse.  That's all they're asking

7    for.  It doesn't sound like you're saying anything different.

8          MR. KOGER:  Because, Your Honor, the first time we

9    heard that was this morning.

10          THE COURT:  But you're hearing it now, though.

11    You're hearing it now.  And you're not saying anything any

12    different.  You just told me you're not going to arrest unless

13    or until you give a warning.  That's all they're asking for.

14    They want that warning, they want that warning.  And you're

15    willing to give it, right?

16          MR. KOGER:  We're willing to give it.  But the

17    conundrum I face is suppose you get 50 people, well-meaning

18    demonstrators, assembled at Murrow Park before rush hour on

19    Friday.  And before the police get there they're off frolicking

20    in the traffic and somebody gets hits.

21          THE COURT:  Do you know what?  There are always all

22    sorts of exceptions, though, aren't there?

23          MR. KOGER:  Yes, Your Honor.

24          THE COURT:  The city just announced that as far as

25    the city is concerned it will not arrest for this offense

495

1    without giving notice.  Now, there may be exceptions to that

2    rule.

3            MR. KOGER:  Right.

4            THE COURT:  And I don't have enough time in the day

5    to deal with all those exceptions.  Although plaintiff could

6    probably cite chapter and verse for thousands of exceptions,

7    I'm not going to require him to do so.  There are always

8    exceptions to the rule.  But the general policy in the rule is

9    that you won't do it unless you give notice.  And I think

10   that's all the plaintiffs were asking for.

11           MR. KOGER:  And in that regard I was correct back in

12   April.  We don't.  We wouldn't.  We wouldn't arrest.

13           THE COURT:  Wait a minute.  You started off trying to

14   correct what you said in April.

15           MR. KOGER:  And give me best two out of three on that

16   one, Your Honor.

17           THE COURT:  All right.  I'll quit while I'm ahead

18   then.  If you stand by that statement in April, then that's

19   fine.

20           MR. KOGER:  I'm standing by that.

21           THE COURT:  Counsel, let me ask plaintiff, you have

22   the relief you're seeking, you just heard the city, the city is

23   on record, the city is not going to arrest.

24           MR. MESSINEO:  We don't have to adjudicate the

25   constitution if they want to consent to the relief.

1    THE COURT:  The city has just announced that it will

2    not arrest anyone for parading without a permit unless and

3    until it has given appropriate notice.  That's all I asked you,

4    what is the very precise relief.  And the city is on record and

5    the whole world has heard it, so there's no need for this Court

6    to do anything.

7    MR. MESSINEO:  And, Your Honor, if they fail to abide

8    by that?

9    THE COURT:  Then apparently you know where I'm

10   located.  But the city is on record.

11   MR. MESSINEO:  Well, I appreciate that.  And to the

12   extent that that is not being accepted as consent to the

13   relief, I'm not exactly sure --

14   THE COURT:  I don't think there's any real case of

15   controversy before me right now that requires this Court to do

16   anything further in light of what the city just said, I don't

17   think.

18   MR. MESSINEO:  We will take them at their word, if

19   that's what you're doing, Your Honor.

20   THE COURT:  Absolutely.

21   MR. MESSINEO:  And we will make sure that their

22   announcement is well known.

23   THE COURT:  All right.  Have a nice day.  It's good

24   to see everyone again.

25   I'm sorry, Mr. Braswell, did you want to say anything

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JEFFREY BARHAM, *et al.*,            )
                                     )
         Plaintiffs,                 )
                                     )
    v.                               )    Civ. Action No. 02-2283 (EGS)
                                     )
CHARLES H. RAMSEY, et al.,           )
                                     )
         Defendants.                 )
_____  )

**ORDER**

Upon consideration of plaintiffs' Motion for Preliminary Injunction, which requests that the District of Columbia be enjoined from arresting demonstrators for "parading without a permit" *in the absence of any notice or opportunity to disperse,* and Defendant's recent representations in open court that the District will give notice and opportunity before making such arrests, it is by the Court hereby

**ORDERED** that plaintiffs' Motion for a Preliminary Injunction Enjoining the District of Columbia From Arresting or Prosecuting Persons for Parading Without a Permit is **DENIED AS MOOT**.


Signed:    **EMMET G. SULLIVAN**
           **UNITED STATES DISTRICT JUDGE**
           **September 29, 2004**



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SARAH CARR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-0098 (ESH) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF CATHY LANIER IN SUPPORT OF DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS

I, Cathy Lanier, under penalty of perjury, declare as follows:

1. I am an officer with the District of Columbia Metropolitan Police Department (MPD) and currently I am Commander of Homeland Security.

2. On January 20-21, 2005, I was Commander of the Special Operations Division of MPD. I have personal knowledge of the mass demonstration the evening of January 20 and early morning of January 21, 2005 in the Adams Morgan neighborhood of Washington, D.C. as I was the Incident Commander on site that evening. I also have personal knowledge of the standard operating procedures of the MPD for mass demonstrations, including the issuance of warnings prior to arrest orders when appropriate.

3. Whenever possible, and time and circumstances permit, it is the standard operating procedure of MPD not to arrest for activities related to mass demonstrations, including Parading Without a Permit, without first issuing a warning to the crowd to disperse. This is set forth in MPD's Standard Operating Procedures for Response to



Mass Demonstrations, Civil Disturbances & Prisoner Processing. I was informed and aware of this standard operating procedure on January 20-21, 2005.

4. I am the officer responsible for issuing the arrest order of protesters for Parading Without a Permit on January 21, 2005 concerning the mass demonstration in the Adams Morgan neighborhood of Washington, D.C. Neither time nor circumstances permitted the issuance of a warning to disperse prior to the arrest order.

5. At approximately 11:20 p.m. I observed a group of several hundred protesters on the move in the 1700-1800 block of Columbia Road. The group mainly was composed of individuals dressed in black clothing with bandannas covering their faces. Members of the group were carrying pipes and torches. The group started walking west on Columbia Road, NW.

6. As I approached the group of protesters from behind the group in my squad car, I observed that several individuals were destroying private property by breaking windows of business establishments. Several other protesters defaced property by spray-painting the front of businesses with cans of spray paint. Several small fires also were started along the way by the protesters. Newspaper boxes also were being hauled into the street as was other debris. Several MPD CDU responded to the area of 18th Street and Columbia Road to investigate the disturbances. Metro Transit Police units also responded to the area.

7. I was one of the first to arrive and I was in a patrol car directly behind the protesters (they did not see my patrol car). I witnessed a lot of vandalism, including the throwing of rocks or other objects through the front windows of several businesses, several fires, spray painting of businesses, destruction of vehicles, newspaper boxes and

2

other debris being hauled into the street, and the blocking of traffic from passing in all directions by persons participating in the unlawful procession. I also saw blood on the pavement.

8. CDU 43 was one of the units instructed to respond to 18th and Columbia Road to assist with a large group of protesters parading in the middle of 18th Street. The cruiser (#406) driven by Lt. Jimmie M. Riley got in front of my squad car and was struck by a brick that shattered the front windshield. CDU 43 also was bombarded with unidentified objects thrown at them.

9. Generally, the MPD seeks to avoid making arrests for Parading Without a Permit. MPD officers in general, and Special Operations Division officers in particular routinely are able to avoid either arrests or terminating demonstrations by negotiations with the organizers of unpermitted demonstrations or parades and reaching agreement on routes or locations to be used that safely can be accommodated. In this instance, the activities of a large number of the participants in the unlawful parade were destructive and violent. To have attempted to negotiate with the "organizers" of this procession would have unreasonably placed police officers and demonstrators at risk of being injured. I did not issue an warnings initially because I had no back-up and the protesters far outnumbered me. I did not issue any warnings thereafter because the situation had turned violent when the brick was thrown through the windshield of CDU 43. Issuing warnings was not appropriate under the circumstances.

10. Based on the above-described events, on January 21, 2005, at approximately 12:23 a.m., I ordered the arrest of the protesters for Parading Without a Permit. I made the decision to arrest for Parading Without a Permit without first giving a warning to

3

disperse because I did not believe either time or circumstances permitted the warning. Protesters had taken over the street and already were engaged in repeated acts of vandalism and destruction of property. In addition, the protesters had initiated an attack on a police vehicle. Based on my training and experience, I thought the likelihood of personal injury to protesters, observers, and members of the MPD was high.

11. As MPD attempted to apprehend the subjects who were destroying property, the subjects and the protesters began to run from the area. Approximately 65-75 protesters who had unlawfully paraded in the roadway ran into the alley rear of 1818 Columbia Road, NW and were arrested for Parading Without a Permit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 6/19/06

Cathy Lanier

4

# METROPOLITAN POLICE DEPARTMENT

## *STANDARD OPERATING PROCEDURES*
### For
## *MASS DEMONSTRATIONS, RESPONSE TO CIVIL DISTURBANCES & PRISONER PROCESSING*







EXHIBIT

*Lanier 5*

9-15-07 DMR

**CHARLES H. RAMSEY**
**CHIEF OF POLICE**

REVISED MAY, 2003

19

34

2.    Crowd Dispersal

When the intensity level of a crowd rises and unlawful disruption,
either through violent or passive means, is occurring to the extent that
the Field Commander determines there is a need to make a positive
police response, he/she will instruct the affected unit commanders, where
time and circumstances permit, to issue warnings to the crowd to
disperse.  In issuing such warnings the following procedures shall be
utilized by unit commanders.

a.    Issuance of Warnings

1)    The issuance of warnings shall be of such
amplification and repetition as to be heard by
the entire assemblage.

2)    Issuances shall be made by the unit commander
from stationary vantage points that are observable
to the crowd, or to a large number of participants.

3)    Additional warnings, where necessary, shall be
given from police vehicles, equipped with public
address systems, moving around the crowd.

4)    The warning shall consist of an announcement
citing the offenses or violations that are being
committed by the participants, and a request or
order, whichever is applicable, that the crowd
disperse.  Whenever possible, this warning shall be
written out prior to the announcement, to ensure
clarity and accuracy, and consistency, if the
warning is repeated.  **(See Appendix D)**

5)    The entire warning process shall be documented by
means of an audio-visual recording, if available.  If this is
not available, then written documentation must retained and
made a part of any arrest files. **(See Appendix D)**

b.    Verbal Persuasion

As a first means of dispersing a crowd under static conditions, the
unit commander shall attempt to verbally persuade the crowd to
disperse of its own accord by announced available exit routes.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.                                )  Civ. A. No. 06-00098 (ESH) | |
| ) | |
| DISTRICT OF COLUMBIA, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT DISTRICT OF COLUMBIA

Pursuant to Fed. R. Civ. P. 26 and 33, defendant District of Columbia objects to and answers Plaintiffs' First Set of Interrogatories to Defendant District of Columbia as follows:

### GENERAL OBJECTIONS

Defendant's General Objections, as set forth herein, are to be considered continuing Objections and/or assertions of privilege and Objections to each and every specific document Interrogatory that follows, even if not referred to in the response to a specific Interrogatory. That some of these General Objections are not restated in response to particular Interrogatories does not waive the assertion and application or the General Objections which are not set forth in full in response to those Interrogatories. Defendant's Objections and responses given herein shall not prejudice any objection and/or assertion of privilege they may later assert in any context. Moreover, Defendant responds to the instant discovery Interrogatory subject to the accompanying Objections, without waiving and expressly preserving all Objections.

1.      Defendant objects to the instructions propounded by plaintiffs to the extent that they seek or purport to impose obligations in excess of those required by the Federal Rules of



Defendant further partially denies Request 2 based on the facts set forth above and in the District's response to Request for Admission 2.

In addition, the District's partial denial is supported by the fact that conduct known to and/or observed by then-Commander Lanier, or observed by MPD personnel and reported to her that she considered before she ordered plaintiffs' arrests and which she reasonably relied upon as probable cause for the arrest she ordered, included (1) that no permit to engage in a procession along the sidewalks and or roadways utilized and incommoded by the plaintiffs and other marchers had been issued by the MPD; (2) that at 10:00 p.m. Commander Lanier was advised by an MPD officer at the AIC that a plan to engage in a snake march from the AIC to an Inaugural Ball site, engaging in property damage along the way had been generally communicated to hundreds of persons in attendance at the AIC; (3) that at 11:20 p.m., Commander Lanier was informed that J20 Marchers had taken over roadways and were causing property damage along their route to the Hilton Hotel; (4) numerous persons engaged in the march carried flaming torches; (3) many persons engaged in the march concealed their identities with masks in the form of bandannas covering their faces; (5) numerous members of the march played makeshift drums and/or chanted loudly while proceeding through a residential area after 11:00 p.m. creating a disturbance that perceptibly disturbed and annoyed residents of that area; (6) members of the march defaced buildings and other property along the march route with spray-paint; (7) members of the march threw missiles from and into public space; (8) members of the march broke numerous windows of buildings near the intersection of 16th Street and Columbia Road, NW; (9) members of the march overturned newspaper vending machines along the march route; (10) members of the march placed or threw newspaper

# 55TH INAGRATION 2005

*January 20, 2005*
*Thursday*

*CR # 18 -Commander Cathy Lanier*
*Commander of Special Operations Division*

| | |
|---|---|
| 0900 hrs | Conference call with all the Command staff at which time all the Commanders state that all their personnel are on post and are on the parade route. |
| 0910 hrs | #18 Commander Lanier runs the parade route and states that nobody is on post from MPD and that its only manned by outside agencies at this time. |
| 0925 hrs | #18 makes a radio statement stating have all MPD personnel get on post/parade route. |
| 0930 hrs | #18 is sending CDU'S 31,34,51 to Malcolm X Park for a snake demo. |
| 0939 hrs | #18 briefs Commander Maupin about his part on the parade route and is told to clear all the trucks off the route. |
| 0943 hrs | #18 briefs A/C Jorden about his part on the parade route |
| 1030 hrs | #18 "where in the hell is OPR'S manpower" |
| 1031 hrs | #18 briefs A/C Dandridge at 6th & PA Ave. about the parade route problems. |
| 1035 hrs | #18 briefs Commander Burton about why his personnel are not on post and states he's missing an entire non-CDU unit. |
| 1043 hrs | #18 briefs Commander McCoy about how well his people look and #18 tells him that they are the only unit fully on post at this time. |
| 1047 hrs | #18 briefs A/C Newshem |
| 1100 hrs | CDU sent to IMF by CR #18 |
| 1105 hrs | CDU 61 sent to 15th & W St. to stage for demo/snake march |
| 1113 hrs | Capt. Herold states he's trying to get an Officer to tape the demo like the Commander had requested. |
| 1115 hrs | #18 briefs CDU'S 24,31,34,35,51 about the demo/snake march that starts at 1130 hours. |
| 1130 hrs | March starts with CDU 34 and 51 in front and rear of march. |
| 1133 hrs | Falcon is told to be up for the entire demo/snake march |
| 1133 hrs | Capt. Herold does not have anyone for the camera duties |
| 1157 hrs | CDU 24,74 moved to Logan circle for Pink demo/march |
| 1158 hrs | Per Intel. Pink march is now south on Conn. Ave. |
| 1201 hrs | #18 tells CDU 34 to hold back because a large group is going to break off and 34 should follow that group. |
| 1205 hrs | Lt. Alter sent to Pink march per #18 |
| 1206 hrs | Demo is now at 16th & R St. southbound |



EXHIBIT
Lanier 9
9-13-07 SMB

1

000. -00'00(SUN) 00:00

P. 005

| | |
|---|---|
| 1711 hrs | Protestors are now going southbound on 18th from M St. against traffic. |
| 1725 hrs | Critical Mass is on bikes and are on Mass Ave. 75 to 100 |
| 1730 hrs | CDU 24 & 34 is sent to Mass Ave. by # 18 |
| 1730 hrs | One APO arrest in the 1100 block of 15th St. for CDU 34 |
| 1731 hrs | Prisoner control again is not answering the radio for the fourth time today for runs. |
| 1756 hrs | # 18 tells Commander Lojo to keep traffic closed until advised by # 18 |
| 1803 hrs | For the third time today the dispatcher has asked over the air "why is the JOCC not answering the phone" |
| 1815 hrs | A woman has passed out inside the MS Grill |
| 1817 hrs | CDU 24, 64 and ESU are with the snake march on H St. |
| 1826 hrs | Snake march is now at H & Mass. Ave. going to Union Station |
| 1830 hrs | Capt. Herold gives the snake march their first warning to please get out of the street for your on safety or we will be forced to make lock ups. |
| 1835 hrs | Capt. Herold gives second warning |
| 1839 hrs | While in front of Union Station Capt. Herold gives the final and third warning. |
| 1840 hrs | Protestors are now on US Capitol grounds |
| 1905 hrs | 10-8 Union Station |
| 1905 hrs | CDU 24 and 51 restage at the Conv. Center |
| 1911 hrs | # 18 to the JOCC "Start relieving 0430 CDU Units, also relocate all 0930 units to the Conv. Center also. |

## NO PERMIT MARCH

| | |
|---|---|
| 2200 hrs | New Intel report states over 700 protestors to do damage and snake march to a ball site, starting at midnight. |
| 2230 hrs | # 18 briefs all SOD Officials at SOD about tonight's march from Intel |
| 2311 hrs | Intel states march will now start early |
| 2320 hrs | Intel states marchers have taken over the streets and are causing all kinds of property damage along the way to the Hilton hotel. |

ROUTE:    1600/1700 block of Columbia, left on 18th in the 2400 block, right on Belmont to north alley entrance.

Protestors are starting fires; throwing rocks into business windows, spray painting private property along with destroying vehicles while blocking traffic from passing in all directions. (All of this while Intel was in front of the protestors and # 18 in the rear)

453

OCO. -00' 00 (SUN) 00:00

*January 21, 2005*
*Friday*

| | |
|---|---|
| **0023 hrs** | # 18 Order of arrest for no permit |
| **0155 hrs** | # 18 talks with Terry Ryan from MPD about charges and what had happened tonight with the protestors damage to property. (call lasts a total of 37mins. & 39 seconds. |

Cr. 9230 with crime scene search Ofc.'s Turner, Davis, DePrince, and Sgt. Arce are taking pictures and recovering evidence of all destruction of property caused by the protestors during their illegal march.

CCN # 008-871 per Insp. Grooms (PD251/PD252)

The following bank addresses will be guarded until the morning crew of employees come to work due to broken glass windows: 1749 ½ Columbia Rd., 1800 Columbia Rd., 1779 Columbia Rd., and a apt. complex at 1768 Columbia Rd.

| | |
|---|---|
| **0200 hrs** | # 18 makes an announcement over the air and informs all MPD officials that they have to do a PD 119 before check off tonight and turn them into SOD HQ by COB 1/21/05. |
| **0215 hrs** | A can of spray paint is found in the alley of arrest by Ofc. Bray and is being recovered by Sgt. Arce for evidence. |
| **0330 hrs** | # 18 Checks Off |

454