UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SARAH CARR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 06-00098 (ESH) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
LIABIILTY**

## Exhibit I

## Defendant District of Columbia's Response to
Plaintiffs' Second Request for Admissions

Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National
Lawyers Guild and the American Civil
Liberties Union of the National Capital Area

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SARAH CARR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 06-00098 (ESH) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT DISTRICT OF COLUMBIA'S RESPONSES TO PLAINTIFFS' SECOND REQUEST FOR ADMISSIONS TO DEFENDANT DISTRICT OF COLUMBIA

Pursuant to Fed. R. Civ. P. 36(a), defendant District of Columbia responds to Plaintiffs' Second Set of Requests For Admissions To Defendant District of Columbia as follows:

1. The attached seven-page document, numbered 7664-7670 and stating on the first page "Testimony of Charles H. Ramsey Chief of Police Metropolitan Police Department December 18, 2003," is a true copy of an authentic document.

**Response 1:    Admit.**

2. The document referenced in Request 1 is a statement that Charles H. Ramsey made in December 2003 to a Committee of the Council of the District of Columbia in his capacity as Chief of Police of the District of Columbia Metropolitan Police Department.

**Response 2:    Admit.**

3. The following statements, which appear on page 3 or 4 (7666 or 7667) of the document referenced in Request 1, are true:

    a. "Over the past year alone [meaning 2003], our Department [meaning the District of Columbia Metropolitan Police Department] has managed close to 300 different demonstrations, marches or rallies in our city [meaning the District of Columbia]."

**Response 3a: Admit.**

    b. "And that total [meaning 300] represents just those events handled by our Special Operations Division."

**Response 3b: Admit.**

    c. "It does not include the many other, *ad hoc* protests that are handled by individual police districts or other MPD elements on a routine basis."

**Response 3c: Admit.**

    d. "And the statistics for 2003 are not out of the ordinary."

**Response 3d: Admit.**

    e. "Since April 2000, in fact, SOD [meaning Special Operations Division] has responded to a total of 1,553 different demonstrations."

**Response 3e: Admit.**

    f. "[T]he vast majority of demonstrations in our city [meaning the District of Columbia]—approximately 80 percent over the past year [meaning 2003]—are non-permitted rallies and marches."

**Response 3f: Admit.**

    g. "These are events [meaning non-permitted rallies and marches] that spring up without advance notice, and which we [meaning District of Columbia police] must respond to and support."

**Response 3g: Admit.**

2

h. "The Metropolitan Police Department is uniquely entrusted to provide the type of open, safe and secure environment that enables free speech to take place here [meaning in the District of Columbia]."

**Response 3h: Admit.**

i. "Of the hundreds and hundreds of demonstrations that we [meaning the District of Columbia Metropolitan Police Department] have handled over the past three years [meaning 2001, 2002, and 2003], not one has resulted in the type of widespread property damage and violence that occurred in Seattle in the fall of 1999, or subsequently in cities such as Quebec, Genoa, Italy, and others."

**Response 3i:  Admit.**

j. "And in only two of the DC demonstrations—the April 2000 protests against the IMF and World Bank, and the September 2002 anti-globalization protests—were there significant numbers of arrests."

**Response 3j:  Admit.**

k. "Beyond temporary disruptions to traffic or other inconveniences, the vast, vast majority of demonstrations in our city occur without any significant negative impact on residents, businesses or the normal operations of our city [meaning the District of Columbia] and its government."

**Response 3k:  Admit.**

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

ELLEN EFROS
Chief, Equity Section I

s/ Thomas L. Koger
THOMAS L. KOGER [427921]
Senior Assistant Attorney General
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6610
Fax: (202) 727-3625 (fax)
E-mail:   Thomas.Koger@dc.gov

August 13, 2007

# Public Oversight Hearing on
# Current Policies and Practices of the
# Metropolitan Police Department Related to
# Demonstrations within the District

## Committee on the Judiciary
## The Honorable Kathy Patterson, Chair
## Council of the District of Columbia

## Testimony of
## Charles H. Ramsey
## Chief of Police
## Metropolitan Police Department

### December 18, 2003

Madame Chair, members of the Committee, staff and guests – I appreciate the opportunity to read this opening statement into the record and, along with Deputy Mayor Kellems and Assistant Chief Al Broadbent, to answer your questions. For the benefit of the audience watching on Channel 13 and others, the text of my statement is posted on the Police Department's website: www.mpdc.dc.gov.

Let me begin by acknowledging the work of this Committee in preparing for these hearings. I respect the oversight role of this Committee and the scrutiny that comes with that role. Under my leadership, the Metropolitan Police Department has cooperated with this Committee, as well as others who have examined different aspects of our policies, procedures and operations. We have approached these particular hearings in the same spirit of cooperation.

And beyond cooperating with the Council and other outside bodies, our Department – as you know – has engaged in a rigorous process of self-examination, especially when the issues involve things so fundamentally important as the defense of Constitutional rights and the protection of lives and property. I believe that it is only through careful examination and close scrutiny that any organization can hope to continuously improve and become more effective. And I can assure the Committee that no aspect of our operations has received more self-scrutiny over the past few years than our handling of demonstrations in our city. As a result, our Department, which has always been recognized as one of the best when it comes to managing large-scale events, has gotten even better.

I appear before this Committee today extremely proud of the men and women of the Metropolitan Police Department ... proud of the sheer number of demonstrations and other major events that we accommodate each year in our city ... and proud of the manner in which we manage these events – efficiently, professionally and safely. Safety, of course, is a consideration that has taken on added urgency in the post-"Nine-Eleven" environment. I am proud that in any given year our Department is there to protect the Constitutional rights of more demonstrators than any other police department in America – and proud that we are able to do so without the type of disruptions, property damage and even violence that have occurred at similar events in other cities. I am proud of our Department's willingness to scrutinize and challenge our current procedures, and to make improvements where improvements are needed.

Am I suggesting that the Metropolitan Police Department is "perfect" when it comes to managing demonstrations in our city? Absolutely not. We are not perfect – we can always improve. But I am here to tell you and tell our residents that when it comes to managing demonstrations and supporting the First Amendment rights of large numbers of people, espousing the whole spectrum of ideas and causes, the Metropolitan Police Department is among the very best – and we continue to get better.

*    *    *    *    *

I think it is very important that we put the subject of these hearings in some context. Over the past year alone, our Department has managed close to 300 different demonstrations, marches or rallies in our city. And that total represents just those events handled by our Special Operations Division. It does not include the many other, *ad hoc* protests that are handled by individual police districts or other MPD elements on a routine basis. These events have brought to our city literally hundreds of thousands of individual demonstrators – fellow Americans who come here – or who already live here, in our Nation's Capital – to express their viewpoints on a wide array of causes. And the statistics for 2003 are not out of the ordinary. Since April 2000, in fact, SOD has responded to a total of 1,553 different demonstrations.

Some of these demonstrations are large and very high-profile, such as the march against US involvement in Iraq that took place this past January or the 2001 Presidential Inauguration and associated protests. But the vast majority of the demonstrations we handle are smaller and more focused – whether it be teachers protesting proposed school cuts, supermarket workers rallying for better benefits in front of the Department of Labor, disability rights activists calling attention to the challenges facing disabled Americans, or individuals espousing any number of foreign policy viewpoints. Interestingly, the vast majority of demonstrations in our city – approximately 80 percent over the past year – are non-permitted rallies and marches. These are events that spring up without advance notice, and which we must respond to and support.

So the vast majority of the demonstrations we support occur below the radar screen, out of the media limelight. Most people don't event know they have occurred. But to those individuals who have assembled to make their voices heard, their causes and their events are no less important than the large-scale rallies that garner wall-to-wall media coverage. All of these demonstrators have the same expectations: to exercise their First Amendment rights openly and securely. And every year, our Department meets those expectations for literally hundreds of thousands of people. The Metropolitan Police Department is uniquely entrusted to provide the type of open, safe and secure environment that enables free speech to take place here in the capital of the free world. We take that responsibility very seriously, and we fulfill that responsibility to the best of our ability.

In addition to upholding the rights of demonstrators, police departments have the equally important responsibility of protecting the lives and property of residents, business owners and others who are not associated with the protests. Again, our Department's track record in protecting our citizenry during major events is exemplary. Of the hundreds and hundreds of demonstrations that we have handled over the past three years, not one has resulted in the type of widespread property damage and violence that occurred in Seattle in the fall of 1999, or subsequently in cities such as Quebec, Genoa, Italy, and others. And in only two of the DC demonstrations – the April 2000 protests against the

IMF and World Bank, and the September 2002 anti-globalization protests – were there significant numbers of arrests.

Beyond temporary disruptions to traffic or other inconveniences, the vast, vast majority of demonstrations in our city occur without any significant negative impact on residents, businesses or the normal operations of our city and its government. I am extremely proud of our Department's track record of supporting the exercise of free speech in our city, while providing the type of protection and security that our residents demand and deserve.

In exploring this whole issue from a historical perspective, this Committee has documented how balancing the free speech rights of demonstrators and the public safety rights of the community has always been a challenge for law enforcement. In recent years, this balancing act has been made even more complex by two important factors: the very real threat of terrorism and the changing nature and tactics of some individual protest movements.

Prior to September 11, 2001, the primary public safety concerns during demonstrations were the safety of the demonstrators and the safeguarding of property. While those things remain important today, public safety has taken on a whole new and more complex dimension since the terrorist attacks of Nine-Eleven. Today, we must consider and plan for the very real possibility that demonstrations in our city could themselves be the targets of terrorists, or that terrorists could use a demonstration or other major event as a "cover" for carrying out an attack against the federal government or the community at large. These situations are not some type of worst-case-scenario fantasy. Rather, they are very real-world possibilities that we must plan for and that we must be able to respond to.

Responding to the threat of terrorism in Washington, DC, means ensuring that our city remains open and accessible if an emergency were to occur. So at the same time we are protecting the free speech rights of individuals during demonstrations, we must also ensure that emergency vehicles and residents can traverse the city in case of an emergency – which leads to my second point about the changing nature of some protests and protest tactics. Here in DC as recently as September 2002 – and in other cities from Seattle up to the present – law enforcement has been faced with certain groups who have had the stated goal of "shutting down" our cities as part of their protests. Those are their words, not mine.

Of course, we can sit here all day and debate whether or not those types of threats are real. The rhetoric has certainly been there, and the protesters in Seattle demonstrated that through the use of "sleeping dragons" and other techniques, they can indeed bottle up traffic and prevent police and other emergency workers from getting around. In a target-rich city such as ours – in the post-Nine-

Eleven world – the fact is that we simply cannot sit back and see if those types of threats can, in fact, be carried out. The safety and well-being of our residents demand that we keep our city open and functioning, even as we accommodate the free speech rights of individuals at the same time.

My point is that the difficult challenges that have faced law enforcement for decades – dating back to the civil rights and Viet Nam War eras – are more complex than ever, as we factor in the threat of terrorism and the constant need for emergency preparedness into all of our plans.

The good news is that of the hundreds of protest groups that our Department interacts with each year, the vast majority recognize and appreciate the new realities of public safety during major events. The MPD – along with the US Park Police and other federal partners – work very well with these groups in going over plans, mapping out demonstration routes, and reaching agreements that both enable these groups to express their opinions and help the police maintain a safe and secure environment for all. These groups include organizers of recent anti-war demonstrations, groups protesting on both sides of the abortion question, as well as a variety of labor, health, education and other activist groups. These and many other advocacy groups have been able to organize and conduct large-scale – and peaceful – demonstrations in our city, even as we face the new threats of terrorism. Thanks to the hard work of both police and protesters, DC today remains an open and accessible city for vigorous and peaceful protest.

Over the past few years, in fact, issues of police performance have arisen primarily during those demonstrations in which organizers have refused to sit down with the police ahead of time to plan their events. Of the hundreds and hundreds of demonstrations that our Department has supported in the past three years, this Committee seems to be focused very narrowly on a minute number of events in which protest organizers not only refused to work with the police ahead of time, but also made repeated and very public threats to damage property and disrupt the functioning of our city. As the Committee examines common themes and issues in this small set of demonstrations, I think it is important that, in addition to examining the performance of the police, you also explore the tactics, rhetoric and performance of the protest groups and their organizers. And I believe it is crucial for this Committee to also consider the rights of our residents, our businesses and workers to be safe and secure – to be able to go about their business – when there are demonstrations in our city. I found it quite interesting that the Committee's "public" witnesses during these two days of hearings did not include a single individual or group representing the critically important perspective of our ANCs, our neighborhood associations, our business community and others.

I recognize that our city will always have protests in which organizers have not secured the appropriate permits ahead of time. And I realize that it is these types of situations that present the greatest challenges to our Police Department, and in which our performance is most likely to be

scrutinized. As a public safety agency, we must be able to perform in all types of protest situations – permitted and non-permitted. And perhaps most importantly, we must be able to recognize our successes and shortcomings after each event, and make any improvements that are needed.

During any one event, I can assure the Committee that e strive to make the best decisions, with the information available at the time, and always in good faith. In retrospect, we may later discover that there are better ways to do things than we did at the time. In these cases, our Department is not afraid to make changes in our policies and procedures.

This was the case after the arrests in Pershing Park in September 2002, which you will recall, followed a morning of illegal protests and some sporadic property damage in downtown DC. Upon reviewing our performance during that event, I directed our Office of Professional Responsibility to conduct a thorough review of that incident and our actions. I also directed our investigators to make recommendations for improvement in future events of this type. In fact, I think it is important for the record to reflect that it is the MPD's own internal report that has served as a primary basis for these hearings.

That report identified a number of management and operational deficiencies that took place during the Pershing Park incident. The report also recommended three important changes related to our mass demonstration procedures. In accepting these three recommendations, I directed that 10 additional actions be taken in order to fully address the deficiencies identified during our internal investigation. These reforms include:

- a re-write of our Mass Demonstration Handbook to reflect our current organization, our use-of-force continuum and our operational practices;
- revisions to our command-and-control procedures, to ensure Command officials have access to timely information;
- tighter procedures on issuing warnings for crowds to disperse;
- the use of an operations log to document all actions taken during an event;
- the designation of an official to take responsibility for the operations log;
- greater flexibility in the use of restraints on individual arrestees who are held in a non-secure facility; removal of the term "hog-tying" from all Department directives – we don't now and have not "hog-tied" arrestees;
- regular monitoring of prisoner processing facilities by our Civil Rights and Force Investigations Division;
- more oversight by our Information Technology office in detecting and troubleshooting any computer problems that may unnecessarily delay prisoner processing;
- and a new standard for more quickly switching to manual prisoner processing procedures

when the automated system fails.

I am pleased to report that all of these recommended reforms have, in fact, been implemented.

Our Department's response to the incident in Pershing Park last September is indicative of our openness to self-examination and our willingness to make changes where changes are needed. I look forward to reviewing the results of this Committee's investigation, and to see what additional changes you believe may be necessary. In the meantime, I feel confident that through our own internal review and improvement processes, we have already implemented significant reforms that have made our management of large-scale demonstrations even better.

*     *     *     *     *

In closing, I want to reiterate that the Metropolitan Police Department takes very seriously our dual obligations to protect the free speech rights of individuals while also protecting the safety and well-being of our communities. While this responsibility has become more challenging than ever in recent years, our resolve to perform exceptionally in this area is greater than ever.

Our Department does not view this issue as an "either-or" proposition – "either" free speech "or" public safety. We are confident that the two can co-exist – indeed, in our democracy, they must co-exist. And just as we have succeeded in protecting the free speech rights of hundreds of thousands of individuals over the past few years in a safe and secure environment, we will strive to become even more professional and more effective in carrying out this awesome responsibility in the future.

Thank you for the opportunity to present this opening statement. Before I take your questions, I would like to make one final request of the Committee. As I mentioned at the beginning of my statement, our Department has cooperated fully with the Committee in its preparations for these hearings, and we have provided you with a large amount of information, much of it very sensitive in nature. I recognize that this information is important to fulfilling your oversight role. However, I do urge the Committee not to release publicly any information we provided that would compromise our Department's ability to maintain order and protect our residents and our communities during future demonstrations.

Thank you for your consideration. And now I would be happy to answer your questions.