UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SARAH CARR, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. A. No. 06-00098 (ESH) |
| ) | |
| DISTRICT OF COLUMBIA, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABIILTY**

# Exhibit K

### Excerpts, Testimony Under Oath by DCMPD Assistant Chief Brian Jordan Before the District of Columbia Council Committee on the Judiciary (November 12, 2003)

Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National
Lawyers Guild and the American Civil
Liberties Union of the National Capital Area

Counsel for Plaintiffs

**Committee on the Judiciary**　　　　　　CondenseIt!™ **Assistant Chief Brian Jordan 11-12-2003**

Page 1

ASSISTANT CHIEF BRIAN JORDAN INTERVIEW

by

MARY M. CHEH, Special Counsel
JOHN HOELLEN, Special Counsel

November 12, 2003

[TRANSCRIPT PREPARED FROM AN AUDIO TAPE RECORDING]

Page 2

APPEARANCES:

ANDREW SAINDON, Assistant Corporation Counsel
　Representing Assistant Chief Brian Jordan

ALSO PRESENT:

KATHY PATTERSON, Council Member and
Chair on the Committee on the Judiciary

AMY MAURO, Staff, Judiciary Committee

[TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING]

Page 3

　　　　　　INTERVIEW
1　　MS. CHEH: In progress] -- the Judiciary Committee
2 of the D.C. City Council, their investigation into the
3 patterns and practices of the Metropolitan Police Department
4 with respect to a mass protest and demonstrations.
5　　And today, as you can see, we are only recording
6 this orally so before we get started I am going to ask that
7 everybody go around the table, identify themselves, spell
8 their last name and state their affiliation.
9　　My name is Mary Cheh, C-H-E-H. I'm a professor of
10 law at George Washington University and I'm here today as
11 the Special Counsel to the Committee.
12　　MS. MAURO: My name is Amy Mauro, M-A-U-R-O, and
13 I'm staff to the Judiciary Committee.
14　　MR. SAINDON: My name is Andrew Saindon, S-A-I-N-
15 D-O-N, I'm with the Office of Corporation Counsel and I'm
16 here to represent Chief Jordan in his personal capacity.
17　　ASSISTANT CHIEF JORDAN: I'm Brian Jordan, Brian
18 K. Jordan, J-O-R-D-A-N. I'm assistant chief of police with
19 the Metropolitan Police Department assigned to Regional
20 Operations Command Central.

Page 4

1　　MS. PATTERSON: I'm Kathy Patterson, Councilmember
2 and chair of the Council Committee on the Judiciary,
3 Patterson is P-A-T-T-E-R-S-O-N.
4　　MR. HOELLEN: John Hoellen, H-O-E-L-L-E-N, I'm
5 with the Office of General Counsel here at the Council and
6 I'm also serving as a Special Counsel for the purposes of
7 this investigation.
8　　MS. CHEH: It may be from time to time given the
9 number of people that are here that we might want to
10 identify ourselves if we interject when somebody else is
11 speaking, but otherwise, I think it ought to go, I think,
12 pretty smoothly.
13　　Our first order of business is to swear in you,
14 our witness, so Kathy, could you do that.
15　　MS PATTERSON: Stand and raise your right hand.
16　　Do you swear or affirm under penalty of law that
17 the testimony you are about to give to the Council of the
18 District of Columbia, Committee on the Judiciary is the
19 truth, the whole truth and nothing but the truth?
20　　ASSISTANT CHIEF JORDAN: Yes, ma'am.
21　　MS PATTERSON: You may be seated.

Page 5

1　　MS. CHEH: And before we begin there are a number
2 of preliminaries I want to go over with you so that
3 everything is clear. First of all, and probably most
4 importantly, I want to make sure that you understand the
5 protections that you have in the rules that we're operating
6 under.
7　　As I mentioned at the outset, this is an
8 investigation into mass protests in the District of Columbia
9 and how the Metropolitan Police Department proceeds and in
10 that regard as part of its approach, the Judiciary Committee
11 has opened this investigation and you have been subpoenaed
12 here today to testify before us; is that right?
13　　ASSISTANT CHIEF JORDAN: Yes, ma'am.
14　　MS. CHEH: And when you were subpoenaed, were you
15 also given a copy of the rules of the Committee?
16　　ASSISTANT CHIEF JORDAN: Yes, ma'am.
17　　MS. CHEH: Now, I see that you are represented by
18 counsel here today and you are entitled to be represented by
19 counsel, but I need to clarify something about that.
20　　You understand that your counsel is a member of
21 the Office of Corporation Counsel; is that right?

Page 6

1　　ASSISTANT CHIEF JORDAN: Yes, ma'am.
2　　MS. CHEH: And is it your understanding that your
3 counsel is here today to represent you personally?
4　　ASSISTANT CHIEF JORDAN: Yes, ma'am.
5　　MS. CHEH: Now, I need to tell so that you
6 understand this, we've had conversations with the Office of
7 Corporation Counsel about this form of representation, and
8 it is understood that when your counsel is here today, your
9 counsel is representing you personally and we are meeting in
10 executive session and your counsel will keep conversations
11 and testimony that you present today confidential and simply
12 between the two of you. He will represent you and your
13 interests alone. Is that your understanding, as well?
14　　ASSISTANT CHIEF JORDAN: Yes, ma'am.
15　　MS. CHEH: Now, under our rules it is important
16 that you understand the nature of what we're doing. This is
17 not a judicial proceeding. It is precisely not a court
18 proceeding. It is an oversight investigation such
19 as you would have out in the open, but we're doing it in
20 executive session. That means in this hearing unlike in
21 court when you've appeared in court and that sort of thing,

Page 37

1 then during that same demonstration, there were a large
2 number of arrests on Connecticut Avenue.
3     ASSISTANT CHIEF JORDAN: No, actually Connecticut
4 Avenue was the smallest number of arrests, I think.
5     MS. CHEH: Well, I mean, a group arrest.
6     ASSISTANT CHIEF JORDAN: Yeah.
7     MS. CHEH: What would be characterized as a mass
8 arrest under the handbook. There was a mass arrest at
9 Pershing Park.
10    ASSISTANT CHIEF JORDAN: Okay.
11    MS. CHEH: There was a mass arrest at the 900
12 block of 12th Street.
13    ASSISTANT CHIEF JORDAN: Yes.
14    MS. CHEH: And there may have been others. So
15 during that particular morning as it proceeded through till
16 noontime, there were various pockets where mass arrests were
17 conducted. Was that, in your mind, or if you know, a
18 tactic, as I said before, designed to stop these groups
19 particularly as they were splintering off from getting, how
20 shall we say, out of control?
21    ASSISTANT CHIEF JORDAN: I think we should clarify

Page 38

1 which one is which. In terms of 2002, the incident of 2002
2 was not a scheduled march. The incident of 2002, if I
3 remember correctly, there were a number of different days
4 where marches were to occur. The mass arrests that occurred
5 in 2002 occurred on a date where there were no permitted
6 marches. There were permits for different parks throughout
7 the city, but there was no clear indication of marches so
8 that there was no plan, as you refer to, nip something in
9 the bud. There was no clear indication what was to occur
10 because all that was permitted and planned for was
11 assemblies at the different parks.
12    MS. CHEH: Now, when these unpermitted actions
13 took place, was it your understanding that they should be
14 stopped?
15    CAPTAIN KLEIN: Which now again, which one?
16    MS. CHEH: When there is a protest or a movement
17 of protesters on an unpermitted march.
18    ASSISTANT CHIEF JORDAN: No, actually the -- the
19 date of -- where they were in the parks because we didn't
20 have any clear information what their intents were, there
21 were no -- we had CDU units around the different parks

Page 39

1 because it wasn't clear what was going to occur, but they
2 were all stationed back. It was designed to be soft, to
3 make sure that it was any show of force. And at least from
4 my area, the goal was that if they wanted to march or tried
5 to march, generally what happens is the organizers will say,
6 we want to march, we want to go from 14th Street to Franklin
7 Park, and in that situation, we can plan to take our CDUs to
8 cut traffic, to let them go down the street and the goal is
9 to make sure people are safe. Make sure traffic is safe,
10 make sure the protesters are safe and make sure that the
11 city continues to operate, and that was the goal of that day
12 to ensure that --
13    MS. CHEH: Right.
14    ASSISTANT CHIEF JORDAN: -- depending on what
15 happened that we could be flexible.
16    MS. CHEH: But since you had people that were not
17 always operating pursuant to any plan that you could figure
18 out. You had people going off in one direction, what would
19 you do about that?
20    ASSISTANT CHIEF JORDAN: Well, and that's exactly
21 what happened. That when the marchers just all began to

Page 40

1 march from, I think, it was Franklin Park --
2     MS. CHEH: So they collected first in Franklin
3 Park?
4     ASSISTANT CHIEF JORDAN: Yes.
5     MS. CHEH: And then almost without warning, they
6 left?
7     ASSISTANT CHIEF JORDAN: They just all started in
8 large numbers out onto K Street into the middle of the
9 street.
10    MS. CHEH: Okay. What did you do then?
11    ASSISTANT CHIEF JORDAN: At that point because
12 this was -- and I can't remember the exact time, but it was
13 the early morning hours on a weekday on K Street, and it was
14 totally unplanned for, traffic -- horns were blowing, people
15 were -- and the marchers didn't have any regard for traffic
16 and it really became a dangerous situation because you are
17 in the middle morning --
18    MS. CHEH: Rush hour.
19    ASSISTANT CHIEF JORDAN: -- traffic on K Street.
20 So cars were trying to get out of the way and at this point
21 it was a very dangerous situation. They were snake marching

Page 41

1 and things of that nature and it was almost impossible to
2 give any direction. So at that point, I had to make a
3 decision that if this continues and somebody gets ran over,
4 then what? So at that point the goal was to try to cutoff
5 the march and then at that point every time -- well, when
6 there was an attempt made to cutoff, they went a different
7 way and that's where once it got up to Vermont Avenue, we
8 stationed CDU units at one end of the block and after they
9 went into the block, we stationed CDU units behind and at
10 that point the decision was made that we had to make the
11 arrests.
12    MS. CHEH: Now -- and I do want to talk about
13 those particular incidents, but talking more in general, we
14 have detected that one of the tactics used in 2002, perhaps
15 even 2000, which may be different and it may be accounted
16 for by the fact that you have these groups behaving this
17 way, but one of the tactics is to take these splinter groups
18 and to enclose them and detain them. Not necessarily to
19 arrest them, but to enclose them and bring them under
20 control; is that correct?
21    ASSISTANT CHIEF JORDAN: I can't speak for anybody

Page 42

1 else. The area which I handled, again, when you have a
2 large crowd of people, I talked to you earlier about CDU
3 formations. One of the things about CDU formation is a line
4 formation.
5     MS. CHEH: Right.
6     ASSISTANT CHIEF JORDAN: Another is a wedge
7 formation and, again, that if the line formation is simply
8 to stop the movement, that's what's used and you go from
9 building line to building line to stop the movement. That
10 is as a result of doing a line formation, if you are going
11 to simply let the crowd disperse, again, you make sure that
12 there is an area for them to disperse and you leave that as
13 the opening. Because in this situation with the number of
14 people out in the street, if you simply left it opened for
15 them to go back where they were, you're putting them back in
16 danger of sending them in the middle of the street.
17    MS. CHEH: Fair enough. But what I am trying to
18 find out is we have had other testimony and we can also look
19 at that particular situation where because a crowd is moving
20 and you want to bring them under control, you might set up
21 your lines front and back, as you've described, and detain

Page 43

1 them and tell them to disperse?
2     ASSISTANT CHIEF JORDAN: Again, I think that would
3 be based on the leader. I think that would be based on the
4 situation in which they are confronted with and the
5 situation in which they are making their decision. At the
6 point that I was and the area that I had, I didn't have any
7 preconceived ideas because it was all based on what I'm
8 confronted with. And in that situation, I had to make the
9 decision based on what I had at the time.
10    MS. CHEH: Right.
11    ASSISTANT CHIEF JORDAN: Now, if there was another
12 situation could I think through it different and do
13 something differently, I think you have to take all the
14 facts and weigh those together.
15    MS. CHEH: Right. But it is a legitimate tactic
16 to -- if you have a group like that to have a line at the
17 front, have a line at the back and then to tell them to
18 disperse in an orderly way. In other words, to have them
19 perhaps dribble out or release them after the crowd itself
20 has come under control or maybe you might use that as an
21 occasion to try to find out who is the leader. Would that

Page 44

1 ever make sense to do that?
2     ASSISTANT CHIEF JORDAN: It could make sense.
3 And, again, it would be based on the totality of
4 circumstances that, for example, we have had situations
5 where I remember and I can't remember which one, it wasn't
6 an IMF, it was an anti-war protesters where the marchers got
7 to the point of 16th and H Street and sat in the street. At
8 that point, you can say, okay, the reason we're putting a
9 line here and a line here is to keep traffic flowing around
10 and if they want to continue to move, we'll wait and we'll
11 control -- cutoff streets again and let them continue their
12 march. That's why I said it depends on the totality of
13 circumstances.
14    MS. CHEH: We've also heard about other kinds of
15 tactics that may make sense depending on the circumstances
16 where there may be large groups and officers may attempt
17 then to divide them into smaller groups. Would that ever be
18 an appropriate tactic?
19    ASSISTANT CHIEF JORDAN: It depends. The options
20 of dealing with mass situations always depends on the safety
21 of officers, the ability to carry out the operation and what

Page 45

1 is the ultimate goal. For example, the way it's formation
2 is a line formation that is used to separate a crowd and in
3 that situation you may separate the crowd to go in and make
4 an arrest or you may separate the crowd to use the next
5 tactic to funnel them so they disperse in a certain
6 direction. So it depends on your ultimate goal with regard
7 the crowd. If you've got -- in 2000 when there were
8 anywhere from 25,000 to 50,000 people, you may use multiple
9 line formations because you are trying to stop them from
10 going down this street.
11    MS. CHEH: Uh-huh.
12    ASSISTANT CHIEF JORDAN: So the tactics are
13 numerous. The logic behind them can vary based on the
14 incident commander, but the purpose is usually based on what
15 you are trying to do ultimately.
16    MS. CHEH: Well, just by way of an example of
17 keeping groups apart. We've had testimony -- we'll talk a
18 little about Pershing Park, but just for the moment as an
19 example, of keeping people in Freedom Plaza separate from
20 people in Pershing Park so that it was easier to control if
21 people were here and people were here. That would be a

Page 46

1 sensible tactic under some circumstances, right?
2     ASSISTANT CHIEF JORDAN: I wasn't at Pershing
3 Park. I can't say what was sensible because I don't have
4 all that information. That's why I say, it depends on the
5 totality of circumstances. It depends on the logic and
6 which was being administered at the time you made your
7 decision.
8     MR. HOELLEN: If I could, just for the record,
9 we've been talking about September 27th, 2002 and we're
10 talking about arrests at Vermont and K that Mr. Jordan has
11 been addressing, and Pershing Park is also on September
12 27th, 2002.
13    MS. CHEH: Okay. Among other tactics, we're
14 informed that there were meetings again prior to the
15 demonstrations in 2002. We'll take that as an example where
16 there were discussions about various techniques that may be
17 used, for example, there were discussions about bicyclists.
18 Apparently in some of these demonstrations they used
19 bicyclists that bicycle all around the city, and how it
20 might be appropriate to use the laws requiring a bicycle to
21 be registered as basis to confiscate bicycles as a way to

Page 47

1 intervene with respect to these bicycle groups.
2     Are you aware of any conversations or plans about
3 bicyclists or how they might be dealt with?
4     ASSISTANT CHIEF JORDAN: No, ma'am.
5     MS. CHEH: Did you have any conversations with
6 anybody prior to the demonstrations, let's say, in 2002
7 about the level of the show of force, in other words, were
8 there decisions made about how many people would be put in
9 riot gear, how many people would be deployed on motorcycles?
10 Did you have any involvement in any of those conversations?
11    ASSISTANT CHIEF JORDAN: No. Again, the 2002 --
12    MS. CHEH: When you were an incident commander.
13    ASSISTANT CHIEF JORDAN: But there were multiple
14 days of 2002.
15    MS. CHEH: Right. Right.
16    ASSISTANT CHIEF JORDAN: There are certain days on
17 2002 where, for example, if there was a march and the plan
18 called for using the bicycle unit to help move the march,
19 that was a softer approach.
20    MS. CHEH: Uh-huh.
21    ASSISTANT CHIEF JORDAN: But still having people

Page 48

1 prepare for if we had to go and move into a full CDU that
2 that can occur. So there was a continuum prepared for from
3 the softest to the hardest.
4     MS. CHEH: I see. Would it only be the CDU units
5 that would be in riot gear?
6     ASSISTANT CHIEF JORDAN: Well, everybody assigned
7 to the detail were CDU.
8     MS. CHEH: I see. And would they have been sort
9 of held out of sight for the most part unless they were
10 specifically needed and then called to the front wherever
11 that might be?
12    ASSISTANT CHIEF JORDAN: Well, there were
13 different -- again, there were different CDU -- there were
14 CDUs that were response platoons. Those would be the ones
15 who were back and available because they had to move around
16 the city and so they would be off the main line. So if they
17 had to get from 14th Street to 19th Street, they would do it
18 off of the main line.
19    Then there may have been the bike units that was
20 designed to funnel the march consistent with the path route
21 and to make sure that if we got to an intersection that that

Page 79

1  MS. CHEH: But that is not your understanding?
2  ASSISTANT CHIEF JORDAN: No. I agree. This is
3  the governing government, but with regard to the operational
4  plan which for the JMF further clarifies the governing
5  document to an incident manual which outlined area
6  responsibility and incident command, that's the document I'm-
7  referring to which guided the directions for handling the
8  incidents.
9  MS. CHEH: Well, let me see more particularly what
10 your understanding might be then. If you turn, for example,
11 to page 21, which is a follow-up of page 20 about crowd
12 dispersal, is it your understanding that these directions
13 about how to deal with a crowd presenting these
14 possibilities of unlawful disruption either through violent
15 or passive means, that there shall be an issuance of
16 warnings to the group to disperse or to stop their behavior.
17 Does that govern?
18 ASSISTANT CHIEF JORDAN: I'm sorry, repeat your
19 question?
20 MS. CHEH: Would this document govern your
21 behavior in those circumstances?

Page 80

1  ASSISTANT CHIEF JORDAN: With regard to what?
2  MS. CHEH: With regard to a crowd that has become
3  something out of control or potentially is violent. It says
4  --
5  ASSISTANT CHIEF JORDAN: That's not what I was
6  dealing with.
7  MS. CHEH: Well, let me ask you without your
8  particular crowd, if the intensity level of a crowd rises
9  and unlawful disruption either through violent or passive
10 means is occurring to the extent that the field commander,
11 which I think you are assuming is you?
12 ASSISTANT CHIEF JORDAN: I think you are referring
13 to a crowd. What I was dealing with was an unpermitted
14 march.
15 MS. CHEH: Uh-huh.
16 ASSISTANT CHIEF JORDAN: That's not a crowd. And
17 the fact that the march was occurring and it was occurring
18 with the intent to create civil disobedience where there was
19 no clear leader, the ability to give dispersal became
20 impossible and the goal was, as it relates in this same
21 management, was then it make an arrest and not to do crowd

Page 81

1  dispersal, which is a different governing issue.
2  MS. CHEH: That is maybe where you were going, but
3  this does talk about crowd management and doesn't make
4  reference to the crowd being a permitted crowd or an
5  unpermitted crowd.
6  ASSISTANT CHIEF JORDAN: And I'm not referring to
7  a crowd, I'm referring to a march.
8  MS. CHEH: And you are saying that these
9  provisions that talk about a crowd --
10 ASSISTANT CHIEF JORDAN: If -- like the crowd was
11 at Franklin Park.
12 MS. CHEH: Uh-huh.
13 ASSISTANT CHIEF JORDAN: If the issue was to
14 disperse Franklin Park, that's dispersing a crowd. That's
15 when the directions of dispersing a crowd kicks in. If you
16 have a march where people are marching without a permit at
17 the point in which they have broken the law which governs
18 marching with or without a permit, and a decision is made to
19 arrest, you are moving into the mass arrest mode.
20 MS. CHEH: Okay. So it is your view that these
21 sections don't apply?

Page 82

1  ASSISTANT CHIEF JORDAN: It is my view that I was
2  not dealing with the sections that govern a crowd, but the
3  sections that govern a march.
4  MS. CHEH: So you didn't feel that any warnings
5  were necessary?
6  ASSISTANT CHIEF JORDAN: No. With regard to the
7  march warnings were impractical and to the point of giving
8  someone directions, impossible.
9  MS. CHEH: Is that because in your after action
10 report, I'm referring to Exhibit No. 2 --
11 ASSISTANT CHIEF JORDAN: Uh-huh.
12 MS. CHEH: -- in about the middle of page, you
13 said, "I determined that to allow the act of civil
14 disobedience to continue could possibly lead to serious
15 bodily injury, et cetera, and considering that any order to
16 disperse could not be communicated to the protesters who
17 were dispersing in different directions, the only avenue was
18 to effect mass arrests of all violators marching without a
19 permit."
20 So I was reading that and it sounded like you were
21 saying that you would have given warnings, but it was not

Page 83

1  possible to communicate them under those circumstances where
2  they were going in different directions?
3  ASSISTANT CHIEF JORDAN: Well, I guess what I was
4  -- if you are asking that question, what I was dealing with
5  was a fluid situation of marchers who had no intent of
6  following directions of the law, pedestrians or anything to
7  that nature. That their clear and distinct purpose was to
8  disrupt traffic in their actions, and that that was
9  occurring and their actions became a danger to them and that
10 I had to take police action to stop it immediately before
11 someone was seriously hurt or killed.
12 MS. CHEH: Right. And you're saying that the
13 situation was fluid, I take it you assume that it was not
14 static, it was not under control, correct?
15 ASSISTANT CHIEF JORDAN: What was fluid was the
16 fact that the marchers without warning and without any clear
17 direction just began snake marching throughout the street.
18 MS. CHEH: But once you had the line in front of
19 them and the line in back of them, they were controlled,
20 weren't they?
21 ASSISTANT CHIEF JORDAN: But the decision was

Page 84

1  already made to arrest.
2  MS. CHEH: So that even though at that point, once
3  there was a line in front of them and a line in back of
4  them, even though in your own mind you had made a decision
5  to arrest, where was the danger?
6  ASSISTANT CHIEF JORDAN: The action stopped the
7  danger. If they were allowed to continue the danger would
8  continue. The action stopped and prevented further danger
9  MS. CHEH: Did you announce to them at that time
10 that they were all being placed under arrest? How did that
11 happen?
12 ASSISTANT CHIEF JORDAN: Did I announce to them,
13 no, I did not.
14 MS. CHEH: So what happened, they were all
15 standing around [inaudible]?
16 ASSISTANT CHIEF JORDAN: What happened was after
17 we -- after we blocked their movement, the decision was made
18 to arrest at which time the CDU units were tactically
19 deployed to go in and arrest each individual involved.
20 MS. CHEH: Now, your chronology, if I can call you
21 back to that, which, again, is Exhibit 1, says that at