## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. A. No. 06-00098 (ESH) |
| ) | |
| DISTRICT OF COLUMBIA, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT DISTRICT OF COLUMBIA'S STATEMENT PURSUANT TO LCvR 7(h) OF MATERIAL FACTS AS TO WHICH DEFENDANT CONTENDS THERE ARE NO GENUINE ISSUES OF MATERIAL FACT IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, District of Columbia ("District"), by and through counsel, respectfully submits this Statement Pursuant To LCvR 7(h) Of Material Facts As To Which Defendant Contends There Are No Genuine Issues Of Material Fact In Support Of Defendant's Motion For Partial Summary Judgment.

1.       On the evening of January 20, 2005, plaintiffs Sarah Carr, Allyson Kirk, Chelsea Kirk, and Jonathan Scolnik attended an Anti-Inaugural Concert ("AIC") presented at the Sanctuary Theater, in a church located at 1459 Columbia Road, NW.  Compt ¶ 18 (Dkt. 1)

2.       The AIC had been well-publicized in advance.  Complt ¶ 18.  The planned presentation of the AIC at the church at 1459 Columbia Road, NW, had been announced over the internet.  Deposition of Sarah Carr, relevant pages of which are annexed as Exh. 17 ("Carr Dep.") at 86:21-87:10.  *See also* Declaration of Jeffrey Madison, executed February 22, 2008 (a copy of which is annexed as Exh. 1 ("Madison Decl.") at ¶¶ 3-4.

3.      It is common for the Intelligence Section to monitor open and publicly accessible websites to ascertain whether there are events or activities planned to take place in Washington, DC, that may implicate issues of security or criminal activity.  These include incidents having any relationship to the Presidential Inauguration.  It was through this routine monitoring of open, publicly accessible websites that MPD learned of the Anti-Inaugural Concert ("AIC") planned for January 20, 2005, to be held at a church at 1459 Columbia Road, NW.  It is the experience of officers in the Intelligence Section of the Metropolitan Police Department ("MPD"), is that private citizens seek information about activities in the District this same way.  In particular, persons who seek out or wish to publicize demonstrations and related activities tend to utilize internet communications, including blogs and websites, for those purposes. Although the Intelligence Section learned of the AIC by monitoring the internet, we did not obtain any information about a possible march following from the AIC.  Declaration of Jeffrey Madison, executed February 22, 2008 ("Madison Decl."), a copy of which is annexed as Exh.1, at ¶¶ 4, 5.

4.      Although the Intelligence Section learned of the AIC by monitoring the internet, we did not obtain any information about a possible march following from the AIC.  Exh. 1 (Madison Decl.) ¶ 5.

5.      Fliers that announced that a march would take place following the AIC were distributed to persons at the AIC.   Deposition of Allyson Kirk ("AKirk Dep."), relevant pages of which are annexed as Exh. 18 at 47:7-48:7.  These Fliers were distributed to people as they entered the venue and were available for attendees to take from a table on the premises at ay time during the AIC. Exh.18 (A. Kirk Dep.) at 47:7-48:7. Carr, the Kirks, and Scolnik each received and read such a Flier.  Compt ¶ 18 (Dkt. 1); J20 Counter Inaugural Ball Flier (Carr Dep Exh. 3) a copy of which is annexed as Exh. 11; Plaintiff Sarah Carr's Response To Defendant District Of

2

Columbia's First Set Of Interrogatories (relevant pages of which are annexed as Exh. 12), at 13

(response # 9); *see* Plaintiff Allyson Kirk's Response To Defendant District Of Columbia's First

Set Of Interrogatories (relevant pages of which are annexed as Exh. 13), at 12 (response # 8); *see*

Plaintiff Chelsea Kirk's Response To Defendant District Of Columbia's First Set Of

Interrogatories (relevant pages of which are annexed as Exh. 14), at 12 (response # 9).

6.    The flier discussing the after-AIC march stated:

Protest March – After the Show!!!!
As we've said tonight's show is not a concert, it's a celebration and it's a
protest!!!  After Anti-Flag's last song we invite you to join in a festive march
from this show through the streets of DC to the doorstep of those in power.
We're going to take our resistance to one of the Inaugural Ball where Bush and
his supporters celebrate their power and privilege at the expense of all.

During the last song of the evening we will distribute buckets, and encourage
drumming, chanting and participation from all.  Dress warm and be prepared to
head out the door.  After the last song we'll exit the space and march down
Columbia Road towards 16th Street.  We imagine a large festive march, that takes
the amazing energy surging through tonight's show to create an explosive protest
against the war in Iraq and the war here at home as well as against all that Bush
represents.  We will march from the show to the Washington Hilton, located at
1919 Connecticut Ave NW.  This is the site of one of tonight's balls.  From the
march, we will engage in our own protests.  We will show people faces behind
those of us who resist this administration and sham.  We will march from 18th St
to Columbia, and make a left on 18th and a right on Florida to get to Connecticut.
We will bring people back to the show space afterwards as well.  Please
remember to be respectful of the people in the Columbia Heights area where we
are guests.  Watch your surroundings and keep the energy focused where it needs
to be – on showing the world our opposition to Bush.

Join us in the streets tonight to send one NO! to the Bush regime and a million
yeses to all of the things we can create together.

Exh. 11 (Flier); *see also* Exh. 12 (Carr Rogs) at 19 (response #9); *see also* Exh. 13

(AKirk Rogs) at 12 (response #8); Exh. 14 (CKirk Rogs) at 12 (response #9).

7.    Carr understood the flier to express "justifiable anger" Exh. 17 (Carr Dep.) at

35:14-22.

8.      The Flier provided a written plan for the March. Exh.18 (AKirk Dep") at

62:15-63:16.  As provided for by the Flier's March Plan, the march was to organize and

commence in a residential area after 11:00 p.m.  Exh. 18 (A Kirk Dep.) at 61:20-62:2.

The March Plan reflected in the Flier provided for the marchers to take their

demonstration to the Hilton Hotel, at which an Inaugural Ball was being held.  Exh. 18

(A Kirk Dep). at 63:20-64:4.

9.      Four bands performed during the AIC.  They were "Anti-Flag," "Q And

Not U," "1905," and "Del Cielo." Exh. 11 (Flier); Exh.17 (Carr Dep.) at 23:17-25:8,

32:20-33:11; Exh. 18 (A Kirk Dep.) at 44:4-5; Deposition of Jonathan Scolnik ("Scolnik

Dep."), relevant pages of which are annexed as Exh. 19, at 53:4-11.  Singers in at least

two of these bands made announcements from the stage at the AIC informing the

attendees of the march discussed in the flier.  Exh. 17 (Carr Dep.) at 32:20-33:11; Exh. 18

(AKirk Dep.) at 50:6-51:12 (Anti-Flag, Justin Sane); Deposition of Chelsea Kirk (CKirk

Dep.), relevant pages of which are annexed as Exh. 20, at 45:16-46:3 (person announced

march plans from stage using microphone after Anti-Flag performance); Exh. 19 (Scolnik

Dep.) at 50:6-51:9 (Anti-Flag announced and encouraged participation); *see also* Exh. 19

at 53:21-54:13 (person from anti-war group also made announcement from stage).  These

announcements were made with sound amplification to be audible to the more than 100

people present in the performance area.  Exh. 17 (Carr Dep.) at 39:16-40:11; Exh. 20

(CKirk Dep.) at 45:16-46:3.

10.     Members of the Bands Q And Not U and Anti-Flag urged the people in

attendance at the AIC to participate in the post-AIC march.  Exh. 17 (Carr Dep.) at 42:6-43:17

(Chris Richards of Q And Not U urged participation in march); Exh. 18 (AKirk Dep.) at 50:6 -

51:1 (Justin Sane of Anti-Flag encouraged march participation); Exh. 19 (Scolnik Dep.) at 50:6-51:9 (Anti-Flag announced and encouraged participation).

11.    The Flier and the announcements from the stage during the AIC provided "very clear instructions" concerning where marchers were to meet, the march route, what the participants should do following the march, and what the purpose or intent of the march was. Exh. 18 (AKirk Dep.) at 169:10-22.  Those instructions also called for marchers to crash – breach security at – the Inaugural Ball being held at the Hilton Hotel.  Declaration of Drew Smith ("Smith Decl.") executed February 22, 2008, a copy of which is annexed as Exh. 2 ¶ 9.

12.    Jeffrey Madison is a Sergeant of the Metropolitan Police Department ("MPD") and has been an MPD Officer since September 10, 1990.  On January 20, 2005, Madison was assigned to the Intelligence Section of the Office of the Superintendent of Detectives within MPD's Special Investigations Branch.  His duties and responsibilities that night included relaying information obtained from an MPD undercover officer ("U/C") to Lieutenant Michael Pavlik of the Special Investigations Branch.  Madison understood that the information that I provided would be relied upon to guide decisions by MPD officials in deploying resources and in seeking to protect against criminal misconduct. Exh. 1(Madison Decl.) at ¶ 3.

13.    Drew Smith is a Detective of the Metropolitan Police Department ("MPD") and has been an MPD Officer since Nov 1992.  On January 20, 2005, Smith was assigned to the Intelligence Section of the Office of the Superintendent of Detectives within MPD's Special Investigations Branch.  His duties and responsibilities that night included monitoring the activities of an MPD undercover officer ("U/C") and relaying information that the U/C provided to him, by cell phone to Sgt. Jeffrey Madison of the Special Investigations Branch.  Smith was also to relay information based on his own observations to Sgt. Madison.  Smith understood that

the information that he provided would be relied upon to guide decisions by MPD officials in deploying resources and in seeking to protect against criminal misconduct. Exh. 2 (Smith Decl.) executed February 22, 2008, a copy of which is annexed as Exh. 2, at ¶ 3.

14.    The U/C that Smith was monitoring was to attend an Anti-Inaugural Concert ("AIC") at a church located at 1459 Columbia Road, NW.  The U/C was to arrive at the church at 1459 Columbia Road, NW, at about 7:00 p.m., and the concert was expected to run until midnight.  The U/C was assigned to attend the AIC, which was open to the public, to gather intelligence regarding possible criminal misconduct that might be conducted in the aftermath of that day's Inaugural proceedings and in the context of the various Inaugural Balls being held in the District.  Smith was working in plain clothes and driving an unmarked cruiser, in which he sat parked in the 1400 block of Columbia Road, NW during the AIC. Exh. 2 (Smith Decl.) ¶ 4.

15.    The officer Smith was monitoring was an experienced U/C, and had on numerous occasions worked in assignments dealing with self-proclaimed anarchists and persons who had espoused criminal misconduct as a means of forwarding their respective agendas.  This officer had provided Smith credible information numerous times detailing the planning of criminal activity that was to occur at demonstrations/protests in the District of Columbia, and had never provided him with false information. Exh. 2 (Smith Decl.) ¶ 5.

16.    The U/C telephoned Smith at or about 9:00 p.m.  The U/C advised that a possible protest march to follow the AIC was being discussed in the church.  The U/C advised that the idea of such a march came as a surprise.  AIC "organizers" wanted to have such a march, but only if enough people joined in to make the march "effective."  The U/C relayed that the selection of bands for the AIC, specifically including the band Anti-Flag, had been intended to draw enough people to the AIC to provide for a large number of march participants.  The U/C

advised Smith that the "anarchists" from Baltimore wanted to march, as did protestors from New York. The U/C also told Smith that the venue was "packed" with people. The U/C informed him that performers with the bands urged persons in attendance to march. Smith provided this information to Sgt. Madison as he received it, and Smith estimated that the AIC had 500 persons in attendance. Exh. 2 (Smith Decl.) ¶ 6.

17.    The U/C advised Smith that the march was to commence at the end of the AIC, at about midnight. In preparation for the march, bandannas were provided by organizers with which marchers could cover their faces. The U/C reported that, along with the bandannas, organizers dispensed vinegar from spray bottles. Vinegar is commonly applied to bandannas in such contexts because the vinegar mitigates the debilitating effect pepper spray and tear gas when the bandannas are used as makeshift "gas masks." Exh. 2 (Smith Decl.) ¶ 7.

18.    The U/C also told Smith that "pipes," such as might be used to hold up banners, were being distributed at the AIC. In prior instances, Smith had known of pvc pipes, suitable for suspending banners, to be distributed, which contained lengths of rebar. Exh. 2 (Smith Decl.) ¶ 8.

19.    The U/C advised Smith of the intended march route, which the U/C said was provided on Fliers distributed at the AIC and announced from the stage during the AIC. According to the U/C, the route would go through Adams Morgan residential and commercial areas and to the Hilton Hotel, where an Inaugural Ball was being held. The U/C told Smith that the person announcing the march route from the stage said that marchers would "crash" --- breach security at -- the Inaugural Ball and that some of the protestors had discussed engaging in various types of property damage along the route from the AIC to the Inaugural Ball. Exh. 2 (Smith Decl.) ¶ 9.

20.    The original intent of the march was for the participants to proceed along the route set forth in the Flier and to arrive at and protest at the Hilton Hotel.  Exh. 18 (AKirk Dep.) at 182:3-183:16.

21.    This intent was communicated to AIC attendees through the Flier and through announcements made during the AIC.  Exh. 2 (A Kirk Dep.) at 184:7-10.   The stage at the AIC had speakers on both sides and was 3-4 feet high.  Exh. 2 (AKirk Dep.) at 43:7-44:8.

22.    Hundreds of people left the AIC with the shared intent of engaging in a demonstration consistent with the plan set forth in the Flier.  Exh. 2 (A Kirk Dep.) at 183:17-184:6.  Hundreds of people participated in the post-AIC march.  Exh. 2 (A Kirk Dep.) at 183:17-20; Exh. 13 AKirk Rogs) at 12 (response # 8).

23.    Some time after 11:00 p.m., the U/C advised Smith that the AIC was being cut short and that the march would commence at about 11:30, instead of midnight.  Smith communicated this to Sgt. Madison immediately. Exh. 2 (Smith Decl.) ¶ 10.

24.    At some point after 11:00, Smith observed 500 or more people exit the church onto Columbia Road, NW.  Some departed the church and walked eastward along Columbia Road, NW, departing the area.  The majority of the people leaving the church, however, moved westward and congregated in the intersection of Columbia Road, NW, and 16th Street, NW.  The U/C advised Smith that poles that had been distributed in the church were being used as the handles of torches.  The torches consisted of the poles with soup cans containing flaming fluids. From where Smith was located in front of the church, he could see numerous flaming torches held aloft by persons in the crowd that had emerged from the church.  The U/C communicated that the U/C felt that the crowd could become violent. Exh. 2 (Smith Decl.) ¶ 11.

25.    On January 20, 2005, Sgt. Madison also had the opportunity to observe hundreds of persons, who had attended an Anti-Inaugural Concert at 1459 Columbia Road, form a group near 16th Street NW, and Columbia Road, NW.  As the group formed, some individuals were in possession of some type of homemade torch.  These torches were then distributed amongst persons in the group and carried by these persons, aflame, as they marched along the roadway of Columbia Road, NE.  These torches appeared to be made of a dowel a couple of feet long, to which a soup can, apparently containing a flammable substance was connected.  Exh. 1 (Madison Decl.) ¶ 7.

26.    Madison had previously viewed a training video depicting the use of such torches by demonstrators to propel flaming liquid or gelatinous material.  Accordingly, Madison viewed the torches that these marchers carried as having the potential to be used as very dangerous weapons.  Exh. 1 (Madison Decl.) ¶ 8.

27.    On January 20, 2005, Madison promptly relayed all information that he received from MPD Detective Drew Smith to Lieutenant Pavlik, with whom Madison was riding in an unmarked MPD cruiser at the time.  Madison heard Lieutenant Pavlik relay all that same information to then-Commander Cathy Lanier.  Exh. 1 (Madison Decl.) ¶ 6.

28.    Some participants in the march wore bandannas or masks covering part or all of their faces to conceal their identities.  Exh. 2 A. Kirk Dep. at 179:8:- 180:8.  Some of the marchers carried torches.  Exh. A. Kirk 56:19-20; Brandon Jourdan.  The torches carried by the marchers were similar.  Exh. 18 (A Kirk Dep.) at 58:18-59:3.  The common appearance suggested that they were manufactured according to a common plan.  Exh. 18 (A Kirk Dep.) at 58:18-60:7.  Numerous marchers played plastic buckets as

drums.  Exh. 18 (A Kirk Dep.) at 56:16-57:5 (drummers were all through out the crowd;

it sounded like more than 10 from A. Kirk's vantage point near the rear of the march.)

30.    After spending five to 10 minutes getting organized, this group of approximately

250 to 300 persons marched westbound on Columbus Avenue.  The U/C was within the group of

marchers and Smith followed behind the march in his unmarked cruiser.  Exh. 2 (Smith Decl.).

When the march commenced outside the AIC venue, more than 100 people assembled on

Columbia Road in front of the church.  The marchers occupied all open lanes of Columbia Road

and also the adjacent sidewalks.  Exh. 18 (AKirk Dep.) at 55:5-56:11.

31.    The 1600 block of Columbia Road. NW, is predominately residential, with

apartment buildings on both sides of the street.  The marchers filled the entire roadway along that

block, and Smith does not recall having seen any of them walking on the adjacent sidewalks.  As

they marched, this group held numerous torches aloft and pounded away loudly on plastic

buckets, which served as drums. Exh. 2 (Smith Decl.) ¶ 13.

32.    As Smith proceeded along Columbia Road, NW, behind the marchers, marked

MPD cruisers moved alongside him.  March participants took newspaper vending boxes from the

sidewalks and laid them on their sides to block the roadway and keep the MPD from following

them.  However, the boxes were removed and Smith resumed his monitoring of the U/C and the

march.  The U/C reported that protestors riding bicycles with the march used their bikes to block

traffic at intersections. Exh. 2 (Smith Decl.) ¶ 14.

33.    As the march progressed, the group repeatedly chanted "Black Bloc, Black Bloc."

The U/C advised Smith at that point that groups of marchers formed clusters and pulled up

bandannas and other items of clothing to conceal their features. The U/C reported to Smith that

the U/C observed persons within the march propel missiles with "wrist rocket" slingshots to

break windows of businesses, saw a banner drop from the "Starbucks" at 18th Street, NW, and Columbia Road, NW, saw protesters throwing news vending machines into the street, observed protesters throwing what appeared to be a large brick or piece of concrete through the window of the MPD's Latino Liaison Unit; had seen bricks thrown at buildings by marchers, and saw march participants spray paint anarchist symbols on buildings and a spray paint a car along the march route. Exh. 2 (Smith Decl.) ¶ 15.

34.    Smith could hear firecrackers being set off in the vicinity of the march, as it crossed 18th Street. Exh. 2 (Smith Decl.) ¶16.

35.    Smith relayed this information reflected in ¶¶ 11, 15-19, 23, 31-33, above, to Sgt. Madison as he received it from the U/C or personally observed it. Exh. 2 (Smith Decl.) ¶17.

36.    Patrick Keller is a Metropolitan Police Department ("MPD") Officer and has been a member of the Department since May 21, 1990.  On January 20, 2005, Keller was assigned Special Operations Division, Commander Cathy Lanier's Office.  Declaration of Patrick Keller, executed on February 22, 2008 ("Keller Decl**."**), a copy of which is annexed as Exh. 3, at ¶ 3.

37.    On January 20, 2005, in response to information provided to then-Special Operations Division ("SOD") Commander Cathy Lanier, by officers in the MPD Intelligence Section, Commander Lanier determined that it was necessary to send MPD Civil Disturbance Unit ("CDU") personnel to Columbia Road, NW, between 16th and 18th Streets, NW, and to 18th Street, NW, after 11:00 p.m. that night to respond to a civil disturbance there.  Commander Lanier also reported to that location, in marked MPD cruiser 18, driven by Lt. Ralph Ennis. Keller traveled in Cruiser 18, as Commander Lanier's scribe. Exh. 3 (Keller Decl.) ¶ 4.

38.    Lanier, Ennis and Keller proceeded from SOD headquarters at 2300 L Street NW, and arrived at Columbia Road, NW, along north bound 16th Street, NW.  A group of more than

200 persons already crossed the intersection of 16th Street, NW, and Columbia Road, NW, when they reached that intersection and upon turning onto Columbia Road, NW, the marchers did not notice marked Cruiser 18 for several moments. Many of the members of the group had bandannas or other cloth items covering parts of their faces.  Many of the members of the group were banging loudly on plastic buckets being used as drums, and a number of the group members were carrying flaming torches.  The group was loud and boisterous as it crossed the intersection. Exh. 3 (Keller Decl.) ¶ 5.

39.    Cruiser 18 turned left onto Columbia Road, NW, and trailed the group.  Along the 1700 block of Columbia Road, NW, members of the group committed a variety of acts of vandalism.  In addition to people spraying paint on buildings and cars, persons within the group were throwing missiles at windows of various storefronts, breaking those windows.  Windows were broken in the CitiBank at 1749-1/2 Columbia Road, NW, in the Kentucky Fried Chicken restaurant at 1753 Columbia Road, NW, in the Popeye's restaurant at 1755 Columbia Road, NW, in the Riggs Bank at 1779 Columbia Road, NW.  Each time a window was broken, the group cheered and its members raised their arms.  This occurred more than six times as the mob traveled in the roadway of the 1700 block of Columbia Road, NW.  It appeared that the entire group was engaging in the celebrations as they moved near the intersection of 18th Street, NW, and Columbia Road, NW, and that the level of violence was escalating.  When Cruiser 18 reached the Sun Trust Bank at 1800 Columbia Road, NW, members of the mob broke several of the bank windows.  The mob then cheered and its members raised their arms in celebration. The MPD Latino Liaison Unit ("LLU") Office is located on the end of the Sun Trust Bank building on the second floor.  Someone in the group hurled a rock or brick through the window of LLU Office, causing it to break with a loud crash, which was once again followed by loud cheering

and arm waving from what appeared to be everyone in the group.  Keller could see and hear this clearly from inside Cruiser 18, when the car was farther from the LLU Office window than the front door of Madam's Organ, at 2461 18th Street, NW, is from the LLU Office window.  The front door of Madam's Organ is nearly directly across 18th Street, NW, from the LLU Office window. Exh. 3 (Keller Decl.) ¶ 6.

40.    A few minutes after the LLU window was broken, MPD Lt. Jimmie Riley turned off of Columbia Road, NW, onto 18th Street, NW, in an MPD marked cruiser, along with CDU 43 personnel in MPD vans.  Someone in the mob threw a brick into the windshield of Riley's cruiser, shattering it.  Once the windshield was broken, many bottles and other missiles were thrown by the mob at Lt. Riley's car and the vans. Exh. 3 (Keller Decl.) ¶ 7.

41.    Lt. Riley was the Lieutenant in command of CDU Platoon 43 that night.  The four 8-member squads that comprised CDU Platoon 43 were adjacent to Riley at this point.  When they emerged from the transport vans, wearing riot gear, the mob ran southward along 18th Street, NW, with members running westward into an ally between Belmont Road, NW, and Riley's cruiser.  MPD officers caught the members of the mob who ran into the ally and then ran north into a dead-ended spur off the main alley.  Keller was able to see the arrested mob members who had run up the spur through the chain link fence at which the spur dead-ended. Exh. 3 (Keller Decl.) ¶ 8.

42.    During the time that the mob was breaking the LLU window, throwing missiles at Riley's cruiser and the CDU vans, and then running away, hundreds of uninvolved onlookers on the sidewalk on the east and west sides of 18th stood by undisturbed by the MPD. Exh. 3 (Keller Decl.) ¶ 9.

43.     Keller has examined a number of photographs taken by MPD's Mobile Crime Unit of parts of the march route and of Lt. Riley's car.  As be testified through his attached declaration, these photographs, which bear Exhibit ##'s 101- 124 fairly and accurately depict the damage caused by the rioters to the subjects they portray.  Exh. 3 (Keller Decl.) ¶ 10.

44.     Jimmie Riley is a Lieutenant of the Metropolitan Police Department ("MPD") and has been a member of the Department since June 1970.  On January 20, 2005, Riley was assigned as the Lieutenant in charge of MPD Civil Disturbance Unit ("CDU") Platoon 43.  His duties and responsibilities throughout that day had been to respond to calls for CDU support.  A CDU Platoon consists of four eight-person squads.  Declaration of Jimmie Riley executed on February 22, 2008 ("Riley Decl."), a copy of which is annexed as Exh. 4, at ¶ 3.

45.     After 11:00 p.m. that night, Riley received a radio communication directing that CDU 43 Platoon don their protective ("riot") gear and report to Columbia Road and 18th Street.  Riley was assigned a marked MPD cruiser in which he responded as directed.  The CDU 43 responded in vans along with him.  As Riley approached his destination, he came upon a large boisterous group of people marching in the roadway as a unit.  Exh. 4 (Riley Decl.) ¶ 4.

46.     When Riley got near the group, someone threw a rock or a brick that hit Riley's cruiser windshield and broke it.  Once that happened, rocks and bottles started flying in the air from all directions toward Riley's car and the vans transporting CDU Platoon 43.  Exh. 4 (Riley Decl.) ¶ 5.

47.     The mob in the roadway then started running south along 18th Street, NW, in the direction of Belmont Road, NW.  There is an alley running from 18th Street, NW, to Columbia Road, NW, some distance north of Belmont Road, NW, which also runs from 18th Street, NW, to Columbia Road, NW.   CDU Platoon 43 and Riley, along with their vehicles, were north of the

14

alley.  MPD CDU personnel had physically formed a police line across 18th Street, NW, from building line to building line, south of the alley.  Some of the people from the mob that were running away ran west, into an alley, before reaching Belmont Road, NW.  Riley and members of CDU Platoon 42 followed these people and arrested them in that alley.  Exh. 4 (Riley Decl.) ¶ 6.

48.    Cathy L. Lanier is the Chief of Police of the Metropolitan Police Department ("MPD" or "Department") and has been a member of this Department since September 1990. Her first week on the job, Lanier was posted at 17th Street, NE, Mount Pleasant, and at Mount Pleasant Park during the Mount Pleasant riots. Declaration of Cathy L. Lanier executed February 22, 2008 ("Lanier Decl.") a copy of which is annexed as Exh. 5, at ¶ 3.

49.    Prior to being appointed Chief, Lanier held the position of Commander, Special Operations Division ("SOD"), of the MPD.  Among the diverse responsibilities of the SOD are planning for large scale demonstrations within the District of Columbia, providing security along the Presidential Inaugural Parade route, providing motor escorts for the President, Vice-President, and other dignitaries, and responding to notifications of First Amendment Assemblies in accordance with the First Amendment Rights and Police Standards Act of 2004 ("Act").  Prior to the April 13, 2005 effective date of the Act, as SOD Commander, Lanier responded to applications for permits to conduct parades and demonstrations on public space in accordance with the District of Columbia's Public Space and Safety Regulations, set forth in 24 D.C.M.R. Chapters 100 and 700.  Lanier responded to such permit applications under authority delegated to her as the SOD Commander by then MPD Chief Charles H. Ramsey. Exh. 5, (Lanier Decl.) ¶ 4.

50.    During the evening of January 20, 2005, Lanier received numerous cell phone calls from MPD Intelligence Section Lieutenant Michael Pavlik.  Pavlik reported to Lanier information that he advised her he had received from an MPD undercover ("U/C") officer assigned to attend the Anti-Inaugural Concert ("AIC") at 1459 Columbia Road, NW.  The U/C, through Pavlik and his other handlers informed Lanier that a Flier had been distributed at the AIC, which announced that a march would follow from the AIC.  The Flier indicated the route the March would take and that it would lead to an explosive protest in Adams Morgan.  After that, Lanier was advised Marchers would proceed to the Washington Hilton and attempt to breach security to "crash" the inaugural Ball going on there.  Pavlik informed Lanier that the U/C anticipated that protestors would engage in violence.  Lanier was further advised that AIC performers were urging people to take part in the protest. Exh. 5, (Lanier Decl.) ¶ 5.

51.    Lanier knew that no permit, as required by District municipal regulations, had been applied for or granted for any such march or demonstration. Exh. 5, (Lanier Decl.) ¶ 6.

52.    In the instance of plaintiffs' march, when Lanier proceeded to Columbia Road, NW, and 16th Street, NW, a group of more than 200 persons had already crossed the intersection of 16th Street, NW, and Columbia Road, NW, when Cruiser 18 reached that intersection.  Cruiser 18 turned left onto Columbia Road, NW, traveling westbound behind the marchers.  They did not appear to notice the marked Cruiser 18 for several moments.  The march was violent and disorderly, and endangering public safety.  Many marchers were carrying flaming torches and using them to set debris in trash containers on fire.  This mob caused significant property damage in the 1700 block of Columbia Road, NW.  Further, Lanier anticipated, based on what she had observed and had been informed by subordinate officers, that if allowed to continue, the march would continue to escalate in violence and property damage and would foreseeably cause

16

injuries to persons in the area.  For these reasons, the march was not "one that District policy", as reflected in 24 DCMR § 705 or by MPD practice, "required the police to support," as plaintiffs assert at page 10 of their brief. Exh. 5, (Lanier Decl.) ¶ 7.

53.    Lanier ordered two CDU platoons to 18th Street, NW, to respond to the march. Exh. 5, (Lanier Decl.) ¶ 8.

54.    The MPD did not prohibit the march.  The marchers staged near the church, as it was reported to Lanier.  They proceeded in the roadway of Columbia Road.  Marchers used torches t set fir to debris in trash receptacles. Participants used newspaper boxes to block the roadway and damaged cars and buildings, cheered on and supported by numerical strength of the rest of the group.  As windows were broken by rocks and bricks thrown by people in the group, the group cheered and raised their arms in apparent celebration of the destruction.  This response was not that of just a few individuals; it was a group response.  The MPD could not support this riotous criminal conduct.  Accordingly, Lanier ordered the rioters to be arrested. Exh. 5, (Lanier Decl.) ¶ 9; Exh. 7 (Lanier Tr.) at 35:25-38:10, 40:12-42:20; 51:15-52: 5; 53:4-154:12; 62:19-64:4; 66:12-67:7, 70:12-71:13.

55.    Lanier determined that probable cause existed for these arrests for rioting based on reports of subordinates and her own observations, including those of events reflected in the District's responses to interrogatories in this case and in the declarations of Jimmie Riley, Jeffrey Madison, Drew Smith, and Patrick Keller in this matter.  Having determined that she had probable cause to arrest the marchers for rioting, Lanier ordered that the Field Arrest paperwork, which was properly completed on the scene, reflect the lesser charge of parading without a permit so that the arrestees could avail themselves of expedited release mechanisms that would not apply if she charged them with rioting.  Exh. 5 (Lanier Decl.) ¶ 10.

56.     Each of the plaintiffs was arrested, as reflected by the "Brief Description of Facts and Circumstances Surrounding Arrest" in their respective Field Arrest Forms, which collectively comprise Exh.s 21-5

> The offense occurred on January 20, 2005 at 2320 hours at the location of 16th Street and Columbia Road, NW.  A group of approximately 250 individuals formed as a group and concealed their identities with the use of masks, scarves, and shirts.  They moved as a group westbound on Columbia Road blocking all westbound traffic lanes and one eastbound traffic lane.  In the 1700 block of Columbia Road the group began arbitrarily destroying mailboxes, light posts, and spray painting vehicles and buildings.  They continued into the 1800 block of Columbia Road and turned South on 18th Street where a majority of the individuals were stopped and arrested.   No permit was issued for this event.  I [Arresting Officer] observed the above-listed demonstration and arrested D-1.  I was assigned to Civil Disturbance Unit [Unit number].

57.     The hundreds of persons who participated in the march and demonstration agreed to a common plan of action through their participation.  Exh. 18 (AKirk Dep.) at 183:17-184:16.

58.     On January 20, 2005, Allyson Kirk and Chelsea Kirk went to the AIC "with full intention to participate in any revolutionary action that might take place that night."  Exh. 18 (AKirk Dep.) at 65:12-68:9; Allyson. Kirk's January 31, 2005 Blog, a copy of which is annexed as Exh. 26..

59.     Allyson Kirk contemplated physical "direct action" in the revolutionary action that she and Allyson Carr went to the AIC "with full intention to participate in . . ." Exh. 18 (A Kirk Dep.) at 70:4-14.

60..     Allyson Kirk understood as of January 20, 2005 that direct action would in some instances include civil disobedience.  Exh. 18 (AKirk Dep.) at 70:4-14.

61.     Allyson Kirk admits that there's a fairly broad continuum of conduct that in the range of militant direct action and controlled protest.  Exh. 18 (AKirk Dep.) at 85:13-18.

62.     On January 20, 2005, the direct action engaged in by March participants included drumming, chanting, and carrying flaming torches as they marched after 11:00 p.m. along District roadways through a residential neighborhood and then on the roadways of a commercial area, blocking the lanes of roadways, rock and brick throwing, window breaking, the hurling of missiles at persons on the sidewalks of Adams Morgan and at uniformed MPD officers, hitting a marked MPD cruiser with various missiles, and the cheering of destruction of property.  Exh. 2 (Smith Decl.) ¶¶  13-15;  Exh. 3 (Keller Decl.) ¶¶ 5-10; Exh. 4 (Riley Decl.) ¶¶ 4-5; Exh. 5 (Lanier Decl.08) ¶¶ 7, 9; Declaration of Cathy Lanier, executed June 19, 2006, a copy of which is annexed as Exh.6, at ¶¶ 6-8; Transcript of Deposition of Cathy L. Lanier, taken on September 13, 2007, in her individual capacity and as designee of defendant District of Columbia ("Lanier Tr."), relevant pages of which are annexed as Exh. 7, at 35:25-38:10, 40:12-42:20; 51:15-52: 5; 53:4-154:12; 62:19-64:4; 66:12-67:7, 70:12-71:13; Defendant's Responses To Plaintiffs' First Set Of Interrogatories To the District Of Columbia ("DC Resp.") a copy of which is annexed as Exh. 8, response #1.b.

63.     The marchers participated in their demonstration with solidarity and unity. Exh. 18 (AKirk Dep.) at 71:22-73:21.

64.     Militant direct action, including civil disobedience, as engaged in along the March route on January 20, 2005, was to "be respected and valued as an important part of the movement as, and in addition to, controlled marches," in Allyson Kirk's

perspective.  Exh. 18 (AKirk Dep.) at 82:22-83:9; 83:18-22; see alsoAllyson Kirk's Blog, a copy of which is annexed as Exh. 26..

65.     Allyson Kirk states that "[a]cts such as the Adams Morgan march, although criticized by some, can cause enough disruption to force our cause to be heard." Exh. 18 (AKirk Dep.) at 85:13-89:4.

66     Shortly before Commander Lanier ordered the arrests, a pair of MPD marked cruisers followed the marchers, protecting them from traffic attempting to move along the roadway behind the march, which occupied multiple lanes at that point.  Exh. 18 (AKirk Dep.) at 87:4-21.

67.     A person on the left side of the group of marchers near the rear of the march threw a rock or brick into the windshield of one of the readily identifiable MPD cruisers protecting the rear of the march.  Exh. 18 (AKirk Dep.) at 87:4-21; 88:10-90:11; 95:1-14.

68.     The person who threw the missile was five or six people deep into the group of marchers, and 20 -30 marchers were in a position to observe the person throw the missile that struck the windshield of the MPD cruiser. Exh. 18 (A Kirk Dep.) at 94:12-95:4.

69.     Allyson Kirk observed the brick thrown from within the crowd, and recognizes that she witnessed the commission of a crime in the throwing of the missile into the windshield of the cruiser.  Exh. 18 (AKirk Dep.) at 90:2-94:11.

70.     No participant in the march attempted to apprehend or to identify to police officers the individual who threw the missile.  Exh. 18 (A Kirk Dep.) at 87:4-21; 88:10-90:11; 95:18-96:15.

71.     Allyson Kirk admits that participants in the March engaged in destructive and violent conduct.  Exh. 18 (A Kirk Dep.) at 135:12-136:1.

72.     Allyson Kirk, Chelsea Kirk and their companion Josh observed two persons spray paint buildings as the Kirks and Josh participated in the march.  These two persons, who the Kirks and Josh observed commit conduct that Allyson Kirk characterizes as "vandalism," ran up along the right side of the march from behind where the Kirks and Josh were near the rear of the march.  These two vandals "spray painted on buildings on the right side where we [the Kirks and Josh] were."   "[T]he people with the spray painting finished their symbols on the buildings that they were doing near us [the Kirks and Josh]."  They "then ran along the sidewalk on the right-hand side up past of the march."  The Kirks and Josh did not distance themselves from the march after observing this criminal activity because "we felt okay.  It felt comfortable about continuing with the march because the mood of the march was, you know, still very upbeat, still very positive."  Exh. 18 (AKirk Dep.) at 170:2-172:7.

73.     Plaintiffs' contention, in paragraph 35 of their Statement Of Undisputed Material Facts In Support Of Plaintiffs' Motion For Partial Summary Judgment on Liability ("Pls Facts") that then-existent "District of Columbia policy  required the MPD to support, not prohibit, street marches that did not have written permits, including street marches at the time and place of plaintiffs' march and marches conducted in the same manner as that which police knew was planned for plaintiffs' march" is not true. Exh. 5, (Lanier Decl.) ¶ 12.

74.     Prior to the effective date of the Act, groups of 25 or more persons seeking to parade or demonstrate on District of Columbia public space were required to obtain a parade/demonstration permit from MPD.  The application and issuance processes were administered by the SOD.  The applicant was required to provide an estimate of the number of

participants, the location or route to be used, the date and time of the parade/demonstration, the

number and description of vehicles, if any, to be used in the parade/demonstration, sound

generation and amplification devices, generators, and other apparatus as might be used. Exh. 5,

(Lanier Decl.) ¶ 13.

75.     The SOD could respond to the application by granting a permit to conduct the

parade/demonstration just as reflected in the application.  The SOD could also issue a permit

authorizing the applicant to proceed with the parade/demonstration on terms based on, but

modified from, those stated in the application.  Finally, the SOD could deny the permit outright.

Exh. 5, (Lanier Decl.) ¶ 14.

76.     The decision of whether to permit the event as described in the application, in

modified form, or not at all, was in all cases governed by the criteria set forth in 24 DCMR §

705.2.  Modifications might be required for a number of reasons.  Some locations and routes are

in significant demand.  As a result, a permit might be issued to authorize the event to take place

at times other than the requested "start" time or "end" time, or even on a date other than that

requested, because the location or route had previously been permitted to another event. Exh. 5,

(Lanier Decl.) ¶ 15.

77.     Further, the use of requested sound generation and amplification might be denied

based on the requested time and location.  SOD would be unlikely to issue a permit for a parade

utilizing equipment capable of generating high decibel sounds late at night or early in the

morning, or in the immediate vicinity of a nursing home or hospital or such other location at

which such sound generation could adversely affect the wellbeing of residents or patients. Exh.

5, (Lanier Decl.) ¶ 16.

78.     In addition, the SOD commonly included restrictions or limitations in permits for events in the immediate vicinity of the White House and a number of other sites, the security of which present critical concerns.  All such limitations were to be based on the application of standards set forth in 24 DCMR § 705.2.  In some instances, the restrictions and limitations were determined following consultation with the United States Secret Service and/or the Office of the Attorney General for the District of Columbia ("OAG"). Exh. 5, (Lanier Decl.) ¶ 17.

79.     Generally, when the SOD felt a need to authorize a permit modified from the terms requested, in accordance with the standards set forth in 24 DCMR § 705.2, an SOD Captain would engage in discussions and negotiations with the applicant.  By doing this, the SOD was able to provide alternatives in some cases, working with the applicant to reach a compromise for a modified permit that would best fit the applicant's objectives. Exh. 5, (Lanier Decl.) ¶ 18.

80.     SOD rarely, if ever, during Lanier's tenure as Commander, from August 2002 through December 2006, denied a permit altogether.  Lanier is unable to recall a single instance during her command that the SOD granted no permit in response to an application. Exh. 5, (Lanier Decl.) ¶ 19.

81.     It was also the practice of the MPD to attempt to facilitate demonstrations and parades for which the organizers had not obtained a permit, when MPD personnel encountered them on public space.  More often than not, when an MPD officer came upon an unpermitted demonstration, an official from the SOD would be contacted.  The SOD official would then attempt to negotiate the parameters of the event, as it would be allowed to proceed. Exh. 5, (Lanier Decl.) ¶ 20.

82.    MPD's ability to facilitate such marches depended significantly on the Department's ability to obtain the agreement of the marchers to conduct their marches on terms that the MPD could safely accommodate.  Therefore, MPD's ability to facilitate an unpermitted march depended significantly on the Department's ability to identify leaders or organizers who could negotiate on behalf of the marchers as a whole and who could obtain the cooperation of the marchers as a whole.  Further, MPD's ability to facilitate an unpermitted march also depended on the size of the group and its willingness to confine its course, compliance with traffic control mechanisms, and lane usage within terms that the Department could safely accommodate, based on location, time of day, and available staffing.  The process of facilitating an unpermitted march commonly involves compromise by the marchers, as does the process of issuing a permit. Exh. 5, (Lanier Decl.) ¶ 21.

83.    However, in carrying out this practice, the official was to be guided by standards, consistent with those of 24 DCMR § 705.2, for determining the manner and extent to which a parade or demonstration lacking a permit would be accommodated.  While some of the criteria set forth in § 705.2 are inapplicable in this on-scene process, others informed the official's decision, such as: whether the conduct of the parade would substantially interrupt the safe and orderly movement of other vehicular and pedestrian traffic contiguous to its route; whether the conduct of the parade would require diversion of such numbers of police officers from their normal police duties that the city would be deprived of reasonable police protection; whether the concentration of persons, animals, and vehicles in the assembly and disbanding areas and along the parade route would substantially interfere with the movement of police, fire, ambulance, and other emergency vehicles on the streets; whether the parade would likely move along its route and then disband expeditiously and without unreasonable delays en route; whether the parade

would substantially interfere with any other parade for which a permit has already been granted; whether the parade is to be held for the sole purpose of advertising for private gain any product, merchandise, contest, or event; and whether the parade would create a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant property damage. Exh. 5, (Lanier Decl.) ¶ 22.

84.     Further, whether an event is provided a written permit through the conventional application process, or authorized to proceed through an on scene approval by an MPD official, the event is only given an approval that is subject to revocation.  If the event should deviate materially from the terms of its written permit or the terms upon which it was authorized by the on scene official, or come to pose a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant property damage or public safety hazard, the MPD could revoke the permit or authorization immediately. Exh. 5, (Lanier Decl.) ¶ 23.

85.     Further, if Lanier had been at the scene when the group of AIC attendees gathered outside the church, she would not have authorized them to march as they did.  Lanier would not have authorized them to play their drums in the residential area.  Lanier would not have authorized them to carry any torches. Lanier would not have authorized them to occupy more than one lane at any point.  Lanier would have imposed restrictions that were consistent with the criteria of 24 DCMR § 705.2.  Lanier would not have authorized the march to proceed through Adams Morgan along the course the marchers intended without a police escort. Exh. 5, (Lanier Decl.) ¶ 24.

86.     As SOD Commander, Lanier was kept apprised of developments in mass demonstration litigation and consulted regarding potential settlements.  In this context, Lanier was timely informed that plaintiffs in *Barham v. Ramsey* had sought an injunction, on

constitutional grounds, to prevent the District from arresting persons for parading without a

permit.  Lanier was also timely informed that Judge Sullivan had denied the motion based on the

District's representation that MPD would not arrest persons for parading without a permit

without providing such persons a warning and opportunity to comply – subject to exceptions in

certain circumstances. Exh. 5, (Lanier Decl.) ¶ 25.

      87.    Lanier was consulted in mid- through late 2004 and early 2005 regarding matters

that resulted in the settlement of *Abbate v. Ramsey*.  Specifically, she was consulted regarding

proposed requirements regarding the handbook governing MPD's responses to mass

demonstrations.  Accordingly, Lanier knew, prior to January 20, 2005, that the *Abbate* plaintiffs,

through their attorneys had agreed to the inclusion of certain provisions in that handbook as

terms of the *Abbate* settlement.  In particular, she knew that the settlement required the handbook

to reflect that:

> An assembly of persons will not be arrested simply because the group does not
> possess a permit.   Such an arrest may only occur after an order to disperse has
> been clearly communicated three times in a manner that is reasonably calculated
> to be heard by each of the persons in the group and after reasonable opportunity to
> disperse has been afforded, to the extent that circumstances reasonably permit,
> without increasing the risk of injury to persons or property through the actions of
> a substantial number of the assembly of persons.

Exh. 5, (Lanier Decl.) ¶ 26; *see also Abbate* Settlement Agreement, fully executed as of

January 17, 2005, a cpy of which is annexed as Exh. 27.

      88.    In April 2000, Lanier was responsible for processing of prisoners arrested in the

context of the International Monetary Fund/World Bank meetings then being conducted in the

District.  On that basis, Lanier knew that the MPD had arrested hundreds of persons on April 15,

2000 on the charge of parading without a permit for having engaged in a snake march along

District roadways. Exh. 5, (Lanier Decl.) ¶ 27.

89.     As of January 20, 2005, Lanier also knew that then-MPD Assistant Chief Brian Jordan had ordered the arrest of more than 150 persons on Vermont Avenue between K and L Streets, NW, on September 27, 2002, for parading without a permit without having issued warnings.  Lanier is aware that Jordan had not given warnings because the demonstrators had marched out of Franklin Square Park into morning rush hour traffic on K Street, creating an immediate danger to themselves and others.  She also understands that the persons Jordan arrested could properly have been arrested for and charged with disorderly conduct or unlawful assembly. Exh. 5, (Lanier Decl.) ¶ 28.

90.     As of January 20, 2005, Lanier was also aware that the Office of the Corporation Counsel/Office of the Attorney General had prosecuted arrests from both the April 15, 2000 event and the Jordan event.  Moreover, Lanier understood that persons who had been arrested for parading without a permit in the April 2000 mass arrest and had refused to identify themselves when presented in D.C. Superior Court had been held in the D.C. Jail until they identified themselves, generally pleading to a lesser charge after serving time in the Jail.  Exh. 5 (Lanier Decl.) ¶ 29.

91.     In assisting in the District's response to plaintiffs' motion for partial summary judgment, MPD Commander (and former Assistant Chief) Brian K. Jordan has reviewed the testimony that he gave in an Executive Session deposition conducted by the Judiciary Committee of the District of Columbia Council, which has been quoted by plaintiffs at pp. 13 and 14 of the Memorandum In Support Of Plaintiffs' Motion For Partial Summary Judgment On Liability ("Pls Mem").  Jordan has also reviewed portions of the transcript of the Executive Session deposition that contain or relate to the testimony quoted in plaintiffs' memorandum.  Declaration

of Brian K. Jordan executed February 22, 2008 ("Jordan Decl.") a copy of which is annexed as Exh. 9 at ¶¶ 3-5.

92.     The testimony quoted in Pls Mem relates to Jordan's September 27, 2002 decision to order the arrest of persons who, without a permit required by District of Columbia municipal regulations, had marched, without warning out of Franklin Square Park onto the roadway of K Street, NW, during Friday morning rush hour. Exh. 9 (Jordan Decl.) ¶ 6.

93.     As reflected in his deposition testimony, Jordan decided to act to control the marchers, and, in fact, arrest them, because they had engaged in unlawful conduct through which they had created a danger to themselves and others. Exh. 9 (Jordan Decl.) ¶ 7.

94.     The group consisted of well over a hundred marchers.  Jordan had probable cause to arrest them because he knew that no permit had been issued by the MPD authorizing such a march into the roadway and they were moving as a unit comprised of more than 25 persons. Based on this probable cause, Jordan had lawful authority to arrest the marchers. Exh. 9 (Jordan Decl.) ¶ 8.

95.     In addition, all of these marchers had acted in a manner to annoy, disturb, interfere with, and offend others – the motorists on K Street, NW.  Based on the circumstances, it was clear to Jordan that they had done so knowingly and deliberately.  This provided probable cause to arrest them as well. Exh. 9 (Jordan Decl.) ¶ 9.

96.     In addition, the circumstances of the marchers' violation of law caused Jordan to exercise his discretion to arrest them rather than to allow them to proceed with their unlawful march or to cordon them and then release them. Exh. 9 (Jordan Decl.) ¶ 10.

97.     The circumstances that influenced Jordan to arrest these marchers included that they had placed themselves, motorists, and lawful pedestrians in danger.  By walking into

morning rush hour traffic on K Street, NW, these marchers forced motorists to stop in order to avoid striking the marchers even though the motorists had the right of way. By doing this, they caused motorists to drive inconsistently with the traffic control devices, creating confusion for following motorists. Exh. 9 (Jordan Decl.) ¶ 11.

98.    At the time he ordered the arrests, Jordan was aware of the practice of the MPD to attempt to facilitate marches for which no permit had been obtained. However, as Jordan testified in his Executive Session deposition, the fact that this large group marched right out into traffic and created a serious danger of pedestrians being struck by traffic eliminated any opportunity to negotiate a route for the unpermitted march and to facilitate it. Exh. 9 (Jordan Decl.) ¶ 12.

99.    The marchers that Jordan ordered arrested on Vermont Avenue, NW, had entered traffic on a busy, major thoroughfare, in a manner that put many people in senseless danger and had essentially rendered K Street, NW, impassible. They had chosen to do so even after MPD Lieutenant Jeffrey Herold had attempted to facilitate a march. Herold had walked into Franklin Square Park seeking march organizers to negotiate with. No one would acknowledge himself or herself to be leader or organizer. Herold advised persons there that the MPD would escort their march along sidewalks, but would arrest marchers if they marched in the roadway. Nevertheless, they marched, *en masse,* onto the roadway of K Street, NW. Exh. 9 (Jordan Decl.) ¶ 13.

100.    By doing this, the marchers had demonstrated that they were not inclined to cooperate with the MPD. By their conduct, they precluded the MPD's accommodation of their march. Their conduct persuaded Jordan that if they were not arrested, but instead, were released from the cordon to go on their ways, they would likely, once again, block a roadway and place themselves and others in danger. Exh. 9 (Jordan Decl.) ¶ 14.

101.    Accordingly, when Jordan ordered their arrests, he did not order them arrested for simply parading without a permit.  Jordan believed they had committed the offenses of disorderly conduct and/or unlawful assembly, as well.  More importantly, Jordan ordered them arrested and directed that they be charged with parading without a permit for having paraded without a permit and having endangered themselves and others in the process, after having failed to cooperate the MPD's affirmative efforts to have facilitated a march.  They had deliberately endangered public safely through the means of an unpermitted march. Exh. 9 (Jordan Decl.) ¶15.

102.    Jordan ordered their arrests without issuing a warning and affording them an opportunity to comply because they had committed misdemeanors in his presence, and endangered themselves and others in circumstances indicating that they could not be anticipated to proceed safely and lawfully or cooperatively if given a further opportunity to do so.  Instead, based on their actions, Jordan expected that they would again place themselves and others in danger if they were allowed to. Exh. 9 (Jordan Decl.) ¶ 16.

103.    Since her January 20, 2005 arrest, A. Kirk has repeatedly participated in demonstrations involving more than 25 people in the roadways of the District of Columbia.  Exh. 18 (AKirk Dep.) at 30:2-13.

104.    A. Kirk had participated in demonstrations involving more than 25 people in the roadways of the District of Columbia on multiple occasions with no interference from the MPD.  Exh. 18 (A Kirk Dep.) at 28:12-19.

105.    MPD did not interfere with other marches in which the plaintiffs participated on January 20, 2005.  Exh.18 (A Kirk Dep.) at 32:19-33:7; 33:21-35:5 38:18-39:3 (earlier march was anti-Bush).

106.    Prior to January 20, 2005, A. Kirk had participated in many demonstrations over a number of years including demonstrations in the District of Columbia.  Exh. 18 (AKirk Dep.) at 169:2-7.  This was the first march in which A. Kirk participated in which persons carried lighted torches.  *Id.* at 57:12-58:17.

107.    Earlier in the day, Allyson Kirk and members of her family, among others, had participated in other demonstrations, including marches, protesting the second inauguration of President George W. Bush.  Those demonstrations were not impeded by the MPD.  Exh. 18 (AKirk Dep.) at 32:19-36:5; 38:18-39:20.

108.    Allyson Kirk participated in demonstrations involving more than 25 persons in the District on occasions prior to and subsequent to January 20, 2005, which were not impeded by the MPD.  Exh. 18(A Kirk Dep.) at 39:4-15; 23:17-27:2.

109.    On August 1, 2007, Judge Emmet Sullivan conducted a fairness hearing in *Burgin, et al.  v. District of Columbia*, 03cv2005 (EGS), concerning the settlement of that matter alluded to by plaintiffs at p. 13 of Pls. Mem.  See copy of transcript of that hearing, relevant pages of which are annexed as Exh. 15.  The Burgin plaintiffs were represented by the same counsel who represented the *Carr* plaintiffs then and now.  In that hearing, Ms. Dunham represented the following to the Court:

> MS. DUNHAM:  Good morning, your Honor.  I would like to add briefly to what Mr. Koger had explained.
>
> THE COURT:  Sure, sure.
>
> MS. DUNHAM:  As you may recall, in a related case of Labatti (sic; Abbate)vs. Ramsey, which settled in January of 2005, there was a provision for equitable relief, changes in police practices, and these changes were accompanied several months later by a new law passed in the District of Columbia.  The First Amendment Assemblies Act of 2004 became effective in April 2005, and since that time I personally as a member of the National Lawyers Guild, D.C. chapter, have been with my partner, Daniel Schember, out on the

streets attending demonstrations including some that we would call feeter matters, not the traditional 25,000 people marching in the streets, and my partner and I have had occasion to attend these matters in the streets, and we can tell you that we are very optimistic based on our experience that the MPD's practices now are to accommodate these matters, to accompany and accommodate, and so I am optimistic that the environment for demonstrators in the District of Columbia has improved. I can't express the same optimism for Capitol or Federal Police, but they are not an issue in our cases. We have observed a marked contrast between the practices of the MPD with respect to demonstrators and those of the Federal Police, but perhaps that's another story for another case.

Exh. 15 (Burgin Hearing Tr.) at 12:21-13:19.

110.. Michael Topper is an Officer of the Metropolitan Police Department ("MPD") and has been an MPD Officer since August 2000. Topper was on duty on January 20, 2005. On that day, he was assigned to MPD Civil Disturbance Unit ("CDU") 43. Between 11:00 p.m. and 11:30 p.m. CDU 43 was ordered to put on our protective equipment, commonly called "riot gear," and directed to report to 18th Street, below Columbia Road. There CDU 43 was to respond to a march involving hundreds of people in the roadway. They were advised that some marchers were carrying torches and that group had engaged in property damage. Declaration of Michael Topper executed on February 12, 2008, ("Topper Decl.") a copy of which is annexed as Exh. 10, ¶¶ 3-5.

111. Topper drove an MPD van transporting his CDU squad to 18th Street, N.W. There they came up behind the group of marchers, which had been described as a "mob." At that time, the marchers took most of the lanes of 18th Street and numerous members of the group were throwing debris at police personnel. Exh. 10 (Topper Decl.) ¶ 5.

112. A line of MPD Officers had formed across 18th Street. This police line prevented the marchers from continuing southward. The marchers entered an alleyway off of 18th Street between where Topper had parked the van and the police line had formed. CDU officers, including Topper, followed them into the alleyway. Exh. 10 (Topper Decl.) ¶ 6.

113.    The marchers' escape was blocked by another police cordon at the other end of

the alley.  My official, Sergeant Black, struck his baton on the pavement once, to get the

marchers' attention, and ordered them to get on the ground.  The objective was to create order in

the alley so that the marchers could be dealt with safely. Exh. 10 (Topper Decl.) ¶ 7.

114.    After that, MPD Officers divided up the work of searching the

marchers/prisoners, placing flex-cuffs on them, and completing Field Arrest Forms for them.

Topper's role was to fill out Field Arrest Forms for some of the prisoners and to be photographed

with the persons for whom he had completed Field Arrest Forms.  As the person who completed

the Field Arrest Forms for a number of the arrestees and who was photographed with them,

Topper is the Arresting Officer for each of these persons, including Chelsea Kirk. Exh. 10

(Topper Decl.) ¶ 8.

115.    Each person arrested was flexcuffed before he or she was photographed with his

or her arresting officer. Exh. 10 (Topper Decl.) ¶ 9.

10.    Topper did not apply flexcuffs to any of the persons arrested. Exh. 10 (Topper Decl.) ¶

10.

116.    Topper was photographed twice with Chelsea Kirk.  The first photograph was

taken on 16th Street, outside the van used to transport her to the MPD Institute of Police

Sciences, the police academy ("IPS").  Ms. Kirk did not complain to Topper that her flexcuffs

had been placed on her improperly at that time.  Nor did she complain of pain or injury caused

by the flexcuffs.  Topper did not observe any injury to her wrists at that point. Exh. 10 (Topper

Decl.) ¶ 11.

117.    The second photograph was a digital photograph taken during her arrest

processing at the IPS.  At least an hour, and perhaps two hours, passed between the time the first

and second photographs were taken.  Ms. Kirk did not complain to Topper that her flexcuffs had

been placed on her improperly at that time, either.  Nor did she complain that the flexcuffs had

caused her or were causing her pain or injury.  Topper did not observe any injury to her wrists at

that point. Exh. 10 (Topper Decl.) ¶ 12.

118.    Topper did not hear Ms. Kirk complain about the tightness of her flex-cuffs or of

injuries to her wrists at any time. Exh. 10 (Topper Decl.) ¶ 13.

14.    Topper has reviewed the Field Arrest Form (#580831) for Ms. Kirk and the two

photographs taken of her standing next to him that are part of the arrest paperwork for her

January 20, 2005 arrest.  Copies of those materials are attached to the declaration.  The

originals of these documents are records of the MPD routinely maintained as records of

the Department's regularly conducted business activities.  The two photographs fairly and

accurately depict Ms. Kirk and Topper. Exh. 10 (Topper Decl.) ¶ 14.

119.    At the time of her participation in the march and of her arrest, Allyson

Kirk was unaware that parading without a permit was unlawful.  Exh.18 (A Kirk Dep.) at

180:16-23.

120.    Exh.s 125 and 126 are photographs taken from the stoop at the front entrance area

of Madams Organ, located at 2461-18th Street, NW, Washington, DC.  MPD photographer Tony

Brown positioned himself on the elevated entrance and focused from eye level westward across

18th Street, NW, on the east façade of the Sun Trust Bank building to capture the image of the

buildings and the roadway and sidewalk between that building and Madam's Organ as the naked

eye would see it from where I stood (Exh. 125).  He also zoomed in to take a larger picture of the

windows of the Latino Liaison Unit (Exh. 126).  These photos fairly and accurately depict the

side of the building and the windows that face 18th Street, NW, Washington, DC.  Declaration of

Tony Brown, executed February 22, 2008, a copy of which is annexed as Exh. 127.

121.    On January 20, 2005, Matthew Singer arrived at Madam's Organ at about

7:30 p.m. and had four or five "Jack Daniels and Cokes" before he walked out into the

street at about 11:30 p.m.  Deposition of Matthew Singer, at 112:6-113:6.

122.    Approximately 15 minutes after the march began, its nature deteriorated

significantly, as it became infected with acts of violence and destruction.  Exh. 12 (Carr

Rogs) at 13 (response #9); Exh. 13 (AKirk Rogs) at 12 (response #8); Exh. 14 (CKirk

Rogs) at 12 (response #9).

123.    Exh. 129 is a satellite map that fairly and accurately depicts the area that it

reflects, including the intersection of 18th Street, N.W. and Columbia Road N.W.,

Belmont Road N.W., and Kalorama Road N.W.  Declaration of Phillip Dickson executed

February 22, 2008, a copy of which is annexed as Exh. 30.


Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

__/s/_Ellen Efros_____
ELLEN A. EFROS [250746]
Chief, Equity I Section

__/s/  Thomas L. Koger_____
THOMAS L. KOGER [427921]
Senior Assistant Attorney General

__/s/  Chad Copeland_____

CHAD COPELAND

  /s/ Jayme Kantor
JAYME KANTOR
Assistants Attorney General
441 4th Street NW
Suite 600 South
Washington, D.C.  20001
(202) 724-6610
Fax: (202)727-3625

Counsel for Defendant District of Columbia