UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR., *et al.*, | : |
| Plaintiffs, | : |
| v. | : Civ. Action No. 06-0098 (ESH) |
| DISTRICT OF COLUMBIA, *et al.*, | : |
| Defendants. | : |

**DEFENDANT DISTRICT OF COLUMBIA'S
STATEMENT PURSUANT TO LCvR 7(h) OF MATERIAL FACTS GIVING
RISE TO GENUINE ISSUES, IN RESPONSE TO PLAINTIFFS' STATEMENT
OF UNDISPUTED (SIC) FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT ON LIABILITY, REQUIRING
LITIGATION BY TRIAL IN ACCORDANCE WITH DEFENDANT DISTRICT
OF COLUMBIA'S DEMAND FOR A TRIAL BY JURY**

Pursuant to LCvR 7(h), defendant District of Columbia ("District"), by and through undersigned counsel, respectfully submits this Defendant District Of Columbia's Statement Pursuant To LCvR 7(H) Of Material Facts Giving Rise To Genuine Issues, In Response To Plaintiffs' Statement Of Undisputed (Sic) Facts In Support Of Plaintiffs' Motion For Partial Summary Judgment On Liability, Requiring Litigation By Trial In Accordance With Defendant District Of Columbia's Demand For A Trial By Jury ("DOppSOF").  Each of the numbered factual assertions is offered to dispute the factual assertions of Plaintiffs' Statement Of Undisputed (Sic) Facts ("PlsSOF") generally and the paragraph of PlsSOF reflected in boldface within parentheses immediately following the citation to the record for the respective DOppSOF paragraph.  :

1.      Exhibit M, the "Brandon Jourdan Video" fails to fairly and accurately represent the march because it fails to depict the occurrence, in the context of the march

of the breaking of windows by march participants, the hurling of missiles at Metropolitan Police Department ("MPD") officers, the setting of fires, the vandalizing of automobiles, the spray-painting of buildings, the placement of newspaper vending boxes in the roadway, the throwing and turning over of newspaper vending boxes, or the throwing of missiles at persons walking along the sidewalks by marchers, as witnessed by MPD officers that night.  Declaration of Drew Smith executed February 22, 2008 ("Smith Decl."), a copy of which is annexed as Exh. 2, at ¶¶ 14, 15; Declaration of Patrick Keller, executed on February 22, 2008 ("Keller Decl."), a copy of which is annexed as Exh. 3, at 6-8, 10; Declaration of Jimmie Riley executed February 22, 2008 ("Riley Decl."), a copy of which is annexed as Exh. 4, at ¶ 5**;**Declaration of Cathy L. Lanier executed on June 19, 2006 ("Lanier Decl. 06"), a copy of which is annexed as Exh. 6, at ¶¶ 6-8; Transcript of Deposition of Cathy L. Lanier, taken September 13, 2007 ("Lanier Tr."), a copy of which is annexed as Exh. 5, at 35:5-38:10, 40:12-42:20; Declaration of Cathy Lanier executed February 22, 2008 ("Lanier Decl. 08"), a copy of which is annexed as Exh. 5, at ¶ 9; Defendant's Responses To Plaintiffs' First Set of Interrogatories To District of Columbia ("DC Resp."), a copy of relevant pages of which are annexed as Exh. 8, at 7-10, response #1.b.  **(PlsSOF ¶ 3).**

     2.     Exhibit O, the "Barry Student Video" fails to fairly and accurately represent the march because it fails to depict the breaking of windows by march participants, the hurling of missiles at MPD officers, the setting of fires, the vandalizing of automobiles, the spray-painting of buildings, the placement of newspaper vending boxes in the roadway, the throwing and turning over of newspaper vending boxes, or the throwing of missiles at persons walking along the sidewalks by marchers, as witnessed by

MPD officers that night.. Exh. 2 (Smith Decl) at ¶¶ 14, 15; Exh. 3 (Keller Decl.) at 6-8, 10; Exh. 4 (Riley Decl.) at ¶ 5; Exh. 6 (Lanier Decl. 06) at ¶¶ 6-8; (Lanier Tr.) at 35:5-38:10, 40:12-42:20; Exh. 7 (Lanier Decl. 08) at ¶ 9; Exh. 8 (DC Resp.) at 7-10, response #1.b. **(PlsSOF ¶ 4).**

    3.    Lanier ordered the plaintiffs arrested based on the following probable cause to believe they had committed the elements of rioting in violation of D.C. Official Code § 22-1322, as well as of parading without a permit in violation of 24 DCMR Ch. 700:

Plaintiffs were presented a plan of action through the urgings of members of bands performing at the Anti-Inaugural Concert ("AIC") conducted at 1459 Columbia Road, NW, and a Flier distributed at the AIC, which called upon AIC attendees to "take [their] resistance to one of the Inaugural Balls where Bush and his supporters celebrate their power and privilege at the expense of all, via a "march down Columbia Road towards 16th Street . . . to create an explosive protest . . . [and] march . . . to the Washington Hilton, located at 1919 Connecticut Ave NW. . . . the site of one of tonight's balls . . . [and] show people faces behind those of us who resist this administration and sham."

An individual had announced from the concert stage with a microphone to the hundreds of people in attendance at the AIC that there was to be a march after the concert to the Hilton Hotel, which was the site of an inaugural ball, and to "crash" the ball site.

Persons at the concert had discussed engaging in various types of property damage along the route from the AIC to the Inaugural Ball, including the use of spray paint.

Plaintiffs agreed to and acted in furtherance of the plan, as reported to Lanier by her subordinates or observed by Lanier personally, by joining as parts of an assemblage of 250 to 300 persons, traversing without a parade/demonstration permit along the roadways of Columbia Avenue, NW, to and along the roadway of 18th Street, NW.

At all times during the march, this assemblage occupied multiple lanes of the roadway and, at times all non-parking lanes of the roadway.

Persons within the assemblage took newspaper vending boxes from the sidewalks and laid them on their sides to block the roadway and keep MPD officers in their cruisers from following the assemblage.

As the assemblage moved along the roadway of Columbia Road, NW, groups of marchers within the assemblage formed clusters and pulled up bandannas and other items of clothing to conceal their features; persons within the assemblage propelled missiles with "wrist rocket" slingshots to break windows of businesses, persons within the assemblage threw news vending machines into the street; persons within the assemblage threw bricks at buildings by marchers; members of the assemblage spray-painted anarchist symbols on buildings and vandalized cars parked along the march route.

Dozens of members of the assemblage carried aloft flaming homemade torches that appeared to be made of a dowel a couple of feet long, to which a soup can, apparently containing a flammable substance was connected similar to torches used in other instances by demonstrators to propel flaming liquid or gelatinous material. Such torches had the potential to be used as very dangerous weapons. That members of the assemblage carried them aloft through the crowded Adams Morgan commercial and entertainment area presented a grave threat of property damage and/or personal injury.

As the assemblage containing the plaintiffs moved along Columbia Road, NW, some persons within the group who were carrying torches used them to set fire to debris in trash receptacles.  Other persons within the group threw missiles at windows of various storefronts, breaking those windows or at persons walking along the sidewalk.  Windows were broken in the CitiBank at 1749-1/2 Columbia Road, NW, in the Kentucky Fried Chicken restaurant at 1753 Columbia Road, NW, in the Popeye's restaurant at 1755 Columbia Road, NW, in the Riggs Bank at 1779 Columbia Road, NW.  Each time a window was broken, the assemblage cheered and its members raised their arms.  This occurred more than six times as the mob travelled in the roadway of the 1700 block of Columbia Road, NW.  It appeared that the entire assemblage was engaging in the celebrations as they moved near the intersection of 18th Street and Columbia Road, and that the level of violence was escalating.

When the assemblage reached the Sun Trust Bank at 1800 Columbia Road, NW, members of the mob broke several of the bank windows.  The mob then cheered and its members raised their arms in celebration. The MPD Latino Liaison Unit ("LLU") Office is located on the end of the Sun Trust Bank building on the second floor.  Members of the assemblage threw what appeared to be a large brick or piece of concrete through the window of the MPD's Latino Liaison Unit causing it to break with a loud crash, which was once again followed by loud cheering and arm waving from what appeared to be everyone in the group.

A few minutes after the LLU window was broken, MPD Lt. Jimmy Riley turned off of Columbia Road, NW, onto 18th Street, NW, in an MPD marked cruiser, along with CDU 43 personnel in MPD vans.  Someone in the mob threw a brick into the windshield

5

of Riley's cruiser, shattering it. Once the windshield was broken, many bottles and other missiles were thrown by the mob, containing the plaintiffs, at Lt. Riley's car and the vans.

Plaintiffs processed as part of the assemblage of many more than 5 persons as it engaged in a public disturbance, which by violent and tumultuous conduct caused extensive property damage and created a grave danger of personal injury, perceptibly celebrating its destructive acts, and adding the strength and support of their numbers to aid, encourage and further that conduct. Plaintiffs' participation and engagement in the violent and tumultuous conduct was apparently deliberate, intentional, and willful.

Lanier knew that no permit had been issued for the demonstration, and perceived that the mob knew that as well.   Exh. 2 (Smith Decl.) at ¶¶ 14, 15; Exh. 3 (Keller Decl.), at 6-8, 10; Exh. 4 (Riley Decl.) at ¶ 5**;** Exh. 6 (Lanier Decl. 06) at ¶¶ 6-8; Exh. 7 (Lanier Tr.) at 35:25-38:10, 40:12-42:20; 51:15-52: 5; 53:4-154:12; 62:19-64:4; 66:12-67:7, 70:12-71:13; Exh. 5 (Lanier Decl. 08) at ¶ 5, 7-10; Exh. 8 (DC Resp.) at 7-10, response #1.b. **(PlsSOF ¶ 27.)**

4.      Lanier ordered plaintiffs and all other members of the unlawful assemblage described in ¶ 3, arrested because their conduct constituted rioting.  Exh. 7 (Lanier Tr.) at 51:15-52: 5; 53:8-15; 62:19-54:4; 66:12-67:7.  (Exh. 5) Lanier Decl.08 ¶ 9. Lanier, while at the arrest scene, conferred by cell phone with the General Counsel for the MPD and elected to charge the arrestees with parading without a permit in order that the arrestees could avail themselves of expedited release mechanisms that would not apply if she charged them with rioting.   (Exh. 7) Lanier Tr. at 51:15-52:12; (Exh. 5) Lanier Decl.08 at ¶ 10. *See also* J20 Counter-Inaugural Ball Flier ("Flier"), a copy of

6

which is annexed as Exh. 11,  Plaintiff Sarah Carr's Responses To Defendant District of Columbia's First Set Of Interrogatories ("Carr Resp.") relevant pages of which are annexed as Exh. 12, at 19 (response #9); Plaintiff Allyson Kirk's Responses To Defendant District of Columbia's First Set Of Interrogatories ("AKirk Resp.") relevant pages of which are annexed as Exh. 13, at 12 (response #6); Plaintiff Chelsea Kirk's Responses To Defendant District of Columbia's First Set Of Interrogatories ("CKirk Resp.") relevant pages of which are annexed as Exh. 14, at 12 (response #9). **(PlsSOF ¶ 31.)**

5.     Prior to the effective date of the Act, groups of 25 or more persons seeking to parade or demonstrate on District of Columbia public space were required to obtain a parade/demonstration permit from MPD.  The application and issuance processes were administered by the SOD.  The applicant was required to provide an estimate of the number of participants, the location or route to be used, the date and time of the parade/demonstration, the number and description of vehicles, if any, to be used in the parade/demonstration, sound generation and amplification devices, generators, and other apparatus as might be used.

The SOD could respond to the application by granting a permit to conduct the parade/demonstration just as reflected in the application.  The SOD could also issue a permit authorizing the applicant to proceed with the parade/demonstration on terms based on, but modified from, those stated in the application.  Finally, the SOD could deny the permit outright.

The decision of whether to permit the event as described in the application, in modified form, or not at all, was in all cases governed by the criteria set forth in 24

DCMR § 705.2. Modifications might be required for a number of reasons. Some locations and routes are in significant demand. Therefore, a permit might issue authorizing the event to take place at times other than the requested "start" time or "end" time, or even on a date other than that requested, because the location or route had previously been permitted to another event.

Further, the use of requested sound generation and amplification might be denied based on the requested time and location. SOD would be unlikely to issue a permit for a parade utilizing equipment capable of generating high decibel sounds late at night or early in the morning, or in the immediate vicinity of a nursing home or hospital or such other location at which such sound generation could adversely affect the wellbeing of residents or patients.

In addition, the SOD commonly included restrictions or limitations in permits for events in the immediate vicinity of the White House and a number of other sites, the security of which present critical concerns. All such limitations were to be based on the application of standards set forth in 24 DCMR § 705.2. In some instances, the restrictions and limitations were determined following consultation with the United States Secret Service and/or the Office of the Attorney General for the District of Columbia ("OAG").

Generally, when the SOD felt a need to authorize a permit modified from the terms requested, in accordance with the standards set forth in 24 DCMR § 705.2, an SOD Captain would engage in discussions and negotiations with the applicant. By doing this, the SOD was able to provide alternatives in some cases, working with the applicant to reach a compromise for a modified permit that would best fit the applicant's objectives.

SOD rarely, if ever, during Lanier's tenure as Commander, from August 2002 through December 2006, was a permit denied altogether. Lanier cannot recall a single instance during her command that the SOD granted no permit in response to an application.

It was also the practice of the MPD to attempt to facilitate demonstrations and parades for which the organizers had not obtained a permit, when MPD personnel encountered them on public space. More often than not, when an MPD officer came upon an unpermitted demonstration, an official from the SOD would be contacted. The SOD official would then attempt to negotiate the parameters of the event, as it would be allowed to proceed.

MPD's ability to facilitate such marches depended significantly on the Department's ability to obtain the agreement of the marchers to conduct their marches on terms that the MPD could safely accommodate. Therefore, MPD's ability to facilitate an unpermitted march depended significantly on the Department's ability to identify leaders or organizers who could negotiate on behalf of the marchers as a whole and who could obtain the cooperation of the marchers as a whole. Further, MPD's ability to facilitate an unpermitted march also depended on the size of the group and its willingness to confine its course, compliance with traffic control mechanisms, and lane usage within terms that the Department could safely accommodate, based on location, time of day, and available staffing. The process of facilitating an unpermitted march commonly involves compromise by the marchers, as does the process of issuing a permit.

However, in carrying out this practice, the official was to be guided by standards, consistent with those of 24 DCMR § 705.2, for determining the manner and extent to

which a parade or demonstration lacking a permit would be accommodated.  While some of the criteria set forth in § 705.2 are inapplicable in this on-scene process, others informed the official's decision, such as: whether the conduct of the parade would substantially interrupt the safe and orderly movement of other vehicular and pedestrian traffic contiguous to its route; whether the conduct of the parade would require diversion of such numbers of police officers from their normal police duties that the city would be deprived of reasonable police protection; whether the concentration of persons, animals, and vehicles in the assembly and disbanding areas and along the parade route would substantially interfere with the movement of police, fire, ambulance, and other emergency vehicles on the streets; whether the parade would likely move along its route and then disband expeditiously and without unreasonable delays en route; whether the parade would substantially interfere with any other parade for which a permit has already been granted; whether the parade is to be held for the sole purpose of advertising for private gain any product, merchandise, contest, or event; and whether the parade would create a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant property damage.

    Further, whether an event is provided a written permit through the conventional application process, or authorized to proceed through an on scene approval by an MPD official, the event is only given an approval that is subject to revocation.  If the event should deviate materially from the terms of its written permit or the terms upon which it was authorized by the on scene official, or come to pose a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant

property damage or public safety hazard, the MPD could revoke the permit or authorization immediately.

Further, if Lanier had been at the scene when the group of AIC attendees gathered outside the church, Lanier would not have authorized them to march as they did. Lanier would not have authorized them to play their drums in the residential area. Lanier would not have authorized them to carry any torches. Lanier would not have authorized them to occupy more than one lane at any point. Lanier would have imposed restrictions that were consistent with the criteria of 24 DCMR § 705.2. Lanier would not have authorized the march to proceed through Adams Morgan along the course the marchers intended without a police escort. Exh. 5 (Lanier Decl.08)  ¶¶ 13-24. **(PlsSOF ¶ 32.)**

6. District of Columbia policy did not require the police to support, rather than prohibit, street marches that did not have written permits, including street marches at the time and place of plaintiffs' march and marches conducted in the same manner as that which the police knew or reasonably understood to be planned for plaintiffs' march. Exh. 5 (Lanier Decl.08) ¶¶ 12-24 (regarding requirements of District policy); (regarding requirements of District policy); Exh. 2 (Smith Decl.) ¶¶ 3-9; Exh. 7 (Lanier Tr.) at 70:12-71:13; Exh. 5 (Lanier Decl.08) ¶ 5; Exh. 11 (Flier) (regarding "that which police knew was planned for plaintiffs' march"). **(PlsSOF ¶ 35.)**

7. The Flier referenced by plaintiffs in ¶ 36 of PlsSOF did not contain the text reflected in PlsSOF ¶ 37. On the contrary, the Flier provided significant additional information and exhorted AIC attendees to participate in the chain of events contemplated by its authors in the following language:

Protest March – After the Show!!!!

> As we've said tonight's show is not a concert, it's a celebration and it's a protest!!! After Anti-Flag's last song we invite you to join in a festive march from this show through the streets of DC to the doorstep of those in power. We're going to take our resistance to one of the Inaugural Ball where Bush and his supporters celebrate their power and privilege at the expense of all.
>
> During the last song of the evening we will distribute buckets, and encourage drumming, chanting and participation from all. Dress warm and be prepared to head out the door. After the last song we'll exit the space and march down Columbia Road towards 16th Street. We imagine a large festive march, that takes the amazing energy surging through tonight's show to create an explosive protest against the war in Iraq and the war here at home as well as against all that Bush represents. We will march from the show to the Washington Hilton, located at 1919 Connecticut Ave NW. This is the site of one of tonight's balls. From the march, we will engage in our own protests. We will show people faces behind those of us who resist this administration and sham. We will march from 18th St to Columbia, and make a left on 18th and a right on Florida to get to Connecticut. We will bring people back to the show space afterwards as well. Please remember to be respectful of the people in the Columbia Heights area where we are guests. Watch your surroundings and keep the energy focused where it needs to be – on showing the world our opposition to Bush.
>
> Join us in the streets tonight to send one NO! to the Bush regime and a million yeses to all of the things we can create together.

Exh. 11 (Flier); *see also* Exh. 12 (Carr Resp) at 19 (response #9); Exh. 13 (AKirk Resp.) at 12 (response #8); Exh. 14 (CKirk Resp.) at 12 (response #9). **(PlsSOF ¶ 37.)**

       8.     The announcement from the stage understood to be referenced by plaintiffs in ¶ 38 of PlsSOF did simply state the march route discussed in PlsSOF ¶ 37; on the contrary, not contain the text reflected in PlsSOF ¶ 37. On the contrary, an individual using a microphone announced to the hundreds of persons in attendance at the time at the AIC that there was to be a march after the concert to the Hilton Hotel, which was the site of an inaugural ball, and that marchers would "crash" – breach security at -- the ball site.

Exh. 2 (Smith Decl.) ¶ 9; Exh. 7 (Lanier Tr.) at 58:22-59:9; Exh. 5 (Lanier Decl.08) ¶ 5. **(PlsSOF ¶ 38.)**

9. The MPD Undercover officer at the AIC learned the following information and transmitted the same through the U/C's handlers to Lanier: The Flier had been distributed at the AIC; there was a plan to march after the concert to the Hilton Hotel, which was the site of an inaugural ball, and to crash the ball site. Within the AIC, this information had been announced to the attendees by a person using a microphone. Further, persons at the concert had discussed engaging in various types of property damage along the route from the AIC to the Inaugural Ball, including the use of spray paint. Exh. 2 (Smith Decl.) ¶¶ 3-10; Exh. 7 (Lanier Tr.) at 57:3-59:21; Exh. 5 (Lanier Decl.08) ¶ 5; Exh. 11 (Flier). **(PlsSOF ¶ 40.)**

10. At the September 2004, hearing before Judge Sullivan in *Barham*, the District represented that it would not arrest persons for parading without a permit without warning and providing an opportunity, subject to exceptional circumstances; however the District did not represent that it would not arrest for rioting without issuing warnings, simply because the rioters were rioting in a roadway. *See* generally, Exh. 16, Transcript of September 27, 2004 hearing in *Barham v. Ramsey*, 02cv2283 (EGS). **(PlsSOF ¶ 43.)**

11. Then-Commander Lanier ordered officers to arrest plaintiffs without warning after she had been informed by subordinates and/or personally observed that plaintiffs were presented a plan of action through the urgings of members of bands performing at the Anti-Inaugural Concert ("AIC") conducted at 1459 Columbia Road, NW, and a Flier distributed at the AIC, which called upon AIC attendees to "take [their] resistance to one of the Inaugural Balls where Bush and his supporters celebrate their

13

power and privilege at the expense of all, via a "march down Columbia Road towards 16th Street . . . to create an explosive protest . . . [and] march . . . to the Washington Hilton, located at 1919 Connecticut Ave NW. . . . the site of one of tonight's balls . . . [and] show people faces behind those of us who resist this administration and sham."

An individual had announced from the concert stage with a microphone to the hundreds of people in attendance at the AIC that there was to be a march after the concert to the Hilton Hotel, which was the site of an inaugural ball, and to "crash" the ball site.

Persons at the concert had discussed engaging in various types of property damage along the route from the AIC to the Inaugural Ball, including the use of spray paint.

Plaintiffs agreed to and acted in furtherance of the plan, as reported to Lanier by her subordinates or observed by Lanier personally, by joining as parts of an assemblage of 250 to 300 persons, traversing without a parade/demonstration permit along the roadways of Columbia Avenue, NW, to and along the roadway of 18th Street, NW.

At all times during the march, this assemblage occupied multiple lanes of the roadway and, at times all non-parking lanes of the roadway.

Persons within the assemblage took newspaper vending boxes from the sidewalks and laid them on their sides to block the roadway and keep MPD officers in their cruisers from following the assemblage.

As the assemblage moved along the roadway of Columbia Road, NW, groups of marchers within the assemblage formed clusters and pulled up bandannas and other items of clothing to conceal their features; persons within the assemblage propelled missiles with "wrist rocket" slingshots to break windows of businesses, persons within the

assemblage threw news vending machines into the street; persons within the assemblage threw bricks at buildings by marchers; members of the assemblage spray-painted anarchist symbols on buildings and vandalized cars parked along the march route.

Dozens of members of the assemblage carried aloft flaming homemade torches that appeared to be made of a dowel a couple of feet long, to which a soup can, apparently containing a flammable substance was connected similar to torches used in other instances by demonstrators to propel flaming liquid or gelatinous material.  Such torches had the potential to be used as very dangerous weapons.  That members of the assemblage carried them aloft through the crowded Adams Morgan commercial and entertainment area presented a grave threat of property damage and/or personal injury.

As the assemblage containing the plaintiffs moved along Columbia Road, NW, some persons within the group who were carrying torches used them to set fire to debris in trash receptacles.  Other persons within the group threw missiles at windows of various storefronts, breaking those windows or at persons walking along the sidewalk.  Windows were broken in the CitiBank at 1749-1/2 Columbia Road, NW, in the Kentucky Fried Chicken restaurant at 1753 Columbia Road, NW, in the Popeye's restaurant at 1755 Columbia Road, NW, in the Riggs Bank at 1779 Columbia Road, NW.  Each time a window was broken, the assemblage cheered and its members raised their arms.  This occurred more than six times as the mob traveled in the roadway of the 1700 block of Columbia Road, NW.  It appeared that the entire assemblage was engaging in the celebrations as they moved near the intersection of 18th Street and Columbia Road, and that the level of violence was escalating.

15

When the assemblage reached the Sun Trust Bank at 1800 Columbia Road, NW, members of the mob broke several of the bank windows.  The mob then cheered and its members raised their arms in celebration. The MPD Latino Liaison Unit ("LLU") Office is located on the end of the Sun Trust Bank building on the second floor.  Members of the assemblage threw what appeared to be a large brick or piece of concrete through the window of the MPD's Latino Liaison Unit causing it to break with a loud crash, which was once again followed by loud cheering and arm waving from what appeared to be everyone in the group.

A few minutes after the LLU window was broken, MPD Lt. Jimmy Riley turned off of Columbia Road, NW, onto 18th Street, NW, in an MPD marked cruiser, along with CDU 43 personnel in MPD vans.  Someone in the mob threw a brick into the windshield of Riley's cruiser, shattering it.  Once the windshield was broken, many bottles and other missiles were thrown by the mob, containing the plaintiffs, at Lt. Riley's car and the vans.

Plaintiffs processed as part of the assemblage of many more than five persons as it engaged in a public disturbance, which by violent and tumultuous conduct caused extensive property damage and created a grave danger of personal injury, perceptibly celebrating its destructive acts, and adding the strength and support of their numbers to aid, encourage and further that conduct. Plaintiffs participation and engagement in the violent and tumultuous conduct was apparently deliberate, intentional, and willful.

Lanier knew that no permit had been issued for the demonstration, and perceived that the mob knew that as well.   Exh. 2 (Smith Decl") at ¶¶ 14, 15; Exh. 3 (Keller Decl.) at 6-8, 10; Exh. 4 (Riley Decl.) at ¶ 5**;** Exh. 6 (Lanier Decl. 06) at ¶¶ 6-8; Exh. 7 (Lanier

Tr.) at 35:25-38:10, 40:12-42:20; 51:15-52: 5; 53:4-154:12; 62:19-64:4; 66:12-67:7, 70:12-71:13; Exh. 5 (Lanier Decl. 08) at ¶ 5, 7-10; Exh. 8 (DC Resp.) at 7-10, response #1.b.  **(PlsSOF ¶ 44.)**

12.   Chief Lanier did not fail "to embrace former Assistant Chief Jordan's [so-called] 'danger prevention' rationale for arrest without warning persons demonstrating in the streets" in response to plaintiffs' questioning regarding a hypothetical situation by plaintiffs' counsel.  Rather, tying her answer to the facts concerning plaintiffs' conduct in this matter, Lanier answered, "If the conduct for which a person is seized is egregious and dangerous, there would be no reason to allow them to simply walk away."  Exh. 7 (Lanier Tr.) at 29:17-30:3.  As Lanier testified later in that deposition, the persons she ordered be arrested were "a riotous group of people engaging in very destructive and dangerous behavior." Exh. 7 (Lanier Tr.) at 63:3-22. **(PlsSOF ¶ 53.)**

13.   MPD Officer Michael Topper was Chelsea Kirk's arresting officer.  He did not place her flexcuffs on her.  However, as her arresting officer, it was Topper's responsibility to prepare her arrest paperwork.  This included being photographed with before she was placed on the MPD vehicle that would transport her to the training academy for the processing of her arrest and again, at least an hour later, following their arrival at the training academy.  Declaration of Michael Topper, executed February 17, 2008 ("Topper Decl."), a copy of whish is attached as Exh. 10, at ¶¶ 8-11.  As reflected in the two photographs of Kirk and Topper annexed to his declaration, on at least two occasions after Kirk was flexcuffed, he had the opportunity to observe, at close range, the condition of her wrists.  Further, on at least these two occasions, Kirk had the opportunity to advise Topper that her flexcuffs were too tight and of any injuries to her wrists that she

might have suffered. Exh. 10 (Topper Decl.) photographs of Chelsea Kirk..

However, at no time did Topper hear Kirk complain that her flexcuffs were too tight or that her wrists were injured.  Nor did Topper observe any injuries to her wrists. Exh. 10 (Topper Decl) ¶¶ 11-14. **(PlsSOF ¶¶ 72, 73.)**

        Respectfully submitted,

        PETER J. NICKLES
        Interim Attorney General for the District of Columbia

        GEORGE C. VALENTINE
        Deputy Attorney General
        Civil Litigation Division

        __/s/_Ellen Efros_____
        ELLEN A. EFROS [250746]
        Chief, Equity I Section

        __/s/  Thomas L. Koger_____
        THOMAS L. KOGER [427921]
        Senior Assistant Attorney General

        __/s/  Chad Copeland_____
        CHAD COPELAND

        __/s/ Jayme Kantor
        JAYME KANTOR
        Assistants Attorney General
        441 4th Street NW
        Suite 600 South
        Washington, D.C.  20001
        (202) 724-6610
        Fax: (202)727-3625

        Counsel for Defendant District of Columbia