1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3        - - - - - - - - - - - - - - - X

 4    SARAH CARR, et al.            :

 5              Plaintiffs,     :

 6       vs.                     : Civil Action No:

 7    DISTRICT OF COLUMBIA,       : 06-00098 (ESH)

 8              Defendant.    :

 9        - - - - - - - - - - - - - - - X

10              Washington, D.C.

11          Monday, August 13, 2007

12

13    Deposition of:  ALLYSON MARGARET KIRK, a witness

14    herein, called for examination by counsel for

15    Defendant in the above-entitled matter, pursuant

16    to notice, taken at the offices of the Attorney

17    General for the District of Columbia, 441 4th

18    Street, N.W., Washington, D.C., beginning at 10:30

19    a.m., before Curtis R. Cloward, CSR, a court

20    reporter and notary public in and for the District

21    of Columbia, when were present on behalf of the

22    respective parties:
```

ORIGINAL

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                          8/13/2007

23

1          A.    I understand now.  Yes, that portion of

2    the emotional distress, yes.

3          Q.    Okay.

4                You express, in your response to

5    interrogatory number 7 about damages, that your

6    arrest in the District of Columbia while

7    demonstrating has chilled your enthusiasm for

8    exercising your First Amendment right.  And has

9    caused you to fear that police in the District do

10   not respect the rights of demonstrators and will

11   arrest you again for participating in a

12   demonstration or will arrest you again when you

13   demonstrate based on the wrongdoing of others;

14   fair?

15         A.    Yes.

16         Q.    Okay.

17               Prior to January 20th, 2005, the day of

18   the event, had you demonstrated in the District of

19   Columbia before?

20         A.    Yes.

21         Q.    On those occasions had you had any

22   interaction at all with the Metropolitan Police

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                          8/13/2007

24

1    Department officers?

2         A.    No direct interaction, but there has

3    always been a police presence at previous marches.

4         Q.    And did that police presence directly

5    impact your ability to express yourself in those

6    previous incidents?

7         A.    In the previous instances, no.

8         Q.    Have you demonstrated in the District

9    since January 20th, 2005?

10        A.    Yes.

11        Q.    Have you had, in that context, any

12   interaction with Metropolitan Police Department

13   officers since January 20th, 2005?

14        A.    Again, no direct interaction, but there

15   has been a police presence at the demonstrations

16   as well.

17        Q.    And in the instances since January

18   20th, 2005, has the presence of Metropolitan

19   Police Department officers impeded in any way your

20   ability to express yourself?

21        A.    Yes.

22        Q.    Okay.

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                8/13/2007

25

1      A.    I feel that much more -- much more

2   uncertain as far as my freedom to express my

3   political beliefs during a demonstration due to

4   the fact that I feel I was wrongfully arrested.

5   So, being there and being a future -- or since the

6   -- since the arrest time being at demonstrations

7   where there was a police presence I felt more

8   threatened because of the fact that I was arrested

9   when demonstrating peacefully on January 20th,

10  2005.

11           I've taken more preparations when I

12  went into the city, by the direction of my parents

13  as well, since the arrest of 2005 as far as always

14  making sure we have $50 cash, always making sure

15  we have ID, state ID, emergency contact numbers on

16  us, and always making sure that we are prepared to

17  be arrested that we had never thought of doing

18  before that date.

19           So it is definitely a more -- more of a

20  -- more of a threat that we've never felt before

21  after that date.

22      Q.    The impediment or limitation that you

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                8/13/2007

28

1    through the Chief through the Department there,

2    some entity, to say that you had not broken any

3    laws.   Then you said had demonstrated peacefully

4    on January 20th, January 20th of 2005; right?

5         A.    Correct.

6         Q.    Within the context of that language

7    intended is the assertion that you had not broken

8    any laws different from that you had demonstrated

9    peacefully?

10        A.    That would be in conjunction with that

11   both of those statements were true.

12        Q.    In prior demonstrations in the District

13   of Columbia, meaning prior to January 20th, 2005,

14   had you demonstrated in groups of more than 25

15   people?

16        A.    Yes.

17        Q.    In any of those instances had the

18   groups processed or marched along public roadways?

19        A.    Yes.

20        Q.    As to those instances, did you know

21   whether the parade had been issued a permit to use

22   the roadways?

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

29

1          A.      I did not.

2          Q.      **In those instances, did anybody from**

3    **the Metropolitan Police Department come upon and**

4    **interact with people in terms of discussing where**

5    **the march would go, what space the march would**

6    **occupy, how it would proceed and so forth?**

7          A.      The police department never directly

8    acted during previous marches, no.

9          Q.      **Where did you march on those occasions?**

10         A.      In D.C., along Constitution, I believe.

11    And, unfortunately, I'm not really familiar with

12    the city so I don't know road names as well.

13             Most of the time we go with my parents

14    and there's usually a flier of some sort saying

15    where the march is and what road it goes down.

16    And I usually just go with my parents and march

17    along with them, so I don't know road names.

18             I know one has been on Constitution,

19    however.

20         Q.      **Were any of those as late in the day as**

21    **the march at which you were arrested?**

22         A.      I believe most were in the afternoon

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

30

1        time.

2            Q.    Since your arrest in the cases of which

3        you've been demonstrating here the District, have

4        you participated in demonstrations involving more

5        than 25 people on any occasion?

6            A.    Yes.

7            Q.    Generally?

8            A.    Yes, I've -- I believe two, one of

9        which being an anti-war protest on January 27th of

10       this year.

11           Q.    In those instances did the

12       demonstration proceed along District roadways?

13           A.    Yes.

14           Q.    Do you know whether, in any of those

15       instances, the demonstration had a notification or

16       a permit issued?

17           A.    I did not.

18           Q.    You did not know?

19           A.    Did not know.

20           Q.    Okay.

21                 Back in January of 2005, would it have

22       struck you as odd that the District of Columbia

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

32

1      2005, would it require -- have required a permit

2      from the local government to do so would that

3      surprise you?

4              A.    Would it surprise me if --

5              Q.    If you needed one?

6              A.    If we needed one?

7              Q.    If you wanted to engage in the same

8      type of conduct in Boston, Virginia on January

9      20th, 2005 that you participated in in Washington,

10     D.C. on January 20th, 2005.

11             A.    Does it strike me as odd?  No.

12             Q.    Would it surprise you if you needed a

13     permit?

14             A.    No.

15             Q.    Is there any aspect of your injuries

16     that we haven't discussed?

17             A.    Not that has not been addressed in this

18     response, no.

19             Q.    When did you arrive in the District on

20     January 20th, 2005?

21             A.    We arrived in the late morning.

22             Q.    And what did you do when you got here?

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

33

1          A.      We met with the rest of the

2    demonstrators for a march at Malcolm X Park.

3          Q.      **And how many of you were there would**

4    **you say?**

5          A.      In my group?

6          Q.      **In the entire demonstration.**

7          A.      I really couldn't estimate.  Over a

8    thousand.

9          Q.      **And if I ask you a question about**

10   **numbers or time or distance or things of that**

11   **nature, I'm asking you to give me your best**

12   **estimate.**

13         A.      Um-hum.

14         Q.      **Is that okay?**

15         A.      Yes.

16         Q.      **Similarly, if you just can't estimate,**

17   **if it would just be a guess, then I'm not asking**

18   **you to guess, I'm asking you to do the best that**

19   **you can if you can.  Fair enough?**

20         A.      Yes.

21         Q.      **And where did this -- this was a march;**

22   **right?**

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                              8/13/2007

34

1        A.    Yes, it was.

2        Q.    **Where did this march go to from Malcolm**

3    **X Park?**

4        A.    It went to Lafayette Park.  I'm unsure

5    of the road name, unfortunately.

6        Q.    **And then what did you all do?**

7        A.    We basically relaxed after the march

8    with my family and browsed -- there was some

9    tables set up with literature and merchandise,

10   bumper stickers, T-shirts, things like that.  We

11   browsed around, used the rest room at a Starbucks,

12   I believe, and ate some snacks in the park with my

13   family.

14       Q.    **When would you estimate you arrived at**

15   **the park?**

16       A.    12:30 maybe, between just after 12:00

17   sometime.

18       Q.    **Was there a police presence at the**

19   **park?**

20       A.    There were police officers there, yes.

21       Q.    **Could you tell whether they were**

22   **Metropolitan police officers there as opposed to**

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

35

```
 1     any of the number of myriad law enforcement

 2     agencies in the District of Columbia?

 3          A.    I could not tell.

 4          Q.    As the demonstration moved from Malcom

 5     X Park to Lafayette Park, did you observe

 6     Metropolitan police along the way?

 7          A.    There were police officers, yes.  I

 8     don't know the distinction between police officers

 9     of different troops though.

10          Q.    Did they, in any way, impede the

11     demonstration?

12          A.    Not at that time, no.

13          Q.    Did any of them take actions which

14     appeared to you were intended to or did facilitate

15     the demonstration?

16          A.    I'm sorry, did they -- repeat the

17     question.

18          Q.    Take any actions which did or appeared

19     to you to facilitate the demonstration?

20               And if I may, by way of example, for

21     instance, perhaps a number of police officers

22     closed two sides of an intersection if a parade
```

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                        8/13/2007

38

1        Q.    At the time that you left Lafayette

2    Park to pass time before you went to the concert,

3    did you have any understanding that there would,

4    in fact, be a march following on from the concert?

5        A.    No.

6        Q.    Between the time you left the park and

7    the time that you arrived at the concert site,

8    what all did you do?

9        A.    We actually were along -- in our

10   walking to try to find somewhere to rest or kill

11   time, we happened to come across one of the

12   security checkpoints where the inaugural parade

13   was being held on Pennsylvania Avenue.  And we

14   joined a small demonstration there with

15   approximately ten to 20 people who just held signs

16   and chanted slogans while there were people going

17   into the inaugural parade.

18       Q.    I'm going to back up to the morning

19   march from Malcom X Park to Lafayette Square.

20             Did that march express a general or

21   commonly-held view or theme?

22       A.    Yes.

ALLYSON MARGARET KIRK

39

1          Q.      And what was that theme?

2          A.      It was in opposition to the second term

3    of George W. Bush.

4          Q.      In other instances in which you

5    demonstrated in the District of Columbia, is that

6    a theme or message that was conveyed by some of

7    those other demonstrations?

8          A.      Yes, there have been demonstrations

9    against Bush before that I've been to.

10         Q.      And when you say -- when you say

11   "before," did any of those occur prior to January

12   20th, 2005?

13         A.      Yes.

14         Q.      And did some of those occur since then?

15         A.      Yes.

16         Q.      After you demonstrated -- did any

17   police officers interfere with or impede your

18   demonstration activity along the inaugural parade

19   route?

20         A.      Not at that time, no.

21         Q.      What did you do after -- after you left

22   the inaugural parade route?

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                          8/13/2007

43

1       Q.      Yeah.

2       A.      It was about that size, only the seats

3    had been taken out so it was just an open room

4    that used to be used for church services.

5       Q.      Okay, stage at one end?

6       A.      Um-hum.  Yes, sorry.

7       Q.      Can you describe the stage for me?

8       A.      It basically spanned about three

9    quarters or maybe two thirds of the distance of

10    the end of the room.  It was set up from the rest

11    of the -- from the floor area with no real

12    separation between the crowd and the band.  It was

13    just raised up for the band to be on.

14            There were two large speakers on either

15    end of the stage and an area where you could stand

16    on the side of the stage on both sides.

17       Q.      Okay, you described the performance

18    area as being similar to a church where the seats

19    have been removed; right?

20       A.      Yes.

21       Q.      I'm interpreting that to reflect a

22    rectangular space?

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

44

1        A.     Yes.

2        Q.     And the stage then would take up about

3    two thirds of the width?

4        A.     Of the -- yes, of the width.

5        Q.     How high from the floor level would you

6    estimate the stage level to be upon which people

7    were standing and performing?

8        A.     Approximately three to four feet.

9        Q.     What attracted you to go to the

10   concert?

11       A.     We are fans of that -- of the band, the

12   main band who was going to be playing that night.

13       Q.     This is going to be a very competitive

14   question between you and your fellow past

15   representatives, so I caution you to answer with

16   care.

17       A.     Okay.

18       Q.     Who was the main band?

19       A.     The main band we went to see was

20   Anti-Flag.

21            MR. KOGER:  Off the record.

22            (Whereupon, there was a discussion held

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                      8/13/2007

47

1    the church close to the time we arrived when we

2    were walking into the church.

3                              (Defendant's Exhibit No.

4                              3, marked for

5                              identification.)

6              BY MR. KOGER:

7         Q.    Ms. Kirk, you have been handed a

8    document marked Exhibit 3 for your deposition;

9    right?

10        A.    Yes.

11        Q.    Okay, does that reflect the contents of

12   the flier that you received at the anti-inaugural

13   concert?

14        A.    Yes.

15        Q.    Did you have occasion while you were at

16   the concert to observe whether many of the people

17   in attendance received such fliers?

18        A.    Yes.  There were -- we did see other

19   people that had fliers and there was -- the people

20   who were handing out fliers were near the entrance

21   when people were coming in so they were handing

22   them out to many people.

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

48

1    Q.    Would you say fliers appeared to be

2    available for anyone that wanted one?

3    A.    I did not see that.  I recall fliers

4    sitting on a table or, you know, available to get

5    at any time.  But they were handed to people as

6    they walked in, so -- when we walked in anyway, so

7    -- which was right when the doors opened.

8    Q.    Did it appear -- did it appear to you

9    that most of the people that you saw at the

10   concert had received such a flier?

11   A.    I did not see that everyone -- that --

12   I mean, people -- most -- when I get fliers I put

13   them in my pocket, so I didn't see everyone had a

14   flier.  But people who walked in at the same time

15   we walked in were handed a flier.

16   Q.    While you were there did you have any

17   conversations with anyone about the contents of

18   the flier?

19   A.    Just myself and Chelsea and Josh.

20   Q.    And what was the nature -- what was the

21   substance of the conversation?

22   A.    Pure excitement.  We were very excited

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

50

1    energy to put out towards -- towards them.  Not

2    positive in a sense of happy, because we were

3    protesting against what they were doing, but

4    positive in a sense of gathering our energy

5    together and putting it forth.

6         **Q.    While you were at the concert did you**

7    **observe anyone make an announcement from the stage**

8    **about the anticipated march?**

9         A.    Yes.

10        **Q.    And who did you observe?**

11        A.    The band Anti-Flag, I believe it was

12   Justin Sane, the lead singer, at a couple of

13   occasions throughout their performance mentioned

14   just their excitement as well about carrying all

15   the energy to the streets in a demonstration after

16   the show.

17        **Q.    Would you spell that person's last name**

18   **for us?**

19        A.    S-a-n-e.

20        **Q.    Thank you.**

21             **Would you say that Mr. Sane encouraged**

22   **people to participate in the march?**

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                          8/13/2007

51

1       A.      Yes.   There was -- there was a lot of

2    momentum.   I believe Anti-Flag was involved with

3    the organization of the demonstration because they

4    spoke about it during the performance.   And they

5    basically -- he had mentioned that there was going

6    to be the march.   There was -- we were going to

7    leave the church together and march down Columbia

8    Avenue and towards the Hilton Hotel where they

9    were having the inaugural ball.

10              And then we were going to return after

11   the inaugural ball to the church so that we could

12   fine our way back.

13       Q.      As it turned out, did the band

14   Anti-Flag actually leave with the attendees of the

15   concert to commence the march?

16       A.      I did not see them, unfortunately,

17   because we had left our belongings in the other

18   room.   And so, before -- while -- right when

19   everyone started to move towards the door we had

20   to go in the opposite direction to get our bags

21   and so we ended up at the tail end of the movement

22   so I did not see them leave.

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

                                                                              55

1              (Whereupon, there was a short pause in

2       the proceedings.)

3              MR. KOGER:  Back on the record.

4              BY MR. KOGER:

5       Q.    You did go outside, you did leave the

6       concert area to participate in the march; is that

7       right?

8       A.    Yes.

9       Q.    There came -- you came, at some point,

10      to an area where the march was commencing?

11      A.    Yes.

12      Q.    What did you find when you got there?

13      A.    We walked outside in the front of the

14      church and saw the march commencing to the right

15      on the road.

16      Q.    Columbia Road?

17      A.    Yes.

18      Q.    How many people would you estimate were

19      in the march at that point?

20      A.    I'm not exactly sure, but I would

21      estimate about a hundred people.

22      Q.    Did the march come to include more

ALLYSON MARGARET KIRK

56

1    people, in your estimation, than a hundred as you

2    continued?

3         A.    It was hard to see because we were near

4    the end of the march the whole time so I didn't

5    really see the span of how long it was.

6         Q.    Okay, it started out on Columbia Road?

7         A.    Yes.

8         Q.    At the point where it started, did the

9    marchers occupy the entire open roadway of

10   Columbia Road?

11        A.    It appeared so, yes.

12        Q.    And did they also take up sidewalk

13   areas along that area of along the road?

14        A.    I believe there were some people on the

15   sidewalk too.

16        Q.    At the beginning of the march did

17   people have drums that were plastic buckets?

18        A.    Yes.

19        Q.    Did people have torches?

20        A.    Yes.

21        Q.    How many drummers would you say there

22   were?

**ALLYSON MARGARET KIRK**

57

1        A.    They were all through the crowd so I

2    couldn't tell, but it sounded like more than ten.

3        Q.    **How many people had torches?**

4        A.    I saw near the end of the march about

5    two.  But I couldn't see all the way to the front.

6        Q.    **Did anybody have banners carried by**

7    **more than one person?**

8        A.    Not in my area, no.

9        Q.    **Did you see them elsewhere?**

10       A.    In the front.  I saw them on a video

11   later; I did not see them that night.

12       Q.    **The video that you saw, did it contain**

13   **anything particularly inconsistent with your**

14   **observations from that night?**

15       A.    Trying to remember.  Other than people

16   that I hadn't seen that were near the front versus

17   the back, nothing that I can recall right now, no.

18       Q.    **Okay.**

19            **Did you see one video or more than one**

20   **video?**

21       A.    More than one.

22       Q.    **Was there anything in any of the videos**

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                              8/13/2007

58

1    that contradicted your experience that night?

2        A.    There was -- there were portions of the

3    march on the video that I had not seen but similar

4    to what I saw.

5        Q.    Would you agree that there were

6    significantly more than a couple of torches

7    depicted in the videos?

8        A.    I did see torches on the video, but I

9    did not pay attention to the number,

10   unfortunately.

11       Q.    They caught your eye though?

12       A.    I saw some, yes.

13       Q.    Had you been in a march before where

14   people were carrying lighted torches?

15       A.    No, but I also had never been to a

16   march at night either where there was not a lot of

17   visibility.

18       Q.    Did the torches appear, torches that

19   you observed on that night, appear to be similar

20   to one another?

21       A.    Yes.

22       Q.    And as you observed the torches on the

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

59

1    video tapes did they appear to be similar to one

2    another?

3         A.    Yes.

4         Q.    Same basic construction; right?

5         A.    It was a stick of some sort, like

6    wooden portion, and fire.  I didn't see what was

7    causing the fire.  Like, I'm familiar with Tiki

8    torches, so it appeared similar to that.

9              Unfortunately, it was dark so you

10   couldn't see what was under the flame, but there

11   was a wooden portion and flame.

12        Q.    You could not tell whether or not there

13   was a can from which the flame emanated?

14        A.    I didn't pay attention to them,

15   unfortunately.  I did see flame and a person

16   holding it, but I didn't look closely at them.

17        Q.    Do you have any reason to believe that

18   the torches were not manufactured in accordance

19   with a common plan or scheme?

20        A.    Did I -- could you say that again?  I'm

21   sorry.

22        Q.    Do you have any reason to believe that

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

61

1          A.     Yes.

2          Q.     Which would suggest that whoever

3    brought them to the concert anticipated a march to

4    follow after the concert?

5          A.     Yes.

6          Q.     Did you see any torches at the concert?

7          A.     No.

8          Q.     They must have come from elsewhere;

9    right?

10         A.     They were not at the concert, yes.

11         Q.     Did anybody distribute bandannas at the

12   concert?

13         A.     No.

14         Q.     Did you see large numbers of persons

15   wearing bandannas at the concert?

16         A.     There were some individuals wearing

17   bandannas at the concert, along with individuals

18   that I had seen through the whole entire day

19   wearing bandannas, yes.

20         Q.     When the march commenced on Columbia

21   Road, were you in a residential neighborhood or a

22   commercial neighborhood or how would you

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

62

1    characterize it?

2         A.    It appeared residential.

3         Q.    Was there -- there was chanting

4    involved in the march, wasn't there?

5         A.    Yes.

6         Q.    What were people chanting?

7         A.    There's pretty common slogans that I've

8    heard at many marches, such as this is what

9    democracy looks like; whose streets, our streets;

10   anti-bush slogans.  I can't think of the exact

11   wording though.

12        Q.    And you recall having heard whose

13   streets our streets?

14        A.    Yes.

15        Q.    Did you understand there to be a march

16   route that was going to be followed by the group

17   at the time that you left the concert?

18        A.    Yes.

19        Q.    And do you recall what that march route

20   was?

21        A.    Again, I'm not familiar with road

22   names; I wasn't either that night because I'm not

ALLYSON MARGARET KIRK
Carr, et al v. District of Columbia                                    8/13/2007

63

1    familiar with the city.

2              But I do know that there was -- the

3    route would go down Columbia Road and then take, I

4    believe, one or two turns to get onto the road

5    leading to the Hilton Hotel.  They did say street

6    names, but I do not remember.

7         Q.    Is any of that information reflected in

8    the flier, which is Exhibit 3?

9         A.    Yes, there is a route on Exhibit 3.

10        Q.    Would it be fair to say that Exhibit 3

11   provides information consistent with the march

12   plan?

13        A.    Yes.

14        Q.    In fact, if there were a written march

15   plan for that night this would suffice?

16        A.    Yes.

17        Q.    Meaning Exhibit 3; right?

18        A.    (Nodding head up and down, inaudible

19   response.)

20        Q.    Exhibit 3 speaks of taking the

21   demonstration to the Hilton mall; right?

22        A.    To the Hilton Hotel, yes.

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                          8/13/2007

64

1    Q.    Right.  And understanding that the --

2    that there was an inaugural ball being conducted

3    there; right?

4    A.    Yes.

5    Q.    The march -- I'm sorry, the flier

6    speaks of an explosive demonstration; does it not?

7    A.    Yes, explosive protest against the war.

8    Q.    Did you think of that as a positive

9    thing or a negative thing?

10    A.    I thought of it as a positive thing in

11    reaction to a negative situation.

12    Q.    Was the fact that the protest was

13    promoted as being explosive more positive than if

14    it had not been promoted as being explosive?

15    A.    I interpreted that as referring to

16    energetic and more of an outpouring of the energy

17    that we had gathered from the concert.

18    "Explosive" meaning taking the energy that we had

19    created and gathered from the music and the people

20    at the concert and exploding forth onto the

21    streets.

22    Q.    As you contemplated people exploding

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                         8/13/2007

65

1       forth onto the streets, what type of conduct by

2       the demonstrators did you visualize?

3               A.      Loud chanting, drumming, and marching.

4                               (Defendant's Exhibit No.

5                               4, marked for

6                               identification.)

7               BY MR. KOGER:

8               Q.      You have before you Exhibit Number 4,

9       marked for identification.

10              Do you recognize Exhibit Number 4?

11              A.      Yes.

12              Q.      What is Exhibit Number 4?

13              A.      It is a response that I wrote on an

14      Indymedia Web site regarding the Adams Morgan

15      march.

16              Q.      What is the Indymedia Web site?

17              A.      I've never posted other than this, so

18      I'm not a hundred percent familiar.  But I know it

19      was -- there were -- there are writers and

20      reporters that cover alternative topics, I believe

21      more -- more leftist or liberal reporters who --

22      one of which wrote a lengthy report on the events

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                      8/13/2007

66

1    of that night.  And there were multiple comments

2    regarding it.

3        Q.    **And is it the lengthy report and the**

4    **related comments that you are responding to in**

5    **this communication which is reflected in Exhibit**

6    **4?**

7        A.    Yes.

8        Q.    **Is this, in essence, an E-mail?**

9        A.    No, it's more of I guess a blog, but

10    meaning just a statement, like a public statement

11    or an opinion that you have regarding that

12    response.

13        Q.    **I'm going to ask you to read it for**

14    **content about which I'll ask you some questions.**

15        A.    Um-hum.

16        Q.    **And let me know when you're done.**

17        A.    Um-hum, I did read it on the way here

18    too.  (Reading.)  Okay.

19        Q.    **This is your writing; correct?**

20        A.    Yes.

21        Q.    **And this was -- there's a date in the**

22    **upper, right-hand corner, 31 January 2005; do you**

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

67

1    see that?

2          A.     Yes.

3          Q.     Is that the date that you wrote it?

4          A.     Yes.

5          Q.     There's another date in the lower,

6    right-hand corner, 2 slash 3 slash 05.

7                 Do you know what that date corresponds

8    to?

9          A.     I don't.  Maybe the date it was -- no,

10   I would say the date it was posted maybe.  I don't

11   know how long it takes to post on or process and

12   post a response.

13         Q.     Okay, but that's not -- that's not your

14   date, yours is the 31 date?

15         A.     The 31st, um-hum.

16         Q.     In the -- in the first sentence of this

17   blog you write:  "I was with my younger

18                sister and her boyfriend at the

19                Punk Rock Counter-Inaugural Ball

20                and we all went there with full

21                intention to participate in any

22                revolutionary action that might

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

68

1           take place that night."

2           Correct reading?

3     A.    Yes.

4     Q.    As you sit here today, is it still your

5     understanding that your sister and her boyfriend

6     shared your intention to participate in any

7     revolutionary action that might have taken place

8     that night?

9     A.    Yes.

10    Q.    What falls into the realm of

11    revolutionary action, as you understand that term?

12    A.    My understanding of that term, as it

13    relates to me, is any kind of speaking in

14    opposition to a ruling party that you feel is not

15    correct.  Speaking out against that in a public

16    setting is a revolutionary action.

17    Q.    Now, the Supreme Court, you may be

18    aware, has addressed speech in the context of the

19    First Amendment on a number of occasions.

20          Are you aware of that?

21    A.    Yes.

22    Q.    And the Court apparently considers flag

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                      8/13/2007

70

1    decisions?

2        A.    Not personally, no, but I don't know

3    those proceedings or....

4        Q.    You've spoken in your answer to my

5    question about revolutionary action and you spoke

6    in terms of speech; right?

7        A.    Speech, and I will add to that physical

8    direct action such as marching and participating

9    in a march to be -- publicly to be seen, to make

10   the purpose of the march aware to others by sound

11   and by action.

12       Q.    In some instances direct action may

13   comprise civil disobedience; fair to say?

14       A.    Yes.

15       Q.    Do you exclude civil disobedience from

16   the type of revolutionary action that you were

17   speaking of in Exhibit 4?

18       A.    Do I exclude it or -- how you did frame

19   that?

20       Q.    Yeah, do you exclude civil disobedience

21   from revolutionary action as you were using that

22   term in Exhibit Number 4?

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                              8/13/2007

71

1          A.     I was not participating in civil

2     disobedience, so I don't see how that -- I don't

3     -- no, there was no civil disobedience involved in

4     that statement.

5          Q.     Let me try it differently.

6          A.     Sorry.

7          Q.     No, that's fine?

8                 According to the blog in Exhibit 4, you

9     indicate that you and others went to the

10    anti-inaugural concert with a full intention to

11    participate in any revolutionary action that might

12    take place that night; right?

13         A.     Yes.

14         Q.     And I'm asking whether at the time that

15    you went to the concert, with the full intention

16    of participating in any revolutionary act that

17    might take place, if that contemplated civil

18    disobedience should a group engage in such

19    conduct.

20         A.     That was not our intention, no.

21         Q.     Okay.

22                Further down, starting at "Out of

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

82

1          Do you recall such a blog?

2     A.    Sorry, I don't.  I didn't read all of

3     them either; I did read some.  I remember the

4     large first articles was the one that I was mainly

5     responding to.

6     Q.    But the defenses of direct militant

7     action incorporated in response to the initial

8     Indymedia posting did, in fact, in some instances

9     defend or seek to justify criminal misconduct;

10    isn't that fair to say?

11    A.    In the aspect of civil diso -- I'm not

12    defending the criminal misconduct such as broken

13    windows and destruction of property, no, if that's

14    what you're asking.

15    Q.    I'm asking it a little differently.

16          There were blogs in response to the

17    piece to which you were responding that, in fact,

18    did defend or did seek to justify criminal

19    misconduct such as broken windows and other

20    activities that occurred that night; right?

21    A.    Did I read some to that effect?  Yes.

22    Q.    Further down the blog you write:

ALLYSON MARGARET KIRK

85

1    Q.    Would that extend to acts of arson for

2    at least -- for which at least one person was

3    arrested that day for attempting to set fire to a

4    portion of the hotel?

5    A.    I do not agree with arson, no, and I

6    did I not see that event take place.

7    Q.    Would that extend to ripping lamps from

8    the front of the Willard Hotel to be used as

9    missiles to be thrown at police officers in the

10   context of the inaugural parade?

11   A.    No, I do not agree with harming

12   individuals, no.

13   Q.    But there's a fairly broad and

14   ambiguous continuum of conduct in the range of

15   militant direct action and controlled protest;

16   fair to say?

17   A.    There's -- there's a very large range

18   of things that can be included in that, yes.

19   Q.    "Acts such as the Adams Morgan

20            march, although criticized by some,

21            can cause enough disruption to

22            force our cause to be heard."

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                      8/13/2007

86

1              **Fair reading?**

2      A.      Yes.

3      Q.      **Fair statement?**

4      A.      Yes.

5      Q.      **You are aware that, in the context of**

6      **the Adams Morgan march, windows of buildings were**

7      **broken; right?**

8      A.      I heard that later, yes.

9      Q.      **And buildings were spray painted;**

10     **right?**

11     A.      Yes.

12     Q.      **And cars were vandalized; right?**

13     A.      I did not hear that, no.

14     Q.      **Did you hear that newspaper vending**

15     **boxes were thrown into the street?**

16     A.      Yes.

17     Q.      **Did you see on the videos that you**

18     **watched that people rolled an industrial size**

19     **dumpster down one roadway into another roadway?**

20     A.      I did see a dumpster being moved, yes.

21     I didn't see where it went though.

22     Q.      **Did you see that some people took**

87

1    **wooden shipping pallets in that video and threw**

2    **them into the roadway?**

3         A.    I did, yes.

4         **Q.    You yourself, during the time of the**

5    **march, saw people throw rocks or other missiles**

6    **into the windows of buildings; is that right?**

7         A.    I saw a -- it is windshield of a police

8    car smashed with a brick.

9         **Q.    Where were you when that happened?**

10        A.    We were on the main -- a large road.

11    Again, I don't know the name of the road,

12    unfortunately.

13              After the -- after the turn we were not

14    on Columbia Road anymore.  We had turned left and

15    we were on a larger road.  I believe it was a

16    two-lane road where the march was on.

17        **Q.    And at the time -- at the time that**

18    **that happened, that you were on the larger road,**

19    **how many lanes of the road did the march occupy?**

20        A.    A large portion of the road occupying

21    parts of both lanes.

22        **Q.    Would it have been safe for the**

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

88

1    marchers and for vehicle traffic, for cars to

2    attempt to pass the march at that point?

3         A.    If -- I didn't see any cars try to pass

4    the march, so I'm not sure.  I -- there were not

5    enough people, it didn't take up the whole road.

6    So there were people kind of scattered in parts of

7    one lane and parts of the other.  So if a car

8    would have attempted to pass, people could have

9    moved over.  But I didn't see anyone try to.

10        Q.    How many people were in the march at

11   the point that you could observe?

12        A.    Again, it seemed like it was about a

13   hundred, maybe more, not much more though.  And

14   from what I could see, and again, I couldn't see

15   how far ahead it went, but it appeared to be

16   around a hundred people.

17        Q.    The police car, the windshield of which

18   you saw struck with a missile of some sort, that

19   was behind the march at that point?

20        A.    Yes.

21        Q.    Was that the only police car behind the

22   march at that point that you saw?

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                8/13/2007

89

1        A.    I believe there were two following

2    closely.

3        Q.    **Lights on?**

4        A.    Not police lights, just headlights.

5        Q.    **Was either of them a marked car?**

6        A.    I believe so.  Yes, I know they were

7    white, they had white front ends, but I really

8    don't remember how they were marked.

9        Q.    **Could you tell that the driver of the**

10   **car that got hit with the missile was a police**

11   **officer?**

12       A.    I did not see inside of the cars.  I

13   believe they might have been slightly tinted, the

14   windows, so I could not see who was driving the

15   car.

16             But it was -- it was obviously a police

17   car; I can say that.  I don't remember if it was

18   marked completely as with headlights or the

19   flashing lights on the top, but I believe there

20   were numbers on the side and maybe a little light

21   in the front of the car like on the dashboard that

22   might have been blue.  But I don't think it was a

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

90

1    fully-marked car though.

2         Q.    You saw the projectile that hit the

3    windshield; right?

4         A.    Yes.

5         Q.    Was the person that threw it nearer to

6    the police car than you were or farther from the

7    police car for where you were?  How would you

8    describe that juxtaposition?

9         A.    Probably similar distances, but there

10   were people in between us like the other sides of

11   the march, but similar in distance.

12        Q.    Did you actually see the person that

13   threw it?

14        A.    I didn't, unfortunately.

15        Q.    After, from your perspective, was there

16   any reason that the person who was about the same

17   distance from the police car that threw the object

18   that hit the police car would not have recognized

19   that he or she was throwing a projectile at a

20   police car?

21             MS. DUNHAM:  Objection, speculation.

22             You may answer.

**ALLYSON MARGARET KIRK**
Carr, et al v. District of Columbia                                    8/13/2007

91

1              THE WITNESS:  I was able to see that it

2     was a police car.  I, unfortunately, can't tell

3     from that person's angle because there were many

4     people in between us.

5              BY MR. KOGER:

6        Q.    **Do you have any reason to believe that**

7     **when the person launched the missile that he**

8     **didn't see his or her target?**

9              MS. DUNHAM:  Same objection.

10             You may answer.

11             THE WITNESS:  I really, unfortunately,

12    couldn't tell because of the fact that there were

13    many people in between us.  I could see the target

14    from my angle but there were many people between

15    me and where the brick came from.

16             BY MR. KOGER:

17       Q.    **My question is a little different.  A**

18    **brick weighs a couple of pounds easy; right?**

19       A.    Yes.

20       Q.    **Somebody launches this thing from a**

21    **crowd up in the air in a particular direction;**

22    **right?**

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                          8/13/2007

92

1          A.      It appeared that way, yes.

2          Q.      And it lands smack dab in the

3    windshield of a police car; right?

4          A.      Yes.

5          Q.      Taking only that into account, and add

6    the fact that you were about the same distance

7    from the police car, and you knew it was a police

8    car as whoever threw the brick what, if any,

9    factors suggest to you that the brick thrower

10   didn't have the car in mind as the target?

11         A.      The factors that I could think of would

12   be the people in between the person and the target

13   and also that the angle from which it was thrown,

14   I could not see from that angle, I didn't know

15   what that person saw because of the fact that they

16   were at a different location, so I can't account

17   for what their view was.

18         Q.      I understand that.  And my question is

19   seeking a justification of a negative, if you

20   will.

21              Again, someone was the same distance as

22   you are, throws a brick up in the air over the

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

93

1    heads of other people.  It lands, the brick, right

2    in the windshield.

3              Now, even without knowing whether it's

4    a police car or not, do you have a reason to

5    believe that that person wasn't throwing the brick

6    at what the brick hit?

7              MS. DUNHAM:  Objection, speculation.

8              You may answer.

9              THE WITNESS:  I don't -- I don't know.

10   I mean, if you're asking me -- I don't know why or

11   what the person was aiming at, no.  I did see the

12   brick hit but I do not know what their target was

13   intended to be.

14             BY MR. KOGER:

15        Q.    Right, and I'm not asking you -- not

16   asking you do you know that's what he intended.

17   I'm asking you do you have a reason to believe it

18   is not, affirmatively not what he intended.

19        A.    I have no reason to believe either way.

20   I'm sorry, I don't know the relevance.  I don't

21   see why my opinion on that would be relevant.

22        Q.    Because you're a witness to a crime.

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

94

1          A.    Yes.

2          Q.    And I'm asking you, as you witnessed

3    the commission of a crime, just based on what you

4    saw, how far were you from the car?

5          A.    I'm not really good with distance

6    again, but 50 feet, maybe?

7          Q.    Okay, even half of that is a pretty

8    good toss for a brick, isn't it?

9          A.    Yeah.  Again, I'm -- I really can't

10   estimate.  I was more to the side.

11               Yes, it's a good toss for a brick.

12         Q.    Were you the only person -- would it be

13   reasonable that you were the only person who saw

14   the brick hit the windshield besides the cop in

15   the car?

16         A.    No.

17         Q.    How many people were in a position to

18   have seen the brick hit the windshield?

19         A.    The tail end of the march, I mean, I

20   don't know who exactly was turned around at the

21   time period.  But who were in visible distance of

22   seeing it, maybe 20, 30 people.

ALLYSON MARGARET KIRK

95

1       Q.    Do you have a general perspective of

2   where the brick was thrown from?

3       A.    I believe it was from the left side of

4   the march.

5       Q.    I mean, as you were -- could you, in

6   your mental visual recollection, see this brick

7   come flying out of approximately here?  Is there a

8   "here" that you could see?

9       A.    It approximately the left side of the

10   march.  We were more on the right side.  And it

11   was, again, the tail end of the march, maybe five

12   to six people in.

13       Q.    Okay, five or six people in.  So

14   whoever threw the brick was within --

15       A.    Yes.

16       Q.    Was surrounded by observers; right?

17       A.    Yes, it appeared that way.

18       Q.    It's fairly unreasonable to believe

19   that a person could be standing within a group,

20   moving in close proximity to one another, and not

21   one of those persons saw the individual throw the

22   brick; fair to say?

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

96

1          A.    Yes.

2          Q.    Anybody tackle anybody?

3          A.    I could not see the person, so I don't

4    know.  I did not see anybody tackle anybody, no.

5          Q.    Did you ever observe anyone restrain an

6    individual and turn that individual over to the

7    police?

8          A.    No.

9          Q.    Did you see anybody point hey, that guy

10   threw a brick?

11         A.    No.

12         Q.    Did you see anybody make any effort at

13   all to identify or apprehend the person who threw

14   the brick into the police car?

15         A.    No.

16         Q.    In relationship in time, approximately,

17   -- let me back up, withdrawn.

18              I've turned to page 12 of your

19   interrogatory responses, which are Exhibit 2.

20         A.    Yes.

21         Q.    And the last two lines -- let me start,

22   the last two lines of that page commence a new

ALLYSON MARGARET KIRK

135

```
 1        A.    Yes.

 2        Q.    Okay, and I'm asking you whether you

 3   would know Cathy Lanier if you saw her?

 4        A.    No.

 5        Q.    Did you see a woman driving one of the

 6   vehicles that was behind the march?

 7        A.    No, I could not see who -- you know,

 8   the gender of the person driving the car.

 9        Q.    Did you see a woman at any point emerge

10   from one of the vehicles?

11        A.    No.

12        Q.    Are there other statements with which

13   you disagree?

14        A.    (Reading.)  I disagree with the

15   statement in paragraph 9, that she says there was

16              "...a large number of the

17              participants in the unlawful parade

18              were destructive and violent."

19   because that was not the case.

20              There was -- there were individuals

21   committing the acts.  It was not the -- it was not

22   a large number of the participants that were
```

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                   8/13/2007

136

1    disruptive and violent.

2              And also how she says in that same

3    paragraph that "To have attempted to

4              negotiate with the `organizers' of

5              this procession would have placed

6              ...[the] police officers and the

7              demonstrators at a risk of being

8              injured."

9              There would have been no need to

10   negotiate with any organizers of the protest.  All

11   she would have had to have done would be give a

12   verbal order to disperse and it would have allowed

13   protesters to disperse or even have the option to

14   do so.

15        Q.    Accepting for the purposes of the

16   question, that having issued a dispersal warning

17   would have put demonstrators on notice that the

18   police were calling upon them to disperse, would

19   it not be speculation to attempt to answer how any

20   number of the protesters would respond to the

21   dispersal order?

22        A.    It would be speculation to try to

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

169

1    the past?

2        A.    No.  Every -- I mean, again, I'll

3    reiterate the fact that I'd been going to

4    demonstrations since I was probably six or seven

5    years old with my family and participated in

6    countless demonstrations and marches, many of

7    which in D.C..  And I've never -- every march I

8    have ever been to there's been a flier describing

9    a parade route or a march route.

10           On the flier there's, you know, been

11   times announced, organizing groups that are

12   involved in organizing the march are on the flier

13   usually at any march I have been to.  It's --

14   which are all here on this flier.  I mean,

15   everything is exactly the way any other flier I've

16   seen is completely the same.

17           When there were announcements made at

18   the concert there were, you know, very clear

19   instructions given by the people announcing the

20   march as far as where to go, where to meet, what

21   to do afterwards, what the purpose of the march

22   was.  It was all very clear and very identical to

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

170

1    any other march I've ever been to in D.C.

2        Q.    You testified earlier today that you

3    had observed spray painting at a certain point in

4    the march by two individuals who spray painted on

5    buildings and then ran away.

6              Do you recall where those individuals

7    were located when they spray painted?

8        A.    Yes.  They were on the right side of

9    the march where -- when we saw them they were --

10   we were near the end of the group, so they ran up

11   along the right side from behind the march, spray

12   painted on buildings on the right side where we

13   were and then ran along the sidewalk on the

14   right-hand side up past of the march.

15       Q.    What, if anything, did any of the other

16   marchers say to those persons responsible for the

17   spray painting?

18       A.    There were a couple people around me

19   that were asking, like, hey, what are you doing.

20   You know, why are you doing that, why are you

21   spray painting, singling them out.  You know, like

22   inquiring about who they were and what they were

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                              8/13/2007

171

1    doing.

2              Josh, who was with us in our group, who

3    was, it seemed, very upset by the fact that they

4    were spray painting because we didn't want that to

5    be.  You know, we didn't want that, you know,

6    those kind of people and that kind of vandalism to

7    be reflecting on what we were trying to do as far

8    as marching peacefully and raising awareness.

9              Josh said to the -- yelled to them hey,

10   what you are doing, that's not what this is about.

11   And they didn't respond but they kept running.

12        Q.    After the other marchers said that to

13   those persons who had been spray painting what, if

14   anything, was going through your own mind as to

15   whether or not you could safely continue with the

16   march?

17        A.    At that point we felt -- we felt okay.

18   It felt comfortable about continuing with the

19   march because the mood of the march was, you know,

20   still very upbeat, still very positive.

21              When the people with the spray painting

22   finished their symbols on the buildings that they

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                          8/13/2007

172

1    were doing near us and they kept running ahead of

2    us, we felt -- or, you know, we saw that they had

3    left where the march was; they had kept running.

4    And so, we felt comfortable continuing with the

5    march because those people were no longer in the

6    vicinity.  The acts of vandalism were no longer

7    around us.

8         Q.    Referring now to Exhibit 4, which is a

9    comment that you had posted on the D.C. Indymedia

10   Web site in response to an article that had been

11   published on that Web site, you wrote in this

12   posting that you had no regrets.

13              Is that correct?

14        A.    That's correct.

15        Q.    Do you stand by that statement?

16        A.    I have no regrets about participating

17   in this march; I have no regrets about going to

18   the concert.

19              It was the intention and the purpose of

20   the concert and the march thereafter was to carry

21   the momentum of the demonstrations of the day and

22   carry the opposition to the inauguration that was

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

179

1    way.  We were, again, at the end of the march, so

2    we think we passed by everything the front of the

3    group passed by because we were at the end of the

4    march.  I did not see any fires.

5         Q.    **Did you see any blood on the pavement?**

6         A.    I did not see any blood on the

7    pavement.

8         Q.    **You testified earlier that persons were**

9    **using scarves or bandannas as protection against**

10   **the cold.**

11        **Do you know of any other reason why a**

12   **person would wear a bandanna or a mask to cover**

13   **the face or part of the face?**

14        A.    I would imagine people might not want

15   to, or people might choose to demonstrate or

16   protest anonymously.

17        I would definitely -- I personally am

18   comfortable saying my name and, you know, being

19   publicly quoted as being there at any march.  I

20   mean, I'm proud to do that.  But I know some

21   people, whether it be their job doesn't allow or

22   their family doesn't approve or anything in that

**ALLYSON MARGARET KIRK**

Carr, et al v. District of Columbia                                    8/13/2007

180

1    category, where they would choose to hide their

2    identity due to the risk of, you know, future

3    consequence or -- or being categorized as in,

4    perhaps, an unwanted group of people which would

5    be radicals or protesters.

6              I know that some people, because of

7    certain life circumstances, choose to protest

8    anonymously and thus cover their face.

9         Q.    If the police had given an order to

10   disperse at any point during the march that you

11   participated in in Adams Morgan on the evening of

12   January 20th, 2005, would you have obeyed that

13   order?

14        A.    Yes, I would have.  That's one of my --

15   the main problems that I see with this arrest.

16   Again, I can't speculate for what the rest of the

17   people in the march would have done, but I know

18   personally we did not even know parading without a

19   permit was a charge.   I did not know previously

20   that that had ever -- that that was even a

21   violation of the law.

22              If -- so, I mean, the whole time that

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                    8/13/2007

182

1              EXAMINATION BY COUNSEL FOR DEFENDANT

2                    BY MR. KOGER:

3         Q.      You indicated that it is common in the

4    context of demonstrations that you've attended and

5    participated in in the District that there be a

6    flier such as Exhibit 3.  And that commonly such

7    fliers identify the route and the organizers;

8    right?

9         A.      Yes.

10        Q.      You indicated that, in fact, Exhibit 3

11   does the same thing; right?

12        A.      Yes.

13        Q.      Who are the organizers, as identified

14   by Exhibit 3?

15        A.      Positive Force D.C., which I'm not

16   familiar with that group.

17                Iraq Veterans Against the War.  I'm

18   been to multiple protests with that group with

19   speakers of that group.  I went to Fort Bragg with

20   Iraq veterans from the war to protest the Iraq

21   war.

22                The D.C. Grassroots Empowerment

ALLYSON MARGARET KIRK

183

1    Project, I've heard about the group but I've never

2    participated in any of their marches.

3              J20 Legal, I've learned of them from

4    that day.  Those were the wonderful people helping

5    us throughout the day, giving us legal advice

6    throughout the day.

7              And it's not on here, but I know

8    Anti-Flag was involved with the protest as well.

9        Q.    You testified, in response to

10   questioning by Ms. Dunham, that you went with the

11   original intent of the demonstration; do you

12   recall that?

13       A.    Yes.

14       Q.    Included in the original intent was to

15   arrive at the Hilton and protest there.

16       A.    Yes.

17       Q.    All right, according to your

18   interrogatories, hundreds of people engaged in the

19   march.

20       A.    Yes.

21       Q.    Do you believe that the hundreds of

22   people shared the same original intent?

ALLYSON MARGARET KIRK

Carr, et al v. District of Columbia                                          8/13/2007

184

1          A.     Yes.

2          Q.     Do you believe that the hundreds of

3    people left the concert with the idea of engaging

4    in a demonstration consistent with the plan set

5    forth in Exhibit 3, such as it is?

6          A.     Yes.

7          Q.     Do you believe that that intent and

8    plan were communicated through announcements in

9    the performance as well as through the flier?

10         A.     Yes.

11         Q.     Do you agree that by participation

12   those who marched and demonstrated agreed to this

13   common plan?

14         A.     The plan of marching peacefully and

15   arriving at the Hilton Hotel to demonstrate

16   against the inaugural ball, yes.

17         Q.     And you testified earlier that some

18   number of persons participated in the march with

19   similar torches suggesting, perhaps, a common

20   manufacturer; right?

21         A.     I believe I saw about two and then

22   others on the video that appeared similar, yes.

OLENDER REPORTING, INC.
1522 K Street, N.W., Suite 720, Washington, D.C. 20005   (202) 898-1108

E-R-R-A-T-A   S-H-E-E-T

Caption: **Carr, et al v. District of Columbia**

Case No. **06-00098 (ESH)**        Date taken: **8/13/2007**

Deposition of: **ALLYSON MARGARET KIRK**

I hereby certify I have read my deposition and that it is
accurate with the corrections listed below.

| Page: | Line: | As Transcribed: | Change To: |
|---|---|---|---|
| 16 | 12 | "legal" | "level" |
| 20 | 12 | "rested" | "arrested" |
| 25 | 25 | delete "that" | |
| 25 | 21 | delete "after" | |
| 26 | 16 | delete "there have" | |
| 27 | 13 | delete "I was not a —" | |
| 30 | 8 | delete "I've —" | |
| 30 | 9 | "being" | "was" |
| 34 | 8 | "was" | "were" |
| 40 | 17 | "were" | "where" |
| 41 | 19 | "there" | "they" |
| 42 | 9 | "wound" | "would" |
| 47 | 18 | delete "there were —" | |
| 47 | 19 | delete "there was —" | |
| 48 | 12 | delete "I mean, people — most —" | |
| 49 | 1 | delete "not only was it —" | |
| 49 | 7 | "I" | "It" |
| 49 | 14 | delete "people" | |
| 51 | 1 | delete "— there was" | |
| 51 | 6 | delete "There was —" | |
| 51 | 18 | delete "before, — while —" | |
| 53 | 8 | "was" | "were" |
| 54 | 3 | delete "believe — I" | |
| 54 | 13 | delete "— or" | |
| 63 | 2 | delete "there was" | |
| 65 | 19 | delete "was — there were —" | |
| 65 | 20 | delete "more —" | |
| 65 | 20 | delete "who —" | |

9-24-07                           *allyson Kirk*
_____          _____
     Date                    Signature of Deponent
Note: If there are no corrections, write "None" above.
Use additional pages if necessary. Be sure you have
dated and signed the errata sheet.

**OLENDER REPORTING, INC.**

1522 K Street, N.W., Suite 720, Washington, D.C. 20005   (202) 898-1108

### E-R-R-A-T-A   S-H-E-E-T

Caption: **Carr, et al v. District of Columbia**

Case No. **06-00098 (ESH)**        Date taken: **8/13/2007**

Deposition of: **ALLYSON MARGARET KIRK**

I hereby certify I have read my deposition and that it is
accurate with the corrections listed below.

| Page: | Line: | As Transcribed: | Change To: |
|---|---|---|---|
| 67 | 15 | delete "um-hum" | "yes" |
| 71 | 2 | delete "I don't see how that -" | |
| 71 | 2 | delete "- I don't" | |
| 75 | 5 | "um-hum" | "yes" |
| 76 | 11 | "is" | "are" |
| 78 | 5 | delete "or I - I don't" | |
| 79 | 15 | delete "the" | |
| 82 | 4 | "articles" | "article" |
| 82 | 11 | "also" | "disobedience" |
| 85 | 17 | delete "- there's" | |
| 87 | 7 | delete "- it is." | |
| 87 | 13 | delete "- after the" | |
| 88 | 3 | delete "If -" | |
| 88 | 4 | delete "I -" | |
| 93 | 9 | delete "I don't -" | |
| 94 | 9 | delete "I'm -" | |
| 95 | 9 | "It" | "It was" |
| 99 | 3 | "presence" | "present" |
| 102 | 9 | delete "- they were" | |
| 102 | 14 | delete "we" | |
| 102 | 15 | delete "previous" | |
| 103 | 22 | delete "there was" | |
| 104 | 11 | delete "there was a" | |
| 104 | 11 | delete "with -" | |
| 105 | 10 | "lots" | "lot" |
| 105 | 12 | "is" | "are" |
| 107 | 13 | delete "there was" | |
| 110 | 1 | "disorganizing" | "disorganized" |

9-24-07

Date                    Signature of Deponent

Note: If there are no corrections, write "None" above.
Use additional pages if necessary. Be sure you have
dated and signed the errata sheet.