UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al.*, | : |
| Plaintiffs, | : |
| v. | : Civ. Action No. 06-0098 (ESH) |
| DISTRICT OF COLUMBIA, *et al.*, | : |
| Defendants. | : |

### DECLARATION OF CATHY L. LANIER

I, Cathy L. Lanier, under penalty of perjury declare as follows:

1. I am an adult over the age of 21 years.

2. I make this declaration based on my personal knowledge of the matters discussed in it.

3. I am the Chief of Police of the Metropolitan Police Department ("MPD" or "Department") and have been a member of this Department since September 1990. My first week on the job, I was posted at 17th Street, NE, Mount Pleasant, and at Mount Pleasant Park during the Mount Pleasant riots.

4. Prior to being appointed Chief, I held the position of Commander, Special Operations Division ("SOD"), of the MPD. Among the diverse responsibilities of the SOD are planning for large scale demonstrations within the District of Columbia, providing security along the Presidential Inaugural Parade route, providing motor escorts for the President, Vice-President, and other dignitaries, and responding to notifications of First Amendment Assemblies in accordance with the First Amendment Rights and Police Standards Act of 2004 ("Act"). Prior to the April 13, 2005 effective date of the Act, as

SOD Commander, I responded to applications for permits to conduct parades and demonstrations on public space in accordance with the District of Columbia's Public Space and Safety Regulations, set forth in 24 D.C.M.R. Chapters 100 and 700. I responded to such permit applications under authority delegated to me as the SOD Commander by then MPD Chief Charles H. Ramsey.

5. During the evening of January 20, 2005, I received numerous cell phone calls from MPD Intelligence Section Lieutenant Michael Pavlik. Pavlik reported to me information that he advised me he had received from an MPD undercover ("U/C") officer assigned to attend the Anti-Inaugural Concert ("AIC") at 1459 Columbia Road, NW. The U/C, through Pavlik and his other handlers informed me that a Flier had been distributed at the AIC, which announced that a march would follow from the AIC. The Flier indicated the route the March would take and that it would lead to an explosive protest in Adams Morgan. After that, I was advised Marchers would proceed to the Washington Hilton and attempt to breach security to "crash" the inaugural Ball going on there. Pavlik informed me that the U/C anticipated that protestors would engage in violence. I was further advised that AIC performers were urging people to take part in the protest.

6. I knew that no permit, as required by District municipal regulations, had been applied for or granted for any such march or demonstration.

7. In the instance of plaintiffs' march, when I proceeded to Columbia Road, NW, and 16th Street, NW, a group of more than 200 persons had already crossed the intersection of 16th Street, NW, and Columbia Road, NW, when we reached that intersection. We turned left onto Columbia Road, NW, traveling westbound behind the

marchers. They did not appear to notice my marked Cruiser 18 for several moments. The march was violent and disorderly, and endangering public safety. Many marchers were carrying flaming torches and using them to set debris in trash containers on fire. This mob caused significant property damage in the 1700 block of Columbia Road, NW. Further, I anticipated, based on what I had observed and had been informed by subordinate officers, that if allowed to continue, the march would continue to escalate in violence and property damage and would foreseeably cause injuries to persons in the area. For these reasons, the march was not "one that District policy", as reflected in 24 DCMR § 705 or by MPD practice, "required the police to support," as plaintiffs assert at page 10 of their brief.

8. I ordered two CDU platoons to 18th Street, NW, to respond to the march.

9. The MPD did not prohibit the march. The marchers staged near the church, as it was reported to me. They proceeded in the roadway of Columbia Road. Participants used newspaper boxes to block the roadway and damaged cars and buildings, cheered on and supported by numerical strength of the rest of the group. As windows were broken by rocks and bricks thrown by people in the group, the group cheered and raised their arms in apparent celebration of the destruction. This response was not that of just a few individuals; it was a group response. The MPD could not support this riotous criminal conduct. Accordingly, I ordered the rioters to be arrested.

10. I determined that probable cause existed for these arrests for rioting based on reports of subordinates and my own observations, including those of events reflected in the District's responses to interrogatories in this case and in the declarations of Jimmie Riley, Jeffrey Madison, Drew Smith, and Patrick Keller in this matter. Having

determined that I had probable cause to arrest the marchers for rioting, I ordered that the Field Arrest paperwork, which was properly completed on the scene, reflect the lesser charge of parading without a permit so that the arrestees could avail themselves of expedited release mechanisms that would not apply if she charged them with rioting.

11. I have been advised of certain representations made and issues raised by plaintiffs in their filings in support of their Motion For Partial Summary Judgment On Liability. I make this declaration to respond to these representations and issues based on my personal knowledge.

12. I am advised that plaintiffs contend, in paragraph 35 of their Statement Of Undisputed Material Facts In Support Of Plaintiffs' Motion For Partial Summary Judgment on Liability ("Pls Facts") that then-existent "District of Columbia policy required the MPD to support, not prohibit, street marches that did not have written permits, including street marches at the time and place of plaintiffs' march and marches conducted in the same manner as that which police knew was planned for plaintiffs' march." Plaintiffs' representation is not true.

13. Prior to the effective date of the Act, groups of 25 or more persons seeking to parade or demonstrate on District of Columbia public space were required to obtain a parade/demonstration permit from MPD. The application and issuance processes were administered by the SOD. The applicant was required to provide an estimate of the number of participants, the location or route to be used, the date and time of the parade/demonstration, the number and description of vehicles, if any, to be used in the parade/demonstration, sound generation and amplification devices, generators, and other apparatus as might be used.

4

14. The SOD could respond to the application by granting a permit to conduct the parade/demonstration just as reflected in the application. The SOD could also issue a permit authorizing the applicant to proceed with the parade/demonstration on terms based on, but modified from, those stated in the application. Finally, the SOD could deny the permit outright.

15. The decision of whether to permit the event as described in the application, in modified form, or not at all, was in all cases governed by the criteria set forth in 24 DCMR § 705.2. Modifications might be required for a number of reasons. Some locations and routes are in significant demand. As a result, a permit might be issued to authorize the event to take place at times other than the requested "start" time or "end" time, or even on a date other than that requested, because the location or route had previously been permitted to another event.

16. Further, the use of requested sound generation and amplification might be denied based on the requested time and location. SOD would be unlikely to issue a permit for a parade utilizing equipment capable of generating high decibel sounds late at night or early in the morning, or in the immediate vicinity of a nursing home or hospital or such other location at which such sound generation could adversely affect the wellbeing of residents or patients.

17. In addition, the SOD commonly included restrictions or limitations in permits for events in the immediate vicinity of the White House and a number of other sites, the security of which present critical concerns. All such limitations were to be based on the application of standards set forth in 24 DCMR § 705.2. In some instances, the restrictions and limitations were determined following consultation with the United

States Secret Service and/or the Office of the Attorney General for the District of Columbia ("OAG").

18. Generally, when the SOD felt a need to authorize a permit modified from the terms requested, in accordance with the standards set forth in 24 DCMR § 705.2, an SOD Captain would engage in discussions and negotiations with the applicant. By doing this, the SOD was able to provide alternatives in some cases, working with the applicant to reach a compromise for a modified permit that would best fit the applicant's objectives.

19. SOD rarely, if ever, during my tenure as Commander, from August 2002 through December 2006, denied a permit altogether. I cannot recall a single instance during my command that the SOD granted no permit in response to an application.

20. It was also the practice of the MPD to attempt to facilitate demonstrations and parades for which the organizers had not obtained a permit, when MPD personnel encountered them on public space. More often than not, when an MPD officer came upon an unpermitted demonstration, an official from the SOD would be contacted. The SOD official would then attempt to negotiate the parameters of the event, as it would be allowed to proceed.

21. MPD's ability to facilitate such marches depended significantly on the Department's ability to obtain the agreement of the marchers to conduct their marches on terms that the MPD could safely accommodate. Therefore, MPD's ability to facilitate an unpermitted march depended significantly on the Department's ability to identify leaders or organizers who could negotiate on behalf of the marchers as a whole and who could obtain the cooperation of the marchers as a whole. Further, MPD's ability to facilitate an

unpermitted march also depended on the size of the group and its willingness to confine its course, compliance with traffic control mechanisms, and lane usage within terms that the Department could safely accommodate, based on location, time of day, and available staffing. The process of facilitating an unpermitted march commonly involves compromise by the marchers, as does the process of issuing a permit.

22.     However, in carrying out this practice, the official was to be guided by standards, consistent with those of 24 DCMR § 705.2, for determining the manner and extent to which a parade or demonstration lacking a permit would be accommodated. While some of the criteria set forth in § 705.2 are inapplicable in this on-scene process, others informed the official's decision, such as: whether the conduct of the parade would substantially interrupt the safe and orderly movement of other vehicular and pedestrian traffic contiguous to its route; whether the conduct of the parade would require diversion of such numbers of police officers from their normal police duties that the city would be deprived of reasonable police protection; whether the concentration of persons, animals, and vehicles in the assembly and disbanding areas and along the parade route would substantially interfere with the movement of police, fire, ambulance, and other emergency vehicles on the streets; whether the parade would likely move along its route and then disband expeditiously and without unreasonable delays en route; whether the parade would substantially interfere with any other parade for which a permit has already been granted; whether the parade is to be held for the sole purpose of advertising for private gain any product, merchandise, contest, or event; and whether the parade would create a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant property damage.

23. Further, whether an event is provided a written permit through the conventional application process, or authorized to proceed through an on scene approval by an MPD official, the event is only given an approval that is subject to revocation. If the event should deviate materially from the terms of its written permit or the terms upon which it was authorized by the on scene official, or come to pose a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant property damage or public safety hazard, the MPD could revoke the permit or authorization immediately.

24. Further, if I had been at the scene when the group of AIC attendees gathered outside the church, I would not have authorized them to march as they did. I would not have authorized them to play their drums in the residential area. I would not have authorized them to carry any torches. I would not have authorized them to occupy more than one lane at any point. I would have imposed restrictions that were consistent with the criteria of 24 DCMR § 705.2. I would not have authorized the march to proceed through Adams Morgan along the course the marchers intended without a police escort.

25. As SOD Commander, I was kept apprised of developments in mass demonstration litigation and consulted regarding potential settlements. In this context, I was timely informed that plaintiffs in *Barham v. Ramsey* had sought an injunction, on constitutional grounds, to prevent the District from arresting persons for parading without a permit. I was also timely informed that Judge Sullivan had denied the motion based on the District's representation that MPD would not arrest persons for parading without a permit without providing such persons a warning and opportunity to comply – subject to exceptions in certain circumstances.

26. I was consulted in mid- through late 2004 and early 2005 regarding matters that resulted in the settlement of *Abbate v. Ramsey*. Specifically, I was consulted regarding proposed requirements regarding the handbook governing MPD's responses to mass demonstrations. Accordingly, I knew, prior to January 20, 2005, that the *Abbate* plaintiffs, through their attorneys had agreed to the inclusion of certain provisions in that handbook as terms of the *Abbate* settlement. In particular, I knew that the settlement required the handbook to reflect that:

> An assembly of persons will not be arrested simply because the group does not possess a permit. Such an arrest may only occur after an order to disperse has been clearly communicated three times in a manner that is reasonably calculated to be heard by each of the persons in the group and after reasonable opportunity to disperse has been afforded, to the extent that circumstances reasonably permit, without increasing the risk of injury to persons or property through the actions of a substantial number of the assembly of persons.

27. In April 2000, I was responsible for processing of prisoners arrested in the context of the International Monetary Fund/World Bank meetings then being conducted in the District. On that basis, I knew that the MPD had arrested hundreds of persons on April 15, 2000 on the charge of parading without a permit for having engaged in a snake march along District roadways.

28. As of January 20, 2005, I also knew that then-MPD Assistant Chief Brian Jordan had ordered the arrest of more than 150 persons on Vermont Avenue between K and L Streets, NW, on September 27, 2002, for parading without a permit without having issued warnings. I am aware that Jordan had not given warnings because the demonstrators had marched out of Franklin Square Park into morning rush hour traffic on K Street, creating an immediate danger to themselves and others. I also understand that

the persons he arrested could properly have been arrested for and charged with disorderly conduct or unlawful assembly.

29. As of January 20, 2005, I was also aware that the Office of the Corporation Counsel/Office of the Attorney General had prosecuted arrests from both the April 15, 2000 event and the Jordan event. Moreover, I understood that persons who had been arrested for parading without a permit in the April 2000 mass arrest and had refused to identify themselves when presented in D.C. Superior Court had been held in the D.C. Jail until they identified themselves, generally pleading to a lesser charge after serving time in the Jail.

I declare under the penalty of perjury that the foregoing is true and accurate

Executed: 2/22/08                           _____
                                             CATHY L. LANIER