Page 1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2
   - - - - - - - - - - - - - - -x
3                                    :
   SARAH CARR, et al.,               :        COPY
4                                    :
              Plaintiffs,            :
5                                    :
         vs.                         : Civil Action No.
6                                    : 06-00098 (ESH)
   DISTRICT OF COLUMBIA,             :
7                                    :
              Defendant.             :
8                                    :
   - - - - - - - - - - - - - - -x
9

10                                   Washington, D.C.

11                                   Thursday, September 13, 2007

12         Deposition of

13             CATHY L. LANIER

14         a witness, taken on behalf of counsel for

15  the Plaintiffs in the above-entitled matter, before

16  Denise M. Brunet, RPR and Notary Public in and for the

17  District of Columbia, taken at the offices of the

18  District of Columbia Metropolitan Police Department,

19  300 Indiana Avenue, Northwest, Washington, D.C.,

20  commencing at 10:16 a.m., when were present on behalf

21  of the respective parties:

22

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 17

1    add the point that there may be exceptions?

2         A    I would say that this statement is a

3    correct statement as of September 2004.

4         Q    But there may be exceptions?

5         A    The District's policy as of September of

6    2004 is we will not arrest for parading without a

7    permit, if this is for simply parading without a

8    permit only.

9         Q    And was it also the policy to not arrest

10   for parading without a permit without giving notice

11   and opportunity to comply with the notice to those who

12   were parading?

13        A    The District's policy as of September 2004

14   is that we would not arrest for simply parading

15   without a permit.

16        Q    I understand that.  And I'm asking you

17   whether there was a second policy, namely, where

18   persons were not simply parading without a permit, but

19   parading without a permit under other circumstances,

20   it was the policy of the District of Columbia not to

21   arrest them without giving notice to them and an

22   opportunity to avoid arrest by complying with the

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 18

1    notice such as dispersing or doing whatever was --

2         MR. KOGER:  Vague and ambiguous.

3         MR. SCHEMBER:  Well, I think I'm going to

4    start over because your objection came right in the

5    middle of my question.

6         MR. KOGER:  The middle?  There was going to

7    be more?

8         BY MR. SCHEMBER:

9    Q    My understanding of your testimony was that

10   you testified as to two District of Columbia policies.

11   Number one, that the District would not arrest simply

12   for parading without a permit.  And second, that the

13   District would not arrest for parading without a

14   permit without giving notice or warning to the

15   paraders and opportunity to comply with the notice or

16   warning, but that there may be exceptions to the

17   notice and warning rule.

18        Is that a correct statement of your

19   testimony and the policy of the District of Columbia?

20   A    I have to stick with my original statement

21   that we would not arrest after September of 2004 for

22   parading without a permit.  And you're asking me if we

80093eff-9c2e-468a-9a34-c67cb15f0e5e

1  would arrest after that date for parading without a

2  permit and that we would then give warnings before

3  arresting for parading without a permit.  We would not

4  arrest for parading without a permit.  So maybe I'm

5  not understanding your question correctly.

6      Q    Well, my question is was there a District

7  of Columbia policy with respect to arrests for

8  parading without a permit that involved giving notice

9  or warnings to the paraders before arresting them?

10     A    There would be circumstances in District

11 policy where if time and circumstances permit,

12 warnings should be given, yes.

13     Q    And if time and circumstances or

14 circumstances did not permit, then warning would not

15 be given, correct?

16     A    Depending on what the violation of law was,

17 yes.

18     Q    I'm talking about parading without a

19 permit.

20     A    I'll say it again.  We wouldn't arrest for

21 parading without a permit after September 2004.

22     Q    And by that, you mean arrest simply for

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 20

1    parading without a permit, correct?

2        A    Yes.

3            MR. SCHEMBER:  Would you mark that, please.

4            (Thereupon, the document was marked as

5            Lanier Deposition Exhibit No. 4 for

6            identification.)

7            BY MR. SCHEMBER:

8        Q    I'm going to show you now a document that's

9    been marked with a blue sticker saying Exhibit

10   Lanier 4.

11           What is that document?

12       A    This is my declaration.

13       Q    Directing your attention to the first

14   sentence of paragraph 3.  Does that sentence say

15   whenever possible, and time and circumstances permit,

16   it is the standard operating procedure of MPD not to

17   arrest for activities related to mass demonstrations,

18   including parading without a permit, without first

19   issuing a warning to the crowd to disperse.

20           Did I correctly read that statement?

21       A    That's correct.

22       Q    And is that a correct statement of District

Page 29

1    is out there.  What I hear is -- I don't want to --

2          THE WITNESS:  I can only repeat my answer.

3    Once a person has been taken into custody and is under

4    arrest, yes, they are in my control.

5          BY MR. SCHEMBER:

6    Q      Is a person under arrest when they are not

7    free to leave police control?

8    A      I would say yes.

9    Q      When a person is within police control,

10   can't you say to the person you will be free to leave

11   if you quietly walk down the sidewalk, but if you

12   don't, I'm going to arrest you.  Isn't that an option

13   available to police who have a person within their

14   control, an ability to speak with them?

15         MR. KOGER:  Argumentative, compound

16   question.

17         THE WITNESS:  It is within a police

18   officer's discretion to do that based on circumstances

19   with which they are faced at the time.  I can think of

20   very few where that would be a good option.

21         BY MR. SCHEMBER:

22   Q      Why?

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 30

1        A      If the conduct for which a person is seized

2    is egregious and dangerous, there would be no reason

3    to allow them to simply walk away.

4        Q      But what if the conduct for which they're

5    seized is parading without a permit?

6             MR. KOGER:  Hypothetical, vague and

7    ambiguous as to circumstances.

8             THE WITNESS:  I will say again, we would

9    not simply arrest someone for parading without a

10   permit.  We would, in cases of simply parading without

11   a permit, if there were -- and I can think of no

12   circumstances in my time on the police department

13   where for simply parading without a permit we would do

14   that.  We would facilitate that parade.

15             BY MR. SCHEMBER:

16       Q      Directing your attention to Lanier

17   Exhibit 4.  This declaration, generally speaking,

18   describes actions you took on January 21, 2005 and

19   reasons for them.  Is that a fair summary of what this

20   document is?

21       A      Yes.

22       Q      Referring to paragraph 5 of the document on

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 35

1    did it appear that a majority of the portion were

2    carrying torches?

3         A    I would say no, not the majority of the

4    ones that I could see.

5         Q    In paragraph 6, you refer to observing

6    several individuals destroying private property by

7    breaking windows of business establishments, correct?

8         A    Yes.

9         Q    Where were these business establishments?

10        A    All along the entire path, Columbia Road.

11   I recall Payless shoe store, a bank.  There were

12   several all along the block, spray paint on cars.

13        Q    What did the individuals do to break the

14   windows?

15        A    Rocks, bricks.

16        Q    They threw them?

17        A    Yes.

18        Q    And where were they when they threw them?

19        A    In the street.

20        Q    About how many individuals did you see do

21   that?

22        A    I would say I saw -- personally observed at

Misty Klapper & Associates
703-780-9559

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 36

1    least 10 to 15 rocks or bricks come from the crowd and

2    smash into windows or cars or even in the direction of

3    people on the sidewalk.

4         Q    And referring to the next sentence, how

5    many persons did you see deface property by spray

6    painting?

7         A    I couldn't give you a number.

8         Q    What do you mean by several?

9         A    I can't give you a number.  I can tell you

10   that there were several people who were spray painting

11   objects along -- objects and cars along the side of

12   the roadway.

13        Q    Well, this sentence refers to the front of

14   businesses, correct?

15        A    Yes.

16        Q    Did you see that?

17        A    Yes.

18        Q    When persons spray painted the front of

19   businesses, they did that from the sidewalk, correct?

20        A    Yes.

21        Q    The next sentence refers to several small

22   fires were started along the way, correct?

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 37

1      A    Yes.

2      Q    Did you see those fires as they were

3  started or did you just see them after they had

4  started, if you saw them at all?

5      A    I observed members of the group with the

6  torches putting the torches -- leaning the torches

7  over towards newspapers stands and trash receptacles,

8  lighting paper and debris in the trash receptacles and

9  attempting to light papers and other boxes on fire.

10     Q    And after that, they continued to march in

11 the street, correct?

12     A    The forward movement of the group never

13 stopped.

14     Q    The next sentence says newspaper boxes also

15 were being hauled into the street, correct?

16     A    Yes.

17     Q    You saw this yourself?

18     A    Yes.

19     Q    About how many newspaper boxes did you see

20 hauled into the street?

21     A    At least four or five.  It was a very

22 chaotic and disorganized mob of people.  There were

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 38

1    periodically members of the group running up and

2    smashing windows, painting, lighting things on fire,

3    flipping things over.  It was a very large group.  The

4    only best way for me to describe that was it was just

5    a chaotic movement, large group.

6         Q    In paragraph 7, you refer to the blocking

7    of traffic from passing in all directions, correct?

8         A    Yes.

9         Q    And this was a group that was moving west

10   to begin with on Columbia Road, correct?

11        A    Yes.

12             MR. KOGER:  Vague.

13             BY MR. SCHEMBER:

14        Q    Did the group block the eastbound traffic

15   on Columbia Road?

16        A    Yes.

17        Q    Was that at all points in time that you

18   were present on Columbia Road?

19        A    Not continuously, no.

20        Q    Was it intermittently that the eastbound

21   traffic was blocked?

22        A    It was intermittently blocked with members

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 40

1    intermittently being blocked by the persons in the

2    group and objects in the street.  I can't tell you it

3    was before or after that incident.

4              BY MR. SCHEMBER:

5         Q    Paragraph 7 also refers to destruction of

6    vehicles, correct?

7         A    Yes.

8         Q    What do you mean by destruction?

9         A    There were vehicles that had spray paint on

10   them, scratches.  I also recall seeing one vehicle

11   with a broken window.

12        Q    In paragraph 8, you refer to Lieutenant

13   Riley getting in front of your squad car, correct?

14        A    Yes.

15        Q    And he was in a car himself, correct?

16        A    Yes.

17        Q    When did his car -- excuse me -- where did

18   his car get in front of yours?

19        A    I don't know the exact location.

20        Q    And how did he do that, by overtaking you

21   or by turning in from a side street or how?

22        A    He came from behind me.  I had called for

80093eff-9c2e-468a-9a34-c67cb15f0e5e

1    backup, because I had no other units on the scene to

2    assist me and the group had got increasingly violent.

3    He came from behind and pulled alongside and started

4    to pull in front of my vehicle.  He didn't quite make

5    it in front of my vehicle before he was hit with a

6    brick.

7         Q    Where was his vehicle when it was hit with

8    a brick?

9         A    Alongside of mine, trying to attempt to

10   pull in front of mine.

11        Q    And where were your vehicles at that time?

12        A    In the roadway.

13        Q    Which roadway?

14        A    I believe we were on 18th Street at the

15   time.

16        Q    Where on 18th Street?

17        A    I can't remember.

18        Q    Was it near Belmont?

19        A    No.

20        Q    Was Lieutenant Riley's car hit by more than

21   one object?

22        A    Several.

80093eff-9c2e-468a-9a34-c67cb15f0e5e

1      Q     And did that occur at different points in

2   time or several objects almost simultaneously?

3      A     I observed several objects strike his car

4   in rapid succession after the brick hit the

5   windshield.  It almost -- once the brick hit the

6   windshield, it almost seemed to incite others to throw

7   objects.  So that was the first object I saw thrown at

8   the police car, and as soon as the window broke, it

9   seemed to incite the rest of the group to start

10  throwing objects as well.  So then there was a barrage

11  of objects thrown in the car.

12     Q     Where was this group?

13     A     It was the group that I had been following

14  in the middle of the street.  I believe we were on

15  18th Street at the time.

16     Q     Your belief is that the objects were thrown

17  at Lieutenant Riley's car by a group on 18th Street;

18  is that correct?

19     A     It was the group that we had been

20  following, yes.

21     Q     And at the time the brick was thrown, the

22  group was on 18th Street, as you recall?

Page 51

1    into the alley?

2        A     After.  In fact, it was some time after.

3        Q     What steps did officers under your command

4    take to effect that arrest?

5        A     I did not observe the steps they took to

6    effect that arrest.  They were stopped in the alley.

7        Q     When you say they were stopped, do you mean

8    the officers or --

9        A     The officers actually made the apprehension

10   of those that were arrested in the alley, and I did

11   not observe that.

12       Q     Do you know how they did it?

13       A     I do not.

14       Q     Did you go into the alley yourself?

15       A     I did not.  I would like to clarify on the

16   question about the statement in paragraph 10, the

17   order to place the charge for parading without a

18   permit given at 12:23 a.m.  I ordered the arrest of

19   the group based on the behavior that I observed.  That

20   to me was conduct consistent with that of a riot.  It

21   was dangerous conduct that had to be stopped before

22   serious injury occurred.

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 52

1          So I gave the order to arrest based on

2     those circumstances.  I later determined that the

3     charge would be parading without a permit.  So the

4     arrest that was ordered before 12:23 a.m. was for

5     rioting.

6          Q     On what basis did you decide to charge the

7     arrestees with parading without a permit?

8          A     I had an option to use my discretion to

9     place a charge, and through circumstances on the scene

10    and conversation with general counsel, I determined

11    that I would place the charge of parading without a

12    permit as opposed to rioting.

13         Q     And that was the charge that was placed

14    against the 65 to 75 persons who were arrested in the

15    alley, correct?

16         A     Yes.

17         Q     Did you have information indicating that

18    each of the persons arrested in the alley knew that

19    the march did not have a permit?

20         A     Again, the arrest was not -- I ordered the

21    arrest for rioting.  I later placed the charge of

22    parading without a permit because it's within my

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 53

1    discretion to do so.  The arrest was based on the

2    conduct that I observed which was consistent with the

3    elements of rioting.

4        Q    When you placed the charge of parading

5    without a permit, did you have information that each

6    of the persons against whom you placed that charge

7    knew that the march did not have a permit?

8        A    The information that I had is that the

9    individuals in that group, the individuals that were

10   arrested were attending a concert prior to engaging in

11   that riotous behavior, which was referred to as the

12   march, that was preplanned to go out and create this

13   havoc in route to an inaugural ball, in which, once

14   they reached that site, were going to crash the

15   inaugural ball and continue to destroy property.

16   Whether there was discussion amongst that group as

17   they planned that conduct as to whether they would

18   need a permit for that conduct or not, I don't know.

19       Q    When you placed the charge of parading

20   without a permit, did you have information indicating

21   that each person against whom you placed that charge

22   knew that the march was one that police had made a

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 54

1    decision not to permit and, yet, they marched anyway

2    after obtaining that knowledge?

3              MR. KOGER:  Lack of foundation.

4              THE WITNESS:  I had information from the

5    intelligence units that it was voiced clearly in the

6    concert event to the group before they engaged in this

7    alleged march that they would be engaging in what was

8    referred to as an unplanned snake march, and along the

9    way -- that there were discussions along the way that

10   there would be property damage.  So it appeared to me

11   that those persons involved clearly understood that

12   they did not have a permit.

13             BY MR. SCHEMBER:

14        Q    Did you have information indicating that

15   each person against whom you placed the charge of

16   parading without a permit had been at the concert?

17        A    I had information that the group that left

18   that concert was under observation from the time they

19   left the concert until the point at which they were

20   arrested, yes.

21        Q    Did you have information indicating that

22   each person arrested in the alley against whom you

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 57

1          THE WITNESS:  No.

2          BY MR. SCHEMBER:

3      Q     What did that officer do to advise you as

4  indicated in that language there?  What I mean is how

5  did the MPD officer communicate to you?

6      A     He didn't communicate to me.  He

7  communicated to the supervisor who communicated to me.

8      Q     Who was that supervisor?

9      A     Lieutenant Pavlik, Michael Pavlik.

10     Q     What was Lieutenant Pavlik's duty

11  assignment at that time?

12     A     Responsible for the management of the

13  intelligence unit.

14     Q     Now, is that an intelligence unit of the

15  special operations division or not in that division?

16     A     Not in that division.

17     Q     Was it Lieutenant Pavlik that spoke with

18  you about this matter?

19     A     Yes.

20     Q     What did Lieutenant Pavlik say?

21     A     During which conversation at what point?

22     Q     Regarding advice by an MPD officer

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 58

1    referenced in this language following number 2 on

2    page 8.

3        A    I recall in general the conversation that

4    the lieutenant advised me that he was being told that

5    there were fliers distributed inside of the concert

6    that talked of the march, planned march after the

7    concert to the inaugural ball site, the plan to

8    destroy property along that march and crash the

9    inaugural ball site I believe at the Hilton.

10            I recall him saying that there were

11   announcements made over the microphone to the group

12   about that march, and that during the course of the

13   evening, at the point when he spoke with me, he was

14   very concerned that the group had gotten quite large

15   and appeared to be eager to engage in this march

16   quickly.

17       Q    And this is what he said in a conversation

18   at 10:00 p.m.?

19       A    At 10:00 p.m., the only -- yes.  I'd say

20   that's a fairly accurate summation of what I was told

21   at 10:00 p.m.

22       Q    What was the content of the announcement

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 59

1    from the stage that Lieutenant Pavlik reported to you

2    as having occurred?

3         A    I believe he summarized the content of the

4    announcement.  I don't believe it was a verbatim

5    repeat.  But that there was a person with a microphone

6    who was advising members of the group that there would

7    be a march, I believe initially had been planned for

8    midnight, and that they would crash the inaugural ball

9    sites.

10        Q    What information did you receive from

11   Lieutenant Pavlik regarding a plan to engage in

12   property damage along the way?

13        A    Again, in summation, he indicated that

14   there were discussions about engaging in various types

15   of property damage along the way, to include the use

16   of spray paint.

17        Q    And you understood him to mean discussions

18   among persons at the concert?

19        A    I understood him to mean both discussions

20   among persons at the concert -- I would say yes, among

21   persons at the concert.

22        Q    Was the carrying of flaming torches by

Page 62

1      Q      Each and every person arrested in the alley

2  was engaged in a riot?

3      A      The definition of a riot is groups of five

4  or more.  Those persons who were not engaging in

5  riotous behavior would have walked away.

6      Q      Did the persons, then, in your view, have a

7  duty to walk away?

8      A      I would say persons in that group who saw

9  the violent and destructive behavior and conduct of

10  those persons, for their own safety, if not common

11  sense, should have walked away.

12      Q      But to avoid committing the offense of

13  rioting, they had a legal duty to walk away?

14      A      They remained with a riotous group of

15  people engaging in very destructive and dangerous

16  behavior.

17      Q      When you say remained with, do you mean

18  were in the presence of?

19      A      I mean were engaging with the mob of folks

20  engaging in the riotous behavior.

21      Q      Everyone was engaging in riotous behavior?

22      A      The entire group.

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 63

1    Q    And that includes those who did not

2    themselves throw missiles or light fires or destroy

3    property?

4    A    Riotous behavior includes incitement and

5    loud chants and screaming and incitement of the other

6    folks.  There's a lot of different conduct involved in

7    riotous behavior.  So I'd say everyone in that group

8    that I observed was engaged in riotous behavior.

9    Q    Because they did acts -- those who did not

10   personally commit acts such as lighting a fire or

11   throwing a missile incited others to do that; is that

12   what you're saying?

13   A    Let me clarify what I'm answering and

14   answer your question.  Every member of that group was

15   guilty of rioting.

16   Q    Why?

17   A    Because of the conduct that they were

18   engaged in with that large group.

19   Q    And what conduct was that?

20   A    The same conduct as described in the past

21   20 minutes.  The large group was very loud,

22   boisterous, disruptive.  They were inciting other

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 64

1    members of the community, were engaging in property

2    damage and dangerous behavior, dangerous to the

3    public.  They were walking in traffic and destroying

4    property.

5         Q    But each and every one of them did not

6    destroy property.  What was the conduct --

7              MR. KOGER:  Argumentative.

8              BY MR. SCHEMBER:

9         Q    Correct?  You're not testifying -- it's not

10   your understanding that each and every one of them

11   destroyed property, correct?

12        A    I didn't say each and every one of them

13   destroyed property.

14        Q    What did those who did not themselves

15   destroy property do to be guilty of rioting?

16             MR. KOGER:  Asked and answered.  You may

17   answer.

18             THE WITNESS:  I've answered the question

19   four times.  They were in a large group of people

20   walking in and out of traffic, creating a hazard,

21   being loud and boisterous in a late hour and engaging

22   with the rest of the group in what was dangerous

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 66

1    A    I did not charge them with a criminal act

2    of covering their face, no.

3    Q    Is it your understanding that persons who

4    wish to exercise First Amendment rights do not have

5    the right to do so while covering their faces?

6    MR. KOGER:  Vague and ambiguous,

7    speculative in that there's no foundation to this

8    hypothetical question --

9    THE WITNESS:  My concern --

10    MR. KOGER:  -- which calls for a legal

11    conclusion.

12    THE WITNESS:  My concern is with a group

13    engaging in that type of riotous behavior, the

14    increased anonymity of the members of the group only

15    adds to the danger of the mentality of that group

16    becoming more dangerous.  So it was a concern for me

17    as a police officer.

18    BY MR. SCHEMBER:

19    Q    How does wearing a mask have that effect?

20    A    Well, it's actually been -- there have been

21    numerous studies done on the dynamics of mob behavior.

22    But the ability to have a sense of anonymity by one

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 67

1    masking one's identity or covering one's identity and

2    melding into a much larger group where you are less

3    visible as an individual is a large part of what

4    creates potentially a dangerous situation when you

5    have a mob that's engaging in setting fires and

6    engaging the type of activity that was going on that

7    night with that group.

8        Q    Did you have information indicating that

9    every person who covered his or her face with a

10   bandana did so to further the unlawful acts of

11   themselves or others?

12       A    I didn't have information as to the reason

13   why any of those people covered their face.

14       Q    What was the temperature outside that

15   night?

16       A    I don't recall.  It was January.  It was

17   cold.

18       Q    Are you aware of whether the constitutional

19   right to engage in assembly and expression includes

20   the right to do so anonymously?

21       A    Yes.

22            THE WITNESS:  Are we going to take a lunch

80093eff-9c2e-468a-9a34-c67cb15f0e5e

Page 70

1    exactly what the content was.

2        Q    Well, did you know at the time what the

3    content of the chanting was, but you just can't recall

4    now?

5        A    I don't recall.

6        Q    Was there chanting with a political

7    message?

8        A    I don't recall the content of the chanting.

9        Q    Did the District of Columbia receive any

10   information concerning the content of the chanting?

11       A    Not that I'm aware of.

12       Q    On page 9 after paragraph -- not paragraph,

13   but after number 15, you say -- and these are your

14   signed responses -- that members of the march

15   participated in the march as part of a common scheme

16   or plan.  And from what you've told me, I trust that

17   what you mean by a common scheme or plan is a common

18   scheme or plan to engage in unlawful acts, correct?

19       A    What I meant was that there was clearly

20   some discussion prior to leaving the concert that they

21   were going to go as a group down to the inaugural

22   ball.  So I meant in that context that they had

80093eff-9c2e-468a-9a34-c67cb15f0e5e

1    planned to do that activity.

2        Q    But you didn't have information that

3    everyone who participated in the march had

4    participated in those discussions, did you?

5        A    The information I had was that it was

6    announced over a loudspeaker and there were fliers

7    handed out throughout the event.

8        Q    But you also indicated, did you not, that

9    you didn't know that everyone at the concert had heard

10   that announcement, correct?

11       A    I can only say that I assessed this group

12   as a group and not as individuals, so I can't say

13   anything with certainty with regard to individuals.

14       Q    Page 10 of this same exhibit, please.  If

15   you would -- do you see where -- in the first full

16   paragraph, one of the additional observations reported

17   to you was, a few lines down, that about a hundred

18   demonstrators were walking on Columbia Road toward

19   18th Street in regular clothing carrying banners and

20   signs.

21            Do you see that?

22       A    Yes.