## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al.*,        ) | |
|           ) | |
|        Plaintiffs,    ) | |
|           ) | |
|       v.         ) | Civ. A. No. 06-00098 (ESH) |
|           ) | |
| DISTRICT OF COLUMBIA,    ) | |
|           ) | |
|        Defendant.    ) | |

## ERRATA AND NOTICE OF CORRECTED FILING OF DEFENDANTS DISTRICT OF COLUMBIA'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF DKT. 52 (MAIN DOCUMENT))

Defendant District of Columbia ("District") respectfully submits this Errata And Notice Of Corrected Filing Of Defendant District Of Columbia's Motion For Partial Summary Judgment (ECF Dkt. 52 (Main Document)) ("Corrected Filing"). The District Of Columbia's Motion For Partial Summary Judgment (ECF Dkt. 52 (Main Document)) filed earlier today contained a version of Defendant District Of Columbia's Statement Pursuant To LCvR 7(h) Of Material Facts As To Which Defendant Contends There Are No Such Genuine Issues Of Material Fact In Support Of Defendant's Motion For Partial Summary Judgment ("DSOF") not filed on Saturday, February 23, 2008 and erroneously included within ECF Dkt. 52 (Main Document) at pages 40 of 83 through 83 of 83. Accordingly, the District now files this Corrected Filing, which properly contains the DSOF as filed on February 23, 2008.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General

Civil Litigation Division

__/s/_Ellen Efros_____
ELLEN A. EFROS [250746]
Chief, Equity I Section

__/s/ Thomas L. Koger_____
THOMAS L. KOGER [427921]
Senior Assistant Attorney General

__/s/ Chad Copeland_____
CHAD COPELAND

__/s/ Jayme Kantor
JAYME KANTOR
Assistants Attorney General
441 4th Street NW
Suite 600 South
Washington, D.C. 20001
(202) 724-6610
Fax: (202)727-3625

Counsel for Defendant District of Columbia

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SARAH CARR, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. A. No. 06-00098 (ESH) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT DISTRICT OF COLUMBIA'S
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, District of Columbia ("District"), by and through counsel, respectfully moves

this Court for an Order, pursuant to Fed. R. Civ. P. 56,  granting the District summary judgment

on plaintiffs' First And Fourth Amendment claims and common law false arrest and false

imprisonment claims.  The District further moves this Court to dismiss plaintiffs' claim for

injunctive relief with prejudice.

The grounds for this motion, as set forth in the District's accompanying memorandum of

points and authorities, incorporated herein by reference, are that plaintiffs' arrests were justified

by probable cause and were not motivated our influenced by any constitutionally protected

activity plaintiffs in which plaintiffs may have been engaged at any time.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

__/s/_Ellen Efros_____

ELLEN A. EFROS [250746]
Chief, Equity I Section

__/s/ Thomas L. Koger_____
THOMAS L. KOGER [427921]
Senior Assistant Attorney General

__/s/ Chad Copeland_____
CHAD COPELAND

__/s/ Jayme Kantor
JAYME KANTOR
Assistants Attorney General
441 4th Street NW
Suite 600 South
Washington, D.C. 20001
(202) 724-6610
Fax: (202)727-3625

Counsel for Defendant District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SARAH CARR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 06-00098 (ESH) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT DISTRICT OF COLUMBIA'S MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, District of Columbia ("District"), by and through counsel, respectfully submits this memorandum of points and authorities in opposition to Plaintiffs' Motion for Partial Summary Judgment On Liability ("PSJM") (Dkt 45) and in support of Defendant District Of Columbia's Cross-Motion For Partial Summary Judgment ("XMot"). As explained in greater detail below, PSJM should be denied and XMot granted for several reasons.

The actions of plaintiffs Sarah Carr, Allyson and Chelsea Kirk, and Jonathan Scolnik provided the District probable cause to arrest them for rioting on January 20, 2005. They were advised of and urged to take part in an unlawful demonstration, the announced intention of which was to create an explosive demonstration in Adams Morgan, to be followed by a protest at a private Inaugural Ball. They took part and cleaved to the march even after it had turned riotous. Further they acted as conspirators in doing so. Accordingly, based on all available information and outward appearances, probable cause supported their arrests for rioting, as well as for the offense of parading without a permit, with which they were charged.

Similarly in joining, as he did, the riot in progress, Matthew Singer created probable cause for his arrest for rioting and well as for parading without a permit, with which he, too, was charged. For these reasons the District should be granted summary judgment on plaintiffs' First Amendment, Fifth Amendment, and common law false arrest claims. These claims should be dismissed with prejudice.

It follows that, because the District's actions comported with the First and Fourth Amendments, plaintiffs' request for injunctive relief should now be denied with prejudice. Further, because the District is entitle to all reasonable inferences in opposing Chelsea Kirk's motion for summary judgment on her common law assault and battery claims, that motion should be denied.

## Summary of Pertinent Facts[1]

Having spent that day protesting and/or observing protests concerning the second Inauguration of George W. Bush, on the evening of January 20, 2005, plaintiffs Sarah Carr, Allyson and Chelsea Kirk, and Jonathan Scolnik joined hundreds of others at an Anti-Inaugural Concert ("AIC") at a church at 1459 Columbia Road, NW. These plaintiffs had learned of the AIC through information posted on internet websites. Defendant's Statement Of Facts As To Which It Contends There Are No Genuine Issues Of Material Fact In Support Of Defendants' Cross-Motion For Partial Summary Judgment ("DSOF") ¶¶ 1,2,16, 22, 24.

The Metropolitan Police Department ("MPD") had also learned of the AIC by monitoring publicly accessible websites, and had assigned an undercover officer ("U/C") to attend the AIC.

---

[1]     The Court is respectfully referred to Defendant's [123 ¶¶] Statement Of Material Facts As To which It Contends There Are No Genuine Issues In Support of Defendant's Cross-Motion For Partial Summary Judgment ("DSOF"), its supporting exhibits, and Defendants Statement Of Material Facts Giving Rise To Genuine Issues Requiring Trial ("DOPPSOF"), and its supporting exhibits, filed herewith pursuant to LCvR 7(h), and incorporated by reference for a complete and properly supported record for the disposition of plaintiffs' motion and the District's cross-motion.

The U/C was to report any information bearing on potential illegal activity or on public safety or security issues to MPD Detective Drew Smith, who would, in turn, report it to his superior, MPD Intelligence Section ("Intell") Sergeant Jeffrey Madison. Madison was to report that information to his superior, Intell Lieutenant ("Lt.") Michael Pavlik, who would, in turn, relay the information to MPD Special Operations Division ("SOD") Commander Cathy L. Lanier. As SOD Commander, Lanier had primary responsibility for determining and implementing MPD's responses to demonstrations that day and to potential threats to Inaugural Balls, among other duties and responsibilities. DSOF ¶¶ 3, 12, 13, 27, 35, 49, 50.

As the U/C communicated to the U/C's handlers, and they to Lanier, a Flier was distributed to AIC attendees announcing that a march would follow from the AIC ("March"). The March would traverse through a residential section of Adams Morgan, building to an "explosive protest" after leaving the residential area and moving into the commercial area of Adams Morgan. The March was then to proceed to the Washington Hilton, at 1919 Connecticut Avenue, N.W., at which one of the Inaugural Balls would be in progress. There the Marchers would conduct another protest, at which they would "show people faces . . . of those of us who resist this administration and sham." The U/C heard attendees discussing breaching security at the Inaugural Ball. The U/C anticipated that protestors would engage in violence. The Flier was augmented by announcements from the performance stage by members of bands, selected for their ability to draw a large crowd to the AIC. The band members urged AIC attendees to participate in the March and protest. The U/C related all this to the U/C's handlers and they to Lanier. As Lanier knew, no permit, as was required by District municipal regulations, had been applied for or granted for any such activity on public space. DSOF ¶¶ 4-11, 14-19. 23, 51.

The concert ended early and hundreds of attendees, including Carr, the Kirks, and Scolnik went out into the streets and assembled to march and protest in accordance with the plan set forth in the Flier and amplified by the performers. Flaming torches, of a common design, were carried by persons in the group assembling. Many Marchers used bandannas, which the U/C had reported had been distributed at the AIC, and other items to cover their faces. Marchers beat upon plastic bucket drums and occupied all lanes of Columbia Road, NW, as they marched through residential Adams Morgan after 11:00 p.m. The U/C, who proceeded as a March participant, kept the U/C's handlers abreast of the rapidly unfolding events. Lanier was still mustering MPD personnel to respond to the potential threat to public safety and post-Inaugural events security posed by the protest, when the March commenced earlier than expected. DSOF ¶¶ 23-31.

Lanier responded in MPD Cruiser 18, driven by a subordinate and carrying a second subordinate as Lanier's "scribe" to document events. They approached Columbia Road from the north on 16th Street. Cruiser 18 reached the intersection of Columbia Road and 16th Street, NW, as the band of about 200 Marchers were passing through the intersection, occupying the westbound lanes of Columbia Road. Many Marchers were carrying flaming torches and the faces of many more were concealed by bandannas and other items. Cruiser 18 turned onto Columbia Road, following the March. As the Marchers moved along the 1700 block of Columbia Road, the March turned violent and destructive. As reported by the U/C from within the March, and observed by Lanier from immediately behind the March, participants spray-painted and vandalized parked automobiles, set fires, sprayed paint on buildings, repeatedly fired projectiles with wrist rockets through the windows of buildings, and heaved bricks and rocks through building windows, including those of two banks. Lanier observed a brick thrown at a

4

person. Carr, the Kirks, and Scolnik, all of whom observed such criminal misconduct along Columbia Road, continued to provide the strength of their numbers in support of the activities of the mob of which they were part. Lanier directed MPD Civil Disturbance unit ("CDU") personnel to respond to Columbia Road in their protective ("riot") gear. DSOF ¶¶ DSOF 37-45; see Exh.s 101-124 (photographs reflecting damage)..

Meanwhile, since about 7:00 p.m., Matthew Singer had been drinking Jack Daniels and Coke's and eating in a bar situated almost directly across the lanes of 18th Street from the Sun Trust building, which housed MPD's Latino Liaison Unit Office ("LLU") DSOF ¶ 39; 120; Exh. 125. As the mob moved through the intersection of 18th Street and Columbia Road, NW, at which the Sun Trust building was situated, marchers broke a number of the banks' windows, and the LLU window on the 18th Street side of the Building. DSOF ¶ 39 Attracted by activity outside the bar, Madam's Organ, Singer decided to run into the mob and proceed with it. A friend of Singer's brother, Nathan, who was with Singer and Nathan in the bar, chose not to follow their lead. Hundreds of bystanders present along the sidewalks on either side of 18th Street also elected not to join the mob. DSOF ¶ 42, 121.

In accordance with Lanier's directives, a CDU platoon, arriving from the south on 18th Street, assembled as a police line across 18th Street. MPD Lt. Jimmie Riley, and CDU Platoon 43, under his immediate command, arrived on 18th Street from Columbia Road, to the north of the mob. A Marcher threw a brick into the windshield of Riley's marked police cruiser, shattering the glass. Immediately, numerous other mob members threw more missiles at Riley's car and MPD vans. As members of MPD CDU Platoon 63 moved into position to seal the exit onto Columbia Road of an alley between Riley's car and Belmont Road, to the south, the Marchers, including Singer, ran south along 18th Street and into that alley, as CDU 43 emerged

5

from their vehicles. Those marchers, including the plaintiffs, were arrested in the alley. DSOF
¶¶ 40-41, 44-47.

Neither Lanier nor any of her subordinate personnel were able to read the minds of the
various plaintiffs as these criminal events unfolded. Based on that which she had observed and
that which had been reported to her by her subordinates, Lanier determined that she had probable
cause to arrest the Marchers for rioting. She ordered that the Field Arrest paperwork, which was
properly completed on the scene, reflect the lesser charge of parading without a permit so that
the arrestees could avail themselves of expedited release mechanisms that would not apply if she
charged them with rioting. DSOF ¶¶ 55,56.

## ARGUMENT

### I.  THE STANDARDS APPLICABLE IN DECIDING THIS MOTION

#### A.  The Summary Judgment Standard

Summary judgment is appropriate only when there exists "no genuine issue as to any
material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c) Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *Waterhouse v. Dist.
of Columbia,* 298 F.3d 989, 991 (D.C.Cir.2002). The moving party bears the burden of providing
a sufficient factual record to demonstrate the absence of such a genuine issue of material fact.
*See Beard v. Banks,* 126 S.Ct. 2572, 2578 (2006). In considering whether the movant has met its
burden, a court must draw all reasonable inferences from the evidentiary record in favor of the
non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

#### B.  The Probable Cause Standard

Probable cause to make an arrest requires a showing "that the police had enough
information to 'warrant a man of reasonable caution in the belief' that a crime has been

committed and that the person arrested has committed it." *Bailey v. United States*, 389 F.2d 305, 309 (D.C. Cir. 1967) (quoting *Carroll v. United States*, U.S. 267 132, 162 (1925). Much less evidence is required to establish probable cause than is required to establish guilt. *Bailey, id.* Probable cause for arrest may exist where an offense has not been committed. Further, even if an individual is arrested for a non-arrestable offense, the arrest comports with the Fourth Amendment if the facts known to the officer at the time of the arrest "gave probable cause to arrest." *Scott v. United States*, 878 A.2d 486, 489 (D.C. 2005) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152-54 (2004); *see also Whren v. United States,* 517 U.S. 806, 812-13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Doe,* 445 F.3d at 468-69; Carr, et al. v. District of Columbia, 06cv0098 (EGS), July 26, 2006 slip. Op. at 8; *Jefferson v. United States,* 776 A.2d 576, 580 (D.C.2001)). A police officer may rely upon reasonably trustworthy information other than personal knowledge as probable cause for arrest. *Beck v. Ohio,* 397 U.S. 89, 91 (1964).

In seeking to establish a lack of probable cause, plaintiffs cite *Perry v. United States*, 276 A.2d 719, 719-20 (D.C. 1971) for the proposition that "[p]resence at and the failure to leave, the scene of rioting by others is not a basis for criminal liability." PSJM at 8. Plaintiffs' reliance on *Perry* ignores the marked evidentiary difference between the Fifth Amendment requirement to convict – proof beyond a reasonable doubt – and the Fourth Amendment requirement to support an arrest – probable cause. *Perry,* which is not concerned with a riot charge, supports the arrests that plaintiffs challenge.

In *Perry,* the appellant was standing immediately in front of a broken store window when approached and questioned by two police officers. 276 A.2d at 719. Perry denied any knowledge of the breaking. The officers entered the store, where they found the store's freezer wide open and a large box containing frozen meats and cigarettes near the store's front entrance.

The two officers responded to sounds coming from the store's basement. There they located and arrested two men. *Id.*

When they returned to street level, the officers arrested Perry, whom they had asked to wait in front of the store. Perry was arrested because one of the men, Stewart, from the basement had supposedly stated to the officers that Perry had served as a lookout for the break-in. Stewart's statement was ruled inadmissible and at trial Stewart denied having made such a statement. Nevertheless, Perry was convicted of attempted burglary in the second degree and attempted petit larceny. *Id.*

On that record, the D.C. Court of Appeals reversed, and instructed that a judgment of acquittal be entered. In summarizing the grounds for its decisions, the Court of Appeals wrote, as quoted in part by plaintiffs, that :

> the only evidence against appellant was that he was standing in front of the broken window of a store that was being burglarized by two other men, with one of whom he had been a casual acquaintance. In our opinion this evidence, while perhaps raising a possibility or even a strong suspicion of participation in the criminal activity, was not sufficient for finding appellant guilty beyond a reasonable doubt.

*Id.* at 719-20.

The United States Supreme Court has explained that the type of "strong suspicion of criminal involvement" identified by the D.C. Court of Appeals in *Perry* does satisfy the Fourth Amendment "probable cause" standard. *See Stacey v. Emery,* 97 U.S. 642, 645 (1878). In *Stacey,* the Court quoted a pair of decisions defining probable cause in terms of the suspicion of criminal conduct. The Court quoted the Mr. Justice Washington, in *Munn v. Dupont,* 3 Wash. 37, stating, "He then defines probable cause in these words: 'A reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the party is guilty of the offence with which he is charged.'" *Stacey,* 97 U.S. at 546.

8

The Court also quoted Chief Justice Shaw [as] defini[ing] it is similar language: 'Such a state of facts as would lead a man of ordinary caution to believe, or to entertain an honest and strong suspicion, that the person is guilty.' *Ulmer v. Leland*, 1 Me. 135." *See also Wolter v. Safeway Stores, Inc.,* 60 F. Supp. 12, 15 (D.D.C. 1945) (recounting standards stated in *Stacey, supra, and Ulmer, supra*).

Thus, Perry's presence at the scene of an ongoing burglary and casual acquaintance with one of the burglars, although insufficient to convict, did provide probable cause for Perry's arrest. *See Perry*, 276 A.2d at 719-20.

## II.    The District Had Probable Cause To Arrest Plaintiffs For Rioting, As It Did

Plaintiffs were arrested for rioting, but only charged with parading without a permit. Probable cause supported plaintiffs' arrests for rioting.

### A,    The Law of Riot

Plaintiffs contend that the District lacked probable cause to arrest them for rioting. Their argument misapprehends the elements and nature of the crime and, accordingly, the evidence that establishes probable cause to arrest for rioting.

Plaintiffs' arrests are supported by probable cause, based on the observations of MPD officers related to Lanier and by her own observations, to believe they had rioted and were rioting at the time the arrests were ordered.

#### 1. The Statute

Rioting, as prohibited by D.C. Official Code § 22-1322, is as follows:

(a) A riot in the District of Columbia is a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons.
    '(b) Whoever willfully engages in a riot in the District of Columbia shall be punished by imprisonment for not more than one year or a fine of not more than $1,000, or both.

Precedent of the District of Columbia Court of Appeals, the United States Circuit Court of Appeals for the District of Columbia Circuit, in addition to decisions of this District Court, all provide guidance on the application of this local statute. This decisional law determines that probable cause existed for plaintiffs' arrests for rioting.

Congress enacted this statute in the aftermath of 1967 riots in the District. The constitutionality of the new statute and its application were challenged in the years following its enactment, resulting in precedent that governs the disposition of the motions in this case. *See, e.g. Matthews v. United States*, 419 F.2d 1177 (D.C. Cir. 1969); *United States v. Jeffries*, 45 F.R.D. 110 (D.D.C. 1968).

### 2. *United States v. Jeffries*

In *United States v. Jeffries*, 45 F.R.D. 110 (D.D.C. 1968), the U.S. District Court for the District of Columbia decided challenges by an individual convicted under the statute of rioting. Jeffries, following his conviction for rioting, moved the Court to overturn the District's riot statute, asserting that it offended the Fifth Amendment's due process clause. *Jeffries*, 45 F.R.D. at 115. The Court observed that jury charges used consistently in the District Court were sensitive to the need to protect individuals from being convicted for having engaged in protected speech, rather than for actions entitled to no protection. In fact, the Court noted, even Jeffries had acknowledged that the riot offense, as defined in the jury instructions, was not subject to challenge. These instructions, which are set forth in whole in the Appendix to the *Jeffries* decision and in the Appendix to *Matthews, supra.* clarify the elements of the crime in this way.

    o  The term 'grave danger' means something more than the possibility of danger or a minor difficulty. The danger may be actually present or threatened. It must definitely be clearly serious and, if not occurring immediately, then it must be very imminent.

- o It is not necessary either for the members of the assemblage to have acted pursuant to an agreement or plan either made in advance or made at the time, or for the members to concentrate their conduct on a single piece of property or one or more particular persons. The defendant does not have to personally know or be acquainted with the other members of the assemblage. The other members of the assemblage need not be identified by name or their precise number established by the evidence.

- o It is sufficient to establish willfulness on the part of the defendant or any other member of an assemblage if you find from all the evidence that by acts, gestures or words he knowingly and intentionally aided or encouraged the tumultuous or violent conduct involving grave danger to property or persons. Willfulness may be inferred. A person is presumed to have knowingly done and intended the natural consequences of his acts.

*Jeffries*, 45 F.R.D. at 118-19.

### 3.    *Matthews v. United States*

Probable cause may be established under the statute absent the existence of elements required under the common law. *Matthews v. U.S.*, 419 F.2d 1177, 1180 (D.C. Cir. 1969) ("[I]n this statute, unlike the requirements of common law and in the early state statutes, there is no necessity for a conspiracy or purposeful joining together to be proved in order to have a riot occur. This recognition of the spontaneity of many recent riots is crucial in making punishable the acts which Congress intended to prohibit.").

In *Matthews*, an individual was convicted under the riot statue based on his having taken liquor that had been looted from a store and left nearby.  In upholding the conviction, the Court clarified the import of differences between riot as crime defined by the statute and as had been defined by the common law. *Matthews*, 419 F.2d at 1180.

> [I]n this statute, unlike the requirements of common law and in the early state statutes, there is no necessity for a conspiracy or purposeful joining together to be proved in order to have a riot occur. This recognition of the spontaneity of many recent riots is crucial in making punishable the acts which Congress intended to prohibit.

*Id.*

The D.C. Circuit noted that "[t]he theory of the District Court was that one may 'engage in' violent or tumultuous conduct by knowingly and intentionally aiding or encouraging it 'by acts, gestures or words'; and that the jury could find such willful engagement here from the tendency of appellant's conduct to enlarge, and to perpetuate, the atmosphere of violence and tumult all about him." *Matthews* at 1183. The trial court's theory was consistent with the Congressional purpose in enacting the statute, which was intended to reach conduct by persons that "have aided, encouraged and furthered the riot and, by so doing, to have engaged in it." *Matthews*, at 1183 (internal quotes omitted). *Id.* The Circuit observed that testimony, in which a police officer described the scene of the incident as "chaos" and "wild," supported the rationale of Congress: "a public riot is a phenomenon which feeds on itself and for which the cooling influence is the cessation of all activity which tempts others to swell the throng and to engage in similar acts." *Matthews* at 1183. This justified attaching criminal liability to conduct that minimally contributed to or extended the significantly more egregious or dangerous conduct in a riot context, such as Matthews' actions, which did not involve violence or destruction of property, because it "contributes to the tumult and promotes new violence. . . . It, inescapably it seems to us, identifies the individual with the climate of violence and turmoil and makes him, in any realistic sense, a part of it." *Matthews* at 1183-84.

Judge Skelly Wright's dissent in *Matthews* serves to underscore a number of points that are pertinent in this case. First, he noted that "[i]t would blink reality not to realize that *what begins as a political or social demonstration* may end violently . . . . *Matthews* at 1188 (Skelly Wright, J., dissenting). This is consistent with Sarah Carr's assessment of events. DSOF ¶121. Moreover, the dissent is instructive here because it emphasizes the extent to which this Circuit applies the riot statute to outlaw spontaneous, non-violent, otherwise non-criminal conduct that

12

merely reinforces tumultuous and violent behavior: "As interpreted [in *Matthews*], this statute

does not require a common purpose, does not require that actions violating the statute be

independently criminal, and does not require that the defendant himself commit violent or

turbulent acts. 491 F.2d at 1192 (dissent). Rather, "[t]he only explicit requirement imposed by

the D.C. statute is that there be serious violence or the threat of it somewhere in the assemblage."

*Matthews* at 1193.

### 4.    *Campbell v. City of Birmingham*

*Matthews* has been relied to explain how something that started as a non-violent

demonstration involving a small number of persons may escalate spontaneously into a riot

resulting in the conviction of an individual, based in part, on the actions of persons he did not

know and had not enlisted as part of his protest. *See Campbell v. City of Birmingham,* 405 So.2d

65, 67 (Ala.Cr.App. 1981).

In Campbell, the defendant and at least six other demonstrators went to the cafeteria at

the University of Alabama in Birmingham Hospital, where about 700 hospital employees and

doctors were eating lunch. Campbell and a companion, Ms. Jue, held a large banner proclaiming

May Day. They shouted against "imperialism" and about the "oppression of the working man."

The other five demonstrators solicited money and handed out pamphlets. They had not obtained

a permit for their activities. *Campbell,* 405 So.2d at 66.

University Police Officer Bradford was called to the lunchroom. There he asked

Campbell and Jue to cease their loud and boisterous conduct and to leave the premises. They

refused and continued talking. Bradford attempted to arrest Campbell. Campbell pulled away as

Bradford attempted to handcuff him. Campbell also yelled, "Here comes the goon squad" and

"goddamn pigs". In the scuffle that ensued, another of Campbell's companions, Mr. Brown,

struck Bradford several times. Trial evidence reflected that four members of the group were "just milling around at this time in another portion of the cafeteria." Additional officers arrived and subdued and removed Jue, Brown and Campbell. A crowd of employees gathered and observed the commotion. Many of them clapped when the arrestees were taken away. All seven demonstrators were arrested. *Campbell,* 405 So.2d at 66.

The appellate court held that it was beyond dispute that Campbell had not engaged in tumultuous and violent before he became embroiled with Officer Bradford. *Campbell,* 405 So.2d at 67. But when Bradford attempted to arrest Campbell, a physical altercation erupted, in which two of Campbell's cohorts assisted him. One of them managed to take Bradford's gun for a time. This conduct did meet the "tumultuous and violent conduct" requirement. *Campbell,* 405 So.2d at 67-68.

Nevertheless, Campbell argued that there was no evidence that he had engaged in the tumultuous and violent conduct as one of group of five or more persons, and therefore, had not engaged in a riot. *Campbell,* 405 So.2d at 68. On the contrary, the appellate court found that the trial evidence included testimony that several, albeit unidentified persons, had made comments against the police and in favor of the demonstrators with whom the police were embroiled. Additionally, Campbell had successfully urged some bystanders to aid him. *Campbell,* 405 So.2d at 68-69.

This, the court explained, as follows, satisfied the Alabama statute's requirement of at least five participants for a riot:

> "Any person who encourages, incites, promotes, or takes part in a riot is guilty of riot as a principal." 54 Am.Jur.2d Mobs and Riots, Section 20. "If persons are present in order to lend the courage of their presence to the rioters, or to assist, if necessary, they may be equally guilty with the principals," 77 C.J.S. Riots, Section 17.

14

*Campbell,* 405 So.2d at 69 (and quoting 77 C.J.S. Riots, Section 13A-11-3, quoting

*Matthews,* 419 F.2d at 1183, for proposition that "acts, gestures or words may satisfy

violent and tumultuous requirement because a riot feeds on itself).

As demonstrated below, the conduct of the mob observed by Lanier or observed by

subordinates and reported to her, and which resulted in the arrest decision, satisfied the elements

of D.C. Official Code § 22-1322. The participation of each of the plaintiffs in the mob activity

provided probable cause to support her or his arrest.

> **B.     Plaintiffs' Arrests For Rioting Are Valid Because They Were Arrested For
> Their Own Riotous Conduct**

Plaintiffs argue that their arrests were invalid because, in their view, they were

permissibly marching in the roadway without a permit and "their own conduct was

constitutionally protected." PSJM at 7.  In fact, plaintiffs' conduct was not constitutionally

protected. The conduct for which plaintiffs were arrested would not have been constitutionally

protected even if they had had a permit or had engaged in that conduct on the sidewalk.

Plaintiffs seek to extend the holdings of three inapposite cases to support their argument

that they were arrested for appearing to have been associated with, or merely in the vicinity of,

actual wrongdoers. PSJM at 7 (citing *United States v. Robel,* 389 U.S. 258, 262-65 (1967);

*Keyishian v. Bd of Regents of Univ. of State of New York,* 385 U.S. 589, 606 (1967); *Elfbrandt v.

Russell,* 384 U.S. 11, 19 (1966).  None of these cases addresses an individual's culpability for his

actions in a riot. Rather, in each of these cases, the U.S. Supreme Court struck down a statute

that permitted the government to penalize an individual solely for his membership in an

organization.

Plaintiffs were not arrested because they "fail[ed] to abandon their own constitutionally

protected conduct by leaving the area where others were engaged in criminal acts," as they

assert.  They were arrested for having encouraged, perpetuated by their support, and thus aided and abetted the violent and tumultuous acts of an assemblage of five or more persons, in which *they* were active participants.  *See Matthews* 419 F.2d at 1180 ("one may 'engage in' violent or tumultuous conduct by knowingly and intentionally aiding or encouraging it 'by acts, gestures and words.")  They were arrested for rioting.  D.C. Code § 22-1322; DSOF ¶ 54, 54.

### 1.    The AIC Attendees

Carr, the Kirks, and Scolnik all marched with a band of more than 100 persons in the roadway of the 1600 – 1700 blocks of Columbia Road before turning with, and as part of, that mob onto 18th Street.  DSOF ¶¶ 32, 33, 38-40, 43, 45, 46, 52, 56, 62, 67.   Along that segment of Columbia Road, mob members spray painted and vandalized parked automobiles, set fires, sprayed paint on buildings, repeatedly fired projectiles with wrist rockets through the windows of buildings, heaved bricks and rocks through building windows, including those of three banks and the MPD Latino Liaison Unit Office, at the corner of Columbia Road and 18th Street.  DSOF ¶¶ 32, 33, 38-40, 43, 45, 46, 52, 56, 62, 67.  At least one person within this large, moving assemblage threw a rock at another person. DSOF ¶ 62..  Finally, someone in the mob threw a brick into the windshield of a marked police cruiser driven by Lt. Jimmie Riley.   Immediately thereafter, numerous other members of the unlawful assemblage threw more missiles at Riley's car and MPD vans.  DSOF ¶¶ 40, 46.

Between the time that the group marched into the 1600 block and its members pelted Riley's car, the loud crack of a missile breaking a building window was audible to the police officers in Cruiser 18, Lanier's car, more than half a dozen times.  DSOF ¶ 39, 54.  Following each such crash, the moving mob, with Carr, the Kirks, and Scolnik near its rear and closest to Cruiser 18, celebrated the criminal act by throwing up their hands and cheering together.  *Id.*  In

16

doing so, all of those participants violated the riot statute. *See* D.C. Official Code § 22-1321; *Matthews*, 419 F.2d at 1180, 1183-84, *Jeffries,* 45 F.R.D. at 118-119 ("It is sufficient to establish willfulness on the part of the [criminal] defendant or any other member of the assemblage if you find from all the evidence that by acts, gestures, or words he knowingly and intentionally aided or encouraged the tumultuous violent conduct involving a grave danger to property or persons willfulness may be inferred),*Matthews, supra*; *Campbell*, 405 So at 68 – 69.

The precedent applying the District's riot statue demonstrates that the District had probable cause to arrest Carr, the Kirks, Scolnik, and Singer for rioting. Carr, the Kirks, and Scolnik were part of an assemblage of five persons or more when members of that assemblage engaged in violent and tumultuous acts. *See Campbell*, 405 So.2d at 68 (resistance of police by two individuals satisfied violent and tumultuous element of riot in incident in which "character and complexion of the demonstrators' conduct changed" from lawful to riotous), 69-70 (persons who had been mere bystanders at outset of incident, but verbally encouraged others engaged in violence and tumult engaged in culpable conduct by so doing, and were properly counted as members of the assemblage).[2]  Officers at the scene observed the mob to act uniformly in celebrating destructive acts, thereby encouraging more such acts. (Keller)  In participating in those mob celebrations, Carr, the Kirks, and Scolnik were fully culpable riot participants.

---

[2]    The *Campbell* Court stated in response to the criminal appellant's contention that his violent and tumultuous acts were not committed in the context of the statutorily required assemblage:

> It is insignificant whether or not those verbally supporting the defendant were members of the May Day Committee who entered the cafeteria. Even if these supporters were employees of the University, rightfully and lawfully in the cafeteria, they became participants in the riot by encouraging the defendant's tumultuous and violent conduct.

*Campbell*, 405 So.2d at 69-70.

Moreover, the mob kept moving at all times. In moving with the mob, Carr, the Kirks, and Scolnik were distinguishable from innocent bystanders at the location of an incident.[3] The mob had progressed along Columbia Road, leaving both destruction and uninvolved onlookers in its wake. Carr, the Kirks, and Scolnik were reasonably perceived as participants because they continued to move with the mob as it committed, and then celebrated, one act of violence after another. In doing so, and increasing the mob, Carr, the Kirks, and Scolnik "tend[ed] to enlarge and perpetrate the atmosphere of violence and tumult, . . . [and fell] within the purview of the section since riot 'is a phenomenon which feeds on itself and for which the cooling influence is the cessation of activity which tempts others to swell to the throng and to engage in similar acts.'" *Campbell*, 405 So.2d at 68, (quoting *Matthews, supra*). Carr, the Kirks, and Scolnik were all toward the rear of the mob. *See* Complt. ¶¶ 23, 23, 25.

### 2.    Singer Engaged In Riotous Conduct

Singer's circumstances are somewhat different than those of the other plaintiffs, but his arrest is similarly justified by probable cause. Singer claims to have been in Madam's Organ when he observed the mob passing, and reacted as follows: "Mr. Singer ran from the club because he wanted to get a closer look at the marchers and learn their message. When police in the vicinity began chasing the marchers, he ran with the marchers away from the police and into an alley . . . ." Complt ¶ 9.

Events transpired quickly from the point at which the mob reached the intersection of 18th Street and Columbia Road, NW. The building housing the Sun Trust Bank and the MPD Latino

---

[3] Campbell at 69:

   "Mere presence does not make one a participant in a riot but if one does something which incites, encourages, or assists in the actual perpetration of the crime, he is an aider and abettor. However, as Wharton, quoting the words of Judge Daly, says: 'Even well-disposed citizens are attracted by excitement * * * and a distinction must be carefully drawn between those who were mere lookers-on and those who were stimulating and encouraging the riot.' " (quoting W. Burdick, 3 The Law of Crime, Section 758 (1946)).

Liaison Office ("LLU") is at that intersection. *See* Exh. 125. Missiles hurled from within the

mob broke windows in the SunTrust Bank. The breaking of the windows made a loud crash

sound audible in Cruiser 18, even over the other noise in the environment. DSOF ¶ 39. The

mob celebrated in the intersection of 18th Street and Columbia Road, NW. *Id.*

The mob turned onto 18th Street and threw another missile, breaking the LLU window,

facing on 18th Street. *See* Exh. 104. The breaking of the windows made a loud crash sound

audible in Cruiser 18, even over the other noise in the environment. The mob celebrated in 18th

Street alongside of the LLU Office. DSOF ¶ 39.

In these events, the mob was moving southward off Columbia Road and along 18th Street

– from left to right of a person exiting Madam's Organ, or standing in front of Madam's Organ

and looking out onto the street. The shattered LLU window was almost directly across the street

from the door of Madam's Organ. DSOF ¶ 122; Exh. 125

Then Lt Riley pulled within close proximity of the behind the mob, and his windshield

was broken by another missile hurled from the crowd. DSOF ¶¶ 40, 46. Immediately, the mob

threw more rocks and bottles at Riley's cruiser. *Id.* When Riley and CDU Platoon 43 emerged

from their vehicles, the mob began to run southward on 18th Street. However, scores of persons

lining the street, who had not engaged in the riot stood their ground and were left undisturbed by

the police. DSOF ¶¶ 47, 41, 42.

This entire sequence of events lasted only several minutes. Singer's attention was

attracted to events unfolding in 18th Street, and so he "*ran* from" Madam's Organ to join in. See

Complt ¶ 9 (emphasis added). That Singer only got as far as the alley when "police began

chasing the marchers," indicates that he would have joined it at some point in the context of (1)

the breaking of the Sun Trust windows, (2) the mob's celebration of the breaking of the Sun

Trust windows, (3) the breaking of the LLU window (and the broken LLU window was clearly visible from the doorway of Madam's Organ), (4) the celebration of the breaking of the LLU window, or (5) the breaking of Riley's cruiser's windshield and the immediately following pelting of the cruiser by the mob.  He would have done so against a panorama of visual and audible indications of tumult and violence and of a police response thereto.  In running to join the mob in this context, Singer's actions reasonably appeared to reflect his active support and participation in the mob's conduct sufficient to evince his willful engagement in a riot, in violation of D.C. Official Code § 22-1322;  *see Matthews* 419 F.2d at 1180.  The police, in arresting Singer and others who had continued to remain engaged in the mob's activities, did so with probable cause to believe that each such person had committed the offense of rioting in his or her presence.  Accordingly, the District should be granted summary judgment on the Fourth and First Amendment claims of all plaintiffs.

**III.    Carr, The Kirks, And Scolnik Are Criminally Culpable For All Criminal Acts Committed Following the AIC By Any Of The AIC Attendees As Coconspirators.**

A party to a continuing conspiracy may be convicted of substantive offenses committed in furtherance of the conspiracy, although he did not participate in or have knowledge of those offenses.  *Pinkerton v. United States,* 328 U.S. 640 (1946).  Because they were parties to the conspiracy to parade unlawfully through and riot in Adams Morgan, and to unlawfully enter the Inaugural Ball at the Hilton Hotel, of which Lanier had been informed, probable cause existed to arrest Carr, the Kirks, and Scolnik.

In *United States v. Bridgeman*, 523 F.3d 1099 (D.C. Cir. 1975), the D.C. Circuit reviewed the convictions of a number of D.C. Department of Corrections inmates who had been tried for their roles in a violent, unsuccessful jail break. Crimes for which their convictions were affirmed included riot and conspiracy.

In late September or early October, 1972, three D.C. inmates, Bridgeman, Gorham, and Jones, came up with a plan to break out of the D.C. Jail. *Bridgeman*, 533 F.2d at 1104. Having had a loaded handgun smuggled to them inside the jail, they implemented their plans on October 11, 1972. Numerous other inmates got involved in one or more criminal acts related to the jail break effort during its 22-hour duration. They had not been involved in the planning, and in some instances were unaware of criminal acts being perpetrated by others in the effort.

In particular, Robert Matthews challenged his conspiracy conviction, asserting that the "evidence is consistent only with his spontaneous participation in certain activities," that "nothing suggests that there was any participation on his part that was planned in conjunction with others," that he simply "happened to be in the same place at the same time . . . (and was) caught up in the events of the moment." *Bridgeman* at 1111. He contended only those who had engaged in deliberate plotting and preparation should be convicted of conspiracy, and not "those who merely participate[d] in events planned and executed through others' conspiratorial prearrangement." *Id.,* at 1111.

Under that reasoning, only the prearrangement to smuggle the gun into the jail would trigger conspiracy culpability. *Id.* The Circuit rejected that argument, stating that numerous events and offenses during the 22-hour incident "constituted planning and preparation to escape from the jail. Any prisoner who *perceived* that an escape would be attempted and who decided to leave his cell and act in furtherance of that objective could properly be deemed as joining in the larger conspiracy to escape which was being carried out while rebellious inmates tortured and hid behind their hostages in an unlawful attempt to obtain their freedom." *Bridgeman*, 523 F.2d at 1111 (citation and fn omitted) (emphasis added). The Court explained that it "must have been plain" from events in the 22-hour incident, that it had been pre-planned and that those who had

21

not been involved in the planning would have realized the objective. *Id.*, at 1111 n.5. Thus,

persons may be deemed to have knowledge of the existence and unlawful purpose of a

conspiracy based on what s/he was in a position to observe and reasonably infer.

The D.C. Circuit articulated the legal consequences of the inmates' conspiratorial

conduct as follows:

> A defendant can join a conspiracy at any time, and can properly be convicted
> though he was not in the conspiracy at its inception. *United*, cert. denied, 396 U.S.
> 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970); Cave v. United States, 390 F.2d 58
> (8th Cir.), cert. denied, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968);
> Nassif v. United States, 370 F.2d 147 (8th Cir. 1966); United States v. Hickey,
> 360 F.2d 127 (7th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210
> (1966). There is no need that he participate in all acts of the conspiracy. United,
> cert. denied, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); United States v.
> Levinson, 405 F.2d 971 (6th Cir.), cert. denied, 395 U.S. 958, 89 S.Ct. 2097, 23
> L.Ed.2d 744 (1971). An individual who joins an already formed conspiracy
> knowing of its unlawful purpose may be held responsible for acts done in
> furtherance of the conspiracy both prior to and subsequent to his joinder. United
> States v. McGann, 431 F.2d 1104 (5th Cir. 1970), cert. denied, 401 U.S. 919, 91
> S.Ct. 904, 27 L.Ed.2d 821 (1971); United States v. Knight, 416 F.2d 1181 (9th
> Cir. 1969); Nelson v. United States, 415 F.2d 483 (5th Cir. 1969), cert. denied,
> 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970); Myzel v. Fields, 386 F.2d
> 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143
> (1968) (civil conspiracy). Where the evidence shows that a defendant knew of the
> conspiracy, associated himself with it and knowingly contributed his efforts
> during its life to further its design, he may be convicted of conspiracy. Langel v.
> United States, 451 F.2d 957 (8th Cir. 1971); Roberts v. United States, 416 F.2d
> 1216 (5th Cir. 1969); *United States v. Levinson, supra; Cave v. United States,
> supra; Nassif v. United States, supra; United States v. Hickey, supra*;
> McManaman v. United States, 327 F.2d 21 (10th Cir.), cert. denied, 377 U.S. 945,
> 84 S.Ct. 1351, 12 L.Ed.2d 307 (1964).

*United States v. Bridgeman*, 523 F.3d 1099, 1107-08 (D.C. Cir. 1975).

Carr, the Kirks, and Scolnik knew from the text of the Flyer, that the post-AIC

demonstration had been planned in advance. The organizers or planners, including the band,

Anti-Flag, were apparent to them. *See* Exh. 17 (Carr Dep.) at 119:4-6; Exh. 18 (AKirk Dep. at

51:1-4; 186:10-187:5 (Flier spoke for, reflected organizers); Exh. 11 (Flier). The Flier and the

urgings performers set out the plan in adequate detail that Carr, the Kirks, and Scolnik are accountable for understanding the unlawful objectives of the plan they were agreeing to and furthering through their participation. *See Bridgeman*, 523 F.2d at 1111. In fact, they knew even prior to receiving the Flyer that an Anti-Flag concert contemplated more than attendance at a musical performance. Exh. 19 (Scolnik Dep.) at 50:15-51:9. Attendance at an Anti-Flag concert implicated protest activity and direct action, perhaps exceeding simple civil disobedience. *Id.*

The Flier itself advised that the objective of the Protest March was to "*take our resistance to one of the Inaugural Balls.*" Exh. 11 (Flier). The Flier detailed the route that participants were to take. The Flier called for a start that was deemed "respectful of the people" in the residential area in which it was to commence. *Id.* This "respectful" start was to include loud chanting and drum-banging between 11:30 and midnight. *Id.* The Flier reflected that organizers expected less restrained protest activity as the demonstration moved away from the residential area – "the people" – into Adams Morgan's commercial area, where the "amazing energy" from the AIC was to give rise to "an explosive protest against all that Bush represents" – including the corporate wealth symbolized by banks and profitable franchises. Then, upon arriving at the target of the plan set forth in the Flier – the site of an Inaugural Ball – the protestors were to show people the faces of resistance to the Bush administration. As the MPD undercover heard AIC attendees planning and reported through his handlers to Lanier, this meant breaching security at the Inaugural Ball.[4] Kirk testified that the torches used by persons in the March evidenced a common plan or scheme. DSOF ¶ 29; see also DSOF ¶¶ 57 (marchers agreed to a

---

[4]    The Flier's last sentence communicates to the protestors to be cognizant of their surroundings and to focus or direct their energies in a manner that would "show[] the world," not merely those along the march route, "[thei]r opposition to Bush." This is entirely consistent with the marchers' approach. They were merely loud and boisterous in moving away from the AIC site past residences. Their intensity built markedly and became violent and destructive through the commercial area of Adams Morgan.

23

common plan action through their participation); ¶ 63.

The organizers of the post-AIC protest planned an unlawful event or chain of events. They offered their plan to the AIC attendees through the Flier and urged the AIC attendees to participate through further statements from the stage during the AIC. By joining in the march, replete with flaming torches brandished in an urban area, Carr, the Kirks, and Scolnik, joined and acted in furtherance of the conspiracy's objectives. Lanier had been informed of the conspiratorial plan based on the first-hand observations of the MPD undercover. She had been informed of the actions taken by the protestors, who had attended the AIC, by the reports of her subordinates and by her own observations. Accordingly, when she ordered the protestors' arrests, she had probable cause to arrest every one of them. Accordingly, District should be granted summary judgment on plaintiffs' First and Fourth Amendment claims, and these claims should be dismissed with prejudice.[5]

## IV.    Plaintiffs' Arrests For Having Paraded Without A Permit Would Not Offend the Fourth Amendment

Plaintiffs assert that their arrests for having paraded without a permit violated their Fourth Amendment rights to be free of unreasonable seizures. Complt ¶ 43; Plaintiffs' Opposition to Defendant District of Columbia's Motion For Partial Dismissal Of The Complaint (Dkt. 14). In the Court's July 26, 2006 Memorandum Opinion And Order, the Court held that it is ambiguous whether "parading without a permit" was a criminal offense prior to the effective date of the First Amendment Rights and Police Standards Act of 2004 ("Act"). Slip op. at 7-8. That ambiguity requires the Court to determine "whether 'a prudent person could have

---

[5]    Plaintiffs argue that under the First Amendment they were not required to abandon the march simply because others were engaged in misconduct. PSJM at 7. However, because they had entered into and acted in furtherance of the conspiracy, it was, in fact, incumbent upon them to affirmatively terminate their participation. *See, e.g., United States v. Cruz*, 127 F.3d 791 (9th Cir. 197); *United States v. Krasn*, 614 F,2d 1229 (9th Cir. 1980)(conspiracy is presumed to continue absent affirmative evidence "the defendant abandoned, withdrew from, or disavowed the conspiracy or defeated its purpose."

reasonably believed' that parading without a permit was a crime and whether there was probable cause to believe plaintiffs engaged in such conduct." Slip op. at 8 (quoting *Doe, et. al. v. Metro. Police of District of Columbia,* 445 F.3d 460, 468 (D.C. Cir. 2006)).

On the facts of *Doe,* the DC Circuit held probable cause to exist as follows:

> The facts and circumstances surrounding John Doe's arrest were the following: An MPD officer, encountering an underage person in possession of alcoholic beverages, sought to enforce the local law prohibiting such possession; the District had routinely criminally prosecuted underage possession of alcohol in the past, *see* Complt. ¶ 34; whether or not such possession constituted a criminal or civil offense was unclear at the time of arrest; and the ambiguity was not removed until three years later when the *Cass* decision issued. A prudent person could have reasonably believed that underage possession of alcoholic beverages was a crime and that John Doe could be arrested for it.

445 F.3d at 468-69.

### A.    The Reasonable Officer Would Have Believed Parading Without A Permit To Be A Crime

To determine whether a police officer acted reasonably in arresting for parading without a permit in this instance requires the Court to determine how the law has been enforced previously. *Id.*[6]

Plaintiffs contend that their arrests for parading without a permit violated local law and the Fourth Amendment because parading without a permit was not a criminal offense at the time of their arrest. *PSJM* at 21. Their argument ignores *Doe*'s holding that the ambiguity of a

---

[6]    Notwithstanding this holding, the District respectfully submits that facts recited by the Court at pp. 6-8 and n.3 of the slip op. determine that "a prudent person *could* have reasonably believed that parading without a permit was a crime." Slip op at 8 (internal quotes omitted). The language of the Title 24 penalty provision "is routinely coupled with penalty provisions." *Id.* at 6. The Council of the District of Columbia found that "misunderstandings concerning the rights and responsibilities of citizens and of government concerning First Amendment exercise [relating to parading without a permit] have become *pervasive*" reflects that either parading without a permit was a crime or that substantial numbers of prudent persons had, in fact, reasonably believed that parading without a permit was a crime. Slip op at 7 (quoting District of Columbia Current Affairs Section of the D.C. Bar November 9, 2004 letter, reprinted in December 1, 2004 Council Report on the Act). Finally, the District of Columbia recognized the need to "make[] clear that it shall not be an offense to assemble or parade in a First Amendment Assembly on a District street, sidewalk, or other public way or obtained an approved assembly" – a permit. Slip op at 8, n.4 (quoting Act § 105(a). Because the operative *Doe* analysis is whether "a prudent person could have reasonably believed," as opposed to necessarily *would* have believed, the District respectfully submits that the record requires the query to be answered in the affirmative.

regulation's nature as civil or criminal reduces the Fourth Amendment inquiry to one of whether "probable cause exists [as] determined by looking at all of facts and circumstances at the time of the arrest, including the knowledge and experience of the arresting officer. *Doe* at 468 (citing *United States v. Kayode*, 254 F.3d 204, 209 (D.C. Cir. 2001), *cert. denied*, 534 U.S. 1147 (2002) (quoted in Decn at 8).

In fact, plaintiffs emphasize their hostility to *Doe* and reassert their argument that parading without a permit was not a criminal offense and that, accordingly, their arrests violated both District law and the Fourth Amendment. PSJM n.10. They insist that the District's enforcement policy renders the regulation non-criminal. PSJM at 23-25  Plaintiffs conclude that no prudent person could have reasonably believed that parading without a written permit was, by itself, a criminal offense." PSJM at 24. Plaintiffs' argument ignores the finding of this Court's prior decision: the prohibition of 24 D.C.M.R. against parading without a permit is not unambiguously civil; therefore, probable to satisfy Fourth Amendment requirements is determined on the facts and circumstances of the incident, including the arresting officer's knowledge and experience.

Plaintiffs point to no decision, such as that in *Cass v. District of Columbia*, 829 A.2d 480 (D.C. 2003), cited by the D.C. Circuit in *Doe*, in which any court has held the Public Space and Safety offense of parading without a permit to be a civil offense. The District's research has found no such case, either.

The enforcement of the regulation through arrest, as Lanier had been informed, had been upheld against a challenge in *Barham* in September 2004. She knew that arrest enforcement had withstood challenge on constitutional grounds, based on MPD's policy of issuing warnings prior

to initiating arrests; she also knew that the reviewing court had understood that exceptions to that policy might occur and would be subject to review at such time as they did.

Lanier had been consulted in the negotiation of the settlement of *Abbate v. Ramsey*, 03cv00767 (EGS). The settlement agreement provided for the case to be dismissed with prejudice, but for the Judge Emmet Sullivan to retain jurisdiction for three years for the purpose of enforcing the non-monetary relief aspects of the settlement. *Abbate, et al., v. Ramsey, et al.*, 355 F. Supp. 2d 377 (D.D.C. 2005). All parties had signed the settlement agreement as of January 18, 2005, two days before the Adams Morgan arrests. *See* copy of signed *Abbate* Settlement Agreement filed with Court as ECF Dkt. 99 in *Abbate*, 03cv00767 (EGS), a copy of which is attached as Exh. 27. As SOD Commander, Lanier was responsible for revisions to and the preparation of MPD's Mass Demonstration Handbook. Accordingly, she knew that the agreed-upon settlement terms would provide for the MPD's Mass Demonstration Handbook to reflect that prior to ordering the mass arrest of demonstrators, the incident commander was to issue warnings and provide participants an opportunity to comply, "when time and circumstances permit[ted]." DSOF ¶¶ 49, 87. *See Abbate*, 355 F. Supp.2d at 383.

Further, in April 2000, Lanier had been responsible for processing of prisoners arrested in the context of the International Monetary Fund/World Bank meetings then being conducted in the District. On that basis, she knew that the MPD had arrested hundreds of persons on April 15, 2000 on the charge of parading without a permit for having engaged in a snake march along District roadways. She also knew that MPD Assistant Brian Jordan had ordered the arrest of more than 150 persons on Vermont Avenue between K and L Streets, NW, on September 27, 2002, without having issued warnings. Jordan had not given warnings because the

27

demonstrators had marched out of Franklin Square Park into morning rush hour traffic on K Street, creating an immediate danger to themselves and others. DSOF ¶¶ 89.

Lanier was also aware that the Office of the Corporation Counsel/Office of the Attorney General had prosecuted arrests from both the April 15, 2000 event and the Jordan event. Moreover, persons who had been arrested for parading without a permit in the April 2000 mass arrest and had refused to identify themselves when presented in D.C. Superior Court had been held in D.C. Jail until they identified themselves, generally pleading to a lesser charge after serving time in the Jail. This reasonably suggested that such arrestees had been brought before the court on a lawful charge. DSOF ¶¶ 88, 90. For these reasons, Commander Lanier and other reasonable police officers could have believed parading without a permit to have been a crime as of January 20, 2005, and that it was permissible to arrest without prior warnings under the circumstances.

**B.    Probable Cause To Arrest Based On The Circumstances**

The record reflects that Lanier had probable cause to arrest plaintiffs at the time of their arrests.

As reflected by the Field Arrest Forms for each of the plaintiffs,

The offense occurred on January 20, 2005 at 2320 hours at the location of 16th Street and Columbus Road, N.W. A group of approximately 250 individuals formed as a group and concealed their identities with the use of masks, scarves, and shirts. They moved as a group westbound on Columbia Road blocking all westbound traffic lanes and one eastbound traffic lane. In the 1700 block of Columbia Road the group began arbitrarily destroying mailboxes, light posts, and spray painting vehicles and buildings. They continued into the 1800 block of Columbia Road and turned South on 18th Street where a majority of the individuals were stopped and arrested.

No Permit was issued for this event.

I, Officer _____, observed the above-listed demonstration and arrested D-1. I was assigned to Civil Disturbance Unit __.

*See* Field Arrest Forms for Sarah Carr, Allison Kirk, Chelsea Kirk, Jonathan Scolnik, and Matthew Singer, DC Exhs. 21-25. Such completed Field Arrest Forms accompanied by Polaroid photographs of the arrestee and his/her arresting officers are accepted by the D.C. the Superior Court in lieu of direct testimony by the arresting officer at the presentment, as evidence of probable cause, to support an order holding the accused to answer.[7]

Plaintiffs' arrests were supported by information in addition to that reflected on the Field Arrest Forms. An MPD undercover officer attended the AIC. PSOF ¶ 39. This MPD officer provided information, based on the officer's observations, that were relayed to Lanier through the U/C's handlers, along with the observations of those handlers and other subordinates. In addition, Lanier observed events providing probable cause for plaintiffs' arrests. DSOF ¶¶ 54, 55, 62, 12-19, 27, 35, 39, 51.

In this instance, the arresting officer was the Commander of MPD's Special Operations Division ("SOD"). SOD is the component of the MPD that was and is responsible for the permitting of and primarily responsible for the facilitation of mass demonstrations. While parade permits are issued pursuant to the authority of the Chief of Police, historically that authority had been delegated to the SOD Commander. That authority had been delegated to Lanier with her

---

[7]    Following the 1968 riots in the District and in response to recommendations by various committees appointed in the aftermath of those riots, the D.C. Superior Court and MPD adopted new procedures to expedite the processing of persons arrested during large scale disorders. *E. g.*, Order, District of Columbia Court of General Sessions [now Superior Court] Administration of Justice During a Major Civil Disorder (Nov. 12, 1969) (per Greene, C. J.), reprinted as Appendix F to Judicial Conference of the District of Columbia Circuit, Report of the Committee on the Administration of Justice Under Emergency Conditions (March, 1973) [hereinafter, 1973 Report]. Under this plan, arresting officers were to complete a Field Arrest Form on the scene, recording the identity of the arrestee, the circumstances of the apprehension-including the charge and material elements of the specification-the name, unit and badge number of the arresting officer, and the identity of any other officer who had witnessed the arrest. As a further means of supporting the validity of the apprehension, a Polaroid photograph was to be taken showing "the arresting officer and his prisoner together." Once these field procedures had been completed, the officer who made the arrest was free to transfer the arrestee to other police personnel for transportation and booking, thus enabling him to remain at the scene of the disorder.

appointment as SOD Commander. She knew that no permit had been sought or issued for the March. DSOF ¶ 51.

Further, Lanier would not have issued a permit authorizing a torch-bearing, drum-pounding parade of hundreds of persons along the March route at 11:00 p.m. on January 20, 2005. She would not have permitted the use of torches, at least without a requirement of commensurate safety measures. Nor would she have granted a permit for such a loud procession along the residential portion of the March route at that time of night. Accordingly, plaintiffs' march differed materially from scores of parades that MPD annually facilitates each year even without a permit. Those are of a nature that the SOD Commander would have issued a permit for, consistent with such on-the-spot modifications as an on-scene official might negotiate with organizers, if a permit had been sought. DSOF ¶¶ 73-85.

Lanier had been informed by subordinates that the march consisted of hundreds of individuals blocking most, if not all, of the lanes of the roadways they traveled on. Like the Vermont Avenue marchers, they engendered a risk to themselves and others. A number of the marchers carried flaming torches and many more concealed their identities as they traveled the roadways. DSOF ¶¶ 62, 24, 25, 28, 31.

Lanier had been advised at 10:00 p.m. that an MPD officer at the AIC had learned of a plan for AIC attendees to engage in a snake march from the AIC to an Inaugural Ball site, engaging in property damage along the way had been generally communicated to hundreds of persons in attendance at the AIC. At 11:20 p.m., Lanier was informed that marchers from the AIC had taken over roadways and were causing property damage along their route to the Hilton Hotel. Accordingly, Lanier ordered two platoons of CDU personnel to respond to 18th Street to monitor the March, as she had been doing by traveling behind the March in her marked cruiser.

Her subordinates also advised her that numerous persons engaged in the march carried flaming torches; many persons engaged in the march concealed their identities with masks in the form of bandannas covering their faces; and that numerous members of the march played makeshift drums and/or chanted loudly while proceeding through a residential area after 11:00 p.m. creating a disturbance that perceptibly disturbed and annoyed residents of that area. DSOF ¶¶ 54, 55. 62, 24, 25, 28, 31.

When she arrived at the intersection of 16th Street and Columbia Road, NW, a large group of persons matching this description had moved through the intersection as a group. Lanier followed the group westbound on Columbia Road, NW, and observed them marching in the roadway as a group of more than 25 persons. She observed them turn onto 18th Street, NW, and continue their march in the lanes of that roadway. DSOF ¶¶ 52, 39.

It had been communicated to Lanier that the announcement of the march at the AIC came as a surprise to the undercover officer, and apparently to AIC attendees generally. The MPD monitored internet websites commonly used by demonstration organizers and demonstrators to communicate about such events and had not seen any information about such a march being planned. That there had not been prior internet communication about the proposed march should have caused these sufficiently savvy demonstrators to infer that the organizers had not obtained the required permit from the MPD. After all, if the organizers had kept the proposed demonstration a secret from the intended audience of potential demonstrators (whom they recruited at the AIC), the organizers would not have shared their plan with the MPD to obtain a permit. This sufficed to provide probable cause for arrest consistent with the scienter requirement of the offense.

Persons joining the march who had not attended the AIC, but who remained with the march to 18th Street, NW, would have been able to recognize, based on the destruction surrounding the march, that it was an event not proceeding according to an MPD permit, even though the MPD had not yet mustered to stop it.[8]

All marchers were accountable for knowing of the requirements for a permit. *Ratzlaff v. United States*, 510 U.S. 135, 149 (1994) (ignorance of law generally no excuse to criminal charge). Therefore, they are validly presumed to working with knowledge of that requirement for purposes of determining probable cause.

Lanier also knew it was MPD's policy not to arrest for simply parading without a permit. However, when Lt. Jimmy Riley arrived in response to her order, someone in the March threw a rock or a brick that struck and broke the windshield of his marked cruiser, as Lanier was able to observe (assault on a police officer). With that, Lanier's effort to moderate the already violent and destructive March conduct so that the March could be further facilitated was defeated. The group-wide conduct had provided probable cause to arrest for disorderly conduct, DC Official Code § 22-1301 and unlawful assembly, DC Official Code § 22-1307, if not rioting. Arresting the marchers for parading without a permit on these facts and circumstances would (and did) comport with MPD's policy of not arresting simply for parading without a permit. Arresting for parading without a permit on these facts and circumstances would comport with the agreed-upon terms of the *Abbate* settlement agreement, which provided for pre-arrest warnings and an opportunity to comply/disperse when time and circumstances permit.

---

[8]     This is true of Singer. Singer ran out of Madam's Organ to join the march. The records indicates that when he came through the door of Madam's Organ, he was just across the street from the broken window of the MPD Latino Liaison Unit Office almost directly across 18th Street; a platoon of CDU officers in riot gear, assembling near the intersection of Belmont Road and 18th Street to his left, and Riley and CDU Platoon 43 were nearby, if not already under assault. A reasonable individual would have recognized that the mob passing Madam's Organ was not engaged in a permitted event at that point under those circumstances. Accordingly, Lanier had probable cause, in keeping with the scienter requirement, to arrest Singer for joining and participating in the march between Cruiser 18 and the police line forming across 18th Street.

Based on these facts and circumstances, a reasonable police officer in Lanier's situation could have believed that probable cause existed for plaintiffs' arrests. *Doe*, 445 F.3d at 468-69; Decn at 8-9.  Accordingly, the District should be granted summary judgment on plaintiffs' First and Fourth Amendment claims and common law false arrest claims and those claims should be dismissed with prejudice.

**V.      The Arrests Enforced A Reasonable Time, Place & Manner Restriction**

Plaintiffs argue that the District's policy regarding arresting persons for parading without a permit was not a constitutionally reasonable time, place, and manner restriction.  PSJM at 16-21.  First, they contend, that "[t]he part of the policy announced at the *Barham* hearing – namely, that with unstated exceptions there would be no arrest without warning – was vague because the exceptions were unstated."  PSJM at 16-17.  Second, the policy was unreasonable because it had not been published to the public, and thus, plaintiffs had no notice that they could be arrested without warning and charged with parading without a permit, if circumstances warranted such a police response before an order to disperse and opportunity to comply could accomplished.  PSJM at 16.  Third, the exception that would permit arrest without a warning or dispersal order and an opportunity to comply was not narrowly tailored.  Finally, plaintiffs argue that the policy is not a reasonable time, place, and manner restriction because it provides for strict criminal liability.  PSJM at 19.

Plaintiffs' arguments misstate the District's policy and ignore or mischaracterize the facts which determine the validity of the District's actions in the sued-upon incident.  As demonstrated below, the District's policy is reasonable and the District's challenged actions constitutionally permissible.

### A.    The Actual Policy

The primary source of municipal policy for purposes of § 1983 analysis is statutory law

or regulation.  *See Bd. of County Commissioners of Bryant County, Oklahoma v. Brown*, 520

U.S. 397, 404 (1997).  With regard to the bases upon which a person may be arrested for

parading without a permit, the formal policy is set forth in 24 DCMR §§ 707, 705, and 100.1.

This regulatory scheme does not provide any exceptions.  As discussed above, its enforcement

was consistent with the scienter requirements recognized in *United States v. Sheehan*, __ F.3d

__, No. 07-3002 (D.C. Cir. Jan. 11, 2008), and in *American-Arab Anti-Discrimination*

*Committee v. City of Dearborn*, 418 F.3d 600-611-612 (6th Cir. 2005) (holding that a statute or

regulation making it an offense of demonstrators to parade or demonstrate of public space

without a permit must contain a scienter requirement).  Plaintiffs have not argued that the

pertinent District regulations lack a scienter requirement.

### B.    Custom and Practice

However, pursuant to the secondary source of municipal policy for purposes of § 1983

analysis – custom and practice, *see Bryant County*, 520 U.S. at 404  – the District did not, in fact,

enforce the regulations by arresting violators without having first issued warnings and provided

an opportunity to comply, absent exceptional circumstances.  Exh. 16 (*Barham* Tr.) at 23:9-18;

38:1-11; 40:10-41:3; Exh. 28 (Mass Demonstration Handbook) at 3.  Judge Sullivan specifically

addressed the constitutionality of the District's custom and practice.  *See* Exh. 16 (*Barham* Tr.) at

17:15-24; 35:24-36:15.  Fully apprised that the District's custom and practice contemplated

exceptions, in which arrests would be made without warnings and opportunities to comply,

Judge Sullivan found that "policy" to pass constitutional muster. Judge Sullivan denied the

34

*Barham* plaintiffs' preliminary injunction motion, which was predicated on their position that the

District's enforcement policy was unconstitutional. Exh. 16 (*Barham*Tr.) at 40:10-41:3.

On January 24, 2005, while representing the plaintiffs in *Abbate v. Ramsey,* 03cv00767

(EGS), counsel for plaintiffs in this matter moved Judge Sullivan to confirm the validity of the

District's custom and practice. On that day, the Court entertained a joint motion by the *Abbate*

plaintiffs and the District to dismiss the *Abbate* case with prejudice, while retaining jurisdiction

for three years to enforce the non-monetary terms of a settlement agreement executed by the

*Abbate* plaintiffs and the District. *See Abbate v. Ramsey,* 355 F. Supp. 2d 377 (D.D.C. 2005).

Among those provisions that the attorneys representing these plaintiffs sought to have Judge

Sullivan enforce on behalf of the *Abbate* plaintiffs was a provision requiring the MPD to have

the following language reflected in its Mass Demonstration Policing Handbook:

> An assembly of persons will not be arrested simply because the group
> does not possess a permit. Such an arrest may only occur after an order to disperse
> has been clearly communicated three times in a manner that is reasonably
> calculated to be heard by each of the persons in the group and after reasonable
> opportunity to disperse has been afforded, *to the extent that circumstances*
> *reasonably permit, without increasing the risk of injury to persons or property*
> *through the actions of a substantial number of the assembly of persons.*

*Abbate,* 355 F. Supp.2d at 381-82, 383 (emphasis added).

The custom and practice that the *Carr* plaintiffs challenge is the custom and practice that

their attorneys moved Judge Sullivan to *order* the District to publish and employ *four days after*

the *Carr* plaintiffs' arrests. Had Lanier issued three warnings – or any warnings – and allowed

plaintiffs to comply, she would have risked injury to persons or property through the actions of a

substantial number of the assembly of plaintiffs. Accordingly, the "policy" enforced against

plaintiffs was the policy incorporated in the settlement agreement that the parties advised Judge

Sullivan of on January 18, 2005, *Abbate* ECF Dkt at 1/18.2005 2d Minute Order, and which the

ACLU and the *Abbate cum* Carr attorneys moved this Court to order pursuant to the settlement agreement..

Plaintiffs, at PSJM p. 16, mischaracterize the testimony of Chief Lanier in her deposition in this matter. They argue that their misstatement of the testimony reflects the District policy. PSJM at 16 (1st ¶). Plaintiffs then attack their own version of District policy as being unconstitutional.

Plaintiffs next argue that the District's policy – as announced in open court in a *Barham* hearing -- is unconstitutional because plaintiffs had no notice of it. This is the MPD's custom and practice permitting the arrest of persons who were actually parading without a permit in violation of 24 DCMR §§ 705and 707 to be arrested without warnings in exceptional circumstances. PSJM at 16. They argue further that the District's policy was unconstitutionally vague. Next they appear to revisit the "notice" argument by objecting that the policy is unconstitutional because the MPD Handbook, which contains the same policy articulated in the *Barham* hearing, is not publicized. *Id.*

First, despite plaintiffs' arguments, it appears that in her deposition as designee of the District of Columbia and policymaker with regard MPD's enforcement of prohibitions against parading without a permit, Chief Lanier made the MPD policy, practice, and custom clear:

> A:    The District's policy as of September of 2004 is we will not arrest simply for parading without a permit, if this is imply for parading without a permit.
> Q:    And it was the District's policy to not arrest for parading without a permit without giving notice and opportunity to comply with the notice to those who were parading.
> A:    The District's policy as of September 2004 is that we would not arrest for simply parading without a permit.
> Q:    I *understand* that. And I asking you whether there was a second policy . . .

Lanier Tr. at 17:5-17 (emphasis added); and

A:    I have to stick to my original statement that we would not arrest after September 2004 for parading without a permit.

And you're asking me if we would arrest after that date for parading without a permit and that we would give warnings for parading without a permit.

We would not arrest for parading without a permit.

Lanier Tr. at 18:20-19:4; and

I'll say it again. We wouldn't arrest for parading without a permit after September 2004.

Lanier Tr. 19:20-21.

*Had* plaintiffs been arrested because they had paraded without a permit, *rather than being arrested on another valid basis and charged with* the lesser offense of parading without a permit, the arrest decision would have been inconsistent with District policy.

In asserting that "plaintiffs had no notice of this restriction," plaintiffs refer to their perversion of the MPD policy, rather than the MPD policy, itself.. They confuse the MPD enforcement practice or their version of it with the restriction that results in arrest. This "restriction" is the combination of 24 DCMR §§ 705 and 707. This restriction is publicized.

Nevertheless, plaintiffs contend that, treating the text of the MPD Handbook as policy would result in the plaintiffs' arrests having been effectuated pursuant to a policy that was unconstitutional for lack of publication. They attempt to bolster this assertion by citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-08 (1972). At best, *Grayned* does not support plaintiffs.

In *Grayned*, the petitioner challenged, as ambiguous, the local anti-noise regulation under which he was convicted for having engaged in a demonstration that trial evidence reflected had interfered with the conduct of classes at a public school. As the Court noted, ambiguity is impermissible because "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. *Grayned*, **at 2299.** The Court held that the regulation was not unconstitutionally vague or ambiguous.

37

**C.    The Regulation and Enforcement Policy Are Not Unreasonable**

In *District of Columbia v. Edgcomb,* 305 A,2d 506 (D.C. 1973), the District of Columbia

Court of Appeals reviewed the judgment of the trial court holding a similar parading without a

permit regulation to be unconstitutional.[9] The trial court held the regulation to be

unconstitutional on its face, and found it to suffer from the fatal infirmities of giving the police

unfettered discretion in determining whether to grant, deny, or revoke parade permits; failing to

provide that applicants procedural safeguards or meaningful opportunity for judicial review of

police action under the regulation; being so vague and indefinite as to violate the due process

requirement of the Fifth Amendment and to chill the exercise of First Amendment rights; having

not been administered in a fair and evenhanded way by the police. *Id.* at 508-09.

Recognizing the need for the government to exercise some legitimate control over the

streets, the Court of Appeals reversed the trial court, reasoning Section 107 to be "merely a

traffic regulation purporting to regulate, for legitimate traffic considerations, only the time, place

and manner of processions and parades."  The Court did "not construe it to vest unlimited

discretion in the police as to granting or denying permits," or "as a tool for suppression of free

expression or assembly."  Thus, the prohibition or restriction survived the same criticism that

plaintiffs launch against the Public Space and Safety regulations and MPD's enforcement

thereof.

Plaintiffs cite no authority requiring that the non-discriminatory enforcement measures be

publicized in unambiguous fashion for the benefit of those who have violated the prohibition.

---

[9]    That regulation, Part I, Section 107 of the Traffic and Motor Vehicle Regulations of the District of
Columbia, provided as follows:

> Processions and parades, except funerals, shall not be allowed except by permit issued by the
> Chief of Police, which permit shall designate the time and route of such procession or parade, and
> no part of such procession or parade shall move except according to the terms of such permit.

That circumstances may cause the MPD to arrest persons who had violated the unambiguous regulations without affording warnings and an opportunity to come into compliance does not render the District's policy unreasonable or unconstitutional, as reflected by Judge Sullivan's denial of the *Barham* motion, with the District having affirmatively gone on record regarding the exceptions.

> **D.** **The Validity Of Plaintiffs' Arrests Survives Their Policy-Based Attack**

Plaintiffs' next contention reflects a flaw in their analysis that they depend on repeatedly throughout PSJM.  Plaintiffs argue that because the MPD Handbook provides that officials need not warn prior to arresting where time and circumstances dictate they respond to criminal activity without warnings, plaintiffs were arrested when MPD could have avoided their arrests.  PSJM at 17.  Their argument ignores that they were breaking the law from the time they massed in the roadway until the time they tried to run away from police after the assault on Riley's car.  Lanier had probable cause to arrest them *all*.

This argument suggests that plaintiffs believe that if they challenge the validity of a municipal policy, practice or custom, they demonstrate that a single act is unconstitutional. There is no support for that thinking.  Even if, hypothetically, a police department had, at one time. a lax firearms training program or review of deadly force usage mechanism, those facts would not dictate that every shooting by an officer of that department was an unconstitutional use of force.  Plaintiffs' attack on MPD policy does not invalidate their arrests.

> **E.** **Plaintiffs' Arrests Satisfy the Requirements of *Cullinane* and *Barham***

In discussing *Cullinane* and *Barham*, plaintiffs overlook critical distinctions between those cases and this. First, in both *Cullinane* and *Barham*, MPD arrested some persons for

whom they lacked probable cause to arrest. Second, in both *Cullinane* and *Barham*, the arrest

paperwork failed to document such probable cause as actually existed.

In this case, the arrestees were observed by MPD at all pertinent times. An undercover

officer monitored them in the AIC and moved with them throughout their march. A plainclothes

officer awaited their departure from the venue, observed them organize themselves outside the

church and followed them in an unmarked car throughout their route. Other plainclothes

personnel in another unmarked car pulled ahead of the march and observed the demonstrators

from in front of the march. Lanier's cruiser pulled up behind the march as it crossed 16th Street

and followed the march along the 1600 and 1700 blocks and down 18th Street. Lt. Riley and

CDU personnel were in position on 18th Street to observe the marchers assault on them. The

conduct observed by MPD officers and reported to Lanier throughout the preparation and

duration of plaintiffs' unlawful trek provided probable cause to arrest all of them.

Thereafter the MPD properly documented the probable cause supporting each arrest. A

Polaroid photograph was taken of each plaintiff with her/his arresting officer and attached to a

properly completed Field Arrest Form before each plaintiff was placed on board a transport

vehicle. When these arrestees were received at MPD's training academy, they were digitally

photographed with their respective arresting officers and computer-generated arrest paperwork

was completed. Each of these two sets of arrest paperwork satisfied the constitutional

requirements for establishing probable cause. *See Sullivan v. Murphy*, 478 F.2d 938, 946, 959-

60 (D.C. Cir. 1973). Accordingly, the District properly discerned, documented, and preserved

probable cause for the arrests of all plaintiffs.

F.    **Scienter Requirement Satisfied At Probable Cause Level**

Finally, plaintiffs argue that the District lacked probable cause to arrest plaintiffs because "[a]bsent a reasonably conveyed police announcement or order denying or revoking permission to march, there can be no probable cause for police to believe the demonstrators are *knowingly* demonstrating without police permission." PSJM at 20-21 (emphasis in original).[10]  Plaintiffs predicate their argument, erroneously, on their contention that "[i]t is undisputed that the time, place, and planned manner of plaintiff's march were such that District policy required the police to support the march at the outset, not prohibit it." PSJM at 21.  This is one of two factual errors in plaintiffs' argument, each of which defeats the argument.

First, as Chief Lanier makes clear in her declaration, this was not a march of the nature MPD was required to support at the outset, or at any point.  Lanier Decl.  In her declaration, Lanier explains that the permitting process in effect at the time provided criteria, which were to be applied by the MPD is determining whether to grant or deny written permit applications.  Lanier Decl.  In determining whether and how to allow a public space demonstration or parade that had no permit to proceed, the MPD applied those criteria which remained pertinent.  *Id.* MPD was not required to facilitate plaintiffs' mid-night, torch-bearing, drum-pounding march. *Id.*  MPD was unable to muster adequate manpower to safely compel a negotiation because the unannounced march started earlier than MPD was able to anticipate through real time intelligence gathering.  That the organizers – who knew there was no permit -- were able to get their unlawful demonstration underway did not require MPD to support the march.  Rather, it required MPD to respond to preserve public safety.

_____

[10]    This proposition reflects the precedent of this Circuit, in *United States v. Sheehan*, __ F.3d __, No. 07-3002 (D.C. Cir. Jan. 11, 2008), and un the 6th Circuit, *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F,3d 600-611-612 (6th Cir. 2005), holding that a statute or regulation making it an offense of demonstrators to parade or demonstrate of public space without a permit must contain a scienter requirement. Plaintiffs do not argue that the pertinent District regulations lack such a requirement.

Secondly, MPD had probable cause to believe that the marchers reasonably knew that there was no permit, as demonstrated above.

## VI.    No Injunction Should Issue

Plaintiffs reargue an issue that has already been decided by this Court in contending that their arrests were unlawful because "parading without a permit" was not a crime.  PSJM at 21-24.  In its July 26, 2006 Order, this Court held that "[t]he provisions regarding 'parading without a permit' were not unambiguously a civil offense." Decn at 6. "Given this ambiguity," this Court was to determine whether probable cause existed to support plaintiffs' arrest for parading without a permit in accordance with Doe, et al. v. Metro. Police Department of District of Columbia, et al., 445 F.35 460 (D.C. Cir, 2006).  Decn at 8.  Thus, whether parading without a permit is a civil or criminal offense under the Public Space and Safety Regulations is no longer an issue before this Court, notwithstanding plaintiffs' hostility to the precedent governing this matter, expressed in fn.10, at 22 of the PSJM.  The remaining issue regarding plaintiffs' arrest for parading without a permit following the Decn is whether the arrests were supported by probable cause as determined by the Circuit's analysis in *Doe*. Decn at 8-9.  The record before this Court demonstrates that plaintiffs' arrests were supported by probable, and that the District should be granted summary judgment on plaintiffs' First and Fourth Amendment claims. *Infra* at 9-20; 20-24; *see, e.g., Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (985); *Mt. Healthy City Sch. Dist.v. Doyle*, 429 U.S. 274, 287 (1977).

Nevertheless, plaintiffs, based on their contention that parading without a permit is a civil offense, argue that this Court should issue an injunction "against the custom, policy, or practice that caused or subjected the plaintiffs to arrest and that threatens to cause or subject future demonstrators to unconstitutional arrest." PSJM at 26 (citations omitted).  On the contrary, the

42

Court should dismiss plaintiffs' claim for injunctive relief with prejudice. As discussed above, plaintiffs' substantive claims upon which they seek injunctive relief should be dismissed, fatally to their injunction claim. *Washington Metro. Area Transit Comm'n v.Holiday Tours*, 559 F.2d 841, 843 (D.C. Cir. 1971).

Plaintiffs' claim calls upon the Court to issue a permanent injunction against a municipal policy that plaintiff have persistently misstated and sought to contort in their PSJM after doing so in the Lanier deposition. Plaintiffs' version of District policy, practice, or custom provides no basis for an injunction against the District.

In addition, an injunction of the nature they appear to seek is unworkable under Fed. R. Civ. P. 65. They call on the Court to craft an injunction against police action in response to a riot, which they label "a peaceful march," *see* PSOF ¶ 1. MPD acted in response to circumstances and demonstrator conduct that even plaintiffs acknowledge was rapidly changing for the worse. *See* Exh. 12 (Carr Rogs) at 19 (response #9); Exh. 13 (AKirk Rogs) at 12 (response #8). The District respectfully submits an injunction cannot be sufficiently narrowly tailored to comply with Rule 65 in response to the fluid and complex circumstances to which MPD responded in Adams Morgan on January 20, 2005. *See Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843 (D.C. Cir. 1985). An effort to craft an injunction as plaintiffs seek would foreseeably result in one that would prohibit police action in at least some situations to the detriment of the rights of affected non-demonstrators, public safety, and/or the safety of police officers. Accordingly, the injunction would disserve the public interest. See *WMATA, supra.*

Violent and destructive demonstrations commonly inflict damage specifically on merchants and businesses that serve the area in which such demonstrations break out. The Court may take judicial notice of the effects of the riots of 1967 in the District, the effects of the 1999

World Trade Organization meeting protests in Seattle, and the protestor-caused damage to

Adams Morgan businesses on January 20, 2005.  Accordingly, plaintiffs requested injunction

should be denied because of the undue prejudice an injunction threatens to third parties.  *See*

*WMATA, supra.*

Furthermore, counsel for these plaintiffs, in representing the plaintiff class in *Burgin, et*

*al, v. District of Columbia,* 03cv2005 (EGS), have acknowledged that the enactment of the First

Amendment Assemblies Act of 2004 and actions taken by MPD in accordance with the *Abbate*

have improved the environment for demonstrators in the District.  Exh. 15 (Burgin fairness

hearing tr.) at 11:21-13:19.  Upon this analysis pursuant to D.C. Circuit precedent, the Court

should grant the District's cross-motion to dismiss plaintiffs' claim for injunctive relief and deny

plaintiffs injunctive claim at this point in the litigation.

**VII.    The Court Should Deny Chelsea Kirk's Common Law Claims**

Chelsea Kirk claims that an officer improperly applied her flexcuffs too tightly and a

female, second officer intentionally tightened them further when Kirk complained of the

tightness.  After Kirk was flexcuffed, she was photographed next to her "arresting officer,"

Michael Topper, before she was placed on the transport vehicle.  Exh. 10 (Topper Decl. and C,

Kirk arrest photo I).  Kirk did not complain to Topper that her flexcuffs were causing her distress

at that point. Exh. 10.  After being transported to the MPD training academy for arrest

processing, Kirk was again photographed with Topper, for the computer-generated arrest

paperwork.  Exh. 10 (Topper Decl and C. Kirk arrest photo II).  Kirk did not complain to Topper

that her flexcuffs were causing her distress at that point, either.  Exh. 10.  In the course of being

arrest processed, Kirk was thumb-printed.  Topper removed her flexcuffs at that point and

replaced them with another pair.  In doing so he did not observe any injury to Kirk's wrists as

she describes and she did not complain of such injury. Topper applied the new flexcuffs in accordance with MPD standard operating procedures which require the officer to place one finger within the flexcuff band and tighten the cuffs only to the point that they press upon the officer's finger. *Id.* This procedure is intended to protect against injuries of the nature that Kirk claims. *Id.* Although it had been in place as a standard operating procedure prior to the *Abbate* settlement, its incorporation into MPD Handbook was expressly provided for in that settlement.

Inferentially, if Kirk had suffered the assault and battery and injuries of which she complained, she would have complained to Topper at the time. The record reflects she did not, and thereby creates a genuine issue of material fact regarding her claim. Accordingly. Plaintiffs; motion should be denied as to this claim.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

__/s/_Ellen Efros_____
ELLEN A. EFROS [250746]
Chief, Equity 1 Section

__/s/ Thomas L. Koger_____
THOMAS L. KOGER [427921]
Senior Assistant Attorney General

__/s/ Chad Copeland_____
CHAD COPELAND

__/s/ Jayme Kantor
JAYME KANTOR
Assistants Attorney General
441 4th Street NW
Suite 600 South
Washington, D.C. 20001

45

(202) 724-6610
Fax: (202)727-3625

Counsel for Defendant District of Columbia

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SARAH CARR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 06-00098 (ESH) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT DISTRICT OF COLUMBIA'S STATEMENT PURSUANT TO LCvR 7(h) OF MATERIAL FACTS AS TO WHICH DEFENDANT CONTENDS THERE ARE NO GENUINE ISSUES OF MATERIAL FACT IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, District of Columbia ("District"), by and through counsel, respectfully submits this Statement Pursuant To LCvR 7(h) Of Material Facts As To Which Defendant Contends There Are No Genuine Issues Of Material Fact In Support Of Defendant's Motion For Partial Summary Judgment.

1.    On the evening of January 20, 2005, plaintiffs Sarah Carr, Allyson Kirk, Chelsea Kirk, and Jonathan Scolnik attended an Anti-Inaugural Concert ("AIC") presented at the Sanctuary Theater, in a church located at 1459 Columbia Road, NW. Compt ¶ 18 (Dkt. 1)

2.    The AIC had been well-publicized in advance. Complt ¶ 18. The planned presentation of the AIC at the church at 1459 Columbia Road, NW, had been announced over the internet. Deposition of Sarah Carr, relevant pages of which are annexed as Exh. 17 ("Carr Dep.") at 86:21-87:10. *See also* Declaration of Jeffrey Madison, executed February 22, 2008 (a copy of which is annexed as Exh. 1 ("Madison Decl.") at ¶¶ 3-4.

3.      It is common for the Intelligence Section to monitor open and publicly accessible websites to ascertain whether there are events or activities planned to take place in Washington, DC, that may implicate issues of security or criminal activity. These include incidents having any relationship to the Presidential Inauguration. It was through this routine monitoring of open, publicly accessible websites that MPD learned of the Anti-Inaugural Concert ("AIC") planned for January 20, 2005, to be held at a church at 1459 Columbia Road, NW. It is the experience of officers in the Intelligence Section of the Metropolitan Police Department ("MPD"), is that private citizens seek information about activities in the District this same way. In particular, persons who seek out or wish to publicize demonstrations and related activities tend to utilize internet communications, including blogs and websites, for those purposes. Although the Intelligence Section learned of the AIC by monitoring the internet, we did not obtain any information about a possible march following from the AIC. Declaration of Jeffrey Madison, executed February 22, 2008 ("Madison Decl."), a copy of which is annexed as Exh.1, at ¶¶ 4, 5.

4.      Although the Intelligence Section learned of the AIC by monitoring the internet, we did not obtain any information about a possible march following from the AIC. Exh. 1 (Madison Decl.) ¶ 5.

5.      Fliers that announced that a march would take place following the AIC were distributed to persons at the AIC. Deposition of Allyson Kirk ("AKirk Dep."), relevant pages of which are annexed as Exh. 18 at 47:7-48:7. These Fliers were distributed to people as they entered the venue and were available for attendees to take from a table on the premises at ay time during the AIC. Exh.18 (A. Kirk Dep.) at 47:7-48:7. Carr, the Kirks, and Scolnik each received and read such a Flier. Compt ¶ 18 (Dkt. 1); J20 Counter Inaugural Ball Flier (Carr Dep Exh. 3) a copy of which is annexed as Exh. 11; Plaintiff Sarah Carr's Response To Defendant District Of

2

Columbia's First Set Of Interrogatories (relevant pages of which are annexed as Exh. 12), at 13

(response # 9); *see* Plaintiff Allyson Kirk's Response To Defendant District Of Columbia's First

Set Of Interrogatories (relevant pages of which are annexed as Exh. 13), at 12 (response # 8); *see*

Plaintiff Chelsea Kirk's Response To Defendant District Of Columbia's First Set Of

Interrogatories (relevant pages of which are annexed as Exh. 14), at 12 (response # 9).

      6.    The flier discussing the after-AIC march stated:

Protest March – After the Show!!!!

As we've said tonight's show is not a concert, it's a celebration and it's a
protest!!!  After Anti-Flag's last song we invite you to join in a festive march
from this show through the streets of DC to the doorstep of those in power.
We're going to take our resistance to one of the Inaugural Ball where Bush and
his supporters celebrate their power and privilege at the expense of all.

During the last song of the evening we will distribute buckets, and encourage
drumming, chanting and participation from all.  Dress warm and be prepared to
head out the door.  After the last song we'll exit the space and march down
Columbia Road towards 16th Street.  We imagine a large festive march, that takes
the amazing energy surging through tonight's show to create an explosive protest
against the war in Iraq and the war here at home as well as against all that Bush
represents.  We will march from the show to the Washington Hilton, located at
1919 Connecticut Ave NW.  This is the site of one of tonight's balls.  From the
march, we will engage in our own protests.  We will show people faces behind
those of us who resist this administration and sham.  We will march from 18th St
to Columbia, and make a left on 18th and a right on Florida to get to Connecticut.
We will bring people back to the show space afterwards as well.  Please
remember to be respectful of the people in the Columbia Heights area where we
are guests.  Watch your surroundings and keep the energy focused where it needs
to be – on showing the world our opposition to Bush.

Join us in the streets tonight to send one NO! to the Bush regime and a million
yeses to all of the things we can create together.

      Exh. 11 (Flier); *see also* Exh. 12 (Carr Rogs) at 19 (response #9); *see also* Exh. 13

(AKirk Rogs) at 12 (response #8); Exh. 14 (CKirk Rogs) at 12 (response #9).

      7.    Carr understood the flier to express "justifiable anger" Exh. 17 (Carr Dep.) at

35:14-22.

3

8.      The Flier provided a written plan for the March. Exh.18 (AKirk Dep") at 62:15-63:16. As provided for by the Flier's March Plan, the march was to organize and commence in a residential area after 11:00 p.m. Exh. 18 (A Kirk Dep.) at 61:20-62:2. The March Plan reflected in the Flier provided for the marchers to take their demonstration to the Hilton Hotel, at which an Inaugural Ball was being held. Exh. 18 (A Kirk Dep). at 63:20-64:4.

9.      Four bands performed during the AIC. They were "Anti-Flag," "Q And Not U," "1905," and "Del Cielo." Exh. 11 (Flier); Exh.17 (Carr Dep.) at 23:17-25:8, 32:20-33:11; Exh. 18 (A Kirk Dep.) at 44:4-5; Deposition of Jonathan Scolnik ("Scolnik Dep."), relevant pages of which are annexed as Exh. 19, at 53:4-11. Singers in at least two of these bands made announcements from the stage at the AIC informing the attendees of the march discussed in the flier. Exh. 17 (Carr Dep.) at 32:20-33:11; Exh. 18 (AKirk Dep.) at 50:6-51:12 (Anti-Flag, Justin Sane); Deposition of Chelsea Kirk (CKirk Dep.), relevant pages of which are annexed as Exh. 20, at 45:16-46:3 (person announced march plans from stage using microphone after Anti-Flag performance); Exh. 19 (Scolnik Dep.) at 50:6-51:9 (Anti-Flag announced and encouraged participation); *see also* Exh. 19 at 53:21-54:13 (person from anti-war group also made announcement from stage). These announcements were made with sound amplification to be audible to the more than 100 people present in the performance area. Exh. 17 (Carr Dep.) at 39:16-40:11; Exh. 20 (CKirk Dep.) at 45:16-46:3.

10.     Members of the Bands Q And Not U and Anti-Flag urged the people in attendance at the AIC to participate in the post-AIC march. Exh. 17 (Carr Dep.) at 42:6-43:17 (Chris Richards of Q And Not U urged participation in march); Exh. 18 (AKirk Dep.) at 50:6 -

51:1 (Justin Sane of Anti-Flag encouraged march participation); Exh. 19 (Scolnik Dep.) at 50:6–
51:9 (Anti-Flag announced and encouraged participation).

11.     The Flier and the announcements from the stage during the AIC provided "very
clear instructions" concerning where marchers were to meet, the march route, what the
participants should do following the march, and what the purpose or intent of the march was.
Exh. 18 (AKirk Dep.) at 169:10-22.  Those instructions also called for marchers to crash –
breach security at – the Inaugural Ball being held at the Hilton Hotel.  Declaration of Drew
Smith ("Smith Decl.") executed February 22, 2008, a copy of which is annexed as Exh. 2 ¶ 9.

12.     Jeffrey Madison is a Sergeant of the Metropolitan Police Department ("MPD")
and has been an MPD Officer since September 10, 1990.  On January 20, 2005, Madison was
assigned to the Intelligence Section of the Office of the Superintendent of Detectives within
MPD's Special Investigations Branch.  His duties and responsibilities that night included
relaying information obtained from an MPD undercover officer ("U/C") to Lieutenant Michael
Pavlik of the Special Investigations Branch.  Madison understood that the information that I
provided would be relied upon to guide decisions by MPD officials in deploying resources and in
seeking to protect against criminal misconduct. Exh. 1(Madison Decl.) at ¶ 3.

13.     Drew Smith is a Detective of the Metropolitan Police Department ("MPD") and
has been an MPD Officer since Nov 1992.  On January 20, 2005, Smith was assigned to the
Intelligence Section of the Office of the Superintendent of Detectives within MPD's Special
Investigations Branch.  His duties and responsibilities that night included monitoring the
activities of an MPD undercover officer ("U/C") and relaying information that the U/C provided
to him, by cell phone to Sgt. Jeffrey Madison of the Special Investigations Branch.  Smith was
also to relay information based on his own observations to Sgt. Madison.  Smith understood that

the information that he provided would be relied upon to guide decisions by MPD officials in deploying resources and in seeking to protect against criminal misconduct. Exh. 2 (Smith Decl.) executed February 22, 2008, a copy of which is annexed as Exh. 2, at ¶ 3.

14.    The U/C that Smith was monitoring was to attend an Anti-Inaugural Concert ("AIC") at a church located at 1459 Columbia Road, NW. The U/C was to arrive at the church at 1459 Columbia Road, NW, at about 7:00 p.m., and the concert was expected to run until midnight. The U/C was assigned to attend the AIC, which was open to the public, to gather intelligence regarding possible criminal misconduct that might be conducted in the aftermath of that day's Inaugural proceedings and in the context of the various Inaugural Balls being held in the District. Smith was working in plain clothes and driving an unmarked cruiser, in which he sat parked in the 1400 block of Columbia Road, NW during the AIC. Exh. 2 (Smith Decl.) ¶ 4.

15.    The officer Smith was monitoring was an experienced U/C, and had on numerous occasions worked in assignments dealing with self-proclaimed anarchists and persons who had espoused criminal misconduct as a means of forwarding their respective agendas. This officer had provided Smith credible information numerous times detailing the planning of criminal activity that was to occur at demonstrations/protests in the District of Columbia, and had never provided him with false information. Exh. 2 (Smith Decl.) ¶ 5.

16.    The U/C telephoned Smith at or about 9:00 p.m. The U/C advised that a possible protest march to follow the AIC was being discussed in the church. The U/C advised that the idea of such a march came as a surprise. AIC "organizers" wanted to have such a march, but only if enough people joined in to make the march "effective." The U/C relayed that the selection of bands for the AIC, specifically including the band Anti-Flag, had been intended to draw enough people to the AIC to provide for a large number of march participants. The U/C

6

advised Smith that the "anarchists" from Baltimore wanted to march, as did protestors from New

York. The U/C also told Smith that the venue was "packed" with people. The U/C informed

him that performers with the bands urged persons in attendance to march. Smith provided this

information to Sgt. Madison as he received it, and Smith estimated that the AIC had 500 persons

in attendance. Exh. 2 (Smith Decl.) ¶ 6.

17.    The U/C advised Smith that the march was to commence at the end of the AIC, at

about midnight. In preparation for the march, bandannas were provided by organizers with

which marchers could cover their faces. The U/C reported that, along with the bandannas,

organizers dispensed vinegar from spray bottles. Vinegar is commonly applied to bandannas in

such contexts because the vinegar mitigates the debilitating effect pepper spray and tear gas

when the bandannas are used as makeshift "gas masks." Exh. 2 (Smith Decl.) ¶ 7.

18.    The U/C also told Smith that "pipes," such as might be used to hold up banners,

were being distributed at the AIC. In prior instances, Smith had known of pvc pipes, suitable for

suspending banners, to be distributed, which contained lengths of rebar. Exh. 2 (Smith Decl.) ¶ 8.

19.    The U/C advised Smith of the intended march route, which the U/C said was

provided on Fliers distributed at the AIC and announced from the stage during the AIC.

According to the U/C, the route would go through Adams Morgan residential and commercial

areas and to the Hilton Hotel, where an Inaugural Ball was being held. The U/C told Smith that

the person announcing the march route from the stage said that marchers would "crash" ---

breach security at -- the Inaugural Ball and that some of the protestors had discussed engaging in

various types of property damage along the route from the AIC to the Inaugural Ball. Exh. 2

(Smith Decl.) ¶ 9.

20.    The original intent of the march was for the participants to proceed along the route set forth in the Flier and to arrive at and protest at the Hilton Hotel. Exh. 18 (AKirk Dep.) at 182:3-183:16.

21.    This intent was communicated to AIC attendees through the Flier and through announcements made during the AIC. Exh. 2 (A Kirk Dep.) at 184:7-10. The stage at the AIC had speakers on both sides and was 3-4 feet high. Exh. 2 (AKirk Dep.) at 43:7-44:8.

22.    Hundreds of people left the AIC with the shared intent of engaging in a demonstration consistent with the plan set forth in the Flier. Exh. 2 (A Kirk Dep.) at 183:17-184:6. Hundreds of people participated in the post-AIC march. Exh. 2 (A Kirk Dep.) at 183:17-20; Exh. 13 AKirk Rogs) at 12 (response # 8).

23.    Some time after 11:00 p.m., the U/C advised Smith that the AIC was being cut short and that the march would commence at about 11:30, instead of midnight. Smith communicated this to Sgt. Madison immediately. Exh. 2 (Smith Decl.) ¶ 10.

24.    At some point after 11:00, Smith observed 500 or more people exit the church onto Columbia Road, NW. Some departed the church and walked eastward along Columbia Road, NW, departing the area. The majority of the people leaving the church, however, moved westward and congregated in the intersection of Columbia Road, NW, and 16th Street, NW. The U/C advised Smith that poles that had been distributed in the church were being used as the handles of torches. The torches consisted of the poles with soup cans containing flaming fluids. From where Smith was located in front of the church, he could see numerous flaming torches held aloft by persons in the crowd that had emerged from the church. The U/C communicated that the U/C felt that the crowd could become violent. Exh. 2 (Smith Decl.) ¶ 11.

8

25.    On January 20, 2005, Sgt. Madison also had the opportunity to observe hundreds

of persons, who had attended an Anti-Inaugural Concert at 1459 Columbia Road, form a group

near 16th Street NW, and Columbia Road, NW.  As the group formed, some individuals were in

possession of some type of homemade torch.  These torches were then distributed amongst

persons in the group and carried by these persons, aflame, as they marched along the roadway of

Columbia Road, NE.  These torches appeared to be made of a dowel a couple of feet long, to

which a soup can, apparently containing a flammable substance was connected.  Exh. 1

(Madison Decl.) ¶ 7.

26.    Madison had previously viewed a training video depicting the use of such torches

by demonstrators to propel flaming liquid or gelatinous material.  Accordingly, Madison viewed

the torches that these marchers carried as having the potential to be used as very dangerous

weapons.  Exh. 1 (Madison Decl.) ¶ 8.

27.    On January 20, 2005, Madison promptly relayed all information that he received

from MPD Detective Drew Smith to Lieutenant Pavlik, with whom Madison was riding in an

unmarked MPD cruiser at the time.  Madison heard Lieutenant Pavlik relay all that same

information to then-Commander Cathy Lanier.  Exh. 1 (Madison Decl.) ¶ 6.

28.    Some participants in the march wore bandannas or masks covering part or

all of their faces to conceal their identities.  Exh. 2 A. Kirk Dep. at 179:8:- 180:8.  Some

of the marchers carried torches.  Exh. A. Kirk 56:19-20; Brandon Jourdan.  The torches

carried by the marchers were similar.  Exh. 18 (A Kirk Dep.) at 58:18-59:3.  The

common appearance suggested that they were manufactured according to a common plan.

Exh. 18 (A Kirk Dep.) at 58:18-60:7.  Numerous marchers played plastic buckets as

drums.  Exh. 18 (A Kirk Dep.) at 56:16-57:5 (drummers were all through out the crowd;

it sounded like more than 10 from A. Kirk's vantage point near the rear of the march.)

30.     After spending five to 10 minutes getting organized, this group of approximately

250 to 300 persons marched westbound on Columbus Avenue.  The U/C was within the group of

marchers and Smith followed behind the march in his unmarked cruiser.  Exh. 2 (Smith Decl.).

When the march commenced outside the AIC venue, more than 100 people assembled on

Columbia Road in front of the church.  The marchers occupied all open lanes of Columbia Road

and also the adjacent sidewalks.  Exh. 18 (AKirk Dep.) at 55:5-56:11.

31.     The 1600 block of Columbia Road. NW, is predominately residential, with

apartment buildings on both sides of the street.  The marchers filled the entire roadway along that

block, and Smith does not recall having seen any of them walking on the adjacent sidewalks.  As

they marched, this group held numerous torches aloft and pounded away loudly on plastic

buckets, which served as drums. Exh. 2 (Smith Decl.) ¶ 13.

32.     As Smith proceeded along Columbia Road, NW, behind the marchers, marked

MPD cruisers moved alongside him.  March participants took newspaper vending boxes from the

sidewalks and laid them on their sides to block the roadway and keep the MPD from following

them.  However, the boxes were removed and Smith resumed his monitoring of the U/C and the

march.  The U/C reported that protestors riding bicycles with the march used their bikes to block

traffic at intersections. Exh. 2 (Smith Decl.) ¶ 14.

33.     As the march progressed, the group repeatedly chanted "Black Bloc, Black Bloc."

The U/C advised Smith at that point that groups of marchers formed clusters and pulled up

bandannas and other items of clothing to conceal their features. The U/C reported to Smith that

the U/C observed persons within the march propel missiles with "wrist rocket" slingshots to

break windows of businesses, saw a banner drop from the "Starbucks" at 18th Street, NW, and

Columbia Road, NW, saw protesters throwing news vending machines into the street, observed

protesters throwing what appeared to be a large brick or piece of concrete through the window of

the MPD's Latino Liaison Unit; had seen bricks thrown at buildings by marchers, and saw march

participants spray paint anarchist symbols on buildings and a spray paint a car along the march

route. Exh. 2 (Smith Decl.) ¶ 15.

34.     Smith could hear firecrackers being set off in the vicinity of the march, as it

crossed 18th Street. Exh. 2 (Smith Decl.) ¶16.

35.     Smith relayed this information reflected in ¶¶ 11, 15-19, 23, 31-33, above, to Sgt.

Madison as he received it from the U/C or personally observed it. Exh. 2 (Smith Decl.) ¶17.

36.     Patrick Keller is a Metropolitan Police Department ("MPD") Officer and has been

a member of the Department since May 21, 1990.  On January 20, 2005, Keller was assigned

Special Operations Division, Commander Cathy Lanier's Office.  Declaration of Patrick Keller,

executed on February 22, 2008 ("Keller Decl."), a copy of which is annexed as Exh. 3, at ¶ 3.

37.     On January 20, 2005, in response to information provided to then-Special

Operations Division ("SOD") Commander Cathy Lanier, by officers in the MPD Intelligence

Section, Commander Lanier determined that it was necessary to send MPD Civil Disturbance

Unit ("CDU") personnel to Columbia Road, NW, between 16th and 18th Streets, NW, and to 18th

Street, NW, after 11:00 p.m. that night to respond to a civil disturbance there.  Commander

Lanier also reported to that location, in marked MPD cruiser 18, driven by Lt. Ralph Ennis.

Keller traveled in Cruiser 18, as Commander Lanier's scribe. Exh. 3 (Keller Decl.) ¶ 4.

38.     Lanier, Ennis and Keller proceeded from SOD headquarters at 2300 L Street NW,

and arrived at Columbia Road, NW, along north bound 16th Street, NW.  A group of more than

200 persons already crossed the intersection of 16th Street, NW, and Columbia Road, NW, when

they reached that intersection and upon turning onto Columbia Road, NW, the marchers did not

notice marked Cruiser 18 for several moments. Many of the members of the group had

bandannas or other cloth items covering parts of their faces. Many of the members of the group

were banging loudly on plastic buckets being used as drums, and a number of the group

members were carrying flaming torches. The group was loud and boisterous as it crossed the

intersection. Exh. 3 (Keller Decl.) ¶ 5.

     39.    Cruiser 18 turned left onto Columbia Road, NW, and trailed the group. Along the

1700 block of Columbia Road, NW, members of the group committed a variety of acts of

vandalism. In addition to people spraying paint on buildings and cars, persons within the group

were throwing missiles at windows of various storefronts, breaking those windows. Windows

were broken in the CitiBank at 1749-1/2 Columbia Road, NW, in the Kentucky Fried Chicken

restaurant at 1753 Columbia Road, NW, in the Popeye's restaurant at 1755 Columbia Road, NW,

in the Riggs Bank at 1779 Columbia Road, NW. Each time a window was broken, the group

cheered and its members raised their arms. This occurred more than six times as the mob

traveled in the roadway of the 1700 block of Columbia Road, NW. It appeared that the entire

group was engaging in the celebrations as they moved near the intersection of 18th Street, NW,

and Columbia Road, NW, and that the level of violence was escalating. When Cruiser 18

reached the Sun Trust Bank at 1800 Columbia Road, NW, members of the mob broke several of

the bank windows. The mob then cheered and its members raised their arms in celebration. The

MPD Latino Liaison Unit ("LLU") Office is located on the end of the Sun Trust Bank building

on the second floor. Someone in the group hurled a rock or brick through the window of LLU

Office, causing it to break with a loud crash, which was once again followed by loud cheering

and arm waving from what appeared to be everyone in the group. Keller could see and hear this clearly from inside Cruiser 18, when the car was farther from the LLU Office window than the front door of Madam's Organ, at 2461 18th Street, NW, is from the LLU Office window. The front door of Madam's Organ is nearly directly across 18th Street, NW, from the LLU Office window. Exh. 3 (Keller Decl.) ¶ 6.

     40.     A few minutes after the LLU window was broken, MPD Lt. Jimmie Riley turned off of Columbia Road, NW, onto 18th Street, NW, in an MPD marked cruiser, along with CDU 43 personnel in MPD vans. Someone in the mob threw a brick into the windshield of Riley's cruiser, shattering it. Once the windshield was broken, many bottles and other missiles were thrown by the mob at Lt. Riley's car and the vans. Exh. 3 (Keller Decl.) ¶ 7.

     41.     Lt. Riley was the Lieutenant in command of CDU Platoon 43 that night. The four 8-member squads that comprised CDU Platoon 43 were adjacent to Riley at this point. When they emerged from the transport vans, wearing riot gear, the mob ran southward along 18th Street, NW, with members running westward into an ally between Belmont Road, NW, and Riley's cruiser. MPD officers caught the members of the mob who ran into the ally and then ran north into a dead-ended spur off the main alley. Keller was able to see the arrested mob members who had run up the spur through the chain link fence at which the spur dead-ended. Exh. 3 (Keller Decl.) ¶ 8.

     42.     During the time that the mob was breaking the LLU window, throwing missiles at Riley's cruiser and the CDU vans, and then running away, hundreds of uninvolved onlookers on the sidewalk on the east and west sides of 18th stood by undisturbed by the MPD. Exh. 3 (Keller Decl.) ¶ 9.

43.     Keller has examined a number of photographs taken by MPD's Mobile Crime Unit of parts of the march route and of Lt. Riley's car. As be testified through his attached declaration, these photographs, which bear Exhibit ##'s 101- 124 fairly and accurately depict the damage caused by the rioters to the subjects they portray. Exh. 3 (Keller Decl.) ¶ 10.

44.     Jimmie Riley is a Lieutenant of the Metropolitan Police Department ("MPD") and has been a member of the Department since June 1970. On January 20, 2005, Riley was assigned as the Lieutenant in charge of MPD Civil Disturbance Unit ("CDU") Platoon 43. His duties and responsibilities throughout that day had been to respond to calls for CDU support. A CDU Platoon consists of four eight-person squads. Declaration of Jimmie Riley executed on February 22, 2008 ("Riley Decl."), a copy of which is annexed as Exh. 4, at ¶ 3.

45.     After 11:00 p.m. that night, Riley received a radio communication directing that CDU 43 Platoon don their protective ("riot") gear and report to Columbia Road and 18th Street. Riley was assigned a marked MPD cruiser in which he responded as directed. The CDU 43 responded in vans along with him. As Riley approached his destination, he came upon a large boisterous group of people marching in the roadway as a unit. Exh. 4 (Riley Decl.) ¶ 4.

46.     When Riley got near the group, someone threw a rock or a brick that hit Riley's cruiser windshield and broke it. Once that happened, rocks and bottles started flying in the air from all directions toward Riley's car and the vans transporting CDU Platoon 43. Exh. 4 (Riley Decl.) ¶ 5.

47.     The mob in the roadway then started running south along 18th Street, NW, in the direction of Belmont Road, NW. There is an alley running from 18th Street, NW, to Columbia Road, NW, some distance north of Belmont Road, NW, which also runs from 18th Street, NW, to Columbia Road, NW. CDU Platoon 43 and Riley, along with their vehicles, were north of the

14

alley. MPD CDU personnel had physically formed a police line across 18th Street, NW, from

building line to building line, south of the alley. Some of the people from the mob that were

running away ran west, into an alley, before reaching Belmont Road, NW. Riley and members

of CDU Platoon 42 followed these people and arrested them in that alley. Exh. 4 (Riley Decl.) ¶

6.

48.    Cathy L. Lanier is the Chief of Police of the Metropolitan Police Department

("MPD" or "Department") and has been a member of this Department since September 1990.

Her first week on the job, Lanier was posted at 17th Street, NE, Mount Pleasant, and at Mount

Pleasant Park during the Mount Pleasant riots. Declaration of Cathy L. Lanier executed February

22, 2008 ("Lanier Decl.") a copy of which is annexed as Exh. 5, at ¶ 3.

49.    Prior to being appointed Chief, Lanier held the position of Commander, Special

Operations Division ("SOD"), of the MPD. Among the diverse responsibilities of the SOD are

planning for large scale demonstrations within the District of Columbia, providing security along

the Presidential Inaugural Parade route, providing motor escorts for the President, Vice-

President, and other dignitaries, and responding to notifications of First Amendment Assemblies

in accordance with the First Amendment Rights and Police Standards Act of 2004 ("Act"). Prior

to the April 13, 2005 effective date of the Act, as SOD Commander, Lanier responded to

applications for permits to conduct parades and demonstrations on public space in accordance

with the District of Columbia's Public Space and Safety Regulations, set forth in 24 D.C.M.R.

Chapters 100 and 700. Lanier responded to such permit applications under authority delegated

to her as the SOD Commander by then MPD Chief Charles H. Ramsey. Exh. 5, (Lanier Decl.) ¶

4.

50.    During the evening of January 20, 2005, Lanier received numerous cell phone calls from MPD Intelligence Section Lieutenant Michael Pavlik.  Pavlik reported to Lanier information that he advised her he had received from an MPD undercover ("U/C") officer assigned to attend the Anti-Inaugural Concert ("AIC") at 1459 Columbia Road, NW.  The U/C, through Pavlik and his other handlers informed Lanier that a Flier had been distributed at the AIC, which announced that a march would follow from the AIC.  The Flier indicated the route the March would take and that it would lead to an explosive protest in Adams Morgan.  After that, Lanier was advised Marchers would proceed to the Washington Hilton and attempt to breach security to "crash" the inaugural Ball going on there.  Pavlik informed Lanier that the U/C anticipated that protestors would engage in violence.  Lanier was further advised that AIC performers were urging people to take part in the protest. Exh. 5, (Lanier Decl.) ¶ 5.

51.    Lanier knew that no permit, as required by District municipal regulations, had been applied for or granted for any such march or demonstration. Exh. 5, (Lanier Decl.) ¶ 6.

52.    In the instance of plaintiffs' march, when Lanier proceeded to Columbia Road, NW, and 16th Street, NW, a group of more than 200 persons had already crossed the intersection of 16th Street, NW, and Columbia Road, NW, when Cruiser 18 reached that intersection.  Cruiser 18 turned left onto Columbia Road, NW, traveling westbound behind the marchers.  They did not appear to notice the marked Cruiser 18 for several moments.  The march was violent and disorderly, and endangering public safety.  Many marchers were carrying flaming torches and using them to set debris in trash containers on fire.  This mob caused significant property damage in the 1700 block of Columbia Road, NW.  Further, Lanier anticipated, based on what she had observed and had been informed by subordinate officers, that if allowed to continue, the march would continue to escalate in violence and property damage and would foreseeably cause

16

injuries to persons in the area. For these reasons, the march was not "one that District policy", as reflected in 24 DCMR § 705 or by MPD practice, "required the police to support," as plaintiffs assert at page 10 of their brief. Exh. 5, (Lanier Decl.) ¶ 7.

53.     Lanier ordered two CDU platoons to 18th Street, NW, to respond to the march. Exh. 5, (Lanier Decl.) ¶ 8.

54.     The MPD did not prohibit the march. The marchers staged near the church, as it was reported to Lanier. They proceeded in the roadway of Columbia Road. Marchers used torches t set fir to debris in trash receptacles. Participants used newspaper boxes to block the roadway and damaged cars and buildings, cheered on and supported by numerical strength of the rest of the group. As windows were broken by rocks and bricks thrown by people in the group, the group cheered and raised their arms in apparent celebration of the destruction. This response was not that of just a few individuals; it was a group response. The MPD could not support this riotous criminal conduct. Accordingly, Lanier ordered the rioters to be arrested. Exh. 5, (Lanier Decl.) ¶ 9; Exh. 7 (Lanier Tr.) at 35:25-38:10, 40:12-42:20; 51:15-52: 5; 53:4-154:12; 62:19-64:4; 66:12-67:7, 70:12-71:13.

55.     Lanier determined that probable cause existed for these arrests for rioting based on reports of subordinates and her own observations, including those of events reflected in the District's responses to interrogatories in this case and in the declarations of Jimmie Riley, Jeffrey Madison, Drew Smith, and Patrick Keller in this matter. Having determined that she had probable cause to arrest the marchers for rioting, Lanier ordered that the Field Arrest paperwork, which was properly completed on the scene, reflect the lesser charge of parading without a permit so that the arrestees could avail themselves of expedited release mechanisms that would not apply if she charged them with rioting. Exh. 5 (Lanier Decl.) ¶ 10.

56.    Each of the plaintiffs was arrested, as reflected by the "Brief Description of Facts and Circumstances Surrounding Arrest" in their respective Field Arrest Forms, which collectively comprise Exh.s 21-5

> The offense occurred on January 20, 2005 at 2320 hours at the location of 16th Street and Columbia Road, NW. A group of approximately 250 individuals formed as a group and concealed their identities with the use of masks, scarves, and shirts. They moved as a group westbound on Columbia Road blocking all westbound traffic lanes and one eastbound traffic lane. In the 1700 block of Columbia Road the group began arbitrarily destroying mailboxes, light posts, and spray painting vehicles and buildings. They continued into the 1800 block of Columbia Road and turned South on 18th Street where a majority of the individuals were stopped and arrested. No permit was issued for this event. I [Arresting Officer] observed the above-listed demonstration and arrested D-1. I was assigned to Civil Disturbance Unit [Unit number].

57.    The hundreds of persons who participated in the march and demonstration agreed to a common plan of action through their participation. Exh. 18 (AKirk Dep.) at 183:17-184:16.

58.    On January 20, 2005, Allyson Kirk and Chelsea Kirk went to the AIC "with full intention to participate in any revolutionary action that might take place that night." Exh. 18 (AKirk Dep.) at 65:12-68:9; Allyson. Kirk's January 31, 2005 Blog, a copy of which is annexed as Exh. 26..

59.    Allyson Kirk contemplated physical "direct action" in the revolutionary action that she and Allyson Carr went to the AIC "with full intention to participate in . . ." Exh. 18 (A Kirk Dep.) at 70:4-14.

60..    Allyson Kirk understood as of January 20, 2005 that direct action would in some instances include civil disobedience. Exh. 18 (AKirk Dep.) at 70:4-14.

61.     Allyson Kirk admits that there's a fairly broad continuum of conduct that in the range of militant direct action and controlled protest.  Exh. 18 (AKirk Dep.) at 85:13-18.

62.     On January 20, 2005, the direct action engaged in by March participants included drumming, chanting, and carrying flaming torches as they marched after 11:00 p.m. along District roadways through a residential neighborhood and then on the roadways of a commercial area, blocking the lanes of roadways, rock and brick throwing, window breaking, the hurling of missiles at persons on the sidewalks of Adams Morgan and at uniformed MPD officers, hitting a marked MPD cruiser with various missiles, and the cheering of destruction of property.  Exh. 2 (Smith Decl.) ¶¶ 13-15;  Exh. 3 (Keller Decl.) ¶¶ 5-10; Exh. 4 (Riley Decl.) ¶¶ 4-5; Exh. 5 (Lanier Decl.08) ¶¶ 7, 9; Declaration of Cathy Lanier, executed June 19, 2006, a copy of which is annexed as Exh.6, at ¶¶ 6-8; Transcript of Deposition of Cathy L. Lanier, taken on September 13, 2007, in her individual capacity and as designee of defendant District of Columbia ("Lanier Tr."), relevant pages of which are annexed as Exh. 7, at 35:25-38:10, 40:12-42:20; 51:15-52: 5; 53:4-154:12; 62:19-64:4; 66:12-67:7, 70:12-71:13; Defendant's Responses To Plaintiffs' First Set Of Interrogatories To the District Of Columbia ("DC Resp.") a copy of which is annexed as Exh. 8, response #1.b.

63.     The marchers participated in their demonstration with solidarity and unity.  Exh. 18 (AKirk Dep.) at 71:22-73:21.

64.     Militant direct action, including civil disobedience, as engaged in along the March route on January 20, 2005, was to "be respected and valued as an important part of the movement as, and in addition to, controlled marches," in Allyson Kirk's

perspective. Exh. 18 (AKirk Dep.) at 82:22-83:9; 83:18-22; see alsoAllyson Kirk's Blog,

a copy of which is annexed as Exh. 26..

65.     Allyson Kirk states that "[a]cts such as the Adams Morgan march,

although criticized by some, can cause enough disruption to force our cause to be heard."

Exh. 18 (AKirk Dep.) at 85:13-89:4.

66     Shortly before Commander Lanier ordered the arrests, a pair of MPD

marked cruisers followed the marchers, protecting them from traffic attempting to move

along the roadway behind the march, which occupied multiple lanes at that point. Exh.

18 (AKirk Dep.) at 87:4-21.

67.     A person on the left side of the group of marchers near the rear of the

march threw a rock or brick into the windshield of one of the readily identifiable MPD

cruisers protecting the rear of the march. Exh. 18 (AKirk Dep.) at 87:4-21; 88:10-90:11;

95:1-14.

68.     The person who threw the missile was five or six people deep into the

group of marchers, and 20 -30 marchers were in a position to observe the person throw

the missile that struck the windshield of the MPD cruiser. Exh. 18 (A Kirk Dep.) at

94:12-95:4.

69.     Allyson Kirk observed the brick thrown from within the crowd, and

recognizes that she witnessed the commission of a crime in the throwing of the missile

into the windshield of the cruiser. Exh. 18 (AKirk Dep.) at 90:2-94:11.

70.     No participant in the march attempted to apprehend or to identify to police

officers the individual who threw the missile. Exh. 18 (A Kirk Dep.) at 87:4-21; 88:10-

90:11; 95:18-96:15.

71.    Allyson Kirk admits that participants in the March engaged in destructive and violent conduct. Exh. 18 (A Kirk Dep.) at 135:12-136:1.

72.    Allyson Kirk, Chelsea Kirk and their companion Josh observed two persons spray paint buildings as the Kirks and Josh participated in the march. These two persons, who the Kirks and Josh observed commit conduct that Allyson Kirk characterizes as "vandalism," ran up along the right side of the march from behind where the Kirks and Josh were near the rear of the march. These two vandals "spray painted on buildings on the right side where we [the Kirks and Josh] were."  "[T]he people with the spray painting finished their symbols on the buildings that they were doing near us [the Kirks and Josh]." They "then ran along the sidewalk on the right-hand side up past of the march." The Kirks and Josh did not distance themselves from the march after observing this criminal activity because "we felt okay. It felt comfortable about continuing with the march because the mood of the march was, you know, still very upbeat, still very positive." Exh. 18 (AKirk Dep.) at 170:2-172:7.

73.    Plaintiffs' contention, in paragraph 35 of their Statement Of Undisputed Material Facts In Support Of Plaintiffs' Motion For Partial Summary Judgment on Liability ("Pls Facts") that then-existent "District of Columbia policy  required the MPD to support, not prohibit, street marches that did not have written permits, including street marches at the time and place of plaintiffs' march and marches conducted in the same manner as that which police knew was planned for plaintiffs' march" is not true. Exh. 5, (Lanier Decl.) ¶ 12.

74.    Prior to the effective date of the Act, groups of 25 or more persons seeking to parade or demonstrate on District of Columbia public space were required to obtain a parade/demonstration permit from MPD. The application and issuance processes were administered by the SOD. The applicant was required to provide an estimate of the number of

participants, the location or route to be used, the date and time of the parade/demonstration, the number and description of vehicles, if any, to be used in the parade/demonstration, sound generation and amplification devices, generators, and other apparatus as might be used. Exh. 5, (Lanier Decl.) ¶ 13.

75.     The SOD could respond to the application by granting a permit to conduct the parade/demonstration just as reflected in the application. The SOD could also issue a permit authorizing the applicant to proceed with the parade/demonstration on terms based on, but modified from, those stated in the application. Finally, the SOD could deny the permit outright. Exh. 5, (Lanier Decl.) ¶ 14.

76.     The decision of whether to permit the event as described in the application, in modified form, or not at all, was in all cases governed by the criteria set forth in 24 DCMR § 705.2. Modifications might be required for a number of reasons. Some locations and routes are in significant demand. As a result, a permit might be issued to authorize the event to take place at times other than the requested "start" time or "end" time, or even on a date other than that requested, because the location or route had previously been permitted to another event. Exh. 5, (Lanier Decl.) ¶ 15.

77.     Further, the use of requested sound generation and amplification might be denied based on the requested time and location. SOD would be unlikely to issue a permit for a parade utilizing equipment capable of generating high decibel sounds late at night or early in the morning, or in the immediate vicinity of a nursing home or hospital or such other location at which such sound generation could adversely affect the wellbeing of residents or patients. Exh. 5, (Lanier Decl.) ¶ 16.

78.     In addition, the SOD commonly included restrictions or limitations in permits for events in the immediate vicinity of the White House and a number of other sites, the security of which present critical concerns.  All such limitations were to be based on the application of standards set forth in 24 DCMR § 705.2.  In some instances, the restrictions and limitations were determined following consultation with the United States Secret Service and/or the Office of the Attorney General for the District of Columbia ("OAG"). Exh. 5, (Lanier Decl.) ¶ 17.

79.     Generally, when the SOD felt a need to authorize a permit modified from the terms requested, in accordance with the standards set forth in 24 DCMR § 705.2, an SOD Captain would engage in discussions and negotiations with the applicant.  By doing this, the SOD was able to provide alternatives in some cases, working with the applicant to reach a compromise for a modified permit that would best fit the applicant's objectives. Exh. 5, (Lanier Decl.) ¶ 18.

80.     SOD rarely, if ever, during Lanier's tenure as Commander, from August 2002 through December 2006, denied a permit altogether.  Lanier is unable to recall a single instance during her command that the SOD granted no permit in response to an application. Exh. 5, (Lanier Decl.) ¶ 19.

81.     It was also the practice of the MPD to attempt to facilitate demonstrations and parades for which the organizers had not obtained a permit, when MPD personnel encountered them on public space.  More often than not, when an MPD officer came upon an unpermitted demonstration, an official from the SOD would be contacted.  The SOD official would then attempt to negotiate the parameters of the event, as it would be allowed to proceed. Exh. 5, (Lanier Decl.) ¶ 20.

82.    MPD's ability to facilitate such marches depended significantly on the Department's ability to obtain the agreement of the marchers to conduct their marches on terms that the MPD could safely accommodate.  Therefore, MPD's ability to facilitate an unpermitted march depended significantly on the Department's ability to identify leaders or organizers who could negotiate on behalf of the marchers as a whole and who could obtain the cooperation of the marchers as a whole.  Further, MPD's ability to facilitate an unpermitted march also depended on the size of the group and its willingness to confine its course, compliance with traffic control mechanisms, and lane usage within terms that the Department could safely accommodate, based on location, time of day, and available staffing.  The process of facilitating an unpermitted march commonly involves compromise by the marchers, as does the process of issuing a permit.  Exh. 5, (Lanier Decl.) ¶ 21.

83.    However, in carrying out this practice, the official was to be guided by standards, consistent with those of 24 DCMR § 705.2, for determining the manner and extent to which a parade or demonstration lacking a permit would be accommodated.  While some of the criteria set forth in § 705.2 are inapplicable in this on-scene process, others informed the official's decision, such as: whether the conduct of the parade would substantially interrupt the safe and orderly movement of other vehicular and pedestrian traffic contiguous to its route; whether the conduct of the parade would require diversion of such numbers of police officers from their normal police duties that the city would be deprived of reasonable police protection; whether the concentration of persons, animals, and vehicles in the assembly and disbanding areas and along the parade route would substantially interfere with the movement of police, fire, ambulance, and other emergency vehicles on the streets; whether the parade would likely move along its route and then disband expeditiously and without unreasonable delays en route; whether the parade

24

would substantially interfere with any other parade for which a permit has already been granted; whether the parade is to be held for the sole purpose of advertising for private gain any product, merchandise, contest, or event; and whether the parade would create a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant property damage. Exh. 5, (Lanier Decl.) ¶ 22.

84.    Further, whether an event is provided a written permit through the conventional application process, or authorized to proceed through an on scene approval by an MPD official, the event is only given an approval that is subject to revocation. If the event should deviate materially from the terms of its written permit or the terms upon which it was authorized by the on scene official, or come to pose a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant property damage or public safety hazard, the MPD could revoke the permit or authorization immediately. Exh. 5, (Lanier Decl.) ¶ 23.

85.    Further, if Lanier had been at the scene when the group of AIC attendees gathered outside the church, she would not have authorized them to march as they did. Lanier would not have authorized them to play their drums in the residential area. Lanier would not have authorized them to carry any torches. Lanier would not have authorized them to occupy more than one lane at any point. Lanier would have imposed restrictions that were consistent with the criteria of 24 DCMR § 705.2. Lanier would not have authorized the march to proceed through Adams Morgan along the course the marchers intended without a police escort. Exh. 5, (Lanier Decl.) ¶ 24.

86.    As SOD Commander, Lanier was kept apprised of developments in mass demonstration litigation and consulted regarding potential settlements. In this context, Lanier was timely informed that plaintiffs in *Barham v. Ramsey* had sought an injunction, on

constitutional grounds, to prevent the District from arresting persons for parading without a permit.  Lanier was also timely informed that Judge Sullivan had denied the motion based on the District's representation that MPD would not arrest persons for parading without a permit without providing such persons a warning and opportunity to comply – subject to exceptions in certain circumstances. Exh. 5, (Lanier Decl.) ¶ 25.

87.    Lanier was consulted in mid- through late 2004 and early 2005 regarding matters that resulted in the settlement of *Abbate v. Ramsey*.  Specifically, she was consulted regarding proposed requirements regarding the handbook governing MPD's responses to mass demonstrations.  Accordingly, Lanier knew, prior to January 20, 2005, that the *Abbate* plaintiffs, through their attorneys had agreed to the inclusion of certain provisions in that handbook as terms of the *Abbate* settlement.  In particular, she knew that the settlement required the handbook to reflect that:

> An assembly of persons will not be arrested simply because the group does not possess a permit.  Such an arrest may only occur after an order to disperse has been clearly communicated three times in a manner that is reasonably calculated to be heard by each of the persons in the group and after reasonable opportunity to disperse has been afforded, to the extent that circumstances reasonably permit, without increasing the risk of injury to persons or property through the actions of a substantial number of the assembly of persons.

Exh. 5, (Lanier Decl.) ¶ 26; *see also Abbate* Settlement Agreement, fully executed as of January 17, 2005, a cpy of which is annexed as Exh. 27.

88.    In April 2000, Lanier was responsible for processing of prisoners arrested in the context of the International Monetary Fund/World Bank meetings then being conducted in the District.  On that basis, Lanier knew that the MPD had arrested hundreds of persons on April 15, 2000 on the charge of parading without a permit for having engaged in a snake march along District roadways. Exh. 5, (Lanier Decl.) ¶ 27.

89.    As of January 20, 2005, Lanier also knew that then-MPD Assistant Chief Brian Jordan had ordered the arrest of more than 150 persons on Vermont Avenue between K and L Streets, NW, on September 27, 2002, for parading without a permit without having issued warnings. Lanier is aware that Jordan had not given warnings because the demonstrators had marched out of Franklin Square Park into morning rush hour traffic on K Street, creating an immediate danger to themselves and others. She also understands that the persons Jordan arrested could properly have been arrested for and charged with disorderly conduct or unlawful assembly. Exh. 5, (Lanier Decl.) ¶ 28.

90.    As of January 20, 2005, Lanier was also aware that the Office of the Corporation Counsel/Office of the Attorney General had prosecuted arrests from both the April 15, 2000 event and the Jordan event. Moreover, Lanier understood that persons who had been arrested for parading without a permit in the April 2000 mass arrest and had refused to identify themselves when presented in D.C. Superior Court had been held in the D.C. Jail until they identified themselves, generally pleading to a lesser charge after serving time in the Jail. Exh. 5 (Lanier Decl.) ¶ 29.

91.    In assisting in the District's response to plaintiffs' motion for partial summary judgment, MPD Commander (and former Assistant Chief) Brian K. Jordan has reviewed the testimony that he gave in an Executive Session deposition conducted by the Judiciary Committee of the District of Columbia Council, which has been quoted by plaintiffs at pp. 13 and 14 of the Memorandum In Support Of Plaintiffs' Motion For Partial Summary Judgment On Liability ("Pls Mem"). Jordan has also reviewed portions of the transcript of the Executive Session deposition that contain or relate to the testimony quoted in plaintiffs' memorandum. Declaration

27

of Brian K. Jordan executed February 22, 2008 ("Jordan Decl.") a copy of which is annexed as

Exh. 9 at ¶¶ 3-5.

92.     The testimony quoted in Pls Mem relates to Jordan's September 27, 2002 decision

to order the arrest of persons who, without a permit required by District of Columbia municipal

regulations, had marched, without warning out of Franklin Square Park onto the roadway of K

Street, NW, during Friday morning rush hour. Exh. 9 (Jordan Decl.) ¶ 6.

93.     As reflected in his deposition testimony, Jordan decided to act to control the

marchers, and, in fact, arrest them, because they had engaged in unlawful conduct through which

they had created a danger to themselves and others. Exh. 9 (Jordan Decl.) ¶ 7.

94.     The group consisted of well over a hundred marchers.  Jordan had probable cause

to arrest them because he knew that no permit had been issued by the MPD authorizing such a

march into the roadway and they were moving as a unit comprised of more than 25 persons.

Based on this probable cause, Jordan had lawful authority to arrest the marchers. Exh. 9 (Jordan

Decl.) ¶ 8.

95.     In addition, all of these marchers had acted in a manner to annoy, disturb,

interfere with, and offend others – the motorists on K Street, NW.  Based on the circumstances, it

was clear to Jordan that they had done so knowingly and deliberately.  This provided probable

cause to arrest them as well. Exh. 9 (Jordan Decl.) ¶ 9.

96.     In addition, the circumstances of the marchers' violation of law caused Jordan to

exercise his discretion to arrest them rather than to allow them to proceed with their unlawful

march or to cordon them and then release them. Exh. 9 (Jordan Decl.) ¶ 10.

97.     The circumstances that influenced Jordan to arrest these marchers included that

they had placed themselves, motorists, and lawful pedestrians in danger.  By walking into

morning rush hour traffic on K Street, NW, these marchers forced motorists to stop in order to avoid striking the marchers even though the motorists had the right of way. By doing this, they caused motorists to drive inconsistently with the traffic control devices, creating confusion for following motorists. Exh. 9 (Jordan Decl.) ¶ 11.

98.    At the time he ordered the arrests, Jordan was aware of the practice of the MPD to attempt to facilitate marches for which no permit had been obtained. However, as Jordan testified in his Executive Session deposition, the fact that this large group marched right out into traffic and created a serious danger of pedestrians being struck by traffic eliminated any opportunity to negotiate a route for the unpermitted march and to facilitate it. Exh. 9 (Jordan Decl.) ¶ 12.

99.    The marchers that Jordan ordered arrested on Vermont Avenue, NW, had entered traffic on a busy, major thoroughfare, in a manner that put many people in senseless danger and had essentially rendered K Street, NW, impassible. They had chosen to do so even after MPD Lieutenant Jeffrey Herold had attempted to facilitate a march. Herold had walked into Franklin Square Park seeking march organizers to negotiate with. No one would acknowledge himself or herself to be leader or organizer. Herold advised persons there that the MPD would escort their march along sidewalks, but would arrest marchers if they marched in the roadway. Nevertheless, they marched, *en masse,* onto the roadway of K Street, NW. Exh. 9 (Jordan Decl.) ¶ 13.

100.    By doing this, the marchers had demonstrated that they were not inclined to cooperate with the MPD. By their conduct, they precluded the MPD's accommodation of their march. Their conduct persuaded Jordan that if they were not arrested, but instead, were released from the cordon to go on their ways, they would likely, once again, block a roadway and place themselves and others in danger. Exh. 9 (Jordan Decl.) ¶ 14.

101. Accordingly, when Jordan ordered their arrests, he did not order them arrested for simply parading without a permit. Jordan believed they had committed the offenses of disorderly conduct and/or unlawful assembly, as well. More importantly, Jordan ordered them arrested and directed that they be charged with parading without a permit for having paraded without a permit and having endangered themselves and others in the process, after having failed to cooperate the MPD's affirmative efforts to have facilitated a march. They had deliberately endangered public safely through the means of an unpermitted march. Exh. 9 (Jordan Decl.) ¶15.

102. Jordan ordered their arrests without issuing a warning and affording them an opportunity to comply because they had committed misdemeanors in his presence, and endangered themselves and others in circumstances indicating that they could not be anticipated to proceed safely and lawfully or cooperatively if given a further opportunity to do so. Instead, based on their actions, Jordan expected that they would again place themselves and others in danger if they were allowed to. Exh. 9 (Jordan Decl.) ¶ 16.

103. Since her January 20, 2005 arrest, A. Kirk has repeatedly participated in demonstrations involving more than 25 people in the roadways of the District of Columbia. Exh. 18 (AKirk Dep.) at 30:2-13.

104. A. Kirk had participated in demonstrations involving more than 25 people in the roadways of the District of Columbia on multiple occasions with no interference from the MPD. Exh. 18 (A Kirk Dep.) at 28:12-19.

105. MPD did not interfere with other marches in which the plaintiffs participated on January 20, 2005. Exh.18 (A Kirk Dep.) at 32:19-33:7; 33:21-35:5 38:18-39:3 (earlier march was anti-Bush).

106.    Prior to January 20, 2005, A. Kirk had participated in many demonstrations over a number of years including demonstrations in the District of Columbia. Exh. 18 (AKirk Dep.) at 169:2-7. This was the first march in which A. Kirk participated in which persons carried lighted torches. *Id.* at 57:12-58:17.

107.    Earlier in the day, Allyson Kirk and members of her family, among others, had participated in other demonstrations, including marches, protesting the second inauguration of President George W. Bush. Those demonstrations were not impeded by the MPD. Exh. 18 (AKirk Dep.) at 32:19-36:5; 38:18-39:20.

108.    Allyson Kirk participated in demonstrations involving more than 25 persons in the District on occasions prior to and subsequent to January 20, 2005, which were not impeded by the MPD. Exh. 18(A Kirk Dep.) at 39:4-15; 23:17-27:2.

109.    On August 1, 2007, Judge Emmet Sullivan conducted a fairness hearing in *Burgin, et al. v. District of Columbia*, 03cv2005 (EGS), concerning the settlement of that matter alluded to by plaintiffs at p. 13 of Pls. Mem. See copy of transcript of that hearing, relevant pages of which are annexed as Exh. 15. The Burgin plaintiffs were represented by the same counsel who represented the *Carr* plaintiffs then and now. In that hearing, Ms. Dunham represented the following to the Court:

> MS. DUNHAM: Good morning, your Honor. I would like to add briefly to what Mr. Koger had explained.

> THE COURT: Sure, sure.

> MS. DUNHAM: As you may recall, in a related case of Labatti (sic; Abbate)vs. Ramsey, which settled in January of 2005, there was a provision for equitable relief, changes in police practices, and these changes were accompanied several months later by a new law passed in the District of Columbia. The First Amendment Assemblies Act of 2004 became effective in April 2005, and since that time I personally as a member of the National Lawyers Guild, D.C. chapter, have been with my partner, Daniel Schember, out on the

streets attending demonstrations including some that we would call feeter matters, not the traditional 25,000 people marching in the streets, and my partner and I have had occasion to attend these matters in the streets, and we can tell you that we are very optimistic based on our experience that the MPD's practices now are to accommodate these matters, to accompany and accommodate, and so I am optimistic that the environment for demonstrators in the District of Columbia has improved. I can't express the same optimism for Capitol or Federal Police, but they are not an issue in our cases. We have observed a marked contrast between the practices of the MPD with respect to demonstrators and those of the Federal Police, but perhaps that's another story for another case.

Exh. 15 (Burgin Hearing Tr.) at 12:21-13:19.

110.. Michael Topper is an Officer of the Metropolitan Police Department ("MPD") and has been an MPD Officer since August 2000. Topper was on duty on January 20, 2005. On that day, he was assigned to MPD Civil Disturbance Unit ("CDU") 43. Between 11:00 p.m. and 11:30 p.m. CDU 43 was ordered to put on our protective equipment, commonly called "riot gear," and directed to report to 18th Street, below Columbia Road. There CDU 43 was to respond to a march involving hundreds of people in the roadway. They were advised that some marchers were carrying torches and that group had engaged in property damage. Declaration of Michael Topper executed on February 12, 2008, ("Topper Decl.") a copy of which is annexed as Exh. 10, ¶¶ 3-5.

111. Topper drove an MPD van transporting his CDU squad to 18th Street, N.W. There they came up behind the group of marchers, which had been described as a "mob." At that time, the marchers took most of the lanes of 18th Street and numerous members of the group were throwing debris at police personnel. Exh. 10 (Topper Decl.) ¶ 5.

112. A line of MPD Officers had formed across 18th Street. This police line prevented the marchers from continuing southward. The marchers entered an alleyway off of 18th Street between where Topper had parked the van and the police line had formed. CDU officers, including Topper, followed them into the alleyway. Exh. 10 (Topper Decl.) ¶ 6.

113.     The marchers' escape was blocked by another police cordon at the other end of the alley. My official, Sergeant Black, struck his baton on the pavement once, to get the marchers' attention, and ordered them to get on the ground. The objective was to create order in the alley so that the marchers could be dealt with safely. Exh. 10 (Topper Decl.) ¶ 7.

114.     After that, MPD Officers divided up the work of searching the marchers/prisoners, placing flex-cuffs on them, and completing Field Arrest Forms for them. Topper's role was to fill out Field Arrest Forms for some of the prisoners and to be photographed with the persons for whom he had completed Field Arrest Forms. As the person who completed the Field Arrest Forms for a number of the arrestees and who was photographed with them, Topper is the Arresting Officer for each of these persons, including Chelsea Kirk. Exh. 10 (Topper Decl.) ¶ 8.

115.     Each person arrested was flexcuffed before he or she was photographed with his or her arresting officer. Exh. 10 (Topper Decl.) ¶ 9.

10.     Topper did not apply flexcuffs to any of the persons arrested. Exh. 10 (Topper Decl.) ¶ 10.

116.     Topper was photographed twice with Chelsea Kirk. The first photograph was taken on 16th Street, outside the van used to transport her to the MPD Institute of Police Sciences, the police academy ("IPS"). Ms. Kirk did not complain to Topper that her flexcuffs had been placed on her improperly at that time. Nor did she complain of pain or injury caused by the flexcuffs. Topper did not observe any injury to her wrists at that point. Exh. 10 (Topper Decl.) ¶ 11.

117.     The second photograph was a digital photograph taken during her arrest processing at the IPS. At least an hour, and perhaps two hours, passed between the time the first

and second photographs were taken. Ms. Kirk did not complain to Topper that her flexcuffs had been placed on her improperly at that time, either. Nor did she complain that the flexcuffs had caused her or were causing her pain or injury. Topper did not observe any injury to her wrists at that point. Exh. 10 (Topper Decl.) ¶ 12.

118.    Topper did not hear Ms. Kirk complain about the tightness of her flex-cuffs or of injuries to her wrists at any time. Exh. 10 (Topper Decl.) ¶ 13.

14.    Topper has reviewed the Field Arrest Form (#580831) for Ms. Kirk and the two photographs taken of her standing next to him that are part of the arrest paperwork for her January 20, 2005 arrest. Copies of those materials are attached to the declaration. The originals of these documents are records of the MPD routinely maintained as records of the Department's regularly conducted business activities. The two photographs fairly and accurately depict Ms. Kirk and Topper. Exh. 10 (Topper Decl.) ¶ 14.

119.    At the time of her participation in the march and of her arrest, Allyson Kirk was unaware that parading without a permit was unlawful. Exh.18 (A Kirk Dep.) at 180:16-23.

120.    Exh.s 125 and 126 are photographs taken from the stoop at the front entrance area of Madams Organ, located at 2461-18th Street, NW, Washington, DC. MPD photographer Tony Brown positioned himself on the elevated entrance and focused from eye level westward across 18th Street, NW, on the east façade of the Sun Trust Bank building to capture the image of the buildings and the roadway and sidewalk between that building and Madam's Organ as the naked eye would see it from where I stood (Exh. 125). He also zoomed in to take a larger picture of the windows of the Latino Liaison Unit (Exh. 126). These photos fairly and accurately depict the

34

side of the building and the windows that face 18th Street, NW, Washington, DC. Declaration of Tony Brown, executed February 22, 2008, a copy of which is annexed as Exh. 127.

121.    On January 20, 2005, Matthew Singer arrived at Madam's Organ at about 7:30 p.m. and had four or five "Jack Daniels and Cokes" before he walked out into the street at about 11:30 p.m. Deposition of Matthew Singer, at 112:6-113:6.

122.    Approximately 15 minutes after the march began, its nature deteriorated significantly, as it became infected with acts of violence and destruction. Exh. 12 (Carr Rogs) at 13 (response #9); Exh. 13 (AKirk Rogs) at 12 (response #8); Exh. 14 (CKirk Rogs) at 12 (response #9).

123.    Exh. 129 is a satellite map that fairly and accurately depicts the area that it reflects, including the intersection of 18th Street, N.W. and Columbia Road N.W., Belmont Road N.W., and Kalorama Road N.W. Declaration of Phillip Dickson executed February 22, 2008, a copy of which is annexed as Exh. 30.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

__/s/_Ellen Efros_____
ELLEN A. EFROS [250746]
Chief, Equity I Section

__/s/ Thomas L. Koger_____
THOMAS L. KOGER [427921]
Senior Assistant Attorney General

__/s/ Chad Copeland_____

CHAD COPELAND

  /s/ Jayme Kantor
JAYME KANTOR
Assistants Attorney General
441 4th Street NW
Suite 600 South
Washington, D.C.  20001
(202) 724-6610
Fax: (202)727-3625

Counsel for Defendant District of Columbia