UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH CARR, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. A. No. 06-00098 (ESH) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT ON LIABIILTY AND OPPOSITION TO DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Plaintiffs reply in support of their partial summary judgment motion, and oppose

defendant's cross-motion, as follows.[1]

**I.  Arrest of the Class Was Unlawful**

Defendant does not dispute that the officers who arrested plaintiffs[2] acted within the

scope of their employment.  Nor does defendant dispute that District of Columbia custom,

policy, or practice caused or subjected plaintiffs to the arrest.  Defendant expressly argues that

---

[1] This opposition does not include a statement of genuine issues requiring trial because we maintain that trial of liability is not necessary; rather, plaintiffs should be granted summary judgment on liability.  Our opening papers and this reply and opposition warrant this conclusion by themselves.  Nonetheless, we include after this reply and opposition a response to defendant's statement of facts and a response to defendant's statement of issues.

[2] As in our opening memorandum, "plaintiffs" refers to both the named class representatives and the members of the plaintiff class.  The Court's October 11, 2006, Order (Doc 27) certifying this case as a class action under Fed. R. Civ. P. 23(b)(2) stated "Plaintiffs are class representatives . . . of all persons who (a) were arrested for parading without a permit on the evening of January 20, 2005, in the Adams Morgan neighborhood of the District of Columbia in the area approximately bounded by Columbia Road, 18th Street, and Belmont road; and (b) may have paraded without a permit, but who committed no other act providing probable cause for custodial arrest."  Order (Doc 27) at 1.

what the police did—arrest the plaintiffs for rioting or conspiracy to riot but charge them with parading in the street without permission—was authorized by District custom, policy, and practice.  Def.'s Mem. at 15-20 (arguing validity of arrest for rioting or conspiracy to riot), 37 (arguing that valid arrest for other offense followed by charge for parading without permission is consistent with District policy).

Defendant does not dispute that it bears the burden of proving probable cause to arrest the plaintiffs.  We show below that defendant's evidence does not meet the burden and that defendant's arguments are contrary to the First and Fourth Amendments.

### A.  The Police Had No Probable Cause to Arrest Plaintiffs for Rioting or Conspiracy to Riot

Defendant erroneously argues that police had probable cause to arrest each plaintiff for rioting or conspiring to riot.

### 1.  There Was No Probable Cause to Arrest Plaintiffs for an Act of Property Destruction or Violence

The undisputed evidence shows that, while some unknown individuals in the area engaged in acts of property destruction or violence, others in the area—the plaintiffs—peacefully assembled and marched in the street for the purpose of political expression.  Defendant does not assert that police had any evidence identifying the individuals who committed acts of property destruction or violence.

Defendant does not assert that any of the named plaintiffs committed an act of property destruction or violence.  It is undisputed that they did not.  Nor does defendant assert that every plaintiff other than the named plaintiffs committed an act of property destruction or violence.  It is undisputed that this was not the case.  Under the class certification order, *supra* n. 2, any

individual who committed acts of property destruction or violence is not a member of the plaintiff class.

The testimony of the named plaintiffs that they and others peacefully assembled and marched in the street for the purpose of political expression is undisputed.  The video tapes show many persons peacefully marching in the street.  Defendant does not dispute the authenticity of the tapes.  Defendant does not assert that what the video tapes show did not happen.  Defendant argues only that the video tapes do not "represent the march" because they do not depict acts of property destruction or violence.  Def.'s Statement of Facts Giving Rise to Genuine Issues at ¶¶ 1 and 2.  Plaintiffs, however, do not dispute that some unknown persons among or near the peaceful marchers committed acts of property destruction or violence. It is undisputed that police were unable to identify these persons.

Probable cause is an individual matter.  *Barham v. Ramsey*, 424 F.3d 565, 573 (D.C. Cir. 2006).  On the undisputed facts, the police had no probable cause to arrest any plaintiff for committing any of the acts of property destruction or violence that occurred.

## 2.  The Police Lacked Probable Cause to Arrest Plaintiffs for Encouraging Property Destruction or Violence

Defendant erroneously argues that plaintiffs "encouraged . . . [and] support[ed] . . . the violent and tumultuous acts of an assemblage of five or more persons, in which *they* were active participants."  Def.'s Mem. at 16 (emphasis in original).  To begin, defendant's statement that "the violent and tumultuous acts" that occurred were the "acts of an assemblage" reveals a fundamental legal defect in defendant's position.  Criminal acts are not "acts of an assemblage" unless they are acts committed by *each individual* in the assemblage.  *Barham v. Ramsey*, 424 F.3d 565, 573 (D.C. Cir. 2006) ("probable cause is a reasonable ground for belief of guilt, and

. . . belief of guilt must be particularized with respect to the person to be . . . seized") (quotation marks and citation omitted). As noted above, there is no evidence that each person in the march personally committed one of the criminal acts that occurred. It is undisputed that plaintiffs did not do such acts.

Defendant's "acts of an assemblage" argument asserts the same "group probable cause" theory that was rejected in *Barham*. In *Barham* the Court rejected arguments for arrest that "refer generically to what 'demonstrators' were seen doing" and fail to assert "that the particular individuals observed committing violations were the same people arrested." 424 F.3d at 574.

Since the filing of plaintiffs' motion and defendant's opposition and cross-motion, Judge Friedman has made the same point in another mass arrest case. *Alliance for Global Justice v. District of Columbia*, No. 01-811 (D.D.C. Mar. 3, 2008). After reading the recommendation of Magistrate Judge Facciola that plaintiffs be granted summary judgment on their false arrest claim, Judge Friedman referred the parties to mediation. He wrote:

> Reading the facts as described by Magistrate Judge Facciola is like 'déjà vu all over again' for those who remember the anti-war demonstrations of the early 1970's, when thousands of demonstrators were arrested on a theory of 'group' probable cause on the steps of the Capitol, in West Potomac Park, and on the streets of the District of Columbia, and when the judges of the Court of General Sessions (now the Superior court) held court 24 hours a day until the protestors were processed and released. In the end, however, no court and very few government officials accepted the notion that the arrest of so many could be constitutionally sustained when there was probable cause to believe that only certain specific individuals had engaged in illegal activity.

*Id.* at 1. In urging the parties to end their litigation "—and to do so now," Judge Friedman referred to Magistrate Judge Facciola's "assessment of the undisputed evidence" and to pp. 4-7 of the Report's conclusion. *Id.* at 2 ("noting that '[i]t is clear that, even if the Court were to accept as true the facts as presented by defendants, the arrests made in this case suffer from the

same fatal flaw as those made in *Barham*—namely that there was no "probable cause to arrest each of the [673] persons caught in the police sweep"'"") (brackets in original).

Here, defendant's erroneous "acts of an assemblage" premise also infects, and invalidates, defendant's encouragement argument. Defendant's declarations assert only that "it appeared" that "everyone in the group" or "the mob" "together" "as a group response" "cheered and raised their arms in apparent celebration" when unknown individuals in the area threw objects that broke windows on Columbia Road or 18th Street. (Def.'s Ex. 5, Decl. of Cathy Lanier ¶ 9; Def.'s Ex. 3, Decl. of Patrick Keller ¶ 6.)[3] Defendant's argument fails because there is no competent evidence identifying any plaintiff as a person who encouraged or supported a criminal act.[4]

Defendant's declarations, even if assumed to be competent evidence—though we show below that they are not—do not establish probable cause to arrest all of the plaintiffs for encouraging or supporting a riot. The plaintiffs are persons who were surrounded by police and arrested in an alley. There is no evidence identifying each and every person who was surrounded in the alley as a person who was seen to be in "the group" on Columbia Road or 18th Street at a time when cheering and arm raising occurred. Nor is there evidence that the police surrounded "the group" on the street with a cordon of officers and ensured that no one joined "the group"

---

[3] Defendant's everyone-cheered-window-breaking theory is new. Chief Lanier did not articulate this theory at her deposition. (Pls.' Ex. F, Cathy Lanier Dep. Tr. 61-62, 64; Def.'s Ex. 7, Cathy Lanier Dep. Tr. 63.)

[4] Defendant argues that a person who resists and fights an arresting officer at a political demonstration can be guilty of rioting in a group of five even if the identities of the numerous persons who verbally encouraged the fighting is unknown. Def.'s Mem. at 13-15. This argument is irrelevant. That in such a case the element of "five or more" can be proved by evidence that sufficiently numerous but unidentified persons verbally encouraged the fighter to fight does not mean that a person can be arrested *for encouragement* absent evidence *identifying* her or him as a person who encouraged riotous acts. Defendant does not argue otherwise.

from the time of the last cheer until the time of the arrest in the alley. Defendant does not assert that there was such a cordon and the video tapes indisputably show that there was none.

Because there is no evidence identifying or ensuring that each person arrested in the alley was a person who cheered or raised an arm on Columbia Road or 18th Street, defendant's evidence—even if it would otherwise establish probable cause as to an individual—has the same defect found in *Barham*. There, police had evidence that some unidentified individuals had committed crimes on the street and evidence that some of them likely had gone into Pershing Park, but no evidence that each person arrested in Pershing Park was one of the persons who had committed a crime on the street. *Barham*, 424 F.3d at 574. That is the situation here. One need only substitute "alley" for "Pershing Park."

Defendant erroneously argues that *Barham* is different because "[i]n this case, the arrestees were observed by MPD at all pertinent times." Def.'s Mem. at 40. That assertion is not supported by any evidence. No declaration by any officer states that *any* individual arrested in the alley, let alone each and every arrestee, was an individual that the officer personally saw in "the group" on the street when cheering and arm-raising occurred. And, as noted, no declaration states (and the videotapes disprove) that there was a cordon of police around "the group" when cheering and arm raising occurred and that this cordon was preserved, with no one joining "the group," from the time of the last cheer until the arrest in the alley.[5]  Absent such evidence there

---

[5] These are the relevant and dispositive points, but it is also true that defendant's declarations do not even show that all groups of persons arrested had been under police observation at all pertinent times, let alone control by police cordon. Defendant's declarations describe only observation of a group that entered the alley from 18th Street. (Def. Ex. 3, Keller Dec., at ¶ 8; Def. Ex. 4, Riley Dec., at ¶ 6.)  All of the named plaintiffs, however, went right on Belmont Street from 18th Street, and then right on Columbia Road, where they were ordered or herded into the alley or trapped in it after they entered it voluntarily. (Pls.' Ex. R, Sarah Carr Dep. Ex. 2 at 15; Pls.' Ex. S, Allyson Kirk Dep. Tr. 108-12; Pls.' Ex. T, Chelsea Kirk Dep. Tr. 139-41; Pls.' Ex. U, Jonathan Scolnik Dep. Tr. 83-99; Pls.' Ex. V, Matthew Singer Dep. Tr. 13-19.)  The

was no probable cause to believe that each and every arrestee in the alley had been a person in "the group" on the street when cheering and arm-raising occurred.  As the Court held in *Barham*, "The fluidity of movement in and around the park preceding the arrests further discredits any attempt to discern probable cause to arrest every person who happened to be there."  434 F.3d at 574.  Here, the fluidity of movement in and around the streets and alleys precluded probable cause to believe that each person arrested in the alley had been among those who had been in the street cheering or raising an arm in support of window-breaking near Columbia Road and 18th Street.[6]

    Magistrate Judge Facciola made the same point in *Alliance for Global Justice v. District of Columbia*, No. 01-811 (D.D.C. Feb. 28, 2008) (report and recommendation that plaintiffs' motion for summary judgment be granted).  There, defendants argued that plaintiffs had "engaged in [illicit] conduct for hours" during a "fluid and fragmented" march, had ignored the arresting officer Herold's repeated orders to leave the roadway, and that there were no persons on the sidewalks within the area intended for the police cordon before the arrests commenced.  *Id.* at 5 (citations omitted).  In his Report and Recommendation, Magistrate Judge Facciola stated that "the Court need look no further than a case decided less than two years ago by our Court of Appeals.  *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006)."

---

Barry Student video shows large numbers of persons walking up Belmont Street, and both that video and the Brandon Jourdan video show people being ordered or herded from Columbia Road into the alley.  No declaration from defendant asserts that this large number of persons that included the named plaintiffs was even under observation by MPD at all pertinent times, let alone control by police cordon.  The videos, moreover, indisputably show that this was not the case.

[6] Defendant erroneously argues that *Barham* is distinguishable because the "arrest paperwork satisfied the constitutional requirements for establishing probable cause."  Def.'s Mem. at 40.  The arrest paperwork shows only that plaintiffs were among those arrested in the alley.

Magistrate Judge Facciola found it "fanciful to argue, as defendants do, that each of the 673 'persons within the cordon was [amongst] the group that Herold had been immediately behind and had been ordering to leave to the street and proceed on the sidewalks.'" *Id.* (citations omitted) (brackets in original).  He added, "[t]o quote Judge Emmet G. Sullivan . . . 'it is nothing short of ludicrous' to suggest that particularized probable cause existed to believe that each of the 673 people cordoned off were amongst those demonstrators observed by Herold to have committed wrongs" during the march.  *Id.* at 5-6 (quoting *Barham v. Ramsey*, 338 F. Supp. 2d 48, 57-58 (D.D.C. 2004).  As in *Barham*, even if "*some people* present that morning had committed arrestable offenses," there was no probable cause to arrest "*everyone*."  *Id.* at 6 (quoting *Barham v. Ramsey*, 424 F.3d 565, 573 (D.C. Cir. 2006) (emphasis in original).  Pointedly, there was no evidence "that the particular individuals observed committing violations were the same people arrested; instead, [police] refer generically to what 'demonstrators' were seen doing."  *Id.* at 6 (quoting *Barham v. Ramsey*, 424 F.3d at 574).  He stated "[it] is clear that, even if the Court were to accept as true the facts as presented by defendants, the arrests made in the present case suffer from the same flaw as those made in *Barham*—namely, that there was no 'particularized probable cause to arrest each of the [673] persons caught in the police sweep.'" *Id.* at 4 (quoting *Barham v. Ramsey*, 424 F.3d at 568) (brackets in original).  He concluded "[i]t is clear, then, that the following conclusion made in *Barham* can be adapted to the present case:

> While we have no reason to doubt that unlawful activity might have
> occurred in the course of the protest—with some individuals engaging
> in disorderly conduct, for example—the simple, dispositive fact here
> is that [defendants] have proffered no facts capable of supporting the
> proposition that [Herold] had reasonable, particularized grounds to
> believe every one of the [673] people arrested was observed committing
> a crime.

*Id.* at 7 (citing *Barham v. Ramsey*, 424 F.3d 565, 574 (D.C. Cir. 2006) (brackets in original).[7]

The foregoing is dispositive. The Court need go no further to reject defendant's "encouragement" argument. Defendant's argument also fails, however, for an additional reason. Defendant's declarations are not competent evidence that each and every individual who was in "the group" when cheering and arm-raising occurred was in fact a person who cheered or raised an arm, and did so to encourage, rather than condemn, the breaking of windows. According to defendant, there were 250 to 300 people in "the group." (Pls.' Ex. F, Cathy Lanier Dep. Tr. 32.) Defendant's witnesses, now-Chief Lanier and Officer Keller, followed "the group," riding in a car, Cruiser 18. (Def.s' Ex. 3, Decl. of Patrick Keller ¶ 6; Ex. 5, Decl. of Cathy Lanier ¶¶ 7, 9.) No one in their position could possibly have seen each member of "the group."[8] No one in their

---

[7] Magistrate Judge Facciola's Report and Recommendation rejected defendant's argument that the arrests were justified because Herold had given "repeated warnings to the arrestees and an opportunity for them to comply with his orders." *Id.* at 5. The Report and Recommendation states:

> It is true that police officers may conduct a mass arrest "after invoking a legal mechanism for clearing the area and then providing an opportunity for the affected persons to follow an order to disperse." *Barham*, 434 F.3d at 576. But in a situation such as this one here, with roaming demonstrators through city blocks populated with residents and business people, the "fluid[ity]" and the "significant time lag between" the demonstrators' disruption and their arrests made it impossible for Herold to reasonably suspect "that all of the occupants [of the area of the arrests] were then breaking the law[,] that they had broken the law before entering" that area, *id.* at 156, or that his "notice [was] reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." *Dellums v. Powell*, 566 F.2d 167, 181-82 n.31 (D.C. Cir. 177). There were simply too many moving pieces. *Id.* at 6.

[8] Chief Lanier testified at her deposition, "I couldn't see the whole crowd." (Pls.' Ex. F, Cathy Lanier Dep. Tr. 34.) No one in her position could have, whether the group numbered between 250 and 300, or was smaller, like the group of about seventy that was arrested. Some of the Barry Student video tape is shot from the rear of the march. (Pls.' Ex. O, Barry Student Video.) This part of his tape confirms the obvious. The entire march could not be seen from that vantage point. Indeed, only a small percentage of the marchers could be seen from Lanier and Keller's position.

position possibly could have seen whether, in any instance, each and every member of "the group" raised an arm.[9]

Also, it simply is not possible for a person hearing a cheer from a group of about seventy people (the approximate number of arrestees), or 250-300 people (the number marching on Columbia Road), to know that each and every individual in the group cheered in an approving way. The Lanier and Keller declarations do not state any words that were cheered in response to window-breaking, but assuming that the overall tone of the sound indicated that it was an approving cheer, it was not possible for Lanier and Keller to know whether this tone was the result of *each* individual cheering in an approving tone, or an approving majority drowning out a minority that was silent or that shouted disapproval, or perhaps a louder minority drowning out a silent or less loud disapproving majority.

Declarations "supporting or opposing" summary judgment "must be made on personal knowledge" and show "competen[ce] to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Because it was impossible for Lanier or Keller to know that each and every individual in "the group" cheered or raised an arm in approval of window-breaking, their declarations are not competent proof of these matters. Accordingly, there is *no* competent evidence that *any* of the plaintiffs, let alone *all*, cheered any act of unlawful conduct.[10]

The Lanier and Keller declarations tacitly admit the point. They say that it *appeared* to Lanier and Keller that everyone cheered and raised an arm and it *appeared* to them that the cheering and arm raising celebrated (rather than condemned) the window-breaking. This

---

[9] Obviously, if all marchers in, say, the rear third of the march simultaneously raised their arms, it would have been impossible for Keller or Lanier to see whether anyone in the front two-thirds of the march did so as well. The raised arms of the rear third of the march would obscure the view of the front two-thirds, making it impossible to see whether they also raised their arms.

[10] In fact, there is evidence that some plaintiffs expressed opposition to unlawful conduct during the march. *See infra*, n. 11.

wording of the declarations is an obvious recognition of the impossibility of their actually knowing, personally, that each and every individual cheered or raised an arm and did so to approve rather than disapprove the window-breaking.

Defendant's memorandum also tacitly acknowledges the inherent human limits on observation and hearing that defeat defendant's argument. The memorandum, at 16, adds to the Keller and Lanier declarations the assertion that "Carr, the Kirks, and Scolnik" were "near [the] rear and closest to Cruiser 18," the car in which Keller and Lanier rode. The tacit implication is that, even if Keller and Lanier could not have seen and heard everyone cheer and raise an arm, they probably could have seen these four named plaintiffs do so. But the declarations do not say that Keller or Lanier saw any of the named plaintiffs (or any identified individuals) do this, and defendant's memorandum, without citation to evidence, misstates the location of plaintiff Carr. Carr was close to the front of the march, far from Cruiser 18. (Pls.' Ex. R, Sarah Carr Dep. Ex. 2 at 14-15.) Carr is easily identified in the Barry Student video by her tall pink rubber boots. She has reddish-brown hair, wore a tan knee-length peacoat, carried a sign, and was smiling. (Pls.' Ex. O, Barry Student Video.) The video confirms what is simply obvious from the undisputed, objective circumstances. If a substantial number, let alone all, of the demonstrators behind Carr raised their arms, no one in Cruiser 18 could possibly tell whether Carr raised her arm at the same time. And no one in Cruiser 18 could possibly know whether or what Carr cheered or shouted, at any time, by herself or with any number of others, let alone simultaneously with all others.[11]

---

[11] In fact, Carr expressed disapproval of an instance of property destruction that she saw. (Pls.' Ex. A, Sarah Carr Dep. Tr. 107-08.) A companion of the Kirk sisters, who was with them at the back of the march, also voiced disapproval to individuals who sprayed paint and then ran away. (Pls.' Ex. B, Allyson Kirk Dep. Tr. 102; Pls.' Ex. C, Chelsea Kirk Dep. Tr. 79-81.) The relevant point, however, is that police had no competent evidence to the contrary.

For these reasons, there is no competent evidence establishing probable cause to arrest all plaintiffs—or even a single one of them—for encouraging or supporting, by word or gesture, acts of property destruction or violence. Defendant's declarations identify no individual as having done this. To the extent the declarations claim that everyone in "the group" did it, the declarations are not competent evidence, because the declarants could not possibly have seen or heard what "everyone" did.[12] Under Rule 56, and the doctrine of "inherent incredibility," defendant's cheering and arm raising evidence must be disregarded. *Jackson v. United States*, 353 F.2d 862, 867 (D.C. Cir. 1965) (invoking doctrine of inherent incredibility to discredit police testimony and noting that "[i]n some cases police testimony, like other testimony, will simply be too weak and too incredible, under the circumstances, to accept . . . . It is enough to invoke the doctrine if the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common knowledge and experience.")

And, as noted earlier, defendant's declarations also are insufficient even if credited, because there is no evidence showing that the group including the plaintiffs that was surrounded and arrested in the alley necessarily was the same as, or a subpart of, "the group" that defendant claims cheered in unison on the street. In sum, there was no probable cause to arrest the plaintiffs for encouraging a riot.[13]

---

[12] Magistrate Judge Facciola's recommendation in *Alliance for Global Justice* held that similar evidence from the District of Columbia did not create a genuine issue for trial. There, the District asserted that a mass arrest was valid because police gave repeated warnings and afforded opportunity to comply. Magistrate Judge Facciola found plaintiffs entitled to summary judgment, however, in part because it was not possible for everyone to have heard the orders. *Alliance for Global Justice v. District of Columbia*, No. 01-811 (D.D.C. Feb. 28, 2008) at 6.

[13] The impossibility of Lanier and Keller having seen or heard that everyone cheered or gestured to approve window-breaking is dispositive. We also would note, however, that under the circumstances revealed by the video tapes, it also appears to have been impossible for the marchers even to do what the Lanier and Keller declarations claim they did. Given the number

### 3. Plaintiffs' Continuing to March or Joining the March Was Not Probable Cause to Arrest Them for Rioting

After presenting the everyone-cheered-window-breaking theory, defendant's memorandum asserts that Carr, the Kirks, and Scolnik were guilty of rioting merely because they "continued to move with the mob" while "the mob . . . committed one act of violence after another." Def.'s Mem. at 18. This argument is incorrect.[14]

Defendant's assertion that "the mob committed" violent criminal acts repeats defendant's erroneous "acts of an assemblage" argument. There is no evidence that each and every individual in the street committed a violent act. It is undisputed that plaintiffs did not commit such acts. Defendant's statements about what "the mob" did reflect the same erroneous "group probable cause" theory condemned in *Barham* and in Judge Friedman's recent opinion in *Alliance for Global Justice*.

---

of marchers, the distance from the front to the rear of the march, the lighting, and the general background noise—as shown on the video tapes—it seems impossible that each and every marcher could see or hear and knowingly cheer, simultaneously, an incident of window breaking on Columbia Road near 18th Street, or on 18th Street near Columbia Road. The video tapes show that when the front of the march was in the vicinity of Columbia Road and 18th Street, the march was spread out, with the rear of the march too far behind for all marchers simultaneously to see or hear an instance of window-breaking. Under the circumstances portrayed on the video tapes, if the incident occurred when marchers at the front could have seen or heard it, marchers at the rear could not have, and vice versa. Any simultaneous cheering at the front and back could only have been for different reasons or simply because others were cheering (not an unusual occurrence in group situations). Defendant bears the burden of proving probable cause; but defendant's declarations do not, as to any incident of window-breaking, describe circumstances showing that it was possible for all marchers simultaneously to see or hear and knowingly cheer that incident. (Such declarations would have to be consistent with, but describe circumstances not shown on, the video tapes.) The declarations do not even state the locations of the front of the march and the back of the march when any window-breaking and cheering incident occurred. In the circumstances shown by the evidence now before the Court, it appears to have been impossible for the marchers to do what Lanier and Keller claim they did.

[14] It is also inconsistent with what defendant's memorandum says just a few pages earlier: "Plaintiffs were not arrested because they 'fail[ed] to abandon their own constitutionally protected conduct by leaving the area where others were engaged in criminal acts,' as they assert." Def.'s Mem. at 15-16.

That plaintiffs continued to march peacefully, moreover, rather than stop their protected conduct, was not evidence of specific intent to further the criminal acts of others. Absent such evidence, plaintiffs were not liable for the others' criminal acts. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 919 (1982);[15] *United States v. Robel*, 389 U.S. 258, 262-65 (1967); *Keyishian v. Board of Regents of Univ. of State of New York*, 385 U.S. 589, 606 (1967); *Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966). Plaintiffs had no duty to repudiate the criminal acts of others or take other steps to disassociate themselves from those acts. *Claiborne Hardware*, 458 U.S. at 925, n. 69.

Defendant erroneously asserts that *Robel*, *Keyishian*, and *Elfbrandt* are "inapposite" because they do not address "an individual's culpability for his actions in a riot." Def.'s Mem. at 15. These cases hold that engaging in political association with others known to be committing unlawful acts is protected by the First Amendment; evidence of this association is not a basis for inferring liability for the others' unlawful acts. Under the holdings of these cases, evidence in addition to the evidence of knowing political association is required, and this additional evidence must show specific intent to further the others' unlawful acts. What these cases held with respect to political association also applies to peaceful assembly. *Claiborne Hardware Co.*, 458 U.S. at 908-11 (peaceful picketing as part of civil rights boycott is protected by First Amendment, though boycott included violent acts by others); *id.* at 919 (evidence of specific unlawful intent is required, citing *Robel* and *Elfbrandt*).

Defendant never expressly asserts that plaintiffs are liable for the criminal acts of others absent evidence showing that plaintiffs specifically intended to further the others' unlawful acts.

---

[15] We discuss *Claiborne Hardware* in greater detail below, in responding to defendant's conspiracy argument.

Indeed, defendant attempts to make such a showing, unsuccessfully as we have seen, by trying to show specific intent to encourage window-breaking by cheering and arm raising.

Nor does defendant expressly assert that engaging in conduct protected by the First Amendment is a permissible basis for inferring specific intent to further the crimes of others. Defendant does not deny that the First Amendment precludes inferences of vicarious criminal liability from protected conduct.

Instead of expressly disputing these First Amendment principles, defendant's discussion of the law of rioting simply ignores the First Amendment. Defendant argues that an individual may be convicted of rioting for taking abandoned liquor that had been looted from a store during a riot. Def.'s Mem. at 11-13. This is irrelevant. Receiving stolen property is not protected by the First Amendment. Such conduct properly may be deemed to be an act that is part of the tumult of a riot. Peacefully marching in the street for the purpose of political expression, however, is protected by the First Amendment. This protected conduct is subject only to reasonable time, place, and manner restrictions. Unlike taking looted liquor, peacefully marching in the street for political purposes cannot constitutionally be deemed to be part of the unlawful tumult of a riot. Defendant overlooks that when "violence . . . occurs in the context of constitutionally protected activity, . . . *precision of regulation* is demanded. The presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to . . . liability and on the persons who may be held accountable." *Claiborne Hardware*, 458 U.S. at 916-17 (italics, citation, and internal quotation marks omitted; emphasis added). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Even if a peaceful political demonstrator knows that others associated with the assembly have committed, are committing, or intend to commit illegal acts, the First Amendment bars an inference from this that the peaceful demonstrator specifically intends to further the others' illegal acts. Peaceful political expression and association, with mere knowledge of other associates' ongoing or planned illegal conduct, is not a constitutionally sufficient basis for inferring criminal liability. Under *Claiborne Hardware*, *Robel*, *Keyishian*, and *Elfbrandt*, additional evidence, showing specific intent to further the others' criminal acts, is required. *Claiborne Hardware*, 458 U.S. at 925-26 ("mere association with [a] group—absent a specific intent to further an unlawful aim embraced by that group—is an insufficient predicate for liability").

If this were not the case, peaceful political demonstrators would be under an obligation immediately to cease their constitutionally protected conduct whenever they see illegal acts by persons in the area whom the police reasonably might perceive to be associated with the demonstration. To avoid arrest, peaceful demonstrators would have to cease marching, go to the sidewalk, and either leave or stand still, becoming onlookers. Peaceful demonstrators, however, have no obligation to take affirmative steps to disassociate themselves from others who engage in criminal acts. *Claiborne Hardware*, 458 U.S. at 925, n. 69. If defendant's view were the law, peaceful demonstrators would be subject to arrest if police had probable cause to believe that the demonstrators saw the unlawful acts of others and continued to demonstrate, even if they actually did not see the unlawful acts.[16]

---

[16] Even the largest and most peaceful demonstrations are often accompanied by some peripheral unlawful conduct; it is impossible for the organizer or sponsor of a demonstration to guarantee that no participant will break a window, overturn a trash can, or get into a fight with an opponent.

An obligation to stop marching peacefully, or face arrest, if one sees (or might reasonably be thought to have seen) others associated with the march commit crimes would have a chilling effect on persons' willingness to participate at all in political demonstrations. It also would hamper their participation, distracting them from their own protected expression, by requiring them constantly to scan the surroundings to see if fellow demonstrators are committing illegal acts. This obligation would be incompatible with the First Amendment.[17]

For these reasons, defendant's argument that Carr, the Kirks, and Scolnik rioted because they continued to march in the area where others committed unlawful acts—"continued to move with the mob"—thereby increasing the number of persons in that area—"increasing the mob," Def.'s Mem. at 18—is incompatible with the First Amendment. Acceptance of defendant's argument would criminalize and impermissibly chill protected political expression.[18]

Defendant's argument that Singer rioted, Def.'s Mem. at 18-20, is wrong for the same reasons. Defendant argues that, by going into 18th Street, Singer "join[ed] the mob" and "the

---

[17] If police could arrest peaceful demonstrators for rioting based on probable cause to believe that they continued to demonstrate after seeing others among them commit illegal acts, this would be a powerful weapon aiding unlawful suppression of anti-government assemblies. Indeed, this would enable the police to arrest large groups of demonstrators by inserting among them a few undercover provocateurs to commit unlawful acts. An instance has been reported in which Canadian police sought to insert into a peaceful demonstration undercover officers wearing bandanas over their faces, one of whom was carrying a large rock. http://www.thestar.com/News/article/249429 (August 24, 2007), with link to "YouTube: Video of Alleged Police Provocateurs" (showing demonstration organizer accusing intruders of being undercover officers, correctly as police later admitted, and demanding that undercover officer put down his rock).

[18] This does not mean that police were prohibited from interfering with the march at all and were obliged simply to let it continue. To the contrary, where some persons are committing violent criminal acts in the midst of others who are peacefully marching and it is not feasible to arrest the wrongdoers while allowing the peaceful marchers to continue, use of police lines and orders to control movement, stop violence, or require marchers to stop their march and disperse is permissible. *Barham v. Ramsey*, 434 F.3d 565, 575-76 (D.C. Cir. 2006). But simply *arresting* the peaceful marchers for the criminal acts of others in their midst is not permissible. *Id.*

mob" threw missiles that broke windows, and "the mob celebrated" this.  Def.'s Mem. at 20, 19.
The Court cannot accept this argument.

It is undisputed that plaintiffs marched peacefully for political purposes, and the videos indisputably show large numbers of persons peacefully marching on 18th Street.  Singer had a constitutional right to join the peaceful marchers.  *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 611-12 (6th Cir. 2005).  It is undisputed that Singer committed no act of property destruction or violence.  That there were other persons in the area who broke windows is not a basis for inferring that Singer rioted.[19]  Allowing such an inference would criminalize conduct protected by the First Amendment, impermissibly chilling protected political expression.  Defendant's argument that "the mob" committed and celebrated crimes advances the same "group probable cause" contention that was rejected in *Barham* and by Judge Friedman in *Alliance for Global Justice*.

### 4.  The Police Lacked Probable Cause to Arrest for Conspiracy to Riot

Defendant argues that there was probable cause to arrest, for conspiracy to riot, plaintiffs who joined the march after reading the leaflet.  Def.'s Mem. at 22-24.  The leaflet said:

### Protest March – After the Show!!!

As we've said tonight's show is not just a concert, it's a celebration and it's a protest!!! After Anti-Flag's last song we invite you to join in a festive march from this show through the streets of DC to the doorstep of the those in power.  We're going to take our resistance to one of the Inaugural Balls where Bush and his supporters celebrate their power and privilege at the expense of us all.

---

[19] This would remain true even if Singer had seen the criminal acts of others; only evidence of his specific intent to further criminal acts would make him liable.  This is the dispositive point.  Nonetheless, it is also true that Singer testified that he did not witness any acts or evidence of spray painting, window breaking, vandalism to cars, or throwing of newspaper vending boxes into the street.  He did not see anything he perceived to be ongoing criminal activity.  He did not see anything that suggested recent criminal activity along the march route that he followed.  (Pls.' Ex. E, Matthew Singer Dep. Tr. 109-110.)

During the last song of the evening we will distribute buckets, and encourage drumming, chanting and participation from all. . . . We imagine a loud festive march, that takes the amazing energy surging through tonights show to create an explosive protest against the war on Iraq and the war here at home as well as against all that Bush represents.  We will march from the show to the Washington Hilton, . . . the site of one of tonight's balls.  From the march, we will engage in our own protests.  We will show people faces behind those of us who resist this administration and sham.  We will march to 18th St from Columbia, and make a left on 18th and a right on Florida to get to Connecticut.  We will bring people back to the show space afterwards as well.  Please remember to be respectful of people in the Columbia Heights neighborhood where we are guests.  Watch your surroundings and keep the energy focused on where it needs to be – on showing the world our opposition to Bush.  Join us in the streets tonight to send one NO! to the Bush regime and a million yeses to all of the things can create together.

(Pls.' Ex. C, Chelsea Kirk Dep, Ex. 2.) [20]

Defendant's argument is erroneous, even as to individuals who read the leaflet.  The leaflet was protected speech, not incitement or conspiracy to riot.  It contains no advocacy that the First Amendment permits to be forbidden.  Nothing in the leaflet states or indicates that the reference to "explosive protest" is "advocacy of the use of force or of law violation . . . where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action," within the meaning of *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).  To the contrary, the leaflet urges marchers "to be respectful of people in the Columbia Heights neighborhood" and throughout the protest to "keep the energy focused where it needs to be – on showing the world our opposition to Bush."  All of the specific acts proposed as means to show opposition to Bush—"festive march . . . through the streets," "drumming, chanting," "loud festive march"—are protected by the First Amendment, subject only to reasonable time, place,

---

[20] Defendant does not argue that its conspiracy theory applies to plaintiffs, such as Singer, who joined the march without having attended the concert or read the leaflet.  This by itself is fatal to defendant's conspiracy argument, as an independent basis for the arrest of all plaintiffs, because police had no probable cause to believe that each and every person—or any particular person— surrounded and arrested in the alley was a person who had read the leaflet.

and manner restriction. Peacefully assembling and marching along the designated route after

reading the leaflet was not evidence of specific intent to riot and, consequently, was not evidence

of conspiracy to riot.[21]

In *NAACP v. Claiborne Hardware Co*., 458 U.S. 886 (1982), the Court held that, under

the First Amendment, individuals could not be held liable for conspiracy for instigating,

managing, or implementing, let alone merely joining, a civil rights boycott, even though the

boycott "included elements of criminality." 458 U.S. at 888. The Court held that the First

Amendment barred the lower court's conclusion "that the entire boycott was unlawful," making

leaders and participants liable for conspiracy. *Id*. at 888 and 915. The Court held that speeches,

peaceful picketing, and encouraging others to join, even by "coercive" speech, were parts of the

boycott that were protected by the First Amendment. *Id*. at 907, 909-911.

The Court so held, despite speeches by the boycott leader that referred to the possibility

that "necks would be broken"—speeches that "might have been understood as inviting an

---

[21] Viewed in context, the natural and most plausible reading of the leaflet's reference to
"explosive protest" is figurative, in the same way that a phrase like "Our protest will be a
political bombshell" is figurative. For this reason, joining the march after reading the reference
to "explosive protest" was not evidence that any marcher even knew that the leaflet proposed
criminal acts, let alone evidence that the marcher specifically intended to further those acts rather
than merely march peacefully. Regarding other language in the leaflet, defendant's
memorandum, at 23, asserts that undercover officers heard and reported to Lanier that some
individuals at the concert had said that the leaflet's sentence, "We will show people faces behind
those of us who resist this administration and sham," meant "breaching security at the Inaugural
Ball." The words of the sentence, of course, do not impart this message. The leaflet, moreover,
says that after demonstrating at "the doorstep" and "site" of the Ball, not inside the Ball, the
march organizers will take marchers back to the concert site. This contradicts the implication
that everyone was supposed to rush inside the Ball—with arrest, not return to the concert site, the
event surely to follow. This point aside, if the "faces" sentence *was* thought by some readers to
be code language for breaching Ball security, there nonetheless is no evidence that each and
every plaintiff who read the leaflet knew the code and therefore had the same understanding.
Nor is there evidence that everyone who knew the code also specifically intended to further the
goal of the coded message rather than merely march peacefully. And there certainly is no
evidence that everyone arrested in the alley had even read the leaflet.

unlawful form of [boycott] discipline or, at least, as intending to create a fear of violence whether or not improper discipline was specifically intended." 458 U.S. at 927. The trial court had found that, in one speech, the boycott leader threatened, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." *Id*. at 902. There was evidence that boycott discipline had included "destruction of goods purchased at boycotted stores, public displays of weapons and of military discipline, denunciation of names gathered by the store-watchers, and subsequent violence against the persons and property of boycott breakers." *Id*. at 897. For example, "In two cases, shots were fired at a house; in a third, a brick was thrown through a windshield." *Id*. at 904. *See also id*. at 905.

The Court held that imposition of liability on the boycott leader for his speeches was precluded by the First Amendment because his "highly charged political rhetoric . . . did not transcend the bounds of protected speech set forth in *Brandenburg*." *Id*. at 927-28.[22] Here, the plain language of the leaflet was protected expression. Unlike the explicit threat to break necks in *Claiborne Hardware*, the plain language is not even "advocacy of the use of force or of law violation," let alone "such advocacy . . . directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. Because the plain language of the leaflet was protected speech, its writers could not be held criminally liable for conspiring to riot, simply for writing and disseminating this language and peacefully marching thereafter.[23]

---

[22] The Court held that the speaker's threats to break the necks of boycott violators would raise a question of his individual liability under the *Brandenburg* standard if violence had occurred soon after the threat. Although some violence did follow the leader's speeches, the Court held that it occurred too long after he spoke. *Id*. at 928.

[23] Defendant's information that some readers of the leaflet believed one sentence was code language for breaching security at an Inaugural Ball did not provide probable cause to arrest the writers, because police had no evidence that the writers actually intended to use the code that

Even if plaintiffs somehow knew that the authors of the leaflet secretly were proposing that marchers commit unlawful acts and knew that some marchers had decided, based on reading the leaflet or otherwise, to commit unlawful acts while marching—though police had no evidence of this—plaintiffs could not be held criminally liable for conspiracy for joining the march and peacefully marching, unless they specifically intended to further the other marchers' criminal acts. *Claiborne Hardware*, 458 U.S. at 919, *citing United States v. Robel*, 389 U.S. 258 (1967), and *Elfbrandt v. Russell*, 384 U.S. 11 (1966). As noted above, the Court in *Claiborne Hardware* held that peaceful participants in the boycott could not be held liable for conspiracy despite the boycott leader's speech proposing violence against persons who breached the boycott and the occurrence of several violent acts against them. The Court also held that persons who participated in the boycott by peaceful picketing had no duty to repudiate the violent acts of others or take other steps to disassociate themselves from the persons who committed them. 458 U.S. at 925 n.69.

Plaintiffs' peaceful marching after reading the leaflet—like peaceful picketing after the boycott leader's speeches in *Claiborne Hardware*—was not a constitutionally permissible basis for deeming plaintiffs liable for conspiracy to riot; and knowledge by the police that plaintiffs had peacefully marched after reading the leaflet, assuming *arguendo* that police had that knowledge as to each and every one of them, did not provide probable cause to arrest the plaintiffs for conspiracy to riot.

Defendant's legal analysis ignores the impact of the First Amendment on the law of conspiracy, just as defendant's discussion of the law of rioting also ignores the First Amendment. Defendant's memorandum discusses and seeks to apply, without any modification, the law of

---

these readers perceived. Nor did police have probable cause to arrest anyone in the alley for writing the leaflet, because police had no evidence that anyone in the alley had written it.

conspiracy as it applies to a prisoner's participation in a conspiracy to escape, Def.'s Mem. at 20-24—just as defendant's memorandum seeks to apply to peaceful demonstrators, without modification, the law of rioting that applies to a person who takes looted liquor during a riot.

Defendant overlooks that in determining whether a prisoner associates himself with a conspiracy to escape and knowingly acts to further its object, the First Amendment does not restrict the inferences of criminal intent or causation that can be drawn from the totality of the prisoner's conduct and the surrounding circumstances. Defendant overlooks that when "violence . . . occurs in the context of constitutionally protected activity, however, precision of regulation is demanded. The presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to . . . liability and on the persons who may be held accountable." *Claiborne Hardware*, 458 U.S. at 916-17 (italics, citation, and internal quotation marks omitted). Where peaceful assembly, marching or political expression occurs at or near the same place and time that several persons in or near the marching assembly commit criminal acts, the First Amendment precludes an inference of vicarious criminal liability—including an inference of causation or intent to aid, abet or conspire—from the constitutionally protected activity.

Under *Claiborne Hardware*, *Robel*, *Keyishian*, and *Elfbrandt*, the Court must reject defendant's argument that peacefully assembling and marching after reading the leaflet was evidence of conspiracy to riot.[24]

---

[24] Defendant does not assert that the specific intent requirement of *Robel*, *Keyishian*, and *Elfbrandt* is inapplicable in determining the First Amendment's restriction of criminal liability for conspiracy to riot, where the claimed conspiratorial act is reading a leaflet proposing a demonstration. Defendant argues only that these cases are inapplicable to determining liability for actual participation in a riot. Defendant acknowledges that these cases restrict imposition of liability for "membership in an organization." Def.'s Mem. at 15. Given this, it would be illogical for defendant to assert that these cases do not restrict imposition of liability for membership in a conspiracy. Obviously, they do, as the Court held in *Claiborne Hardware*. Defendant's conspiracy argument does not assert otherwise.

**5. The Essence of Defendant's Argument is "Group Probable Cause," Conspiracy by Leaflet, and Imagery of Rioting, Not Evidence and Proper Legal Argument**

As we have seen, the essence of defendant's legal argument is that everyone in the street was a "mob" and "the mob" committed and celebrated acts of property destruction and violence. This argument is the same unacceptable "group probable cause" argument that defendant has asserted unsuccessfully in *Barham* and *Alliance for Global Justice*.

Defendant adds to "group probable cause" its theory of conspiracy by leaflet. Though a leaflet proposing a political protest march obviously is political speech, defendant's conspiracy theory never mentions the First Amendment, its standards, and how they apply to the case. There is no mention of *Brandenburg*. Rather, defendant's legal analysis is based on jailbreak conspiracy law. First Amendment cases, however—*Brandenburg*, *Claiborne Hardware*, *Robel*, *Keyishian*, and *Elfbrandt*—defeat defendant's attempt to apply jailbreak law to the plaintiffs.

The third major underpinning of defendant's argument is irrelevant imagery. Defendant says, for example, without reference to law, that the march was "replete with flaming torches brandished in an urban area." Def.'s Mem. at 24. *See also*, Def.'s Mem. at 4. We asked defendant at its deposition whether carrying a torch during the march was unlawful. Defendant's answer was no. (Pls.' Ex. Q, Cathy Lanier Dep. Tr. 59-60.) Defendant's repeated reference to torches, without discussion of law or mention of its own legal concession on the subject, aptly illustrates defendant's injection of irrelevant imagery into the briefing of this case.[25]

The principal image that defendant's memorandum seeks to convey by its prose is that property destruction and violence were the pervasive and dominant characteristics of the activity

---

[25] Defendant also asserts, without reference to law, that "Many Marchers used bandannas . . . and other items to cover their faces." Def.'s Mem. at 4. Defendant, however, does not deny that persons have a constitutional right to demonstrate anonymously. Nor did it deny this at its deposition. (Pls.' Ex. Q, Cathy Lanier Dep. Tr. 67.)

in the street.  Again, defendant seeks to convey this image without reference to law.  We expressly addressed the applicable legal principle in our opening memorandum.  We noted that, because probable cause to arrest must be particularized as to each individual arrested, the illegality of a mass arrest does not depend on whether there was lack of probable cause to arrest a small or large percentage of the group.  Pls.' Mem. in Support of Mot. for Partial Summary Judgment on Liability at 6 n.3.  A mass arrest is invalid unless there is probable cause to arrest each and every member of the group.  *Barham v. Ramsey*, 424 F.3d 565, 573 (D.C. Cir. 2006).  The probable percentage of wrongdoers among the group, whether high or low, is irrelevant.

Defendant's memorandum does not dispute this point of law, but it nonetheless persistently and irrelevantly seeks to convey the image of an assembly whose principal activity is not marching and political expression, but property destruction and violence.  In painting this prose image, defendant's memorandum makes no reference to defendant's own estimates of the number of march participants and the number of acts of property destruction or violence that occurred.  Based on defendant's estimates, and even assuming that each act was committed by a different individual and that each of them was a march participant—assumptions that likely overstate criminal act participation by a factor of two or more—the number of persons who committed acts of property destruction or violence was small compared to the number of marchers.  According to defendant there were 250-300 marchers.  (Pls.' Ex. F, Cathy Lanier Dep. Tr. 32.)  According to defendant, "at least 10 to 15 rocks or bricks" were thrown, "[a]t least four or five" newspaper boxes were hauled into the street, and "several" people, an unknown number, spray painted objects.  (Pls.' Ex. F, Cathy Lanier Dep. Tr. 35-37.)   According to this testimony, the wrongdoers were few compared to the many who marched peacefully.  The image

of the march portrayed in defendant's memorandum is not only irrelevant but false, based on defendant's own evidence.

The video tapes indisputably show at least major portions of the march on Columbia Road and 18th Street. The portions on film show large numbers and the overwhelming majority of march participants engaged solely in peaceful marching and political expression. The video tapes, not the prose in defendant's memorandum, are evidence. The evidence, particularly the video tapes, shows that the violent imagery that pervades defendant's memorandum has no roots in reality.

### 6. Mass Arrest of the Plaintiffs for Rioting or Conspiracy to Riot, Absent an Order to Disperse, Violated the Fourth Amendment

We have shown that, on the undisputed evidence, it was impossible for the police to have probable cause to arrest, for rioting or conspiracy to riot, each individual in the street or in the alley. In the circumstances of this case, mass arrest without an order to disperse violated the Fourth Amendment. As our Court of Appeals said in *Barham*:

> Our case law addressing large-scale demonstration scenarios does not suspend—or even qualify—the normal operation of the Fourth Amendment's probable cause requirements. Rather, this case law merely amplifies one essential premise that has a bearing on the case at hand: when compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protestors, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order.

*Barham*, 434 F.3d at 575. If a riot begins in the midst of a peaceful demonstration and police cannot identify the individuals who are committing or encouraging illegal acts (or who conspired to commit or encourage them), the only way police on the scene can determine who is rioting and who is not is by giving an order to disperse and a reasonable opportunity to comply. Only then can police justifiably detain, as a group, those who fail to obey the order and remain in the area where rioting continues to occur. It is undisputed that police arrested the plaintiffs *en*

*masse*, without giving an order to disperse.  Under *Barham*, the mass arrest of the plaintiffs was unconstitutional.[26]

B. **Arrest of the Plaintiffs for Demonstrating Without Police Permission Would Have Been Unlawful, and Charging Them with This Offense Was Unlawful, Because Police Did Not Order the Marchers to Disperse or Inform them that Permission was Denied**

Defendant does not dispute that demonstrating in the street without police permission is not and cannot be a strict liability offense.  Defendant does not dispute that, for this reason, arresting or charging a group of persons for demonstrating without permission requires evidence that each person in the group actually knew there was no permission.  *See United States v. Sheehan*, 512 F.3d 621, 631 (D.C. Cir. 2008); *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 611-12 (6th Cir. 2005).

---

[26] Defendant's argument that it was constitutionally permissible for police to effect the mass arrest of the plaintiffs without an order to disperse ignores the appellate holding in *Barham* and instead relies solely on events in the district court that preceded the appellate decision.  Def.'s Mem. at 34-35.  Obviously, even if there were contrary district court rulings preceding the *Barham* appellate decision, these rulings could not be followed now by this Court.  Further, Judge Sullivan's determination that there was no need to issue a preliminary injunction in *Barham* and his approval of a private settlement in *Abbate v. Ramsey*, 355 F. Supp. 2d 377 (D.D.C. 2005), were not rulings on the merits of any constitutional claim.  Judge Sullivan did not hold in *Barham* that arrest without warning of an "undifferentiated crowd of protestors" was constitutional.  Rather, Judge Sullivan declined to address the circumstances in which arrest of demonstrators without warning was constitutional, and the only example defendant's counsel offered at the hearing was arrest without warning of individuals who frolicked in the street and were struck by traffic.  (Pls.' Ex. F, Cathy Lanier Deposition Ex. 2 (*Barham* Transcript) at 40-41.)  Nor did the *Abbate* settlement approve arrest without order to disperse of an "undifferentiated crowd of protestors."  The *Abbate* settlement required that there be no mass arrest unless "some means exist to match each person to be arrested with a specific offense which there is probable cause to believe that person committed."  355 F. Supp. 2d at 382-83.  Where such particularized probable cause existed as to each individual in a group, the settlement nonetheless went on to require that three orders to disperse be given and reasonable opportunity to disperse be afforded to the extent that circumstances reasonably permit.  Def.'s Mem. at 35, *quoting Abbate*.  The *Abbate* settlement did not say that police could arrest an "undifferentiated crowd of protestors" without any order to disperse.

It is undisputed that police arrested plaintiffs without ordering them to stop their march or to disperse, or otherwise informing them that their demonstration was not allowed.  (Pls.' Ex. F, Cathy Lanier Deposition Ex. 4 at 3-4.)  For this reason, police lacked probable cause to arrest or charge plaintiffs for demonstrating in the street without police permission.  Because the police gave no order or warning, they had no evidence that each individual arrested actually knew that permission had not been granted.  *Sheehan*, 512 F.3d at 631 (police warning that demonstrator lacks permission is evidence of demonstrator's actual knowledge, but demonstrator must be permitted to defend against charge by asserting she did not hear the warning).

As we have noted, Magistrate Judge Facciola recommended that plaintiffs in *Alliance for Global Justice* be granted summary judgment.  There, the District presented evidence that police had given demonstrators warning orders and had afforded them opportunity to comply; but, as Magistrate Judge Facciola found, no evidence showed that each person arrested had heard an order.  *Alliance for Global Justice v. District of Columbia*, No. 01-811 (D.D.C. Feb. 28, 2008) at 6.  Here, it is undisputed that police did not even give an order that plaintiffs could have obeyed to avoid arrest.

Defendant erroneously argues that no order to disperse and opportunity to comply was required before effecting the mass arrest of the plaintiffs.  As noted above, our Court of Appeals held precisely the opposite in *Barham v. Ramsey*, 424 F.3d 565, 575 (D.C. Cir. 2006).  Absent an order to disperse or an order informing plaintiffs that they lacked permission to demonstrate, it was impossible for the police to know that *any* demonstrator, let alone *each* and *every* demonstrator, actually knew that she or he lacked permission to demonstrate.

Defendant erroneously argues that an order to disperse or other police communication denying permission to continue the demonstration was not required to satisfy the scienter

requirement of *Sheehan* and *City of Dearborn*.  Defendant asserts that "the organizers" of the march "knew there was no permit," Def.'s Mem. at 41; but the police had no probable cause to believe that *any* individual arrested in the alley, let alone *each and every* person arrested in the alley, was an organizer of the march.  Defendant does not claim to the contrary.

Further, the Court cannot accept defendant's argument that the absence of "prior internet communication about the proposed march should have caused these sufficiently savvy demonstrators to infer that the organizers had not obtained the required permit from the MPD." Def.'s Mem. at 31.  Police had no evidence that each person arrested was a "savvy demonstrator" who knew of the absence of prior Internet communication about the march.  Evidence of actual knowledge, not presumption of knowledge that arguably should have been inferred from silence, is required.  Absence of communication about a fact is not actual knowledge of that fact. Absence of Internet communication about a march does not impart actual knowledge that police permission has not been granted.  In deciding whether to join a street march, persons have no duty to assess circumstances and draw inferences about whether police have granted permission. *City of Dearborn*, 418 F.3d at 611-12.  Nor do persons have any obligation to conduct a thorough search of relevant Internet websites before undertaking First Amendment activity.  And even if a plaintiff did search the Internet and note the absence of reference to a permit, that provides no basis even for inference, let alone actual knowledge, about whether police on the scene, in accordance with announced District of Columbia policy, have decided to allow a street march that has no written permit.[27]

---

[27] Defendant concedes that it was District policy not to arrest persons simply for parading in the street without a written permit.  Def.'s Mem. at 37 ("'I'll say it again.  We wouldn't arrest for parading without a permit after September 2004.'" (quoting Lanier Tr. 19:20-21)).

Defendant argues that "MPD was *not required to facilitate* plaintiffs' mid-night, torch-bearing, drum-pounding march," Def.'s Mem. at 41 (emphasis added); but this argument is irrelevant. Defendant admitted that District policy generally required the police to support peaceful demonstrations that did not have a written permit. See our opening memorandum at 22 (quoting testimony of former Police Chief Ramsey and citing defendant's admission that the testimony was true). Defendant does not argue that mid-night marches, with or without drums or torches, are unlawful per se.[28] Whether it would have been a reasonable time, place, or manner restriction for police to order persons to stop marching at that time of night or to order individuals with torches to extinguish them or drummers to stop drumming is irrelevant. What is relevant, and undisputed, is that the police gave no such orders. Absent such orders, police had no probable cause to believe that anyone actually knew that the police were unwilling to permit marching at that time, or carrying torches, or drumming on drums.[29]

Defendant erroneously argues that "[p]ersons joining the march . . . would have been able to recognize, based on the destruction surrounding the march, that it was not an event proceeding according to an MPD permit." Def.'s Mem. at 32. Under *Sheehan* and *City of Dearborn*, evidence of actual knowledge, not presumption of knowledge that could have been inferred from surrounding circumstances, is required. But even if marchers could be held liable merely for failing to infer what they reasonably should have inferred, it is not the case that reasonable marchers necessarily should have inferred that the police had denied permission to march. It is undisputed that plaintiffs were peacefully marching and that the police never announced that the

---

[28] Nor does defendant argue that police had probable cause to believe that everyone arrested in the alley was a person who had carried a torch or drummed on a drum, even if such acts were unlawful.

[29] This is the relevant point, but it is also true that police previously had allowed night marches in the streets of the same neighborhood, having no written permits, and replete with drums, amplified sound, and "fire breathers." (Pls.' Ex. W, Adam Eidinger Dep. Tr. 87-99.)

march was unlawful and never ordered participants to disperse.   In these circumstances plaintiffs

reasonably could and should have inferred that the peaceful march was proceeding with police

permission and that police would only seek to arrest individuals who committed acts of property

destruction or violence

In sum, the mass arrest of the plaintiffs without order to disperse or other police

communication denying permission to demonstrate violated the Fourth Amendment because,

first, it was contrary to the explicit requirement of *Barham* and, second, it meant that, under *City

of Dearborn* and *Sheehan*, police lacked probable cause as to the scienter element that must be

read into any prohibition against demonstrating without police permission.

### C.  Under District Policy, Plaintiffs Could Not Be Arrested for Parading Without a Permit

Defendant's memorandum admits that District of Columbia policy prohibited arrest for

parading without a permit: "Had plaintiffs been arrested because they had paraded without a

permit, rather than being arrested on another valid basis and charged with the lesser offense of

parading without a permit, the arrest decision would have been inconsistent with District policy."

Def.'s Mem. at 37.[30]  As defendant's memorandum describes the District's policy, parading

without a permit was a criminal offense, but an offense for which a person could only be

charged, not arrested.[31]

---

[30] Defendant's admission that arrest *for* parading without a permit was, without exception,
prohibited, renders moot the question whether the First Amendment allows a policy that
generally precludes arrest without warning for parading without permission but has unstated
exceptions of which the public has no notice.

[31] Defendant's argument, Def.'s Mem. at 38, that its written permit scheme was constitutional is
irrelevant.  Plaintiffs do not claim otherwise.  The question presented is whether plaintiffs were
arrestable for not having a permit (or for rioting or conspiracy to riot), not whether defendant's
written permit scheme was, on its face, unconstitutional.

If plaintiffs could not be arrested for parading without a permit, and if there was no probable cause to arrest plaintiffs for rioting or conspiracy to riot, then arrest of the plaintiffs was unreasonable.[32]   Arrest of a person who is not arrestable is unreasonable.  An arrest is a seizure, and an unreasonable arrest therefore is an unreasonable seizure.  An unreasonable seizure violates the Fourth Amendment.

An unreasonable arrest for marching in the public street for political purposes also violates the First Amendment.  Marching in the public street for political purposes is protected First Amendment conduct that is subject only to reasonable time, place, or manner restrictions narrowly tailored to serve legitimate government interests.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clarke v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Perry Education Assn. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45 (1983).  An unreasonable arrest is not a reasonable time, place, or manner restriction.  Unreasonable arrest serves no legitimate government interest.  Arrest of a person who is not arrestable is also a false arrest under District of Columbia common law.  *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C. 1973) ("The gist of any complaint for false arrest or false imprisonment is an unlawful detention").

---

[32] Defendant has the burden of proving probable cause.  *Dellums v. Powell*, 566 F.2d 167, 175-76 (D.C. Cir. 1977).  Rioting, conspiracy to riot, and parading without a permit are the only offenses that defendant's memorandum discusses.  If there was no probable cause to arrest the plaintiffs for rioting or conspiracy to riot and if they were not arrestable for parading without a permit, then defendant has failed to show that plaintiffs were arrestable for anything.  Defendant's memorandum at 39 asserts without explanation that the police "had probable cause to arrest . . . *all*" plaintiffs because they all "were breaking the law from the time they massed in the roadway until the time they tried to run away from police after the assault on Riley's car."  (Emphasis in original.)  Defendant does not state what law plaintiffs were breaking and why all of them were subject to arrest simply for assembling in the roadway or running away from police after an incident of rock throwing.  And, of course, police had no probable cause to believe that each person arrested in the alley was a person who had "massed in the roadway" and attempted to "run away from police" after the assault on Riley's car.

Because plaintiffs could not be arrested for parading without a permit, the Court need not decide whether parading without a permit was a criminal offense. Even if it was, plaintiffs were not arrestable for that offense. If there was no probable cause to arrest plaintiffs for rioting or conspiracy to riot, plaintiffs are entitled to prevail on their claims for unlawful arrest, for they were not arrestable for the only other offense that defendant mentions.[33]

Alternatively, the Court should hold that parading without a permit was not a criminal offense. To support this argument, we rely on our previous submissions.

## II. No Motion for Injunction is Pending Before the Court

Defendant argues that no injunction should issue, Def.'s Mem. at 42-44, but no motion for an injunction is before the Court. At the October 11, 2007, status hearing the Court expressly instructed plaintiffs not to seek an injunction at this time and said that the cross motions for partial summary judgment would address only liability. In accordance with the Court's instruction, plaintiff's motion seeks only summary judgment on liability. It does not request that the Court issue an injunction.

Our opening memorandum argued that, because District of Columbia policy allowed the unlawful arrest of the plaintiffs and the District expressly has asserted that mass arrest of demonstrators would be appropriate if similar circumstances were to arise again, the Court

---

[33] Defendant's discussion of practice in April 2000, Def.'s Mem. at 27-28, is not relevant. The applicable practice had been established in September 2004. Defendant erroneously asserts that "enforcement of the regulation through arrest . . . had been upheld against a challenge in *Barham* in September 2004." Def.'s Mem. at 26. Rather, at the September 2004 *Barham* hearing, the District announced its policy that it would no longer arrest persons parading in the street "simply because [they] haven't got a permit." (Pls.' Ex. F, Cathy Lanier Deposition Ex. 2 (*Barham* Transcript) at 31.) As stated in defendant's memorandum at 37, persons would be arrested thereafter only "on another valid basis." Defendant's discussion of the January 2005 settlement in *Abbate v. Ramsey*, 355 F. Supp. 2d 377 (D.D.C. 2005), Def.'s Mem. at 27, is irrelevant and omits the relevant part, acknowledged later, which expressly said, "An assembly of persons will not be arrested simply because the group does not possess a permit." Def.'s Mem. at 35.

should hold the District *liable* for injunctive relief as well as damages.  Pls.' Opening Mem. at

26.  An order granting plaintiffs' motion and holding defendant liable for injunctive relief as well

as damages would not necessarily mean that the Court would be required to issue an injunction.

If the Court grants plaintiffs' motion and finds defendant liable to plaintiffs, plaintiffs

thereafter will determine whether to seek an injunction.  Plaintiffs do not request an injunction

now.

### III.   Singer's Assault and Battery Claim is Unopposed and Defendant's Opposition to Chelsea Kirk's Claim Lacks Merit

Defendant does not dispute at all plaintiff Singer's chemical spraying assault and battery

claim.

Defendant does not dispute that the officer who handcuffed Chelsea Kirk acted within the

scope of employment and that the facts stated by plaintiff, if true, establish an assault and

battery.  Defendant presents no evidence from either the officer who applied the handcuffs or

anyone who saw that officer apply them.  Defendant presents no evidence that any officer looked

at plaintiff's wrists and saw that the handcuffs were not too tight or that the wrists were not

injured.   Plaintiff's account of what happened when the cuffs were applied is uncontradicted.

Plaintiff's testimony that her wrists were bleeding from the handcuffs is uncontradicted.  (Pls.'

Ex. T, Chelsea Kirk Dep. Tr. 174.)

Defendant's only evidence regarding Ms. Kirk is a declaration from Michael Topper, the

arresting officer who was photographed with plaintiff twice and depicted with her in the field

arrest form.  Citing that declaration, defendant's memorandum states:

> Topper removed her flexcuffs . . . and replaced them with another pair.  In doing
> so he did not observe any injury to Kirk's wrists as she describes and she did not
> complain of such injury.  Topper applied the new flexcuffs in accordance with
> MPD standard operating procedures which require the officer to place one finger
> within the flexcuff band and tighten the cuffs only to the point that they press

upon the officer's finger.  *Id.*  This procedure is intended to protect against
injuries of the nature that Kirk claims.  *Id.*

Def.'s Mem. at 44-45 (citing Def.'s Ex. 10, Topper Dec. and C. Kirk arrest photo II), filed as

Doc. 48-14 on February 23, 2008.

This portion of defendant's memorandum is unsupported by evidence.  The Topper

declaration (Doc 48-14) says none of this.  To the contrary, Officer Topper expressly states, "I

did not apply flexcuffs to any of the persons arrested."  (Def.'s Ex. 10, Dec. of Michael Topper ¶

10.)  Nowhere does he say that he removed and replaced plaintiff's flexcuffs.  He merely says

that "Ms. Kirk did not complain to me, . . . I did not hear Ms. Kirk complain . . . at any time" and

"I did not observe any injury to her wrists" at the two times when they were photographed

together.  (*Id.* at ¶¶ 11-13.)  But he never says that he *looked at* plaintiff's restraints and *saw* that

they were *not* too tight or *saw* that her wrists were *not* injured.  Officer Topper's declaration thus

indicates that he observed no injury to Ms. Kirk's wrists because he never looked at her wrists.

His declaration does not state facts warranting an inference that plaintiff's uncontradicted

account of what happened, and the injury that resulted, is untrue.

Complaining about an assault and battery, let alone complaining to a particular person, is

not an element of assault and battery.  To prevail, plaintiff has no obligation to present evidence

that she complained, much less that she complained to Officer Topper.  Nonetheless, it is

undisputed that plaintiff *did* complain about the too-tight cuffs and injury to her wrists.  She not

only complained to the officer who applied them, resulting only in their being yanked tighter, she

also complained later, after the first cuffs (which were behind her back) were removed and the

second cuffs were applied (in front), enabling her to see that her wrists were bleeding.  After the

second cuffs were applied, she showed her bleeding wrists to an officer.  She testified "[l]ater,

when we were in the holding facility, I asked if they could be loosened.  And he said the only

way they could be loosened is if you're bleeding.  And I showed him that I was bleeding and he said, I'm sorry, they're—you'll slip out of them if I loosen them."  (Pls.' Ex. T, Chelsea Kirk Dep. Tr. 174.)  Neither of these officers was Topper.

Plaintiff's testimony that her cuffs were applied to tightly, that when she immediately complained they were yanked tighter, that her wrists were bleeding as a result, and that she showed her bleeding wrists to an officer is uncontradicted.  Topper's declaration saying only that he did not "observe any injury," without stating that he looked, and that plaintiff did not complain to him, though it is undisputed that she complained twice to other officers, does not create a genuine dispute of material facts warranting trial.

This is dispositive, but there is additional uncontradicted evidence showing that plaintiff had ample reason not to complain to or seek any help from Officer Topper.  Plaintiff testified at her deposition that during the time she and seventy or so other arrestees were detained in the alley, police forced them to remain in a stress position on their knees with their hands on their heads.  After being in this position

> however long, your legs start to go numb.  You lose circulation in your legs,
> you lose circulation in your arms from keeping them up . . . . And some people
> were—were resting their bottoms down on their legs on the back of their legs
> to try to relieve the pain from our knees.  And one officer would go through and
> kick them until they sat back up in the original stress position . . . . At one
> point the officer was walking through the crowd to kick someone back into
> position and he pushed me over for no reason.  I was sitting up on my knees
> like I was supposed to, not saying anything, and he kicked me.

*Id.* at 154-55.  The officer who kicked plaintiff and other arrestees was Officer Topper.  Plaintiff remembered him because he turned out later to be her arresting officer.  *Id.* at 206-07.  *See also* Pls.' Ex. S, Allyson Kirk Dep. Tr. 118-21, 124-25 (testifying that an officer kicked Chelsea and others, and identifying the officer who did this as Officer Topper).  Officer Topper's cruelty is

not conduct that would inspire belief that he would help an arrestee in pain.  That plaintiff did

not complain to *him* about her cuffs is not a basis for denying her summary judgment.

**Conclusion**

      For these reasons, plaintiffs' motion for partial summary judgment should be granted in

its entirety.  Defendant's cross motion for partial summary judgment should be denied.

                                        Respectfully submitted,

                                        /s/ Arthur B. Spitzer
                                        Arthur B. Spitzer, D.C. Bar No. 235960
                                        Fritz Mulhauser, D.C. Bar No. 455377
                                        American Civil Liberties Union
                                        of the National Capital Area
                                        1400 20th Street, NW, #119
                                        Washington, DC 20036
                                        202/457-0800

                                        /s/ Daniel M. Schember
                                        Daniel M. Schember, D.C. Bar #237180
                                        Susan B. Dunham, D.C. Bar # 362378
                                        Gaffney & Schember, PC
                                        1666 Connecticut Avenue, NW, Suite 225
                                        Washington, DC 20009
                                        202/328-2244

                                        On behalf of the D.C. Chapter, National Lawyers
                                        Guild and the American Civil Liberties Union of the
                                        National Capital Area

                                        Counsel for Plaintiffs

April 11, 2008