UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH CARR, et al.,

        Plaintiffs,

v.                                     Civ. A. No. 06-00098 (ESH)

DISTRICT OF COLUMBIA,

        Defendant.

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABIILTY**

# Exhibit Q

# Excerpts, Deposition of Cathy Lanier

Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National
Lawyers Guild and the American Civil
Liberties Union of the National Capital Area

Counsel for Plaintiffs

59

1  from the stage that Lieutenant Pavlik reported to you
2  as having occurred?
3      A   I believe he summarized the content of the
4  announcement.  I don't believe it was a verbatim
5  repeat.  But that there was a person with a microphone
6  who was advising members of the group that there would
7  be a march, I believe initially had been planned for
8  midnight, and that they would crash the inaugural ball
9  sites.
10     Q   What information did you receive from
11 Lieutenant Pavlik regarding a plan to engage in
12 property damage along the way?
13     A   Again, in summation, he indicated that
14 there were discussions about engaging in various types
15 of property damage along the way, to include the use
16 of spray paint.
17     Q   And you understood him to mean discussions
18 among persons at the concert?
19     A   I understood him to mean both discussions
20 among persons at the concert -- I would say yes, among
21 persons at the concert.
22     Q   Was the carrying of flaming torches by

60

```
 1   persons engaged in the march a criminal act?
 2           MR. KOGER:  Calls for a legal conclusion.
 3   You may answer.
 4           THE WITNESS:  I would say simply carrying a
 5   torch, no.
 6           BY MR. SCHEMBER:
 7      Q    Further down on page 8, was the playing of
 8   makeshift drums by members of the march a criminal
 9   act?
10      A    After 11:00 p.m. in a residential
11   neighborhood being loud and boisterous, yes.
12      Q    Was playing a makeshift drum being loud and
13   boisterous?
14      A    Yes, very.
15      Q    Was chanting loudly in the march a criminal
16   act?
17      A    Again, I will describe -- the answer is
18   yes.  Again, I will describe this as not an orderly
19   march with a few people beating on drums.  This was a
20   chaotic mob of people who were extremely disruptive
21   and violent in their conduct in proceeding through a
22   residential neighborhood to a point where people
```

61

1  living in the neighborhood were yelling at them out
2  their windows to stop destroying their property.  It
3  was a very chaotic scene.
4       Q    Did you hear the residents say that?
5       A    Yes.  Yes, I did.
6       Q    How many residents did you hear say that?
7       A    I observed two young men in an apartment
8  window screaming down, trying to get over the sound,
9  loud sound of the group, about his car being destroyed
10 by the group as they moved through the street.
11      Q    Did you have any information indicating
12 that any of the persons arrested in the alley had
13 thrown a missile into public space?
14      A    The persons arrested in the alley were part
15 of the mob of people that were engaging in a riotous
16 behavior, yes.
17      Q    Are you saying that each and every one of
18 them through a missile?
19      A    I didn't say I could identify who threw
20 missiles.  I said the persons that were arrested in
21 the alley were part of a large group of persons
22 engaging in a riot.

1    Q    Each and every person arrested in the alley
2  was engaged in a riot?
3    A    The definition of a riot is groups of five
4  or more. Those persons who were not engaging in
5  riotous behavior would have walked away.
6    Q    Did the persons, then, in your view, have a
7  duty to walk away?
8    A    I would say persons in that group who saw
9  the violent and destructive behavior and conduct of
10 those persons, for their own safety, if not common
11 sense, should have walked away.
12   Q    But to avoid committing the offense of
13 rioting, they had a legal duty to walk away?
14   A    They remained with a riotous group of
15 people engaging in very destructive and dangerous
16 behavior.
17   Q    When you say remained with, do you mean
18 were in the presence of?
19   A    I mean were engaging with the mob of folks
20 engaging in the riotous behavior.
21   Q    Everyone was engaging in riotous behavior?
22   A    The entire group.

63

1     Q    And that includes those who did not
2 themselves throw missiles or light fires or destroy
3 property?
4     A    Riotous behavior includes incitement and
5 loud chants and screaming and incitement of the other
6 folks. There's a lot of different conduct involved in
7 riotous behavior. So I'd say everyone in that group
8 that I observed was engaged in riotous behavior.
9     Q    Because they did acts -- those who did not
10 personally commit acts such as lighting a fire or
11 throwing a missile incited others to do that; is that
12 what you're saying?
13     A    Let me clarify what I'm answering and
14 answer your question. Every member of that group was
15 guilty of rioting.
16     Q    Why?
17     A    Because of the conduct that they were
18 engaged in with that large group.
19     Q    And what conduct was that?
20     A    The same conduct as described in the past
21 20 minutes. The large group was very loud,
22 boisterous, disruptive. They were inciting other

64

```
 1   members of the community, were engaging in property
 2   damage and dangerous behavior, dangerous to the
 3   public.  They were walking in traffic and destroying
 4   property.
 5        Q    But each and every one of them did not
 6   destroy property.  What was the conduct --
 7             MR. KOGER:  Argumentative.
 8             BY MR. SCHEMBER:
 9        Q    Correct?  You're not testifying -- it's not
10   your understanding that each and every one of them
11   destroyed property, correct?
12        A    I didn't say each and every one of them
13   destroyed property.
14        Q    What did those who did not themselves
15   destroy property do to be guilty of rioting?
16             MR. KOGER:  Asked and answered.  You may
17   answer.
18             THE WITNESS:  I've answered the question
19   four times.  They were in a large group of people
20   walking in and out of traffic, creating a hazard,
21   being loud and boisterous in a late hour and engaging
22   with the rest of the group in what was dangerous
```

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

65

1  behavior.
2         BY MR. SCHEMBER:
3     Q   What do you mean by -- what did they do to
4  engage with the rest of the group?
5     A   Walking into moving traffic, first of all,
6  is part of dangerous behavior, I would say, especially
7  at 11:30 at night.
8     Q   Anything else?
9     A   The entire conduct of the group was
10 dangerous.
11    Q   In your declaration, you refer to persons
12 wearing black clothing, correct?
13    A   Black and dark clothing, yes.
14    Q   Was it a criminal act to wear black or dark
15 clothing?
16    A   Absolutely not.
17    Q   Was it a criminal act to wear a bandana
18 over the face?
19    A   I believe there's a statute about masking,
20 wearing a mask in public.
21    Q   So are you saying it was a criminal act for
22 them to wear bandanas?

MISTY KLAPPER & ASSOCIATES     (703) 780-9559

1    A    I did not charge them with a criminal act
2  of covering their face, no.
3    Q    Is it your understanding that persons who
4  wish to exercise First Amendment rights do not have
5  the right to do so while covering their faces?
6         MR. KOGER:  Vague and ambiguous,
7  speculative in that there's no foundation to this
8  hypothetical question --
9         THE WITNESS:  My concern --
10        MR. KOGER:  -- which calls for a legal
11 conclusion.
12        THE WITNESS:  My concern is with a group
13 engaging in that type of riotous behavior, the
14 increased anonymity of the members of the group only
15 adds to the danger of the mentality of that group
16 becoming more dangerous.  So it was a concern for me
17 as a police officer.
18        BY MR. SCHEMBER:
19   Q    How does wearing a mask have that effect?
20   A    Well, it's actually been -- there have been
21 numerous studies done on the dynamics of mob behavior.
22 But the ability to have a sense of anonymity by one

67

1   masking one's identity or covering one's identity and
2   melding into a much larger group where you are less
3   visible as an individual is a large part of what
4   creates potentially a dangerous situation when you
5   have a mob that's engaging in setting fires and
6   engaging the type of activity that was going on that
7   night with that group.
8       Q    Did you have information indicating that
9   every person who covered his or her face with a
10  bandana did so to further the unlawful acts of
11  themselves or others?
12      A    I didn't have information as to the reason
13  why any of those people covered their face.
14      Q    What was the temperature outside that
15  night?
16      A    I don't recall.  It was January.  It was
17  cold.
18      Q    Are you aware of whether the constitutional
19  right to engage in assembly and expression includes
20  the right to do so anonymously?
21      A    Yes.
22           THE WITNESS:  Are we going to take a lunch