UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH CARR, *et al.*,        )
                             )
            Plaintiffs,      )
                             )
   v.                        )   Civ. A. No. 06-00098 (ESH)
                             )
DISTRICT OF COLUMBIA,        )
                             )
            Defendant.       )
_____)

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABIILTY**

# Exhibit S

# Excerpts, Deposition of Allyson Kirk

Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National
Lawyers Guild and the American Civil
Liberties Union of the National Capital Area

Counsel for Plaintiffs

108

1   point.  So, it was on the same road that the
2   commercial area was that the car was hit with the
3   brick.  But we weren't within proximity of a
4   restaurant at that time.
5       Q.   If you had continued going along on
6   Columbia -- were you on Columbia before you turned
7   onto Belmont?
8       A.   Columbia was the first road that we
9   started off on that was still residential.
10      Q.   Right.
11      A.   And I believe there was a left-hand
12  turn onto a commercial road.
13      Q.   Okay, then you took a route off that
14  commercial road onto Belmont; is that right?
15      A.   Correct.
16      Q.   If you had stayed on the commercial
17  road were there other establishments that were
18  open ahead of you?
19      A.   I could not see that, unfortunately,
20  because there were a lot of people and cars and
21  commotion in the front.  So I could not see over
22  the crowd at that point.

```
 1       Q.    What was the commotion?
 2       A.    People shuffling, the cars following,
 3  the police cars following, the helicopter above
 4  with the lights shining and sirens.  I believe
 5  there were police on foot coming in at that point
 6  too.
 7       Q.    From ahead of you?
 8       A.    I believe so, yes.
 9       Q.    You make the right on Belmont, if you
10  will --
11       A.    Yes.
12       Q.    -- and then what happens?
13       A.    We make a right.  We are distanced from
14  the march at this point but we are still
15  accompanied by --
16       Q.    Behind it?
17       A.    Behind the march.
18             Really, I believe at this point it was
19  not well-grouped anymore.  There were people kind
20  of scattering because there were police on foot
21  coming and there were the cars -- there were more
22  cars, more sirens coming it sounded like.  So the
```

110

1    group seemed to be slightly disorganizing, I guess
2    you would say.
3         We had already broken off from the
4    group and were behind, basically looking for a way
5    to get back to the main road or back to the
6    church.  Because we really were not familiar with
7    the area and knew no other Metro station nearby,
8    so we moved more further down Belmont.
9         It was just Chelsea, Josh and I.  I
10   believe there were a couple of people following
11   behind us and we were talking about how to get
12   back to the Metro or what road we were on or where
13   we were basically.
14        And we decided -- we -- while we were
15   moving forward on Belmont we could see more
16   commotion again ahead of us as in more cops coming
17   in on foot.  The lights were still shining from
18   the helicopter and there were sirens coming from
19   that angle.
20        So, we turned right onto an alleyway.
21   Partially to avoid the commotion that was going on
22   up with the police and the protesters, and then

111

1  also because it appeared that alleyway connected
2  to the original road that we had been on.  So we
3  turned down that road, hopefully getting back to
4  where the church was.
5      Q.   And what happened?
6      A.   We got just a slight way down the
7  alley, Chelsea, Josh and I and a few other people
8  behind us.  And there were police that came in and
9  blockaded the end of alleyway and in riot gear.
10     Q.   Where did they come from?
11     A.   The other road.
12     Q.   So they are --
13     A.   Coming.
14     Q.   -- they are coming towards you?
15     A.   Correct.
16     Q.   Okay.
17     A.   There were maybe ten police or so
18 dressed in riot gear.  And they started shouting
19 but it was still far so we couldn't really hear
20 what they were saying, so we kept moving forward.
21          We decided that it would be -- that we
22 should just go forward and try to talk to the

1  police and say that we were just trying to get
2  back to the Metro.  And we had already distanced
3  and removed ourselves from the march and we were
4  just trying to get back home at this point, so we
5  decided to try to approach the police.
6        And one of the them in the middle of
7  the group knelt down and aimed a gun at us and we
8  stopped at that point.  And we were close enough
9  too so we could start to hear what they were
10 saying.  And they were saying freeze, get back,
11 get back, stop moving, freeze, put your hands on
12 your head.  And so, we stopped and put our hands
13 on our head.
14    Q.   What can you tell me about the officer
15 who knelt and pointed a gun at you?
16    A.   He was smaller stature than the other
17 police, but unfortunately can't make out too much
18 detail because they were all dressed in the same
19 riot gear.  But he was in the center of the group
20 of them and was a shorter man, I believe.
21    Q.   Visor up or down?
22    A.   Down.

118

1  officer that was standing in front of us what we
2  were being detained for and he didn't -- just
3  didn't answer me.  And then I asked if we were
4  being arrested, are we going to jail, are we being
5  arrested, and they said yes.
6         And I said -- I was still asking why
7  and they wouldn't answer; they just didn't answer
8  me.
9         And basically we stayed there for a
10 long period of time.  We did not know why we were
11 being detained.  A couple of people were asking
12 for officers' badge numbers or names for
13 identification purposes and they were told no.
14        There was cruel conduct by the police,
15 by some of the police that were there as far as
16 threats that were made when people were trying to
17 ask and they would get -- people were asking
18 questions and they were getting frustrated and the
19 police were getting frustrated with them.
20        And one officer said shut up, you are
21 in a dark -- you're in a D.C. alleyway, we could
22 do whatever we want to do right now.

119

1        They would -- any time anyone would try
2   to sit down, because it was very hard on your
3   knees on the ice on the pavement, it was uneven,
4   like concrete and some gravel there, so it was
5   very difficult to kneel on your knees with your
6   hands on your head because it just put all the
7   pressure, all the stress on your knees.
8        People would try -- you know, we would
9   try to sit our behind on our legs since it was
10  less stress on your knees.  And an officer would
11  move through the crowd and kick the person back
12  into position and yell and say get up, get back up
13  on your knees.
14       And basically we just stayed there for
15  -- it was, I think, two hours total in that
16  position, maybe just under two hours in the
17  position because we were eventually told to stand
18  up and searched individually and handcuffed and
19  moved more towards the vans where we were loaded
20  into.
21       Q.   Where were you over this course of
22  kneeling in relationship to your sister Chelsea?

120

1    A.    Right behind her, maybe a little bit to
2    the left.
3    Q.    Did you observe anyone touch her?
4    A.    One of the officers, I guess like I
5    said, who had moved through and were kicking
6    people back in position did, at one point, kick
7    her with his boot as he was walking by.  And told
8    -- or just kicked her as he was walking by.
9           She was crying the whole time and so it
10   was very frightening and frustrating to be
11   completely powerless to help her at any point.
12   Because every time I tried to talk to them I was
13   told to shut up.  And threats were made such as
14   the we can do whatever we want to you, we're in a
15   dark alley.
16          So, I did observe an officer kick her,
17   yes.
18   Q.    Can you describe that officer?
19   A.    He had -- I believe it was brown hair,
20   medium stature, Caucasian.  And that's from what I
21   remember seeing.  But I do know his name because
22   we were later taken a picture with him and he was

121

 1    our arresting officer so it was officer Topper.
 2    But visually, that's what I remember.
 3         Q.    When you were cuffed, a plastic device
 4    used as opposed to metal handcuffs?
 5         A.    Yes, they were the hard Flexicuffs.
 6         Q.    Were you cuffed with your hands in
 7    front of you or behind you?
 8         A.    Behind.
 9         Q.    When you were cuffed do you recall
10    whether the officer put his finger within the cuff
11    as he or she was closing it to determine its
12    proximity to your wrists?
13         A.    I don't remember that.  I don't
14    remember that being done.  But no, I don't
15    remember that being done.  They were just
16    tightened to the point where I just couldn't move,
17    couldn't maneuver my wrists.
18         Q.    Did it surprise you that they were
19    tightened to the point where you could not move
20    your wrists?
21         A.    I was surprised that there was -- I'm
22    going to say excessive force only because of the

124

```
 1                    AFTERNOON SESSION
 2                                           (2:45 p.m.)
 3    Whereupon,
 4                 ALLYSON MARGARET KIRK,
 5    the Witness on the stand at the time of recess,
 6    having been previously duly sworn, was further
 7    examined and testified as follows:
 8           EXAMINATION BY COUNSEL FOR DEFENDANT
 9                        (RESUMED)
10         MR. KOGER:  Back on the record.
11         BY MR. KOGER:
12      Q.   Ms. Kirk, do you recognize Exhibit 5?
13      A.   Yes.
14      Q.   This is the collateral receipt
15   reflecting your having forfeited collateral based
16   on your arrest; right?
17      A.   Yes.
18      Q.   And it reflects, in line 11 on the
19   first page, that Officer, first initial `M', last
20   name Topper, was your arresting officer; right?
21      A.   Yes.
22      Q.   And that is the officer that is also
```

125

1   reflected in the Polaroid next to you on the what
2   I'll call the field arrest form, the arrest
3   document itself; right?
4        A.   Yes.
5        Q.   And that is the officer that kicked
6   your sister while she was kneeling in the
7   alleyway; right?
8        A.   Yes, along with other people.
9        Q.   Did he kick you?
10       A.   No.
11       Q.   When you received this document, or as
12  of the time you executed this document, which is
13  Exhibit 5, did you understand its implications?
14       A.   They explained to me that it was not an
15  admission of guilt, but it was, I guess, a forfeit
16  of -- of -- I'm trying to get the way they worded
17  it.  They just -- they were advising people to
18  post and forfeit and that was the term they
19  used --
20       Q.   Um-hum.
21       A.   -- to -- that way -- our main concern
22  was being able to get home and not be admitting --