UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

SARAH CARR, et al.,

        Plaintiffs,

v.                 Civ. A. No. 06-00098 (ESH)

DISTRICT OF COLUMBIA,

        Defendant.

---

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABIILTY**

# Exhibit W

# Excerpts, Deposition of Adam Eidinger

Arthur B. Spitzer, D.C. Bar No. 235960
Fritz Mulhauser, D.C. Bar No. 455377
American Civil Liberties Union
of the National Capital Area
1400 20th Street, NW, #119
Washington, DC 20036
202/457-0800

Daniel M. Schember, D.C. Bar #237180
Susan B. Dunham, D.C. Bar # 362378
Gaffney & Schember, PC
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
202/328-2244

On behalf of the D.C. Chapter, National
Lawyers Guild and the American Civil
Liberties Union of the National Capital Area

Counsel for Plaintiffs

ADAM EIDINGER
Carr, et al v. District of Columbia, et al                                      9/21/2007

```
                                                                    1

 1               UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA

 3      - - - - - - - - - - - - - - - - -X

 4      SARAH CARR, et al.,             :

 5                 Plaintiffs,           :

 6      v.                               : Civil Action No.

 7      DISTRICT OF COLUMBIA, et al.,   : 06-0098 (ESH)

 8                 Defendants.          :

 9      - - - - - - - - - - - - - - - - -X

10                         Friday, September 21, 2007

11                         Washington, D.C.

12           Deposition of ADAM EIDINGER, a witness,

13      called for examination by counsel for the

14      Defendant, in the above-entitled matter,

15      pursuant to notice, taken at the offices of the

16      Attorney General, located at 441 Fourth Street,

17      N.W., Sixth Floor South, Washington, D.C.

18      Washington, D.C.  20001. beginning at 1:23 p.m.

19      before Leanne M. Krivonak, CVR, CCR, a court

20      reporter and notary public in and for the

21      District of Columbia.

22
```

COPY

ADAM EIDINGER
Carr, et al v. District of Columbia, et al                                 9/21/2007

2

1   APPEARANCES:

2        On behalf of the Plaintiffs:

3             GAFFNEY & SCHEMBER, P.C.

4             By:  Susan B. Dunham, Esquire

5             1666 Connecticut Avenue, N.W.

6             Suite 225

7             Washington, D.C.   20009

8                  -- and --

9             AMERICAN CIVIL LIBERTIES UNION

10            OF THE NATIONAL CAPITAL AREA

11            FREDERIC V. MULHAUSER, ESQUIRE

12            1400 - 20th Street, N.W.

13            Suite 119

14            Washington, D.C.   20036

15

16       On behalf of the Defendant:

17            OFFICE OF THE ATTORNEY GENERAL

18            By:  JAYME KANTOR, ESQUIRE

19            Senior Assistant Attorney General

20            441 Fourth Street, N.W.

21            Sixth Floor, South

22            Washington, D.C.   20001

3

1                         C O N T E N T S

2     WITNESS                                                  PAGE

3        Adam Eidinger

4           By Ms. Kantor                                      4, 119

5           By Ms. Dunham                                      82

6

7                          E X H I B I T S

8

9                         (None marked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

ADAM EIDINGER
Carr, et al v. District of Columbia, et al                                    9/21/2007

87

1   Q.  And then you testified that you might
2   have joined them, meaning the march, if you had
3   known about it.
4         Is that correct?
5   A.  Yes.
6   Q.  Why did you say that?
7   A.  Why did I say that?  Because, you know,
8   I thought there should have been more
9   protesting, not just that morning or that day,
10  so I just felt like an evening protest would be
11  effective and getting the word out that people
12  are opposed to the new -- another four years of
13  George Bush.
14  Q.  Do you recall whether or not there had
15  been other evening protests or marches in your
16  neighborhood?
17  A.  In the last five years, or we're going
18  back to say 2000?
19  Q.  Yes.
20  A.  There has been, yes.  There have been
21  marches for statehood.  I even organized one.
22  Q.  Do you recall when that took place?

ADAM EIDINGER

Carr, et al v. District of Columbia, et al                                   9/21/2007

88

1    A.  Yes, I organized one in 2002.  We

2  marched through Adams Morgan with a huge D.C.

3  flag.  When was it exactly?  I think it was

4  in -- well, it was sometime -- it was before the

5  election of 2002, and I think it was proceeding

6  a few months -- sometime -- three months, four

7  months -- actually, you know what?  I know it

8  was in April of 2002.

9    Q.  And this was the march that you had

10  organized?

11    A.  Yes.

12    Q.  And it took place during the evening?

13    A.  Yes.

14    Q.  Do you recall at what time in the

15  evening it took place?

16    A.  Yes, we -- we began marching after

17  sundown.  It was approximately 8:00 o'clock.

18        And I did another march actually that

19  same election cycle on election night eve -- the

20  day before the election.  And we had hundreds of

21  people, and we marched from about 7:30 till

22  about 10:00 o'clock at night all throughout

1   Adams Morgan and U Street.
2       Q.  You say that was during -- just before
3   the election?  Would that have been in November
4   then?
5       A.  That was in 2002 -- November 2002, yes.
6           So, April 2002 and November 2002 I,
7   personally, organized marches in my own
8   neighborhood.
9           But they started -- they actually
10  started somewhere else.  They started -- well,
11  one started at City Paper which is on Champagne
12  Street.  That was the night before the election.
13  And the other one started at HR57, which is down
14  U Street and we marched up to Adams Morgan.
15          Both of them were without permits, I
16  must would like to note.
17      Q.  Which was going to be one of my
18  questions to you.  Thank you.
19          Did these marches take place in the
20  street?
21      A.  Yes, of course.
22      Q.  And approximately how many people took

1  part in these marches?  Let's start with the
2  April 2002 march.
3      A.  About a hundred people.  And that was
4  April 2002.  And then the second one was about
5  200 people.
6      Q.  And that would have been in November of
7  2002?
8      A.  That's right.
9      Q.  And you -- just to confirm, these
10 marches took place in the street and did not
11 have permits?
12     A.  That's correct.
13     Q.  How do you know they did not have
14 permits?
15     A.  Well, nobody applied for the permit.  I
16 was the organizer.  Both of them were campaign
17 events around -- I was running for U.S. Shadow
18 Representative.  And, you know, I promoted the
19 rallies.  I made the flyers -- I mean, with the
20 help of my campaign team, but ultimately I was
21 taking responsibility for it.
22         We had a P.A. system in one of the

ADAM EIDINGER

Carr, et al v. District of Columbia, et al                    9/21/2007

91

1   marches that was in the back of a convertible
2   and was leading the march. Yes, so we did it.
3        Q.  You said you have a P.A. system. By
4   this do you mean that the sound of the march was
5   actually amplified?
6        A.  Well, we had -- myself and other people
7   were leading chants on the P.A. system. So,
8   yes, it was amplified, but we weren't, you know,
9   amplifying the crowd per se, you know.
10       Q.  Okay. So --
11       A.  That's kind of like what question was,
12  did we amplify the march, and it was like, well,
13  no, we amplified the actual march; we amplified
14  people speaking.
15       Q.  You were one of the leaders of the
16  march, however?
17       A.  On both occasions I was the leader of
18  the march.
19       Q.  And so, did you lead the crowd in
20  chanting?
21       A.  At times, yes.
22       Q.  Through an amplification?

1    A.  Through two 18-inch 200 watt JBL
2  speakers, very loud speakers.  Actually you
3  could hear them a couple blocks away.
4    Q.  Did the crowd also engage in chanting?
5    A.  Yes.
6    Q.  Did the crowd engage in any other what
7  I will call noise-making activity using any kind
8  of instruments such as a drum, or a horn, or
9  something else?
10   A.  We did have a couple drums, a couple
11 bongo-type of drums.  We had noise shakers that
12 you would shake on one occasion.  I think the
13 second march.
14   Q.  Okay.  And did the police allow these
15 night time amplified marches to proceed even
16 though you did not have a permit?
17   A.  Oh, yes, on both occasions.  And the
18 police who did arrive on the scene on both
19 occasions simply asked, where are you going, and
20 can we help you out.  They were -- they were
21 actually quite helpful and where we -- they led
22 us -- well, they -- I don't want to say led us,

1  but they at times got in front of the march or
2  got behind the march, but there was usually a
3  police car -- one or two police cars on both
4  occasions.
5      Q.  So, but the police actually facilitated
6  your march?
7      A.  Once the march had started and they
8  sort of came upon us, they then tried to
9  facilitate traffic around us.  They tried to
10 keep, you know, us from doing anything
11 dangerous.
12         I think we marched on only one side of
13 the street on the second march -- the one
14 election night eve.
15     Q.  Did the police give any orders to the
16 marchers?
17     A.  Yes, they did a couple -- especially on
18 the election eve march.  There were a number of
19 streets that were under construction in the
20 neighborhood and they sort of steered us away
21 from them, saying, you can't go up that street;
22 there's construction up there.  Oh, okay.  And

ADAM EIDINGER
Carr, et al v. District of Columbia, et al
9/21/2007

94

1  then we went down a different block. So there
2  was a little bit of their facilitating where you
3  would go.
4         We ultimately decided where we were
5  going. And we paused. I should note this. We
6  paused on numerous occasions in the middle of
7  the street, sometimes for as long as 10 minutes.
8         And we would erect a 15-foot by 30-foot
9  D.C. flag, and we would hold it there. And we
10 had people who would walk on stilts in front of
11 the flag and do -- we also had people who
12 breathed fire. And actually they did that on
13 one of those marches -- the election night eve.
14        But also on a third occasion -- I
15 believe it was in May of 2005 or I'm sorry, 2002
16 -- at the corner of 18th and Columbia we set
17 up -- we had a rally with no permit. And we had
18 hundreds of people come. And we had people who
19 breathed fire and we did all kinds of wonderful
20 things.
21        And we told the police in advance we
22 were going to do this. We didn't ask for a

Olender Reporting, Inc.
Washington, D.C.
(888) 445-3376
Baltimore, MD
WORLDWIDE
W. Palm Beach, FL

95

1  permit. We just told the substation there and
2  they let us do it. They didn't stop us from
3  doing it.
4      Q. I'd like to ask you some questions
5  about the breathing fire. Can you describe in
6  greater detail what that entailed?
7      A. Well, I believe it's white alcohol.
8  I've never done it, but I believe it's white
9  alcohol which is put onto either a stick or onto
10 like a ball that's kind of like a leather swab.
11 And it's lit.
12      And sometimes people will put the
13 alcohol in their mouth and blow the alcohol out
14 onto this fireball and shoot -- it looks like
15 they're breathing fire.
16      There's other people who put the
17 alcohol laden ball in their mouth. They close
18 their mouth around it, but removing all the
19 oxygen, the fire goes out, but there's enough
20 sparking on there that if you pull it out and
21 you're quick, you can make the thing keep
22 burning and so it looks like you're eating fire,

1   but you're really just putting it out in your
2   mouth and then it's lighting on its own when it
3   comes out.
4           And there's also -- it's called fire
5   spinning. And it's when someone will have like
6   a chain, and on the end there is like -- it's a
7   little container that holds a piece of leather
8   soaked in alcohol, in this white alcohol. It's
9   lit and it's spin around and it goes over their
10  heads, spin all around.
11          And sometimes there are sticks that
12  have fire on both ends. These are all sort of
13  circus tricks. And -- or burning end tricks
14  which is a festival out in the west, out in
15  Nevada.
16          And it's very safe if you know what
17  you're doing. And it's done in public at
18  protests quite frequently. It just is not
19  something people talk about a lot, but it's a
20  very beautiful thing to watch and we did it in
21  Adams Morgan and absolutely no problems with the
22  authorities and large crowds -- people gathered

ADAM EIDINGER
Carr, et al v. District of Columbia, et al                                          9/21/2007

97

1    around and were pretty impressed.
2         Q.  Let me clarify something.  I have in
3    my mind -- I'm envisioning somebody blowing fire
4    out of their mouth.
5         A.  Uh-huh.  And this fire is blown toward
6    a crowd?
7         A.  Well, it's not fire.  It's actually the
8    liquid alcohol.  It's the white alcohol.  I
9    believe it's -- I may be getting it wrong, but I
10   think it's called white alcohol.
11             And they have it in their mouth.  They
12   don't drink it.  You really -- you need to wash
13   your mouth out afterwards when you're all done,
14   but -- and they just sort of spit it out as a
15   fine mist.
16             And there's something already lit that
17   they're holding in front of them and then when
18   it hits that, then it looks like a fire -- from
19   the audience, it looks like a fireball coming
20   out of the mouth, but actually it's just -- the
21   liquid then is catching on fire as it leaves the
22   mouth.  And it only will shoot out like a foot

Olender Reporting, Inc.           (888) 445-3376              WORLDWIDE
Washington, D.C.                  Baltimore, MD             W. Palm Beach, FL

ADAM EIDINGER

Carr, et al v. District of Columbia, et al                                        9/21/2007

98

1    or two, so if people are seated, you know, 20,
2    30 feet away in a circle around the person who
3    is doing this -- safe distance.
4         Q.   So, just to clarify then this fire
5    shoots out for one or two feet?
6         A.   A second.  One second and one or two
7    feet, yes.
8         Q.   Would it be fair to say that some kind
9    of incendiary device is used in order to engage
10   or make work this fire breathing technique?
11        A.   You need a lighter; you need the white
12   alcohol; and you need something that will absorb
13   the alcohol and burn but not actually burn.
14             Usually it's like a metal thing with
15   leather because leather doesn't really burn.
16   It's like you put it out before the leather
17   starts burning.  You want the alcohol to burn
18   off.
19             I've spent a lot of time around people
20   who do this.  I've never done it myself, but I
21   know that they -- it's an incendiary device,
22   yes, I mean, it burns.

1    Q.  And just to confirm then that you
2    testified earlier that D.C. police officers were
3    on the scene and did not interfere with your use
4    of the incendiary device?
5    A.  Because it wasn't my use.  I organized
6    the event.
7    Q.  The events --
8    A.  Other people came and did this who were
9    -- I knew they were coming, but I wasn't the one
10   that actually facilitated.  I mean, I didn't
11   actually do the fire.
12       But, yes, the police were present.
13   Q.  And did not interfere --
14   A.  -- on the occasion where we had -- did
15   not interfere.  That's right; they did not
16   interfere.
17       And the occasion where we had -- we
18   actually advertised the event as an event where
19   there would be fire.  And there were like four
20   or five police officers who came and kept a
21   close eye on things, but they did not interfere.
22       The fire department did not show up