**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                  )
**SARAH CARR, *et al.*,**                         )
                                                  )
                              **Plaintiffs,**     )
                                                  )
                         **v.**                   )        **Civil Action No. 06-00098 (ESH)**
                                                  )
**DISTRICT OF COLUMBIA,**                         )
                                                  )
                              **Defendant.**      )
_____  )

## AMENDED MEMORANDUM OPINION

Plaintiffs represent a class of individuals arrested by the District of Columbia's

Metropolitan Police Department while marching through the Adams Morgan neighborhood to

protest the second inauguration of President George W. Bush.  They have sued the District of

Columbia ("the District") alleging, *inter alia*, that the arrests violated their First and Fourth

Amendment rights.  Before the Court are the parties' cross-motions for partial summary

judgment limited to the issue of liability only.  For the reasons stated herein, plaintiffs' motion

for summary judgment will be granted and defendant's motion for summary judgment will be

denied.

## BACKGROUND

On the evening of January 20, 2005, plaintiffs Sarah Carr, Allyson Kirk, Chelsea Kirk,

and Jonathan Scolnik attended an Anti-Inaugural Concert ("the Concert") at the Sanctuary

Theater, in a church located at 1459 Columbia Road, N.W.  (Def.'s Stmt of Undisputed Material

Facts ["Def.'s Facts"] ¶ 1.)  The Concert was publicized on the Internet.  (*Id.* ¶ 2.)  The

Intelligence Section of the Metropolitan Police Department ("MPD") learned about the Concert

through monitoring open and publicly accessible websites.  (*Id.* ¶ 3.)  The Intelligence Section

did not learn anything about a possible march following the Concert from the Internet.  (*Id.* ¶ 4.)

At the Concert, announcements were made from the stage and fliers were distributed that

stated that after the performance, a march would begin and would terminate in front of the Hilton

Hotel, where one of the inaugural balls was being held.  (*Id.* ¶¶ 5, 9, 10.)   The flier stated:

Protest March - After the Show!!!!

> As we've said tonight's show is not a concert, it's a celebration
> and it's a protest!!!  After Anti-Flag's last song we invite you to
> join in a festive march from this show through the streets of DC to
> the doorstep of those in power.  We're going to take our resistance
> to one of the Inaugural Ball[s] where Bush and his supporters
> celebrate their power and privilege at the expense of all.
>
> During the last song of the evening we will distribute buckets, and
> encourage drumming, chanting and participation from all.  Dress
> warm and be prepared to head out the door.  After the last song,
> we'll exit the space and march down Columbia Road towards 16th
> Street.  We imagine a large festive march, that takes the amazing
> energy surging through tonight's show to create an explosive
> protest against the war in Iraq and the war here at home as well as
> against all that Bush represents.  We will march from the show to
> the Washington Hilton, located at 1919 Connecticut Ave NW.
> This is the site of one of tonight's balls.  From the march, we will
> engage in our own protests.  We will show people faces behind
> those of us who resist this administration and sham.  We will
> march to 18th St from Columbia, and make a left on 18th and a right
> on Florida to get to Connecticut.  We will bring people back to the
> show space afterwards as well.  Please remember to be respectful
> of the people in the Columbia Heights area where we are guests.
> Watch your surroundings and keep the energy focused where it
> needs to be – on showing the world our opposition to Bush.
>
> Join us in the streets tonight to send one NO! To the Bush regime
> and a million yeses to all of the things we can create together.

(Def.'s Mot. Ex. 11 [Flier].)

An undercover officer was assigned to attend the Concert to gather intelligence regarding

2

possible criminal activity.  (Def.'s Facts ¶¶ 14-15.)   At around 9:00 p.m., the undercover officer telephoned Detective Drew Smith of the Intelligence Section of the Office of the Superintendent of Detectives within MPD's Investigation Branch. (*Id.* ¶ 16.)  The undercover officer reported that a possible protest march was being discussed in the church, but that the organizers only wanted to have the march if enough people participated for it to be effective.  (*Id.* ¶ 16.)  The undercover officer further advised that the march was to begin around midnight and that the organizers were distributing bandannas and poles[1] that could be used to hold up banners at the Concert.  (*Id.* ¶¶ 17-18.)   He advised Smith of the intended march route and said that a person speaking from the stage had said that the marchers would "crash" the Inaugural Ball.  He also stated that some of the protesters were discussing engaging in property damage along the route. (*Id.* ¶ 19.)[2]

At some point after 11:00 p.m., Smith observed 500 or more people exit the church onto Columbia Road N.W.  (*Id.* ¶ 24.)  Some departed the area, while the majority congregated at the intersection of Columbia Road N.W. and 16th Street N.W.  (*Id.*)  Some unspecified number of the persons in the crowd were carrying the poles that had been distributed in the church.  (*Id.*) They had soup cans attached to them full of flaming fluid and were being used as torches.  (*Id.*)

After spending five to ten minutes getting organized, a group of between 250 and 300 persons marched westbound on Columbia Road N.W.  (*Id.* ¶ 30.)  Detective Smith followed behind the march in his unmarked cruiser.  (*Id.*)  Plaintiff Singer, who was at Madam's Organ, a

---

[1] Smith was aware of prior instances in which these PVC poles contained lengths of rebar.  (*Id.* ¶ 18.)

[2] Plaintiffs object to these representations by the undercover officer as not supported by competent evidence.  (*See* Pls.' Response to Defendant's Facts ¶ 19.)

nightclub on 18th Street N.W., saw the march go by and went out into the street to learn more about the demonstration. (Pls.' Stmt of Undisputed Material Facts ["Pls.' Facts"] ¶ 5.)  During the march, some unidentified protesters committed criminal acts such as spray-painting buildings, pulling newspaper vending machines into the street, and breaking windows.  (Pls.' Facts ¶ 7; Def.'s Facts ¶ 33.)  Rocks and bottles were thrown at police vehicles.  A rock broke the windshield of a police cruiser.  (Def.'s Facts ¶ 46.)  Smith heard firecrackers being set off. (Def.'s Facts ¶ 34.)

Smith's observations and his information from the undercover officer were relayed to then-Special Operations Division Commander Cathy Lanier. (*Id.* ¶ 27.)  Lanier decided to send two MPD Civil Disturbance Units ("CDU") to Columbia Road N.W. between 16th and 18th Streets, NW, and to 18th Street N.W.  (*Id.* ¶ 53.)  Commander Lanier also reported to that location in a marked MPD cruiser.  Based on what she had heard from her subordinates and her own observations, Lanier decided that she had probable cause to order an arrest of the protestors for rioting.  (*Id.* ¶ 55.)

The CDU officers blocked the protesters into an alley and arrested them.[3]  No order to stop or disperse was given prior to the arrest.  (Pls.' Facts ¶ 21.)  Lanier ordered the Field Arrest paperwork to reflect the lesser charge of parading without a permit so that the arrestees could avail themselves of expedited release mechanisms that would not apply if she charged them with rioting.  (Def.'s Facts ¶ 55.)  Between 65 and 75 people were arrested.  (Pls.' Facts ¶ 21.)

---

[3] There is a dispute between the parties as to whether the protesters ran into the alley when they saw the officers exiting their vehicles (*see* Def.'s Facts ¶ 47) or whether the officers herded the protesters into the alley.  (*See* Pls.' Facts ¶ 21.)  This dispute is not material to the resolution of the motions.

Plaintiffs were among those arrested.  (*Id.*)

On January 19, 2006, plaintiffs filed a class action against the District of Columbia seeking damages and other relief based on their allegedly illegal mass arrest and detention. Chelsea Kirk and Matthew Singer also seek damages individually for the injuries they allegedly sustained after being arrested.  Plaintiff Kirk claims that upon her arrest, a District of Columbia police officer applied plastic handcuffs too tightly to her wrists and then further tightened them when she protested.  (*See* Pl.'s Facts ¶ 72)  She alleges that this caused painful cuts, bleeding and swelling.  (*Id.* ¶ 73.)  Plaintiff Singer alleges that he approached the police officers in the alley with his hands raised, saying that he was not part of the protest.  (*Id.* ¶ 66.)  He claims that he was told to get down on all fours, which he did, at which point another officer bent down and sprayed him in the face with pepper spray thereby inflicting pain to Singer's face and eyes.  (*Id.* ¶¶ 66-68.)

On March 6, 2006, defendant filed a motion to dismiss arguing that parading without a permit is a criminal offense that gives rise to probable cause.  On July 26, 2006, the Court denied the motion to dismiss, holding that the relevant statutes do not unambiguously define parading without a permit as a civil or criminal offense.  *See Carr v. District of Columbia*, Civil Action No. 06-00098 (D.D.C. Jul. 26, 2006) at 8-10 (hereinafter "Mem. Op.").  The Court found that the determination of whether plaintiffs' arrest for parading without a permit was supported by probable cause would turn on whether the decision to arrest was reasonable in light of the facts and circumstances at the time of the arrest and the knowledge and experience of the arresting officer.  *Id.* at 8.  The parties have now filed cross-motions for partial summary judgment with

respect to the issue of liability on all claims.[4]

## ANALYSIS

## I.      SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), a motion for summary judgment shall be granted if there is

no genuine issue of material fact, and the moving party is entitled to judgment as matter of law.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   In considering a motion for

summary judgment, the "evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Id.* at 255;  *see also Wash. Post. Co. v. United States*

*Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).   The moving party

"bears the initial responsibility of informing the district court of the basis for its motion and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any' which it believes demonstrate the absence

of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   In

response, the opposing party must "go beyond the pleadings and by [its] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"  *Id.* at 324 (internal quotation marks omitted).

---

[4] Because Singer's claim for assault and battery is unopposed by defendant, summary judgment will be granted on that claim.  (*See* Pls.' Opp'n 34.)  *See Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F.Supp.2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by a defendant, a court may treat those arguments that the plaintiff failed to address as conceded.")). *See also Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.Supp.2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## II.   PLAINTIFFS' ARREST VIOLATED THE FOURTH AMENDMENT

Plaintiffs contend that their arrest violated the Fourth Amendment because it was not supported by probable cause.[5]  "Probable cause for a warrantless arrest is the constitutional criterion by which its legality is measured." *Pendergrast v. United States*, 416 F.2d 776, 783 (D.C. Cir. 1969).   An arrest based on probable cause cannot constitute an unreasonable search or seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 819 (1996).   "Whether the police have probable cause for an arrest is determined by viewing the totality of the circumstances from the perspective of a prudent police officer and in light of the police officer's training and experience." *United States v. Catlett*, 97 F.3d 565, 573 (D.C. Cir. 1996) (citation omitted).   "Probable cause exists if the arresting officer possesses information 'sufficient to warrant a prudent man in believing that the [suspect has] committed or [is] committing an offense." *United States v. Kayode*, 254 F.3d 204, 209 (D.C. Cir. 2001) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alterations in original).   The District argues that probable cause existed to arrest plaintiffs for rioting, conspiracy to riot, and/or parading without a permit. The Court will address each of these alleged offenses in turn.

### A.   Rioting

The District first argues that probable cause supported plaintiffs' arrest for rioting.  (*See* Def.'s Mot. 9.)   D.C. Code § 22-1322 provides that "[a] riot in the District of Columbia is a

---

[5] Because the Court concludes that plaintiffs' arrest violated the Fourth Amendment, it need not reach plaintiffs' argument that the policy pursuant to which they were arrested violates the First Amendment.

public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons."   D.C. CODE. § 22-1322(a) (2001).   This behavior is punishable by imprisonment of not more than one year, a fine of not more than $1,000, or both.   *See id.* § 22-1322(b).   The District argues that plaintiffs were arrested "for having encouraged, perpetuated by their support, and thus aided and abetted the violent and tumultuous acts of an assemblage of five or more persons, in which *they* were active participants."   (Def.'s Mot. 16 (emphasis in original).)

It is well-established that the determination of probable cause must be an individualized matter.   *See, e.g.*, *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006).   "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.   This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . ."   *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).   To demonstrate that plaintiffs' arrests were valid, therefore, the District must show that it had probable cause to arrest each individual for rioting.   The fact that rioting is a group offense does not eliminate the constitutional requirement of particularized suspicion of guilt.[6]

_____

[6] The District cites the D.C. Circuit's opinion in *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977), in an attempt to support its argument that the police may conduct a mass arrest if "'the tenor of the demonstration as a whole . . . is substantially affected with violence or obstruction.'"   (Def.'s Opp'n 20 (quoting *Cullinane*, 566 F.2d at 120).)   The District's selective use of *Cullinane* ignores the very next sentence of the opinion in which the Court states:

> We do not suggest of course that one who has violated no law may
> be arrested for the offenses of those who have been violent or
> obstructive.   As we have seen however the police may validly
> order violent or obstructive demonstrators to disperse or clear the

The District attempts to address this requirement by offering generalized characterizations of the behavior of the individuals in the "mob."  After each act of vandalism, the District claims, "the moving mob, with Carr, the Kirks, and Scolnik near its rear . . . celebrated the criminal act by throwing up their hands and cheering together."  (Def.'s Mem. 16.)[7]  Second, it refers to the statement of Officer Keller, who was present at the scene, that "the mob [acted] uniformly in celebrating destructive acts [by individual protesters], thereby encouraging more such acts."  (*Id.* 17.)   These kinds of generalized statements are legally insufficient to establish probable cause.  *See Barham*, 434 F.3d at 574.   Nowhere does the District "ma[ke] [any] effort to ascribe misdeeds to the specific individuals arrested."  *Id.*[8]   None

---

> streets.  If any demonstrator or bystander refuses to obey such an order after fair notice and an opportunity to comply, his arrest does not violate the Constitution even though he has not previously been violent or obstructive.

*Id.*

Thus, contrary to the District's representation, *Cullinane* specifically prohibits mass arrests without notice or opportunity to comply where a crowd has become violent or obstructive.

[7] Chief Lanier did not raise the collective cheering as a basis for her decision to order the mass arrest at her deposition.   (*See* Pls.' Opp'n 5 n. 3.)

[8] The District also contends that it has demonstrated individualized probable cause by providing properly completed Field Arrest Forms for each plaintiff. (*See* Def.'s Opp'n 4-6.) This is simply wrong.  All that the Field Arrest Forms show is that the plaintiffs were in fact arrested.  They provide absolutely *no* evidence that any specific arrest was based on probable cause.

Nor do the cases the District cites support its interpretation of the law.  In *Sullivan v. Murphy*, 478 F.2d 938, 967 (D.C. Cir. 1973), the D.C. Circuit held that any arrest not accompanied by a field arrest form and polaroid would be presumptively invalid, subject to rebuttal by the District.  The Court did not hold, as the District argues, that the converse is also true, *i.e.*, that any arrest accompanied by proper documentation is presumptively supported by probable cause.  *Cullinane* simply clarified that *Sullivan* did not bar "any and all mass arrests

of the officers' declarations state that they were able to identify any specific person arrested in the alley as the same individual who had previously been seen cheering and raising his or her arms.[9]  In fact, it is undisputed that the officers were not even able to identify specifically those individuals who engaged in the acts of vandalism.   The District has therefore "proffered no facts capable of supporting the proposition that [Lanier] ha[d] reasonable particularized grounds to believe every one of the [approximately 70] people arrested was observed committing [the] crime" of rioting.  *Id.*[10]

Alternatively, the District argues that Carr, the Kirks, and Scolnik were guilty of rioting because they continued to move with the "mob" despite the vandalism that was occurring.  By continuing to march, the District claims, plaintiffs "tend[ed] to enlarge and perpetrate the atmosphere of violence and tumult . . . ." and therefore may be charged with rioting.   (Def.'s Mot. 18 (internal quotation marks and citation omitted).)  This argument lacks merit.   The law is clear that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."  *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1992).   Rather, when

without the completion of field arrest forms" because "probable cause may exist even though evidence of it is not recorded at the time of the arrest."  566 F.2d at 121.  Therefore, these cases make clear that the touchstone of a lawful arrest is a particularized showing of probable cause.

[9] The District makes a generalized claim that "the arrestees were observed by MPD at all pertinent times."  (Def.'s Mem. 40.)  In fact, as plaintiffs explain, the officers could not have seen all members of the crowd simultaneously so as to make the determination that each and every person cheered following each act of vandalism.  (*See* Pls.' Opp'n 9-12.)

[10]   This same reasoning applies with equal force to the District's arguments regarding conspiracy to riot and parading without a permit and provides an alternative basis why these arguments must also fail, for absent a particularized showing as to a specific individual's behavior, the District cannot show probable cause to justify that person's arrest.

violence "occurs in the context of constitutionally protected activity, . . . precision of regulation is demanded.  Specifically, the presence of activity protected by the First Amendment imposes restraints . . . on the persons who may be held accountable . . . ." *Id.* at 916-17 (internal quotation marks and citation omitted).   If a person is to be punished for his association with those who engaged in vandalism, there must be "clear proof that . . . [he] specifically intend[ed] to accomplish [the aims of the protest] by resort to violence." *Scales v. United States*, 367 U.S. 203, 229 (1961) (citation and internal quotation marks omitted).  Under Supreme Court precedent, a peaceful political protester may not be punished for failing to cease his protected activity simply because others associated with the assembly may have committed illegal acts.[11]

Therefore, since the District has not provided any particularized showing that any individual plaintiff intended to engage in or further riotous behavior, it cannot sustain its arrest on this ground.[12]

---

[11] The District attempts to distinguish these cases, arguing that each plaintiff engaged in riotous conduct so as to provide probable cause.  However, as previously explained, the District has provided no particularized evidence that any individual plaintiff engaged in any behavior that  was criminal or that encouraged criminal behavior.  The cases cited by the District are distinguishable from this case because the person convicted actually engaged in and furthered unlawful behavior.  *See United States v. Matthews*, 419 F.2d 1177 (D.C. Cir. 1969) (upholding rioting conviction of defendant who stole liquor that had been looted from a store and left nearby); *Campbell v. City of Birmingham*, 405 So.2d 65 (Ala. Cr. App. 1981) (upholding rioting conviction of defendant who refused an officer's order to leave the premises of the protest and resisted arrest).

[12] The District's argument with respect to plaintiff Singer fails for the same reasons.  The District argues that Singer left the bar to join the march at a time when acts of vandalism were being committed, thereby demonstrating by his actions "his active support and participation in the mob's conduct sufficient to evince his willful engagement in a riot . . . ."  (Def.'s Mot. 20.)  Even assuming that the District was correct that Singer intended to join the demonstration (which Singer denies), absent evidence that Singer intended to engage in and further the vandalism, he cannot be punished for the peaceful exercise of his First Amendment rights.

### B.       Conspiracy to Riot

The District next argues that probable cause existed to arrest Carr, the Kirks, and Scolnik for conspiracy because the language of the flier and the announcements from the stage put them on notice that attending the Concert "implicated protest activity and direct action, perhaps exceeding simple civil disobedience." (Def.'s Mot. 23.) The District points to the language in the flier that explained that the objective of the march was to "take our resistance to one of the Inaugural Balls" and to create "an explosive protest against all that Bush represents." (*Id.* (quoting Def.'s Ex. 11).) The District also notes that the undercover officer heard some Concert attendees planning to breach security at the Inaugural Ball. (*Id.*) Based on the flier and the comments heard by the undercover officer, the District proceeds to argue that "[t]he organizers of the post-[Concert] protest planned an unlawful event or chain of events" and by joining the march, "Carr, the Kirks, and Scolnik, joined and acted in furtherance of the conspiracy's objectives." (Def.'s Mot. 24.)

This argument is frivolous. The language in the flier cannot reasonably be construed as advocating the use of force or imminent unlawful action and is therefore protected by the First Amendment. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Moreover, even if plaintiffs knew that some of the organizers of the march were planning to engage in unlawful action, they may not be held criminally liable for conspiracy for joining the march and protesting peacefully, unless they specifically intended to further the unlawful actions of others. (*See* Section I.A., *supra*.) The District therefore lacked probable cause to arrest plaintiffs for conspiracy to riot.

### C.       Parading Without A Permit

The District's final argument is that it had probable cause to arrest plaintiffs for parading

without a permit.   As this Court has previously explained in denying the District's motion to

dismiss, the provisions governing parading without a permit are not unambiguously criminal or

civil in nature.  (See Mem. Op. at 6-8.)  Under these circumstances, "probable cause . . . is

determined by looking at all of the facts and circumstances at the time of the arrest, including the

knowledge and experience of the arresting officer."  *Doe et al. v. Metro. Police Dept. et al.*, 445

F.3d 460, 468 (D.C. Cir. 2006).

Although the parties expend considerable energy debating "the circumstances under

which police may deal with a group of demonstrators in the aggregate," *Barham*, 434 F.3d at

575, this Court's analysis must be guided by the longstanding precedent in this Circuit governing

mass arrests.  The D.C. Circuit addressed this issue most recently two years ago in *Barham v.*

*Ramsey*, 434 F.3d 565 (D.C. Cir. 2006).  In *Barham*, MPD Assistant Chief Peter Newsham

ordered the mass arrest of all persons in Pershing Park based on the widespread infractions he

had seen by demonstrators earlier that morning and during the hour in which he observed the

activities in the park.  *Id.* at 569-70.   The arrests of 386 people were made with no prior warning

to the occupants of the park to disperse and no notice that arrest was imminent.  *Id.* at 570.

In determining  whether Assistant Chief Newsham was entitled to qualified immunity for

ordering the arrests,  the D.C. Circuit considered and rejected arguments similar to those raised

by the District here.[13]  The Court acknowledged that under its precedent the "police are permitted

to control an undifferentiated mass of people if necessary to quell a large-scale demonstration

that has become unruly or violent."  *Id.* at 575.   However, it went on to clarify that the

---

[13] Similar arguments were also raised and rejected by the Magistrate Judge in *Alliance for Global Justice v. District of Columbia.  See Alliance for Global Justice v. District of Columbia* 2008 WL 554248, at *1 (D.D.C. Mar. 3, 2008).

13

> case law addressing large-scale demonstration scenarios does not
> suspend - or even qualify - the normal operation of the Fourth
> Amendment probable cause requirements.  Rather this case law
> merely amplifies one essential premise . . . : when compelling
> circumstances are present, the police may be justified in detaining
> an undifferentiated crowd of protesters, *but only after providing a*
> *lawful order to disperse followed by a reasonable opportunity to*
> *comply with that order*.

*Id.*  (emphasis added).

In reaching this holding, the Court relied upon two of its earlier cases -- *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977), and *Dellums v. Powell*, 566 F.3d 167 (D.C. Cir. 1977).  In *Cullinane*, the Court evaluated the First Amendment implications of the District's "police line" regulation and "failure to move-on" ordinance.  It explained that "[t]he First Amendment does not conflict with the need for flexibility when dealing with large unruly assemblies" and affirmed that the "the police may validly order violent or obstructive demonstrators to disperse or clear the streets" and may arrest those who refuse to comply.  *Barham*, 434 F.3d at 575 (citing *Cullinane*, 566 F.2d at 120).  Shortly after *Cullinane*, the *Dellums* Court upheld a jury verdict against the U.S. Capitol Police Chief who ordered the mass arrest of a group of demonstrators on the Capitol steps.  It explained that these demonstraters could not be arrested unless the Chief reasonably believed that they could be validly evicted under the Capitol Grounds ordinance and had given them an order to disperse and the opportunity to comply.  *See Dellums*, 566 F.2d at 183.

After reviewing this longstanding precedent affirming the notice requirement, the *Barham* Court concluded that its holdings in these cases were enough to put "Newsham, a reasonable police officer, on notice that the Constitution does not tolerate the unwarranted, indiscriminate arrest of hundreds of individuals as a response to the demonstration that he

14

faced." *Barham*, 434 F.3d at 576.  In response, the District offers no principled basis for

distinguishing this case from *Barham*.[14]  Therefore, under this Circuit's law, no reasonable

officer could have believed that there was probable cause to order a mass arrest of plaintiffs for

parading without a permit absent fair notice and an opportunity to comply.[15]

_____

[14] The District maintains that *Barham* is distinguishable because Lanier had probable cause to arrest all of these plaintiffs for parading without a permit, whereas in *Barham*, Newsham had no way of knowing that the people he arrested in the park were the same as those who had participated in the "unlawful assembly." (*See* Def.'s Mot. 10-11.)  What the District fails to recognize is that the arrest here suffers from the same flaw as the arrest in Pershing Park.

In *Barham*, the Court explained that "[t]here is no indication of how an officer might distinguish between a 'demonstrator' and a person walking to work or enjoying a stroll through the park, let alone how one would distinguish someone engaged in an allegedly illegal assembly from a passerby interested in hearing the political speech of protesters" and therefore it concluded that Newsham lacked particularized probable cause.  434 F.3d at 155.  Similarly, the District has offered no indication of how the arresting officers in this case could distinguish between the protesters and any other person who might have been in the alley at the time the arrest was ordered.  The District itself notes that the march attracted  "hundreds of uninvolved onlookers." (*See* Def.'s Facts ¶ 42.)  Furthermore, one of the named plaintiffs, Matthew Singer, claims not to have been part of the march, but rather "a passerby interested in hearing the political speech of protesters."  (*See* Pls.' Facts ¶ 66.)

Moreover, even if the District were correct in its assertion that each of the arrestees was parading without a permit, *Barham* makes clear that this would not be enough to sustain a mass arrest.  As the Court explained, "[a]s a prerequisite to instituting a mass arrest intended to diffuse a volatile demonstration, police must have a valid legal basis for clearing the area." *Barham*, 434 F.3d at 576.  However, this is not sufficient, for as the Court went on to explain, even if Newsham had had a valid legal basis, "he could not deal with the crowd as a unit unless he first issued an order to disperse and then provided a reasonable period of time to comply with that order." *Id.* (internal quotation marks omitted).  The *Barham* Court's holding is very clear -- the Fourth Amendment requires notice and an opportunity to disperse before instituting a mass arrest -- and it is undisputed that this did not occur here.  *See also Dellums*, 566 F.2d at 183 (demonstraters could not be arrested unless the Chief reasonably believed that they could be validly evicted under the Capitol Grounds ordinance *and* had given them an order to disperse and the opportunity to comply).

[15]  Moreover, the District concedes that parading without a permit cannot be a strict liability offense, which means that arresting an individual for this offense requires particularized evidence that he actually knew that the demonstration was not authorized by a permit.  *See*

The District argues that no pre-arrest notice was required under its policy which provides that:

> An assembly of persons will not be arrested simply because the group does not possess a permit.  Such an arrest may only occur after an order to disperse has been clearly communicated three times in a manner that is reasonably calculated to be heard by each of the persons in the group and after reasonable and after reasonable opportunity to disperse has been afforded, to the extent that the circumstances reasonably permit, *without increasing the risk of injury to persons or property through the actions of a substantial number of the assembly of persons.*

(*See* Def.'s Ex. 27 [Settlement Agreement in *Abbate v. Ramsey*] at 7 (emphasis added).)[16]

According to the District, "[t]he italicized language indicates that the official in command has the discretion to determine whether a warning is required under the circumstances" and that

---

*United States v. Sheehan*, 512 F.3d 621, 631 (D.C. Cir. 2008); *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 611-12 (6th Cir. 2003). Defendant argues, however, that the circumstances at the time of the arrest were such that Lanier could reasonably have believed that the protesters knew that their parade was unpermitted.  They note, *inter alia*, that the march, unlike the Concert, was not publicized on the Internet; that the protest occurred in the public roadways and lacked a police escort; and that the protesters were aware that the march would include loud drumming and chanting in a residential area in violation of the District's noise regulations.  (*See* Def.'s Opp'n 19.)

The Court finds this circumstantial evidence insufficient to support the reasonable belief that each and every protester knew that permission for the protest had not been granted.  This is particularly true given that under the District's policy at the time, police on the scene could authorize an unpermitted march.  (*See* Pls.' Ex. H [Def.'s Response to Interrogatories] No. 5.)  Therefore, until law enforcement provided notice that the protest was not allowed as required by *Barham*, even a protester who was aware that the march was unpermitted had no way of knowing that his behavior was unlawful.

[16] This policy was implemented as part of a settlement agreement, which was approved by Judge Sullivan of this Court on January 24, 2005.  *See Abbate v. Ramsey*, 355 F.Supp.2d 377 (D.D.C. 2005).  Judge Sullivan's approval of the agreement did not require his consideration of any constitutional claims.  More importantly, it predated the D.C. Circuit's decision in *Barham*.

16

Chief Lanier exercised that discretion to determine that it was not.   (Def.'s Opp'n 21).   Putting

aside the constitutional implications of giving law enforcement unfettered discretion to

determine when to punish unpermitted parading, *see District of Columbia v. Edgcomb*, 305 A.2d

506 (D.C. 1973),  the District cannot overturn the D.C. Circuit's interpretation of the

constitutional requirements by putting a policy in place that authorizes the very behavior that the

Court has outlawed.  To the extent that this policy permits a police officer to order the mass

arrest of a group of demonstrators simply because some members of the group have engaged in

violent and obstructive behavior, it directly contradicts the D.C. Circuit's holdings in *Cullinane*,

*Dellums*, and *Barham*.   Despite the District's claims that this situation was somehow

exceptional, it has failed to offer any basis to differentiate this case from those previously

decided by the Circuit.  The holdings of those cases are clear that even a crowd "substantially

infected with violence or obstruction" must be given notice and an opportunity to disperse before

a mass arrest is ordered.  *Cullinane*, 566 F.2d at 120.  Therefore, those holdings are controlling

here.

## III.   CHELSEA KIRK IS ENTITLED TO SUMMARY JUDGMENT ON HER ASSAULT AND BATTERY CLAIM

Plaintiff Chelsea Kirk has also moved for summary judgment on her assault and battery

claim.  (*See* Pls.' Mot. 28-29.)  She claims that an officer improperly applied her flexicuffs too

tightly and then further tightened them when she complained.  She maintains that her wrists were

injured by the cuffs.   In response, the District has submitted a declaration from Kirk's arresting

officer, Michael Topper, with whom she was photographed twice, once before she was placed on

the transport vehicle and once after being transported to the MPD training academy for arrest

processing.  (Def.'s Ex. 10 [Topper Declaration] ¶ 11.)  Topper states that in the course of

processing Kirk's arrest, he did not observe any injury to Kirk's wrists, nor did she complain to him of any injury.  (*Id.* ¶¶ 11-12.)

Topper's declaration does not rebut Kirk's allegations of assault and battery.  He was not involved in nor did he witness the placing of the cuffs on Kirk's wrists.  (*Id.* ¶ 10.)  He also never examined the cuffs or determined whether they were properly applied.  Topper's statement that he did not observe any injury after-the-fact is only relevant, if at all, to the question of damages, not to liability.  Summary judgment must therefore be granted with respect to Kirk's claim for liability for assault and battery.

## **CONCLUSION**

For the reasons explained herein, plaintiffs' motion for partial summary judgment [Dkt. 45] will be **GRANTED** and defendant's motion for partial summary judgment [Dkt. 52]  will be **DENIED**.

**SO ORDERED**.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:  July 15, 2008

18